IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA    RECEIVED
NORTHERN DIVISION

2006 OCT 30 P 4: 37

RICHARD PETERSON,        )
    PLAINTIFF,            )
                           )        DEBRA P. HACKETT, CLK
                           )        U.S. DISTRICT COURT
vs.                      )    Case No:  2:06CV110-VPM   T ALA
                           )
TOWN OF CLAYTON, ALABAMA,    )
    DEFENDANT,            )

## NARRATIVE SUMMARY OF UNDISPUTED FACTS AND
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Town of Clayton, Alabama, in the above styled cause and moves this court to grant summary judgment in its favor for the following reasons:

## I.    STATEMENT OF FACTS

### A. UNDISPUTED FACTS

*Facts Relating to History of Employment with Town of Clayton*

Richard Peterson was employed by the Town of Clayton in 2001, and in February of 2002, he became Assistant Chief for the Town of Clayton. (Deposition of Richard Peterson, 32.20 – 32.23; Affidavit of Thomas Killingsworth, page 1 ¶ 3 and 4)

While serving as Assistant Chief for the Town of Clayton, Mr. Peterson also served as Police Chief for the Town of Hurtsboro. (Deposition of Richard Peterson, 50.3 – 50.6; Affidavit of Thomas Killingsworth, page 1 ¶ 5) Although Mr. Peterson claims that he does not know the distance[1], Hurtsboro is

---

[1] Peterson drove from Clayton to Hurtsboro five days a week for approximately two years

approximately thirty miles from Clayton. (Deposition of Richard Peterson, 59.12 – 60.3, Affidavit of Thomas Killingsworth, page 1 ¶ 5) Peterson states his "best guess" is that he could drive from Hurtsboro to Clayton in twenty (20) to thirty (30) minutes. (Deposition of Richard Peterson, 60.11 – 61.5) As Police Chief of Hurtsboro, Mr. Peterson was able to adjust his work schedule so that his responsibilities in Clayton did not conflict with his responsibilities in Hurtsboro. (Deposition of Richard Peterson, 61.8 – 61.16). Peterson states that one of the police officers under him in Hurtsboro was Kenneth Lightner. (Deposition of Richard Peterson, 75.20 – 75.22) Lightner was also an officer in Clayton. (Deposition of Richard Peterson, 75.2 – 75.7) In late 2004 and early 2005, there were only three full-time police officers working for Clayton. (Deposition of Richard Peterson, 75.2 – 75.7) While serving as Chief of Police in Hurtsboro, Peterson could control both his Hurtsboro schedule and Lightner's Hurtsboro schedule. (Deposition of Richard Peterson, 84.18 – 85.2)

In 2004, new mayors were elected in Hurtsboro and in Clayton. (Deposition of Richard Peterson, 61.23 – 62.2, Affidavit of Thomas Killingsworth, page 1 ¶ 6; Affidavit of Shug Rowland, page 1 ¶ 3) After taking office, the new Mayor of Clayton, Shug Rowland, studied the scheduling of the police force and decided that the town would be better served by returning the shifts for the police department to eight-hour shifts. (Prior to Mayor Rowland's election, the shifts had been changed to twelve-hour shifts.) Affidavit of Thomas Killingsworth, page 2 ¶ 7; Affidavit of Shug Rowland, page 1 ¶ 3)

The eight-hour shifts were as follows: (1) 7:00 a.m. to 3:00 p.m.; (2) 3:00 p.m. to 11:00 p.m.; (3) 11:00 p.m. to 7:00 a.m. (Deposition of Richard Peterson, 69.20 – 77.13; Affidavit of Thomas Killingsworth, page 2 ¶ 8; Affidavit of Shug Rowland, page 1 ¶ 3)

At the time, there were three full-time police officers working for the Town of Clayton. Police Chief Jamie Williams' shift was the 7:00 a.m. to 3:00 p.m. shift. Peterson's shift was the 3:00 p.m. to 11:00 p.m. shift. Officer Lightner had the 11:00 p.m. to 7:00 a.m. shift. (Deposition of Richard Peterson, 69.20 – 77.13; Affidavit of Thomas Killingsworth, page 2 ¶ 9 and page 5 ¶ 20; Affidavit of Shug Rowland, page 1 ¶ 4)

Williams is white. Lightner is black. (Deposition of Richard Peterson, 73.15 – 73.19; Affidavit of Thomas Killingsworth, page 6 ¶ 21; Affidavit of Shug Rowland, page 3 ¶ 10)

These three men – Williams, Lightner, and Peterson – were the only full-time police officers for Clayton. (Affidavit of Shug Rowland, page 3 ¶ 10) The town will employ part-time, "on call" officers to help the town and allow the fulltime officers to have occasional days off, but these three men were the only full-time officers. Affidavit of Thomas Killingsworth, page 2 ¶ 9; Affidavit of Shug Rowland, page 3 ¶ 11)

As was stated above, in 2004 new mayors were elected in both Clayton (where Peterson was the Assistant Police Chief) and Hurtsboro (where Peterson was the Chief of Police). (Affidavit of Thomas Killingsworth, page 1 ¶ 6) Soon after the new administration in Hurtsboro took office, Peterson left Hurtsboro

and took a job with the State of Alabama in Montgomery, Alabama. (Deposition of Richard Peterson, 77.18 – 78.10; Affidavit of Thomas Killingsworth, page 2 ¶ 10; Affidavit of Shug Rowland, page 2 ¶ 5) Although Peterson claims that he does not know how far it is from Clayton to Montgomery, the distance between the two places is approximately 73 miles. (Deposition of Richard Peterson, 83.10 – 83.16, Affidavit of Thomas Killingsworth, page 6 ¶ 23(c)). Peterson admits that, "give or take a little bit" it took him an hour to an hour and a half to drive from Montgomery to Clayton, depending on the route that he took and the traffic. (Deposition of Richard Peterson, 83.17 – 84.17)  His new job was twice as far from Clayton as his Hurtsboro job, and he could not control the schedule at his new job.

Peterson starting working in Montgomery on November 29, 2004, after the mayor of Clayton had made the shift changes.[2] (Deposition of Richard Peterson, 78.6 – 78.10)  Affidavit of Thomas Killingsworth, page 3 ¶ 12; Affidavit of Shug Rowland, page 2 ¶ 5)

Although Peterson had trouble recalling the exact times during his deposition, at his second job in Montgomery, he was initially either expected to work from 8:00 AM to 5:00 or 8:00 AM to 4:00 PM.  Soon after beginning work in Montgomery, he requested flex time and it was approved.  It is unclear from Peterson's testimony exactly when the flex time started, but flex time made his

---

[2] The council *ratified* the mayor's decision at a council meeting on December 13, 2004, but it is undisputed that the actual shift changes took place prior to Peterson starting working in Montgomery.

Montgomery job schedule 7:00 AM to 3:30 PM. (Deposition of Richard Peterson, 82.19 – 83.7; 85.6 – 91.8). The significant point is that the earliest Peterson's work day in Montgomery ever ended was 3:30 PM, and this apparently did not start until "roughly 90 days" after starting in Montgomery. In any event – be it 5:00 PM, 4:00 PM, or 3:30 PM – during the Monday through Friday workweek, Peterson was still at his job in Montgomery when he was expected to be starting his shift in Clayton.

Peterson was a full time Police Officer for the Town of Clayton. (Deposition of Richard Peterson, 72.4 – 72.16; Affidavit of Thomas Killingsworth, page 1 ¶ 3; Affidavit of Shug Rowland, page 3 ¶ 11)

He was the Assistance Chief of Police for the Town of Clayton. (Deposition of Richard Peterson, 73.3 – 73.6; Affidavit of Thomas Killingsworth, page 1 ¶ 4; Affidavit of Shug Rowland, page 1 ¶ 4)

He took a second full-time job approximately 73 miles from his job in Clayton. Affidavit of Thomas Killingsworth, page 6 ¶ 23(c); Affidavit of Shug Rowland, page 2 ¶ 5)

It took him approximately an hour to an hour and a half to travel between jobs. (Deposition of Richard Peterson, 84.2 – 84.10)

His work day in Montgomery did not end until after his work day in Clayton was to begin.

Monday through Friday[3], Peterson was late to work in Clayton most of the time after taking the job in Montgomery.  Affidavit of Thomas Killingsworth, page 2 ¶ 10 and ¶ 11; Affidavit of Shug Rowland, page 2 ¶ 6) Peterson's timesheets are offered in support of this motion. Affidavit of Thomas Killingsworth, page 2 ¶ 11)  The following summary of the time sheets from December 10, 2004 through May 12, 2005 illustrate the severity of the tardiness issue.  The following chart shows the days he was late during this time period.

| DATE | ACTUAL ARRIVAL TIME | HOURS/ MINUTES LATE |
| --- | --- | --- |
| 12/10/04 Friday | 6:00 PM | 3 Hours |
| 12/13/04 Monday | 5:20 PM | 2 Hours, 20 Minutes |
| 12/14/04 Tuesday | 5:00 PM | 2 Hours |
| 12/17/04 Friday | 5:30 PM | 2 Hours, 30 Minutes |
| 12/21/04 Tuesday | 5:30 PM | 2 Hours, 30 Minutes |
| 12/23/04 Thursday | 5:30 PM | 2 Hours, 30 Minutes |
| 12/27/04 Monday | 5:00 PM | 2 Hours |
| 12/28/04 Tuesday | 5:00 PM | 2 Hours |
| 12/29/04 Wednesday | 5:00 PM | 2 Hours |
| 12/30/04 Thursday | 5:00 PM | 2 Hours |
| 01/03/05 Monday | 5:00 PM | 2 Hours |
| 01/04/05 Tuesday | 5:00 PM | 2 Hours |
| 01/07/05 Friday | 5:00 PM | 2 Hours |
| 01/11/05 Tuesday | 5:00 PM | 2 Hours |
| 01/13/05 Thursday | 5:00 PM | 2 Hours |
| 01/14/05 Friday | 5:00 PM | 2 Hours |
| 01/17/05 Monday | 5:00 PM | 2 Hours |
| 01/18/05 Tuesday | 5:00 PM | 2 Hours |
| 01/19/05 Wednesday | 5:00 PM | 2 Hours |
| 01/20/05 Thursday | 5:00 PM | 2 Hours |
| 01/27/05 Thursday | 5:00 PM | 2 Hours |

---

[3] On the Saturdays and Sundays that he was scheduled to work, tardiness was not a significant issue.

| | | |
|---|---|---|
| 01/28/05 Friday | 5:00 PM | 2 Hours |
| 01/31/05 Monday | 5:00 PM | 2 Hours |
| 02/03/05 Thursday | 5:00 PM | 2 Hours |
| 02/04/05 Friday | 3:20 PM | 20 Minutes |
| 02/11/05 Friday | 5:00 PM | 2 Hours |
| 02/14/05 Monday | 5:15 PM | 2 Hours, 15 Minutes |
| 02/15/05 Tuesday | 5:00 PM | 2 Hours |
| 02/17/05 Thursday | 5:15 PM | 2 Hours, 15 Minutes |
| 02/18/05 Friday | 5:00 PM | 2 Hours |
| 02/23/05 Wednesday | 5:17 PM | 2 Hours, 17 Minutes |
| 02/24/05 Thursday | 5:00 PM | 2 Hours |
| 02/28/05 Monday | 5:00 PM | 2 Hours |
| 03/01/05 Tuesday | 5:00 PM | 2 Hours |
| 03/02/05 Wednesday | 5:00 PM | 2 Hours |
| 03/03/05 Thursday | This appears to be a call out for a burglary on Peterson's off day.  Giving him the benefit of the doubt, this day will not be included in the discussions below. | |
| 03/07/05 Monday | 5:00 PM | 2 Hours |
| 03/08/05 Tuesday | 5:00 PM | 2 Hours |
| 03/09/05 Wednesday | 5:00 PM | 2 Hours |
| 03/11/05 Friday | 5:00 PM | 2 Hours |
| 03/14/05 Monday | 5:00 PM | 2 Hours |
| 03/17/05 Thursday | 5:00 PM | 2 Hours |
| 03/18/05 Friday | 5:00 PM | 2 Hours |
| 03/21/05 Monday | 5:00 PM | 2 Hours |
| 03/22/05 Tuesday | 5:00 PM | 2 Hours |
| 03/30/05 Wednesday | 5:00 PM | 2 Hours |
| 04/04/05 Monday | 4:30 PM | 1 Hour, 30 Minutes |
| 04/05/05 Tuesday | 4:00 PM | 1 Hour |
| 04/06/05 Wednesday | 5:00 PM | 2 Hours |
| 04/07/05 Thursday | 5:00 PM | 2 Hours |
| 04/11/05 Monday | 5:00 PM | 2 Hours |
| 04/12/05 Tuesday | 5:00 PM | 2 Hours |
| 04/13/05 Wednesday | 5:00 PM | 2 Hours |
| 04/14/05 Thursday | 5:00 PM | 2 Hours |
| 04/15/05 Friday | 5:00 PM | 2 Hours |
| 04/18/05 Monday | 5:00 PM | 2 Hours |
| 04/19/05 Tuesday | 5:00 PM | 2 Hours |
| 04/20/05 Wednesday | 5:00 PM | 2 Hours |
| 04/21/05 Thursday | 5:00 PM | 2 Hours |
| 04/22/05 Friday | 5:00 PM | 2 Hours |
| 04/26/05 Tuesday | 5:00 PM | 2 Hours |
| 04/27/05 Wednesday | 5:00 PM | 2 Hours |

| 04/29/05 Friday | 5:00 PM | 2 Hours |
|---|---|---|
| 05/04/05 Wednesday | 5:00 PM | 2 Hours |
| 05/05/05 Thursday | 5:00 PM | 2 Hours |
| 05/06/05 Friday | 5:00 PM | 2 Hours |

According to the time sheets, during this same timeframe, Peterson was

off work, at military drill, took comp time, or was sick on the following dates:

| | |
|---|---|
| 12/15/05 | 3/20/05 |
| 12/16/04 | 3/23/05 |
| 12/30/04 | 3/24/05 |
| 12/23/04 | 3/25/05 |
| 12/25/04 | 3/26/05 |
| 1/5/05 | 3/27/05 |
| 1/6/05 | 3/28/05 |
| 19/05 | 3/29/05 |
| 1/10/05 | 3/31/05 |
| 1/12/05 | 4/1/05 |
| 1/15/05 | 4/2/05 |
| 1/16/05 | 4/3/05 |
| 1/24/05 | 4/8/05 |
| 1/25/05 | 4/9/05 |
| 1/26/05 | 4/10/05 |
| 2/1/05 | 4/16/05 |
| 2/2/05 | 4/17/05 |
| 2/5/05 | 4/24/05 |
| 2/6/05 | 4/25/05 |
| 2/7/05 | 4/30/05 |
| 2/8/05 | 5/2/05 |
| 2/9/05 | 5/3/05 |
| 2/16/05 | 5/10/05 |
| 2/21/05 | 5/11/05 |
| 2/22/05 | 5/12/05 |
| 2/25/05 | |
| 2/26/05 | |
| 3/3/05 | |
| 3/4/05 | |
| 3/5/05 | |
| 3/6/05 | |
| 3/13/05 | |
| 3/15/05 | |
| 3/16/05 | |
| 3/19/05 | |

The above dates are significant only because they should not be included in any discussion that compares the days that Peterson was late to work with days that he arrived on time.

According to Peterson's time sheets, there are thirty (30) days between December 10, 2004 and May 12, 2005 that he reported to work on time. During this time period, Mr. Peterson was late to work **over 68%** of the time. If one looks only at the Monday through Friday workweek, the percentage is much higher.

During this time period, of the thirty (30) days Mr. Peterson got to work on time twenty-two (22) of the days fell on Saturday or Sunday. During this time period, Mr. Peterson only got to work on time eight (8) days during the Monday through Friday work week.

Mayor Rowland recognized that Mr. Peterson was not getting to work on time and attempted to address this problem with him. (Affidavit of Thomas Killingsworth, page 3 ¶ 12 Attachment B; Affidavit of Shug Rowland, page 2 ¶ 7) Mayor Rowland informed Peterson that it was acceptable for Mr. Peterson to work full-time in Montgomery and part-time with the Town of Clayton or part-time in Montgomery and full-time with the Town of Clayton. It was important, however, that Peterson report to work on time. (Affidavit of Thomas Killingsworth, page 3 ¶ 12 Attachment B; Affidavit of Shug Rowland, page 2 ¶ 7) In his previous jobs, Peterson, like Rowland, expected people he was in

charge of to get to work on time. (Deposition of Richard Peterson, 163.12 - 163.14; 173.15 – 173.22)[4]

Mayor Rowland also requested that Peterson attend a council meeting so the matter could be further discussed. Peterson did not attend the meeting. (Affidavit of Thomas Killingsworth, page 3 ¶ 12 Attachment A; Affidavit of Shug Rowland, page 2 ¶ 8)   Rowland considers this an act of insubordination. (Affidavit of Shug Rowland, page 2 ¶ 8) Interestingly, when asked if he ever called meetings when he was Chief of Police of Hurtsboro, Peterson could not remember; but if he ever did call a meeting, he expected his officers to attend. (Deposition of Richard Peterson, 169.8 – 169.14).

In March of 2005, Peterson informed the Town Council, in writing, that he had not requested and had no intention of requesting that any changes be made to his job situation.  In fact, he made it clear that he expected things to continue exactly as they were.  (Peterson Deposition, Defendant's Exhibit 29, page 6 of exhibit, ¶ 3 and last sentence of ¶ 4 of document dated March 11, 2005)

In light of Peterson's continued, habitual tardiness and his refusal to attend the meeting to discuss the problem, Mayor Rowland notified Peterson of a determination hearing that was to be held Tuesday, May 3, 2005, to address the issues of Peterson's (1) unsatisfactory record of getting to work when his shift started and (2) insubordination. (Affidavit of Thomas Killingsworth, page 4 ¶ 14; Affidavit of Shug Rowland, page 3 ¶ 9) Peterson exercised his right,

---

[4] When ask whether he, as the Chief of Police of Hurtsboro, could tolerate habitual tardiness, however, he stated that he could not answer the question because he never had to deal with that problem. (172.23 – 173.14)

outlined in the Clayton Employee Handbook, to waive the determination hearing. Article VIII, Section 5(A)(4) of the Employee Handbook states that an employee may waive his determination hearing. It also states that, "**Waiver of the Determination Hearing shall be considered an admission that the charges against the employee are correct.** In the event of waiver, the Mayor shall render his/her decision within five (5) working days of the date on which the Determination was set." (Affidavit of Thomas Killingsworth, page 3 ¶ 8 and page 4 ¶ 15; Affidavit of Shug Rowland, page 3 ¶ 9)(emphasis added)

In correspondence dated May 6, 2005, Mayor Rowland notified Peterson of his decision to terminate Peterson effective May 9, 2005. (Affidavit of Thomas Killingsworth, page 4 ¶ 16; Affidavit of Shug Rowland, page 3 ¶ 9)

On May 10, 2005 Peterson gave notice of his right to appeal the termination decision.   (Affidavit of Thomas Killingsworth, page 4 ¶ 17 Attachment G; Affidavit of Shug Rowland, page 3 ¶ 9) A special council meeting was set for May 19, 2005. At that meeting, the Town Council affirmed and ratified the termination of Peterson. (Affidavit of Thomas Killingsworth, pages 4-5 ¶¶ 17 and 18 Attachment H; Affidavit of Shug Rowland, page 3 ¶ 9)

On July 1, 2005, after his termination, Peterson filed his original complaint with the EEOC.

On August 6, 2005, Peterson amended his EEOC complaint.

On February 3, 2006, this lawsuit was filed.

*Facts Relating to Allegation that*
*Termination Is Racially Motivated*

At the time Peterson was terminated, the only white police officer for the Town of Clayton was Chief Jamie Williams. (Affidavit of Thomas Killingsworth, page 7 ¶ 25; Affidavit of Shug Rowland, page 3 ¶ 10) A few weeks after Peterson was terminated, Chief Williams was terminated. (Affidavit of Thomas Killingsworth, page 7 ¶ 25; Affidavit of Shug Rowland, page 5 ¶ 16) His termination was ratified by the Town Council on June 13, 2005. (Affidavit of Thomas Killingsworth, page 7 ¶ 25; Affidavit of Shug Rowland, page 5 ¶ 16)

Following the terminations of Peterson and Williams, Clayton hired two additional police officers. (Affidavit of Thomas Killingsworth, page 7 ¶ 26; Affidavit of Shug Rowland, page 5 ¶ 17) One was Robert Patrick. He was hired as the Chief of Police for Clayton. Chief Patrick is black. The other officer was Aaron Grubbs. Aaron Grubbs is black. Both Patrick and Grubbs are still employed by the Town of Clayton. (Affidavit of Thomas Killingsworth, page 7 ¶ 26; Affidavit of Shug Rowland, page 5 ¶ 17)

In his complaint, Peterson states that, "Plaintiff worked a second job as did white officers; Plaintiff requested that his shift hours accommodate his second job as was done for white officers." (Paragraph six (6) and seven (7) of complaint.) When asked about this during deposition, however, Peterson could not identify any similarly situated white officers.

> Q. Are you aware of any other employees that were police officers that had two full-time jobs that were located an hour to an hour and a half away from Clayton?
>
> A. I have no knowledge of that. No.

(Deposition of Richard Peterson, 95.6 – 95.10)

\*\*\*

Q. If the sentence [paragraph 6] read, The defendant worked a second **full-time job**, as did white officers -- that is -- I'm changing what it actually says to your circumstance, which is a full-time job at Clayton and a full-time job elsewhere.  Do you understand what I'm asking you?

A. Yes, sir.  I understand.

Q. Are there any such officers that would fit -- any such white officers that would fit that, that you know of?

A. I don't have any knowledge of that.

(Deposition of Richard Peterson, 120.6 – 120.10)

\*\*\*

Q. All right.  Plaintiff requested that his shift hours accommodate his second job, as was done for white officers.  Tell me the white officers you are aware of who requested that their shift hours accommodate a second job away from Clayton.

A. I don't know of their conversation with the chief.  I do know they worked there part time with Clayton.  I don't know the circumstances of it.

Q. **And the only knowledge you have is about people working part time with Clayton, whenever you refer to these other white officers that had more than one job; am I right?**

A. **Yes.**

(Deposition of Richard Peterson, 123.10 – 124.1)

\*\*\*

A. I was treated differently than white employees.

Q. Okay.  Elaborate on that for me.

A. Same circumstances, be it part time or full time.

Q. But -- well, finish your sentence.  Go ahead.

A. They was allowed to work whatever shift that accommodated them. I was not given that opportunity.

Q. Now, you said "same circumstances, be it part time or full time." You don't have any examples of people working two full-time jobs, do you?

A. I don't have any knowledge of it.

(Deposition of Richard Peterson, 124.20 – 125.11)

***

Q. Let me just try to go back to your sentence. You said -- I wrote it down -- they were allowed to work the shift that accommodated them. Who are "they" and who are "them"?

A. Those other officers.

Q. Can you list a single person that fits what we're talking about here that was treated differently, as far as their work schedule, than you were?

A. What are we talking about? Are we talking about any employment, part or full, or what are we talking about?

Q. Okay. Well, let's talk about your situation, okay? Your situation is a police officer?

A. Yes.

Q. Full time with Clayton?

A. Yes.

Q. Full time with the State of Alabama?

A. Yes.

Q. Your jobs were at least an hour to an hour and a half travel time apart from one another?

A. Yes.

Q. You understood that you were scheduled to come in at 3 –

A. Yes.

Q. -- with Clayton, and your work schedule with the State wouldn't allow that?

A. Yes.

**Q. Is there anybody out there that's similarly situated to you under those circumstances?**

**A. I have no knowledge of that.**

**Q. What makes you think that under those circumstances that I just outlined -- the police officer; two full-time jobs; the jobs are an hour to an hour and a half away from each other; expected to show up at 3; can't show up at 3 – that if you had been white, that there would be anything different about what happened?**

**A. That would be mere speculation.  I have no knowledge of that.**

Q. The third paragraph says, Plaintiff intends to assert and prove that both the denial of accommodation and termination were motivated by his race. I'd like for you to tell me what proof you have that the denial of accommodation and termination were motivated by your race.

> MR. NEWMAN:  I'm going to object to the form.  Go ahead and answer, if you can.

A. I was black.

Q. Okay.  Any other proof or evidence?

**A. There is no other circumstances, other than race.  I don't know of any other circumstance.**

Q. But you've told me all the evidence and proof that you have that it was because of race; right?  I can move on from that question?

A. That's my belief.

> MR. DERRICK:  And now I'd like to clean up my question and address your objection, if you'll tell me what the grounds are for it.

> MR. NEWMAN:  The ultimate decision maker decides what constitutes proof.  So your using the word "proof" is inappropriate.

MR. DERRICK:  Okay.  I'm not sure that I agree, but for the sake Of –

MR. NEWMAN:  Well, witnesses can offer evidence.

MR. DERRICK:  Yeah.  That's what I was about to say.  I'm not sure that I agree, but that's fine.

Q. Have you told me all the evidence that you have that your denial of accommodation was motivated by race?

A. The actions by the party involved.

Q. That is the termination?

A. And what led up to it.

Q. Well, sir, that's what we're here about today.  This is my chance to talk to you, and I'm asking you what evidence you have that the denial of these accommodations was motivated by race.

A. My being black -- it's my belief as to what stimulated this entire situation.

Q. Do you have any other evidence that the denial of accommodation was motivated by your race?

A. No more than what will be presented by my attorney.

Q. Have you told me all the evidence you have, that you are aware of, that the denial of this accommodation was motivated by your race?

A. My attorney has that same information.

Q. Good.  So your attorney has whatever information you have, as far as evidence that the denial of this accommodation was motivated by race; correct?

A. Yes.

Q. Okay.  Now is the time, because you're under oath and this is my chance to ask you –

A. Yes.

Q. -- for you to tell me if there's any more evidence, other than what we've already discussed.

A. The evidence that I presented to my attorney.

Q. I need to know what that evidence is.  Do you understand that's how this works?  And if you've told me everything, fine.  We'll move on but if there's –

**A. I've told you everything.**

**Q. Okay.  Have you told me all the evidence you have that your termination was motivated by your race?**

**A. Yes.**

**Q. So there's no more evidence -- you've told me all the evidence there is that the denial of accommodation and the termination was motivated by your race?**

**A. Yes.[5]**

(Deposition of Richard Peterson, 126.11 – 132.2)(emphasis added)

***

Q. Do you have knowledge of anyone who had a job situation similar to yours?  By that, I mean a police officer with a full-time job in Clayton, another full-time job anywhere in any area, nearly as far away as Montgomery, that we can compare to your situation.

A. I don't have any knowledge of that.

Q. Do you even know during the time that you worked in Clayton how many total full-time employees the Town of Clayton had outside of the police department?

A. I don't -- I don't know.

**Q. Do you know anyone who had -- anyone -- full time or part time, okay -- regardless of whether they were a police officer or not, that had a job with Clayton and had a second job that was an hour to an hour and a half away from Clayton?**

---

[5] Peterson's entire deposition is offered in support of this motion, in large part, because of this response.

**A. I have no knowledge of that.**

(Deposition of Richard Peterson, pages 179.10 – 180.5)(emphasis added)

Neither the Town of Clayton nor Peterson can identify any officers, other than Lightner and Peterson, who had two full-time jobs. (Deposition of Richard Peterson, 95.6 – 95.10; 125.7 – 125.11; 126.23 – 128.7; 170.18 – 179.9; Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any full-time employee who had a second, full-time job approximately 73 miles from Clayton. (Deposition of Richard Peterson, 179.10 – 180.5; Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any employee who worked two full-time jobs with overlapping job schedules. (Deposition of Richard Peterson, 95.6 – 95.10; 125.7 – 125.11; 126.23 – 128.7; 170.18 – 179.9; Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any full-time employee whose schedule was adjusted by the Town of Clayton to accommodate a second full-time job. (Deposition of Richard Peterson, 116.22 – 117.7; 120.13 – 128.7; Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify an employee of the Town of Clayton who has been habitually tardy for work that in any way

compares to the <u>number of days</u> Peterson was tardy during the last months of his employment. (Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any employee who remained employed by the Town of Clayton who was tardy the number of times Peterson was tardy during the last months of his employment. (Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any employee whose habitual tardiness in any way compared to the number of days and <u>the average number of minutes and hours</u> Peterson was tardy during the last months of his employment. (Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Neither the Town of Clayton nor Peterson can identify any employee who remained employed by the Town of Clayton who was tardy the number of days and <u>the average number of minutes and hours</u> Peterson was tardy during the last months of his employment. (Affidavit of Thomas Killingsworth, page 6 ¶ 23; Affidavit of Shug Rowland, page 4 ¶ 13)

Peterson's race was not a factor in his termination. Any complaints Peterson made regarding race, or any other matters, were not factors in his termination. (Affidavit of Thomas Killingsworth, page 7 ¶ 24; Affidavit of Shug Rowland, page 4 ¶ 13)

*Facts Relating to Allegation of Retaliation*

Peterson's "Response to Motion for More Definite Statement" states that "defendant terminated plaintiff's employment in retaliation for employee complaining that the failure to accommodate his work schedule was racially motivated." ("Response to Motion for More Definite Statement", page 1, ¶ 2)

As was stated above, Peterson filed his original charge with the EEOC July 1, 2005, *after* he was terminated. (Attachment to Plaintiff's "Response to Motion for A More Definite Statement")

Prior to his termination, there is evidence that Peterson complained to the town council *about* Mayor Shug Rowland personally, but Shug Rowland is not the defendant in this case. Furthermore, the complaints that Peterson did make about Rowland related to personal interaction between the two, not Peterson's work schedule or unlawful employment practices. This will be addressed *infra*.

While the Complaint alleges that Peterson "requested that his shift hours accommodate his second job," (Complaint page 2, ¶ 7) a closer look at what Peterson actually "requested" does not support this.  On March 11, 2005, Peterson sent a memo to the Mayor and the Town Council that stated, "I contend that I have *not made a requested* orally *or* for that matter *in any other manner requested* that my status be anything other than what it presently is within the police department...I have *no intention of requested* any other status other than my present status." *(sic)* (Peterson Deposition, Defendant's Exhibit 29, page 6 of exhibit, ¶ 3 and last sentence of ¶ 4 of document dated March 11, 2005)(emphasis added)

Additionally, when Peterson was asked to attend the December 13, 2004 Town Council meeting, so that the issues related to his two fulltime jobs with conflicting schedules could be discussed, he refused to attend. (Deposition of Richard Peterson, 167.10 – 170.6; Affidavit of Thomas Killingsworth, page 3 ¶ 12 Attachment B; Affidavit of Shug Rowland, page 2 ¶ 8)

As was stated above, Peterson did not complain to the town council that "the failure to accommodate his work schedule was racially motivated." He complained to the town council about Shug Rowland personally. In his January 11, 2005 "Letter of Grievance", Peterson listed eight (8) very vaguely phrased "complaints and allegations" against Rowland. In the letter, Peterson offers no evidence but states that "it appears that Mayor Rowland intentions are Racially motivated, politically motivated and he is clearly using his position to accomplish his intended goals." (Defendant's Exhibit 9 to the deposition of Richard Peterson) He then gave the following list:

"12/02/04 @ 10:00 p.m. I (Assistant Chief Richard Peterson) were Threaten and Harass by Mayor Shug Rowland.

12/10/04 @ 9:30 p.m. I (Assistant Chief Richard Peterson) was harass on the job by Mayor Rowland after a home Barbour County Basketball Game.

12/12/04 @ 3:30 p.m. I (Assistant Chief Richard Peterson) were given a letter that was meant to intimidate me as well as belittle me by reducing my rank to officer Richard Peterson.

12/13/04 in an attempt to continue his intimidation, several untrue statements were listed in the Clayton Record quoted as Mayor Rowland statements.

12/14/04 @ 8:15 p.m. I (Assistant Chief Richard Peterson) were subject to more of Mayor Rowland harassment and intimidation.

12/15/04 @ 12:55 a.m. I (Assistant Chief Richard Peterson) again were subjected to Mayor Rowland harassment.

01/10/05 @ 7:45 a.m. I (Assistant Chief Richard Peterson) were once again subjected to Mayor Rowland harassment.

01/10/04 (sic) @ 11:44 p.m. I (Assistant Chief Richard Peterson) were harassed by Mayor Rowland once again it has to stop!"

(Defendant's Exhibit 9 to the deposition of Richard Peterson)

During his deposition, Peterson was asked about each of these items. None of these  "complaints and allegations" relate to the alleged failure to accommodate his work schedule.  None contain any evidence or suggestion of evidence that Rowland's alleged behavior was racially motivated.  Even if the acts attributed to Rowland are true, which is assumed for this motion only, they certainly do not constitute unlawful employment practices.

Each of Peterson's vague and conclusory "Complaints and Allegations" will now be addressed.

### 1.    "12/02/04 @ 10:00 p.m. I (Assistant Chief Richard Peterson) were Threaten and Harass by Mayor Shug Rowland."

This is all of the information Peterson provided to the Town Council in his letter.   He was asked to provide more detail at his deposition:

Q.    ... Tell me what you're talking about as far as December 2nd, '04, at 10 p.m., if you recall.

A.    That was my first conversation with Mayor Rowland.

Q.    About what?

A.    Well, he came into the police department about ten o'clock that night, and he came in threatening.  That was my first conversation I ever had with him.

Q.    The first time you had ever spoken to the man in your life?

A.    The first time we had ever had a conversation, December 2nd at 10 p.m.

Q.    When you say "threatening," what did he say that was threatening?

A.    He came in, and he threatened to take away my rank as assistant chief, to take away my compensatory time that I had accumulated, to take away my job.

Q.    Did he say why?

A.    Well, he didn't -- not to me. I guess that's what he wanted to do.

Q.    Y'all were talking -- was he talking –

A.    He was talking. I was listening. He made his -- what he was going to say –

Q.    Okay. Well, let me back up and ask -- tell me everything you remember Rowland saying to you December 2nd, 2004, at 10 p.m.

A.    Well, he came in, and he said that I would not be the assistant chief. He also said that he was going to take away my compensatory time. He also said that I would not be working full time with the Town of Clayton, and he later got to the part about this young man -- that I would arrest him and let the Court decide whether or not he was mental.

Q.    Is that everything you remember about that conversation?

A.    That's everything I can remember right at this particular moment.

Q.    All right. Do you know why he made the statements he did about not being assistant chief? Did he explain -- did he elaborate on any of that?

A.    No. But I had heard rumors.

Q.    Okay. What rumors had you heard?

A.    That people thought I was the chief of police.

Q.    From whom did you hear these rumors?

A.    Well, I heard it from the chief.

Q.    The current chief told you that there were rumors on the street that you, in fact, were the chief?

A.    Not the current chief at that time.  Chief Williams.

Q.    Okay.  Have you told me everything you remember about December 2nd, 2004, as far as any conversation you had in the presence of or with Mayor Rowland?

A.    That's pretty much it.  He did most of the talking, but those were the basic topics of his discussion.

(Deposition of Richard Peterson, 198.15 – 201.9)

The above has nothing to do with Peterson's work schedule, his race, or unlawful employment practices.

### 2.    "12/10/04 @ 9:30 p.m. I (Assistant Chief Richard Peterson) was harass on the job by Mayor Rowland after a home Barbour County Basketball Game."

This is all of the information Peterson provided to the Town Council in his letter.  He was asked to provide more detail at his deposition:

Q.    Next, you list December 10th, 2004, at 9:30 p.m.  I was harassed on the job by Mayor Rowland after a home Barbour County basketball game.

A.    Yes.

Q.    Tell me everything you remember about that.

A.    It was roughly 9:30 p.m.  I was actually working.  I received a call from the chief that the basketball game was over -- and this is a black school -- and that the -- the school children was accumulating at the Beeline store there in Clayton on North Midway Street and they was -- had loud music and creating a ruckus.  He said he had received a complaint in reference to that.  Now, I was sitting there at the time he, and I was talking on the phone.  It was a cell phone.  I know that wasn't going on.  As we conversated, Mayor Rowland pulled up, parked across the street facing the store.  He didn't get out.  He didn't make a conversation with me, but he sat there and just -- he sat there looking in that way.  Several of the young men there at the store --

they got irritated about it, and they started to get irate. I had to actually get out and calm them because they started towards him. So he really liked to have enticed a riot by doing that. There was no cause for it, other than it was a black situation. There was no cause for it. I know the situation that I received a phone call on in relationship to there being a ruckus. I was sitting there because I knew they was going to come there after the game. That didn't happen.

Q.      Have you ever in your history of police work had to deal with a ruckus after a basketball game or football game?

A.      Yes.

Q.      That happens; right?

A.      Yes. It happens.

Q.      And what I think I -- Mayor Rowland drove up to the Beeline?

A.      He drove up to the Beeline.

Q.      In the Beeline parking lot or across the street?

A.      No. He parked across the street at the dentist office.

Q.      So he pulls into the dentist office?

A.      Yes.

Q.      He didn't get out of the car?

A.      No.

Q.      He sat there?

A.      Sat there.

Q.      Okay. Have you told me everything there is to tell me about December 10th, 2004, as far as the harassment on the job that you contend happened by Mayor Rowland?

A.      No. Well, he drove to the building right next to the Beeline. He sat there. Then I believe the chief pulled up beside his vehicle. They talked. The chief left. Shortly thereafter, I drove off because a vehicle came through at a rather high rate of speed. I pulled off, stopped the

vehicle down the road near the center of town on a back street. And as I made contact with the vehicle, the mayor pulled up, riding by real slow. He didn't say anything, but he rode by just looking. Yes.

Q.    Is that it, as far as the harassment you received by Mayor Rowland on December 10th?

A.    Yes. As far as I can remember.
(Deposition of Richard Peterson, 201.10 – 205.12)

To summarize, the Mayor of Clayton sat in his car next to a convenience store after a basketball game, he did not get out of his car, and he did not speak to Peterson. This is, according to Peterson, harassment.  In fact, it is not harassment.  It has nothing to do with Peterson's work schedule, it has nothing to do with his race, and it has nothing to do with unlawful employment practices.

### 3.    "12/12/04 @ 3:30 p.m. I (Assistant Chief Richard Peterson) were given a letter that was meant to intimidate me as well as belittle me by reducing my rank to officer Richard Peterson."

This is all of the information Peterson provided to the Town Council in his letter.   He was asked to provide more detail at his deposition:

Q.    Next, you have December 12th, 2004, at 3 p.m.  I was given a letter that was meant to intimidate me as well as to belittle me by reducing my rank to Officer Richard Peterson.  Tell me about that.

A.    Well, I was the assistant chief of police.  That was -- that was a known thing, when the mayor even took office.  And it's not common to refer to you anything other than what you are.  I was the assistant chief of police, and I think he intentionally wrote that letter as Officer Peterson, just as in that newspaper, that council thing.  He never once referred to me as Assistant Chief Peterson -- Richard Peterson. I'm still the assistant chief of police.[6]

---

[6] "As used in this article, the term 'law enforcement officer' shall mean an official who is certified by the Alabama Peace Officers' Standards and Training Commission…including police chiefs and deputy police chiefs..." Ala.Code 1975 § 11-43-231

Q.   But it was the way you were addressed, not the content of the letter that you are -- that you're referring to, as far as this December 12th letter; am I right?

A.   Well, the address made the contents not proper.  Yes.

Q.   I understand but that's -- the problem you had is that he referred to you as Officer Peterson instead of Assistant Chief Peterson?

A.   There was an intent there.  Yes.

Q.   Okay.  But is that everything about that letter that you have a problem with?

A.   As far as I can recall.
(Deposition of Richard Peterson, 204.13 – 205.18)

Again, the above has nothing to do with Peterson's work schedule, it has nothing to do with his race, and it has nothing to do with unlawful employment practices.  It is not harassment.

### 4.   "12/13/04 in an attempt to continue his intimidation, several untrue statements were listed in the Clayton Record quoted as Mayor Rowland statements."

Peterson was asked, but could not remember the substance of this article. (Deposition of Richard Peterson, 207.7 – 207.19)  In any event, they were alleged statements made to the paper, not to Peterson.

### 5.   "12/14/04 @ 8:15 p.m. I (Assistant Chief Richard Peterson) were subject to more of Mayor Rowland harassment and intimidation."

This is all of the information Peterson provided to the Town Council in his letter.  He was asked to provide more detail at his deposition:

Q.   Number five, December 14th, 2004, at 8:15 p.m.  I was subject to more of Mayor Rowland's harassment and intimidation.   That's December 14th, 2004, at 8:15 p.m.  What were you talking about there?

A.    That's where he saw me at the -- one of the local convenience stores in Clayton.  He spoke in reference to that council meeting and that I shouldn't have talked to Councilman Beasley and just -- he approached me in an unwanted manner.

Q.    Well, that's why I need you to tell me everything that you recall about that day.

A.    This conversation was about the council meeting and that I shouldn't have talked to the council member about it because the council member is the one who told me that I didn't have to attend the meeting.  And I sent a letter in reference to that.

Q.    So you never actually spoke to the mayor or the governing body as a whole about not attending; is that right?

A.    I sent the mayor a letter.

Q.    Okay.  After you spoke to one of the council members?

A.    I guess -- I spoke to -- gave the council members and the mayor a letter.  All of them got the same letter.

Q.    Have you told me everything you remember about December 14th, 2004?

A.    As far as I can remember.

(Deposition of Richard Peterson, 207.20 – 209.4)

In summary, (1) Peterson is asked to attend a council meeting to discuss his employment situation, (2) he does not attend, (3) the mayor sees him the next day and discusses the fact that he did not attend, and (4) Peterson considers this harassment.   This has nothing to do with Peterson's work schedule, it has nothing to do with his race, and it has nothing to do with unlawful employment practices.  It is not harassment.

**6.    "12/15/04 @ 12:55 a.m. I (Assistant Chief Richard Peterson) again were subjected to Mayor Rowland harassment."**

Again, Peterson provides very little detail regarding the sixth "complaint and allegation." It is obvious why:

Q.    December 15th, 2004, 12:55 a.m.. . . I, again, was subject to Mayor Rowland's harassment. Tell me what you recall about that.

A.    Well, I would call it stalking because he was riding around that time of morning, pretty much following me around as I patrolled. There was no cause for it. He didn't say anything to me, but I actually physically saw him, looked at him.

Q.    Anything else?

A.    No.
(Deposition of Richard Peterson, 209.5 – 209.19)

Shug Rowland, the Mayor of Clayton, was driving on the streets of Clayton. Richard Peterson considers this harassment, but it is not harassment. More importantly, this nothing to do with Peterson's work schedule, it has nothing to do with his race, and it has nothing to do with unlawful employment practices.

### 7.    "01/10/05 @ 7:45 a.m. I (Assistant Chief Richard Peterson) were once again subjected to Mayor Rowland harassment."

It is very, very difficult to understand how in the world the events Peterson describes here could be considered harassment *on the part of* Shug Rowland. The event Peterson described certainly has nothing to do with Peterson's work schedule, it has nothing to do with his race, and it has nothing to do with unlawful employment practices.

It does, however, shed a great deal of light on Peterson's notion of what constitutes harassment and appropriate conduct for a police officer who is on duty.

Q.    January 10th, 2005, at 7:45 p.m.  I was once again subjected to Mayor Rowland's harassment.  Tell me what you recall about that.

A.    I can't call the exact circumstances.  I believe this is going to be where I actually caught him stalking, along with one of his friends, and gave chase to him.  They attempted to elude me.  We went over 25 miles at over 75 miles an hour on a dark county road, two-lane highway.  I believe that's going to be the incident.  January 10th.

Q.    January 10th?

A.    Yes.

Q.    7:45 p.m.?

A.    Yes.  It was dark.

Q.    You gave chase to the mayor and one of his friends?

A.    Uh-huh.

Q.    Now, how is that harassment on his part?

A.    Okay.  Because they was stalking me.  But when they drove up, they wasn't aware that I was aware of what they was doing.  And when they popped up, I was waiting on them.  They realized it.  They turned around and hightailed it, and I gave chase to them.

Q.    Okay.  Let's take it one at a time, then.  What were they doing before you gave chase?

A.    They was coming to my area where they had no business even being -- in that area where I was.  It was not in the downtown area.  It was off the roadway.  It was in an area where they had no business being.  They was out of place.  But they thought it was unexpecting to me, but I was waiting on them.

Q.    Okay.  Were you on duty?

A.    Yes.

Q.    What area was this that these two men had no business being?

A.    Well, it was County Road 53.  It was a young lady that I knew, a friend of mine -- she lived in that area.  And I guess their thinking was

that I was there, but I wasn't there.  I was waiting on them to come there because they had been seen in that area before that.

Q.    Before that day?

A.    Before that day.  Yes.

Q.    Okay.  They were on a county road?

A.    County Road 53.

Q.    But they weren't in anybody's yard or house?  They were –

A.    They didn't quite make it.

Q.    All I'm saying to you is that when you saw them doing what you call stalking, they were in a vehicle?

A.    Yes.

Q.    On a county road?

A.    Yes.

Q.    In Barbour County?

A.    Yes.

Q.    Inside or outside the city limits?

A.    Right at the city limit.

Q.    And someone had told you that they had been on that county road before?

A.    Well, I had seen them myself.

Q.    You had seen them yourself?  And were you hiding, waiting and watching for them?

A.    Well, I wasn't hiding.  I was parked in the dark, backed up off the road, just sitting there.

Q.    Can you give me an idea how far out of town you were?  You don't –

A.    We were still in the city limits.

Q.    Still in the city limits?  So you were in the city limits?  Were you, like, on a dirt road or something?

A.    Yes.

Q.    Okay.  And you had a hunch the mayor and one of his friends would be driving by?

A.    Yes.

Q.    And is that the reason you were pulled off on the side of the road waiting?

A.    Yes.

Q.    Is that the only reason you were pulled off on the side of the road waiting?

A.    Yes.

Q.    How long did you wait for them before they came by?

A.    It wasn't long.  Maybe 30 minutes.  It wasn't long.
(Deposition of Richard Peterson, 209.20 – 213.18)

* * *

Q.    And where does it lead?

A.    It just leads to that person's driveway and on back out.

Q.    Okay.  And who is this person?

A.    Ms. Linda Baxter.
(Deposition of Richard Peterson, 214.23 – 215.4)

* * *

Q.    . . .is she a girlfriend?

A.    She's a friend.

Q.    And you think that's not the first time that they had been checking to see if you went to see Linda?  Is that what you're telling me?

A.    I guess that's what they was doing.

Q.    And so you had your lights off?

A.    Yes.

(Deposition of Richard Peterson, 215.7 – 215.15)

* * *

Q.    And were you able to actually see the mayor inside the vehicle at 7:45 p.m.?

A.    Well, I didn't actually see him -- see him like I'm looking at you, but I could tell it was him.

(Deposition of Richard Peterson, 216.2 – 216.6)

* * *

Q.    Okay.  How far did you chase them?

A.    I don't know but it was -- it was a ways.

Q.    You said you got –

A.    . . . -- it was a good ways.  I'm going to give 20 -- a minimum of 20 miles, at a high rate of speed.

(Deposition of Richard Peterson, 216.20 – 217.4)

* * *

Q.    Did you have your lights on?

A.    No.

Q.    Okay.  So you didn't blue light them?

A.    No.

Q.    You just followed them?

A.    Yes.

Q.    And you didn't stop them?

A.    No, I did not.

Q.     You didn't ticket them?

A.     No.
(Deposition of Richard Peterson, 218.17 – 219.3)

* * *


Q.     Did you leave the police jurisdiction?

A.     Yes.
(Deposition of Richard Peterson, 219.17 – 219.18)

* * *

So, Peterson chases Rowland through the night – in a vehicle in which Rowland is a passenger, no less – and Peterson thinks Rowland is the harasser.

**8.    "01/10/04 (sic) @ 11:44 p.m. I (Assistant Chief Richard Peterson) were harassed by Mayor Rowland once again it has to stop!"**

After allegedly being chased through the night at a high rate of speed, the mayor called Peterson. To Peterson this was harassment on Rowland's part.

Q.     . . . January 10th, 11:44 p.m. I was harassed by Mayor Rowland once again.

A.     Yes. He may have called me. I can't recall exactly, but I do know later that night he called me and said where I better not be and things of that nature.

Q.     Where –

A.     I better not be on County Road 53, which was County Road 53 -- the road I saw him on earlier.

Q.     He told you, you should not be on County Road 53?

A.     I better not be on County Road 53.

Q.     Did he say why?

A.    No.

Q.    Do you remember anything else about that conversation?

A.    I don't remember it right off.  I don't.

Q.    Okay.  We've just gone over Defendant's Exhibit 9, which is a letter you wrote January 11th, 2005, to the mayor pro tem and the Clayton Town Council, listing eight occurrences that you allege to have constituted harassment, primarily by Mayor Rowland.  Have you told me everything you remember about those eight occurrences?

A.    As far as I can remember.  Yes.

(Deposition of Richard Peterson, 221.23 – 223.5)

### Facts Relating to Town of Clayton

The City of Clayton is an equal opportunity employer.  It has a policy against racial discrimination in employment. The Town has a grievance procedure that forbids discipline or discrimination against an employee for the use of such procedure.  The Town also has a procedure for appealing suspensions, demotions, and dismissals to the Town Counsel. (Affidavit of Thomas Killingsworth, page 3 ¶ 13; Affidavit of Shug Rowland, page 5 ¶ 14)

### B.    DISPUTED FACTS

For this motion, the Defendant has made every effort to rely primarily on the Plaintiff's on testimony.  The City is not certain whether Lightner was a full or part-time employee with the Town of Hurtsboro, but for this motion, assumes he was based upon Peterson's testimony regarding the same.

For the purposes of this motion only, the Defendant does not dispute the descriptions of the alleged acts of Rowland outline in Peterson's "Complaints and Allegations" discussed above.  These facts will be disputed at trial.

## II. **ANALYSIS**

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 governs motions for summary judgment: "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

According to the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327

(1986) (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).


### B. Merger of Claims

Paragraph 1 of the complaint recites that this action is brought pursuant

to 42 U.S.C. §§ 1981, 1983, and 2000e (Title VII). (See Complaint at 1, ¶ 1.)

Section 1981 states: "All persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and

enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981 (Lexis

2005).

> Section 1983 states:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983 (Lexis 2005).

According to the Supreme Court, "the express 'action at law' provided by

§ 1983 for the 'deprivation of any rights, privileges, or immunities secured by

the Constitution and laws,' provides the exclusive federal damages remedy for

the violation of rights guaranteed by § 1981 when the claim is pressed against

a state actor." Jet v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36 (1989); see also Butts v. County of Volusia, 222 F.3d 891, 894-95 (11th Cir. 2000) (holding "§ 1983 contains the sole cause of action against state actors for violations of § 1981").

Accordingly, § 1983 is the statutory vehicle through which a party enforces rights conferred under § 1981. Section 1981 uses the same requirements of proof and the same analytical framework as Title VII of the Civil Rights Act of 1964. See Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

### C. Municipal Liability

"To prevail on his claim for damages against [a municipality], [a plaintiff] must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." Jet v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36 (1989). "A plaintiff who sues a municipality under § 1983 for a violation of the rights contained in § 1981 may not rely upon the doctrine of respondeat superior." Butts v. County of Volusia, 222 F.3d 891, 893 (11th Cir. 2000).

"To impose section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

### 1. Peterson's Allegation of Racial Discrimination

In this case, there is no underlying statutory violation upon which to base municipal liability.

Section 1981 uses the same requirements of proof and the same analytical framework as Title VII of the Civil Rights Act of 1964. See Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

### (a) Prima Facie Showing

Under the McDonnell Douglas framework, "a plaintiff can establish a prima facie case that she was discriminated against ... by showing: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue." See Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 842-43 (11th Cir. 2000).

### (1) No Similarly Situated Employees

Peterson cannot make the required prima facie showing. He cannot identify any Clayton police officer who is similarly situated.

Peterson cannot identify any white officers who had two fulltime jobs.

Peterson cannot identify any fulltime employee who had a second, fulltime job approximately 73 miles from Clayton.

Peterson cannot identify any employee who worked two fulltime jobs with overlapping job schedules.

Peterson cannot identify any fulltime employee whose schedule was adjusted by the Town of Clayton to accommodate a second fulltime job.

Peterson cannot identify an employee of the Town of Clayton who has been habitually tardy for work that in any way compares to the <u>number of days</u> he was tardy during the last months of his employment.

Peterson cannot identify any employee who remained employed by the Town of Clayton or who had his schedule adjusted who was tardy the number of times Peterson was tardy during the last months of his employment.

Peterson cannot identify any employee whose habitually tardiness in any way compared to the number of days and <u>the average number of minutes and hours</u> Peterson was tardy during the last months of his employment.

Peterson cannot identify any employee who remained employed by the Town of Clayton or who had his schedule adjusted who was tardy the number of days and <u>the average number of minutes and hours</u> Peterson was tardy during the last months of his employment.

Because Mr. Peterson cannot make a prima facie showing of discrimination, his allegations fail.

It is the Defendants position that the Plaintiff must show that he and a comparator are similarly situated "in all relevant aspects." <u>Silvera v. Orange County Sch. Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001). In this case, all "relevant aspects" dictate finding a comparator who, at a minimum, is a police officer, who works two full time jobs, who takes a second job approximately 70 miles away, who is not able to leave the second job in time to get to the first job, who is late at least 68% of the time, who is late approximately two hours each time he is late. The plaintiff cannot do this.

The defendant anticipates that the plaintiff may argue that rather than identifying a comparator who is similarly situated "in all relevant aspects, " he only compare the conduct for which the he was actually disciplined to the conduct for which non-minority employees were not disciplined. See Lloyd v. Hi-Ridge Transport 396 F.Supp.2d 1290, 1294 (M.D.Ala.,2005). While the defendant's position is that the requirement to identify a "similarly situated" employee requires more that just comparing conduct, the fact of the matter is that the plaintiff cannot identify another non-minority employee whose conduct approach his.

Further more, if the plaintiff should attempt to rely on Lloyd v. Hi-Ridge Transport, the fact that the Peterson was replace with another back police office – unlike the employee in Lloyd – cannot be ignored.

### (2) Not Qualified For The Job

Peterson cannot make the required prima facie showing that he was qualified for the job. Because of his poor attendance record, Peterson was not qualified for the position from which he was terminated. "[A] regular and reliable level of attendance is a necessary element of most jobs···· An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual..." Cf. _Tyndall v. National Educ. Centers, Inc.,_ 31 F.3d 209, 213 (4th Cir.1994)(Tyndall is an ADA case, but the proposition that one is not qualified for a job if one does not show up for it is reasonable and sound.)

### (b) Race-Neutral Reason

"Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005).

Even assuming Mr. Peterson could make a prima facie showing of disparate treatment, Mayor Rowland articulated a non-discriminatory reason for the termination of Peterson. He was habitually late for work and he was insubordinate. Rowland's decision was ratified by the Town Council.

Peterson's position was filled by black police officer.

### (c)  No Evidence of Pretext

"Once an employer meets its burden to produce a non-discriminatory reason for its actions, the presumption of discrimination is eliminated." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005).

"To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005). "This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004).

Mr. Peterson cannot identify any Clayton employees who had anything near his attendance record.

There is no basis to dispute Rowland's explanation for termination.

In the absence of an underlying constitutional or federal statutory violation, municipal liability can never arise. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

### 2. Peterson's Allegation of Retaliation

Peterson did not file a complaint with the EEOC until after he was terminated.

Furthermore, the activity that he claims participated in is very specifically stated in his complaint: "complaining that the failure to accommodate his work schedule was racially motivated," not, for example, complaining about Shug Rowland because he was driving his car on the streets of Clayton or because he looked at him from inside his car after a basketball game.

Title VII prevents an employer from retaliating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A claim brought under 42 U.S.C. § 1981 is analyzed under the same framework as a Title VII claim because both statutes have the same requirements of proof. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998). To establish a *prima facie* case of

retaliation under Title VII, a plaintiff must show: (1) he participated in an activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir.2000).

To demonstrate participation in a protected activity for purposes of a *prima facie* case a plaintiff must show that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir.2002) Accordingly, a plaintiff must demonstrate both his subjective belief that his employer was engaged in unlawful employment practices and that his "belief was *objectively* reasonable in light of the facts and record presented." *Id.* at 1312.

In this case, the complaints and allegations made prior to his termination were almost exclusively personal complaints about Shug Rowland, rather than complaints about the Town of Clayton -- *"I had heard rumors . . .He didn't get out [of his vehicle]. He didn't make a conversation with me, but he sat. . . looking. . . He didn't say anything to me, but I actually physically saw him, looked at him. . . [He] was in the city limits, [but he was] in my area where [he] had no business even being -- in that area where I was. . . [He] was out of place . . . well, I didn't actually see him . . ."*

Peterson was deposed at length and offered nothing to suggest that, prior to his termination, he made any complaints about unlawful *employment* practices.

> Q.      You told me all of the reasons that -- all of the evidence you have to support your allegation that you were retaliated against, that you know of?
>
> A.      Yes.

(Deposition of Richard Peterson, 172.4 – 172.8)

Again Peterson's complaint was specific about the alleged unlawful employment practice: the failure to accommodate his work schedule was racially motivated.    That is what his complaint said, but that is not what Peterson said under oath:

> **Q. What makes you think that under those circumstances that I just outlined -- the police officer; two full-time jobs; the jobs are an hour to an hour and a half away from each other; expected to show up at 3; can't show up at 3 – that if you had been white, that there would be anything different about what happened?**
>
> **A. That would be mere speculation.  I have no knowledge of that.**

(Deposition of Richard Peterson, 127.22 – 128.7)

Peterson has offered no evidence to demonstrate a subjective belief that his employer was engaged in unlawful employment practices.

If he did have such a belief it was not "*objectively* reasonable in light of the facts and record presented."  The only white officer on the force was fired a few weeks after Peterson.  Both the white officer and Peterson were replaced by black officers.

If a plaintiff establishes his *prima facie* case, the employer has the burden to produce a legitimate, nondiscriminatory reason for its actions. Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir.1999). This burden is "exceedingly light" and the employer "need not persuade the

court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir.), *cert. denied,* --- U.S. ----, 126 S.Ct. 478, 163 L.Ed.2d 363 (2005) (quotation omitted). If the employer satisfies its burden, thus rebutting the presumption of retaliation, the plaintiff must then demonstrate that the employer's reason is a pretext for retaliatory conduct. *Sullivan,* 170 F.3d at 1059. "To show that the employer's reasons were pretextual, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper,* 390 F.3d at 725 (quotation omitted).

The race-neutral reasons for termination and the absence of pretext have been discussed at length above. The Defendant incorporates them into this section of the brief by reference.

### 3. Municipal Policy

Even if Peterson could prove intentional discrimination, he would still be required to identify a municipal custom or policy that was the moving force behind the alleged violation.

"It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

causal link between the municipal action and the deprivation of federal rights." Board of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

Town of Clayton is an equal opportunity employer. The Town of Clayton has a policy against racial discrimination in employment. There is no unconstitutional or illegal custom or policy upon which to base municipal liability.

### III. **CONCLUSION**

WHEREFORE, defendant the Town of Clayton, Alabama, respectfully moves for a summary judgment in its favor.

Respectfully submitted this the 30th day of October, 2006.

R. Todd Derrick (DER006)

OF COUNSEL:
COBB, SHEALY, CRUM, DERRICK & PIKE
Post Office Box 6346
Dothan, Alabama 36302
(334) 677-3000
(334) 677-0030

### **CERTIFICATE OF SERVICE**

I hereby certify that I have this day hand delivered a copy of this document upon:

Malcolm R. Newman, Esquire
Post Office Box 6137
Dothan, Alabama 36302
(334) 792-2132

This the 30th day of October, 2006.

R. Todd Derrick (DER006)