**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION**

RICHARD PETERSON,　　　　　）
　　　　PLAINTIFF,　　　　　　）
　　　　　　　　　　　　　　　）　　2006 OCT 30 P 4· 36
vs.　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　）　　DEBRA P. HACKETT. CLK
　　　　　　　　　　　　　　　）　　U.S. DISTRICT COURT
TOWN OF CLAYTON, ALABAMA,　）　　Case No: M2:06CV110-VFM
　　　　DEFENDANT,　　　　　　）

### Appendix of Legal Authority Cited

Pursuant to the Court's Order of June 1, 2006 [Document 18 ¶ 7], the following rules, codes, statutes, and case law is cited in the Defendant's Brief. It is listed in the order in which it is cited and copies are attached.

Ala.Code 1975 § 11-43-231

Federal Rule of Civil Procedure 56

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)

42 U.S.C. § 1981

42 U.S.C. § 1983

42 U.S.C. §2000e

Jet v. Dallas Indep. Sch. Dist., 491 U.S. 701(1989)

Butts v. County of Volusia, 222 F.3d 891 (11th Cir. 2000)

Standard v. A.B.E.L. Servs., 161 F.3d 1318 (11th Cir. 1998)

McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 842-43 (11th Cir. 2000).

Silvera v. Orange County Sch. Bd., 244 F.3d 1253 (11th Cir. 2001)

Lloyd v. Hi-Ridge Transport  396 F.Supp.2d 1290, 1294 (M.D.Ala.,2005)

Tyndall v. National Educ. Centers, Inc., 31 F.3d 209 (4th Cir.1994)

Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763 (11th Cir. 2005)

City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

Gupta v. Florida Bd. of Regents, 212 F.3d 571 (11th Cir.2000).

Weeks v. Harden Mfg. Corp., 291 F.3d 1307 (11th Cir.2002)

Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056(11th Cir.1999)

Cooper v. Southern Co., 390 F.3d 695 (11th Cir.)

Board of the County Comm'rs v. Brown, 520 U.S. 397


Respectfully submitted this the 30th day of October, 2006.

R. Todd Derrick (DER006)

OF COUNSEL:
COBB, SHEALY, CRUM, DERRICK & PIKE
Post Office Box 6346
Dothan, Alabama 36302
(334) 677-3000
(334) 677-0030

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of this document upon:

Malcolm R. Newman, Esquire
Post Office Box 6137
Dothan, Alabama 36302
(334) 792-2132

This the 30th day of October, 2006

R. Todd Derrick (DER006)


Appendix of Legal Authority Cited
2

Westlaw.

117 S.Ct. 1382                                                                                                                                      Page 1
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

▷

Briefs and Other Related Documents
Board of County Com'rs of Bryan County, Okl. v.
BrownU.S. (Tex.),1997.
Supreme Court of the United States
BOARD OF THE COUNTY COMMISSIONERS OF
BRYAN COUNTY, OKLAHOMA, Petitioner,
v.
Jill BROWN et al.
**No. 95-1100.**

Argued Nov. 5, 1996.
Decided April 28, 1997.
Rehearing Denied June 16, 1997. See 520 U.S. 1283,
117 S.Ct. 2472.

Arrestee brought § 1983 action against county,
county sheriff, and reserve deputy, in which she
sought to recover for injuries sustained when she was
forcibly removed from automobile after it was
stopped. The United States District Court for the
Eastern District of Texas, Paul N. Brown, J., entered
judgment on jury verdict for plaintiff, and county
appealed. The Court of Appeals for the Fifth
Circuit, 67 F.3d 1174, affirmed, finding that county
was subject to municipal liability for sheriff's single
decision to hire deputy after inadequate background
check. After petition for certiorari was granted, the
Supreme Court, Justice O'Connor, held that: (1) §
1983 plaintiff may not establish municipal policy
giving rise to liability merely by identifying
policymaker's conduct that is properly attributable to
municipality, but must also demonstrate that, through
its deliberate conduct, municipality was "moving
force" behind injury alleged, and (2) evidence failed
to establish that sheriff's isolated failure to perform
adequate screening reflected deliberate indifference
to high risk that deputy would use excessive force.

Vacated and remanded.

Justice Souter dissented and filed an opinion in which
Justice Stevens and Justice Breyer joined.

Justice Breyer dissented and filed an opinion in
which Justice Stevens and Justice Ginsburg joined.
West Headnotes
**[1] Civil Rights 78 ☜1351(1)**

78 Civil Rights

78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other
Governmental Bodies
        78k1351 Governmental Ordinance, Policy,
Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
        (Formerly 78k206(3))
Municipality may not be held liable under § 1983
solely because it employs tort-feasor, and instead,
plaintiff must identify municipal "policy" or
"custom" that caused plaintiff's injury. 42 U.S.C.A. §
1983.

**[2] Civil Rights 78 ☜1351(1)**

78 Civil Rights

78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other
Governmental Bodies
        78k1351 Governmental Ordinance, Policy,
Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
        (Formerly 78k206(3))
Act performed pursuant to "custom" that has not
been formally approved by appropriate decision
maker may fairly subject municipality to liability
under § 1983 on theory that relevant practice is so
widespread as to have force of law. 42 U.S.C.A. §
1983.

**[3] Civil Rights 78 ☜1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
        (Formerly 78k242(5))
Evidence failed to establish that sheriff's isolated
decision to hire deputy without performing adequate
screening reflected deliberate indifference by sheriff
to high risk that deputy would use excessive force,
and thus, county could not be held liable for sheriff's
decision in § 1983 action brought by automobile
passenger who was injured when deputy used
excessive force in removing her from vehicle after it
was stopped; while deputy's record may have made
him poor candidate for position, it did not create

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                        Page 2
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

obvious risk of use of excessive force, as primary charges in deputy's record arose from single incident while he was college student. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☜1343**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1))
It is not enough for § 1983 plaintiff merely to identify conduct properly attributable to municipality against which action is brought, and plaintiff must also demonstrate that, through its deliberate conduct, municipality was "moving force" behind the injury alleged; that is, plaintiff must show that municipal action was taken with requisite degree of culpability and must demonstrate direct causal link between municipal action and deprivation of federal rights. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☜1343**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1))
Where plaintiff in § 1983 action claims that particular municipal action itself violates federal law, or directs employee to do so, resolving issues of whether municipality had requisite degree of culpability and whether direct causal link existed between municipal action and deprivation of federal rights is straightforward, as § 1983 contains no state-of-mind requirement independent of that necessary to state violation of underlying federal right. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☜1031**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1030 Acts or Conduct Causing Deprivation
      78k1031 k. In General. Most Cited Cases
      (Formerly 78k110.1)
In any § 1983 suit, plaintiff must establish state of mind required to prove underlying violation of his or her federal rights. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☜1343**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1))

**Civil Rights 78 ☜1351(1)**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1351 Governmental Ordinance, Policy, Practice, or Custom
        78k1351(1) k. In General. Most Cited Cases
        (Formerly 78k206(1))
Proof that municipality's legislative body or authorized decision maker has intentionally deprived plaintiff of federally protected right necessarily establishes that municipality acted culpably, as is required to allow recovery in § 1983 action. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☜1343**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1343 k. In General. Most Cited Cases
      (Formerly 78k206(1))

**Civil Rights 78 ☜1351(1)**

78 Civil Rights
  78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1351 Governmental Ordinance, Policy, Practice, or Custom
        78k1351(1) k. In General. Most Cited Cases
        (Formerly 78k206(1))
Conclusion that action taken or directed by municipality or its authorized decision maker itself violates federal law will also determine that municipal action was moving force behind injury of which plaintiff complains, as is required to allow

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 3
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
(Cite as: 520 U.S. 397, 117 S.Ct. 1382)

recovery in § 1983 action. 42 U.S.C.A. § 1983.

[9] Civil Rights 78 ☞1345

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1345 k. Acts of Officers and Employees
in General;   Vicarious Liability and Respondeat
Superior in General. Most Cited Cases
            (Formerly 78k206(2.1))
Where § 1983 plaintiff claims that municipality has
not directly inflicted injury, but nonetheless has
caused an employee to do so, rigorous standards of
culpability and causation must be applied to ensure
that municipality is not held liable solely for actions
of its employee. 42 U.S.C.A. § 1983.

[10] Civil Rights 78 ☞1343

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
To the extent that cause of action is recognized under
§ 1983 based on single decision attributable to
municipality, action is recognized only where
evidence that municipality has acted and that plaintiff
has suffered deprivation of federal rights must also
prove fault and causation. 42 U.S.C.A. § 1983.

[11] Civil Rights 78 ☞1401

78 Civil Rights
    78III Federal Remedies in General
        78k1400   Presumptions,   Inferences,   and
Burdens of Proof
            78k1401 k. In General. Most Cited Cases
            (Formerly 78k240(1))
That plaintiff has suffered deprivation of federal
rights at hands of municipal employee will not alone
permit inference of municipal culpability and
causation in § 1983 action, as plaintiff will simply
have shown that employee acted culpably.   42
U.S.C.A. § 1983.

[12] Civil Rights 78 ☞1343

78 Civil Rights
    78III Federal Remedies in General

        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
"Deliberate indifference" to plaintiff's federally
protected rights, showing of which on part of
municipality is required in order for plaintiff to
recover in § 1983 action, is stringent standard of
fault, requiring proof that municipal actor disregarded
known or obvious consequence of his action. 42
U.S.C.A. § 1983.

[13] Civil Rights 78 ☞1345

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1345 k. Acts of Officers and Employees
in General;   Vicarious Liability and Respondeat
Superior in General. Most Cited Cases
            (Formerly 78k206(2.1))
Plaintiff must demonstrate that municipal hiring
decision reflects deliberate indifference to risk that
violation of particular constitutional or statutory right
will follow decision in order to establish that
municipality acted with deliberate indifference and
may be held liable in § 1983 action based on
inadequate screening, and only where adequate
scrutiny of applicant's background would lead
reasonable policymaker to conclude that plainly
obvious consequence of decision to hire applicant
would be deprivation of third party's federally
protected right can official's failure to adequately
scrutinize   applicant's   background   constitute
"deliberate indifference." 42 U.S.C.A. § 1983.

[14] Civil Rights 78 ☞1088(1)

78 Civil Rights
    78I   Rights   Protected   and   Discrimination
Prohibited in General
        78k1088   Police,   Investigative,   or   Law
Enforcement Activities
            78k1088(1) k. In General. Most Cited Cases
            (Formerly 78k132.1)
Finding of culpability on part of municipality in §
1983 action based on failure to perform adequate
screening prior to hiring of employee cannot depend
on mere probability that any officer inadequately
screened will inflict any constitutional injury; rather,
it must depend on finding that particular employee in
question was highly likely to inflict particular injury

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                    Page 4
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

suffered by plaintiff, and connection between background of particular applicant and specific constitutional violation alleged must be strong. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ☞1343**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1343 k. In General. Most Cited Cases
         (Formerly 78k206(1))
Congress did not intend municipalities to be held liable under § 1983 unless deliberate action attributable to municipality directly caused deprivation of federal rights. 42 U.S.C.A. § 1983.
**\*\*1384 Syllabus** <sup>FN\*</sup>

> FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*397** Jill Brown (hereinafter respondent) brought this 42 U.S.C. § 1983 damages action against petitioner county, alleging, among other things, that its Deputy Burns had arrested her with excessive force, and that it was liable for her injuries because its Sheriff Moore had hired Burns without adequately reviewing his background. Burns had pleaded guilty to various driving infractions and other misdemeanors, including assault and battery. Moore, whom the county stipulated was its Sheriff's Department policymaker, testified that he had obtained Burns' driving and criminal records, but had not closely reviewed either before hiring Burns. The District Court denied the county's motions for judgment as a matter of law, which asserted that a policymaker's single **\*\*1385** hiring decision could not give rise to § 1983 municipal liability. Respondent prevailed following a jury trial, and the Fifth Circuit affirmed, holding that the county was properly found liable based on Moore's decision to hire Burns.

*Held:* The county is not liable for Sheriff Moore's isolated decision to hire Burns without adequate screening, because respondent has not demonstrated that the decision reflected a conscious disregard for a high risk that Burns would use excessive force in violation of respondent's federally protected right.

Pp. 1387-1394.

(a) A municipality may not be held liable under § 1983 solely because it employs a tortfeasor, see, *e.g., Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611. Instead, the plaintiff must identify a municipal "policy" or "custom" that caused the injury. See, *e.g., Pembaur v. Cincinnati,* 475 U.S. 469, 480-481, 106 S.Ct. 1292, 1298-1299, 89 L.Ed.2d 452. Contrary to respondent's contention, a "policy" giving rise to liability cannot be established merely by identifying a policymaker's conduct that is properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. See *Monell, supra,* at 694, 98 S.Ct., at 2027. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. Pp. 1387-1388.

**\*398** b) Respondent's claim that a policymaker's single facially lawful hiring decision can trigger municipal liability presents difficult problems of proof. This Court has recognized a § 1983 cause of action based on a single decision attributable to a municipality only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation. See, *e.g., Pembaur, supra,* at 481, 106 S.Ct., at 1299. In relying heavily on *Pembaur,* respondent blurs the distinction between § 1983 cases that present no difficult fault and causation questions and those that do. Claims such as the present, which do not involve an allegation that the municipal action itself violated federal law or directed or authorized the deprivation of federal rights, require application of rigorous culpability and causation standards in order to ensure that the municipality is not held liable solely for its employees' actions. In *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, for example, the Court held that a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action-there, an allegedly inadequate training *program*-has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was not simply negligent, but was taken with "deliberate indifference" as to its known or obvious consequences. *Id.,* at 388, 109 S.Ct., at 1204. Respondent's reliance on *Canton* for an analogy between failure-to-train cases and inadequate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                      Page 5
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

screening cases is not persuasive. In leaving open the possibility that municipal liability could be triggered by evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, *id.,* at 390, and n. 10, 109 S.Ct., at 1205 and n. 10, the *Canton* Court simply hypothesized that, in this narrow range of circumstances, the violation may be a highly predictable consequence of the failure to train and thereby justify a finding of "deliberate indifference" by policymakers. Predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult. Only where adequate scrutiny of the applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference." Neither the District Court nor the Court of Appeals directly tested whether Burns' background made his use of excessive force in making an arrest a plainly obvious consequence of the hiring decision. Pp. 1388-1392.

**\*\*1386** (c) Even assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, Moore's failure to scrutinize Burns' record cannot constitute "deliberate indifference"**\*399** to respondent's federally protected right to be free from the use of excessive force. To test the link between Moore's action and respondent's injury, it must be asked whether a full review of Burns' record reveals that Moore should have concluded that Burns' use of excessive force would be a plainly obvious consequence of his decision to hire Burns. Respondent's showing on this point was inadequate because the primary infractions on which she relies to prove Burns' propensity for violence arose from a single college fight. A full review of Burns' record might well have led Moore to conclude that Burns was an extremely poor deputy candidate, but he would not necessarily have reached that decision *because* Burns' use of excessive force would have been a plainly obvious consequence of the decision to hire him. The District Court therefore erred in submitting the inadequate screening theory to the jury. Pp. 1392-1394.

67 F.3d 1174 (CA5), vacated and remanded.

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, J., and BREYER, JJ., joined, *post,* p. 1394. BREYER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post,* p. 1401.

Wallace B. Jefferson, San Antonio, TX, for petitioner.
Brian Serr, Waco, TX, for respondents.For U.S. Supreme Court briefs, see:1996 WL 345580 (Pet.Brief)1996 WL 419725 (Resp.Brief)1996 WL 484436 (Reply.Brief)

Justice O'CONNOR delivered the opinion of the Court.

Respondent Jill Brown brought a claim for damages against petitioner Bryan County under Rev. Stat. § 1979, 42 U.S.C. § 1983. She alleged that a county police officer used **\*400** excessive force in arresting her, and that the county itself was liable for her injuries based on its sheriff's hiring and training decisions. She prevailed on her claims against the county following a jury trial, and the Court of Appeals for the Fifth Circuit affirmed the judgment against the county on the basis of the hiring claim alone. 67 F.3d 1174 (1995). We granted certiorari. We conclude that the Court of Appeals' decision cannot be squared with our recognition that, in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the "moving force" behind the plaintiff's deprivation of federal rights. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2027, 56 L.Ed.2d 611 (1978).

I

In the early morning hours of May 12, 1991, Jill Brown (hereinafter respondent) and her husband were driving from Grayson County, Texas, to their home in Bryan County, Oklahoma. After crossing into Oklahoma, they approached a police checkpoint. Mr. Brown, who was driving, decided to avoid the checkpoint and return to Texas. After seeing the Browns' truck turn away from the checkpoint, Bryan County Deputy Sheriff Robert Morrison and Reserve Deputy Stacy Burns pursued the vehicle. Although the parties' versions of events differ, at trial both deputies claimed that their patrol car reached speeds

117 S.Ct. 1382                                                                                                                           Page 6
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

in excess of 100 miles per hour. Mr. Brown testified that he was unaware of the deputies' attempts to overtake him. The chase finally ended four miles south of the police checkpoint.

After he got out of the squad car, Deputy Sheriff Morrison pointed his gun toward the Browns' vehicle and ordered the Browns to raise their hands. Reserve Deputy Burns, who was unarmed, rounded the corner of the vehicle on the passenger's side. Burns twice ordered respondent from the vehicle. When she did not exit, he used an "arm bar" technique, grabbing respondent's arm at the wrist and elbow, **\*401** pulling her from the vehicle,**\*\*1387** and spinning her to the ground. Respondent's knees were severely injured, and she later underwent corrective surgery. Ultimately, she may need knee replacements.

Respondent sought compensation for her injuries under 42 U.S.C. § 1983 and state law from Burns, Bryan County Sheriff B.J. Moore, and the county itself. Respondent claimed, among other things, that Bryan County was liable for Burns' alleged use of excessive force based on Sheriff Moore's decision to hire Burns, the son of his nephew. Specifically, respondent claimed that Sheriff Moore had failed to adequately review Burns' background. Burns had a record of driving infractions and had pleaded guilty to various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness. Oklahoma law does not preclude the hiring of an individual who has committed a misdemeanor to serve as a peace officer. See Okla. Stat., Tit. 70, § 3311(D)(2)(a) (1991) (requiring that the hiring agency certify that the prospective officer's records do not reflect a felony conviction). At trial, Sheriff Moore testified that he had obtained Burns' driving record and a report on Burns from the National Crime Information Center, but had not closely reviewed either. Sheriff Moore authorized Burns to make arrests, but not to carry a weapon or to operate a patrol car.

In a ruling not at issue here, the District Court dismissed respondent's § 1983 claim against Sheriff Moore prior to trial. App. 28. At the close of respondent's case and again at the close of all of the evidence, Bryan County moved for judgment as a matter of law. As to respondent's claim that Sheriff Moore's decision to hire Burns triggered municipal liability,

the county argued that a single hiring decision by a municipal policymaker could not give rise to municipal liability under § 1983. *Id.,* at 59-60. **\*402** The District Court denied the county's motions. The court also overruled the county's objections to jury instructions on the § 1983 claim against the county. *Id.,* at 125-126, 132.

To resolve respondent's claims, the jury was asked to answer several interrogatories. The jury concluded that Stacy Burns had arrested respondent without probable cause and had used excessive force, and therefore found him liable for respondent's injuries. It also found that the "hiring policy" and the "training policy" of Bryan County "in the case of Stacy Burns as instituted by its policymaker, B.J. Moore," were each "so inadequate as to amount to deliberate indifference to the constitutional needs of the Plaintiff." *Id.,* at 135. The District Court entered judgment for respondent on the issue of Bryan County's § 1983 liability. The county appealed on several grounds, and the Court of Appeals for the Fifth Circuit affirmed. 67 F.3d 1174 (1995). The court held, among other things, that Bryan County was properly found liable under § 1983 based on Sheriff Moore's decision to hire Burns. *Id.,* at 1185. The court addressed only those points that it thought merited review; it did not address the jury's determination of county liability based on inadequate training of Burns, *id.,* at 1178, nor do we. We granted certiorari, 517 U.S. 1154, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996), to decide whether the county was properly held liable for respondent's injuries based on Sheriff Moore's single decision to hire Burns. We now reverse.

II

[1] Title 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured**\*403** in an action at law, suit in equity, or other proper proceeding for redress."

We held in *Monell v. New York City Dept. of Social Servs.,* 436 U.S., at 689, 98 S.Ct., at 2035, that municipalities and other local governmental bodies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                           Page 7
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

are "persons" within the **1388 meaning of § 1983. We also recognized that a municipality may not be held liable under § 1983 solely because it employs a tortfeasor. Our conclusion rested partly on the language of § 1983 itself. In light of the statute's imposition of liability on one who "subjects [a person], or causes [that person] to be subjected," to a deprivation of federal rights, we concluded that it "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.,* at 692, 98 S.Ct., at 2036. Our conclusion also rested upon the statute's legislative history. As stated in *Pembaur v. Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others* " (citing *Monell, supra,* at 665-683, 98 S.Ct., at 2022-2032). We have consistently refused to hold municipalities liable under a theory of *respondeat superior.* See *Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985) (plurality opinion); *id.,* at 828, 105 S.Ct., at 2438 (opinion of BRENNAN, J.); *Pembaur, supra,* at 478-479, 106 S.Ct., at 1297-1298; *St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality opinion); *id.,* at 137, 108 S.Ct., at 931 (opinion of BRENNAN, J.); *Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).

[2] Instead, in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. See *Monell, supra,* at 694, 98 S.Ct., at 2027; *Pembaur, supra,* at 480-481, 106 S.Ct., at 1298-1299; *Canton, supra,* at 389, 109 S.Ct., at 1205. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts **404** may fairly be said to be those of the municipality. *Monell, supra,* at 694, 98 S.Ct., at 2027. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. 436 U.S., at 690-691, 98 S.Ct., at 2035-2036 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613-1614, 26 L.Ed.2d

142 (1970)).

[3] The parties join issue on whether, under *Monell* and subsequent cases, a single hiring decision by a county sheriff can be a "policy" that triggers municipal liability. Relying on our decision in *Pembaur,* respondent claims that a single act by a decisionmaker with final authority in the relevant area constitutes a "policy" attributable to the municipality itself. So long as a § 1983 plaintiff identifies a decision properly attributable to the municipality, respondent argues, there is no risk of imposing *respondeat superior* liability. Whether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time is immaterial. Rather, under respondent's theory, identification of an act of a proper municipal decisionmaker is all that is required to ensure that the municipality is held liable only for its own conduct. The Court of Appeals accepted respondent's approach.

[4] As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

[5][6][7][8] Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.**405** Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. **1389*Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complains.

[9] Sheriff Moore's hiring decision was itself legal, and Sheriff Moore did not authorize Burns to use excessive force. Respondent's claim, rather, is that a single facially lawful hiring decision can launch a series of events that ultimately cause a violation of federal rights. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. See *Canton, supra,* 489 U.S., at 391-392, 109 S.Ct., at 1206-1207; *Tuttle, supra,* at 824, 105 S.Ct., at 2436 (plurality opinion). See also *Springfield v. Kibbe,* 480 U.S. 257, 270-271, 107 S.Ct. 1114, 1121-1122, 94 L.Ed.2d 293 (1987) (*per curiam*) (dissent from dismissal of writ as improvidently granted).

[10] In relying heavily on *Pembaur,* respondent blurs the distinction between § 1983 cases that present no difficult questions of fault and causation and those that do. To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation. For example, *Owen v. Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), and *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), involved formal decisions of municipal legislative bodies. In *Owen,* the city council allegedly censured and discharged an employee without a hearing. 445 U.S., at 627-629, 633, and n. 13, 100 S.Ct., at 1403-1404, 1406, and n. 13. In *Fact Concerts,* the city council canceled a license permitting a concert following a dispute over the performance's content. 453 U.S., at 252, 101 S.Ct., at 2752. Neither decision reflected implementation of a generally applicable rule. But we did not question that each decision, duly promulgated by city lawmakers, could trigger municipal liability if the decision itself were found to be unconstitutional. Because fault and causation were obvious in each case, proof that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury.

Similarly, *Pembaur v. Cincinnati* concerned a decision by a county prosecutor, acting as the county's final decisionmaker, *475 U.S., at 485, 106 S.Ct., at 1301,* to direct county deputies to forcibly enter petitioner's place of business to serve *capiases* upon third parties. Relying on *Owen* and *Newport,* we concluded that a final decisionmaker's adoption of a course of action "tailored to a particular situation and not intended to control decisions in later situations" may, in some circumstances, give rise to municipal liability under § 1983. 475 U.S., at 481, 106 S.Ct., at 1299. In *Pembaur,* it was not disputed that the prosecutor had specifically directed the action resulting in the deprivation of petitioner's rights. The conclusion that the decision was that of a final municipal decisionmaker and was therefore properly attributable to the municipality established municipal liability. No questions of fault or causation arose.

[11] Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the **\*407** *employee* acted culpably. We recognized these difficulties in **\*\*1390***Canton v. Harris,* where we considered a claim that inadequate training of shift supervisors at a city jail led to a deprivation of a detainee's constitutional rights. We held that, quite apart from the state of mind required to establish the underlying constitutional violation-in that case, a violation of due process, 489 U.S., at 388-389, n. 8, 109 S.Ct., at 1205, n. 8-a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. *Id.,* at 388, 109 S.Ct., at 1204. A showing of simple or even heightened negligence will not suffice.

We concluded in *Canton* that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." *Id.,* at 387, 109 S.Ct., at 1204. We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. *Id.,* at 390, 109 S.Ct., at 1205. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 9
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the "deliberate indifference"-necessary to trigger municipal liability. *Id.,* at 390, n. 10, 109 S.Ct., at 1205, n. 10 ("It could ... be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *id.,* at 397, 109 S.Ct., at 1209 (o'CONNOR, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ..."). In addition, the existence of a pattern of *408 tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury. See *id.,* at 390-391, 109 S.Ct., at 1205-1206.

Before trial, counsel for Bryan County stipulated that Sheriff Moore "was the policy maker for Bryan County regarding the Sheriff's Department." App. 30. Indeed, the county sought to avoid liability by claiming that its Board of Commissioners participated in no policy decisions regarding the conduct and operation of the office of the Bryan County Sheriff. *Id.,* at 32. Accepting the county's representations below, then, this case presents no difficult questions concerning whether Sheriff Moore has final authority to act for the municipality in hiring matters. Cf. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Respondent does not claim that she can identify any pattern of injuries linked to Sheriff Moore's hiring practices. Indeed, respondent does not contend that Sheriff Moore's hiring practices are generally defective. The only evidence on this point at trial suggested that Sheriff Moore had adequately screened the backgrounds of all prior deputies he hired. App. 106-110. Respondent instead seeks to trace liability to what can only be described as a deviation from Sheriff Moore's ordinary hiring practices. Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high.

Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the *409 plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

**1391 In *Canton,* we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability. 489 U.S., at 390, and n. 10, 109 S.Ct., at 1205, and n. 10 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). Respondent purports to rely on *Canton,* arguing that Burns' use of excessive force was the plainly obvious consequence of Sheriff Moore's failure to screen Burns' record. In essence, respondent claims that this showing of "obviousness" would demonstrate both that Sheriff Moore acted with conscious disregard for the consequences of his action and that the Sheriff's action directly caused her injuries, and would thus substitute for the pattern of injuries ordinarily necessary to establish municipal culpability and causation.

The proffered analogy between failure-to-train cases and inadequate screening cases is not persuasive. In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree *410 of predictability may

117 S.Ct. 1382                                                                    Page 10
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable.

Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, however, there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

[12] In attempting to import the reasoning of *Canton* into the hiring context, respondent ignores the fact that predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult than predicting what might flow from the failure to train a single law enforcement officer as to a specific skill necessary to the discharge of his duties. As our decision in *Canton* makes clear, "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Unlike the risk from a particular glaring omission in a training regimen, the risk from a single instance of inadequate screening of an applicant's background is not "obvious" in the abstract; rather, it depends upon the background of the applicant. A lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly. But that is only a generalized showing of risk. The fact that inadequate scrutiny of an applicant's background would make a violation of rights *likely* cannot alone **\*411** give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation. After all, a full screening of an applicant's background might reveal no cause for concern at all; if so, a hiring official who failed to scrutinize the applicant's background cannot be said to have consciously disregarded an obvious risk **\*\*1392** that the officer would subsequently inflict a particular constitutional injury.

[13] We assume that a jury could properly find in this case that Sheriff Moore's assessment of Burns' background was inadequate. Sheriff Moore's own testimony indicated that he did not inquire into the underlying conduct or the disposition of any of the misdemeanor charges reflected on Burns' record before hiring him. But this showing of an instance of inadequate screening is not enough to establish "deliberate indifference." In layman's terms, inadequate screening of an applicant's record may reflect "indifference" to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the *relevant* "indifference." A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

Neither the District Court nor the Court of Appeals directly tested the link between Burns' actual background and the risk that, if hired, he would use excessive force. The District Court instructed the jury on a theory analogous to that reserved in *Canton.* The court required respondent to prove that Sheriff Moore's inadequate screening of Burns' background was "so likely to result in *violations of constitutional*\*412 *rights* " that the Sheriff could "reasonably [be] said to have been deliberately indifferent to the *constitutional needs* of the Plaintiff." App. 123 (emphasis added). The court also instructed the jury, without elaboration, that respondent was required to prove that the "inadequate hiring ... policy directly caused the Plaintiff's injury." *Ibid.*

[14] As discussed above, a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong. What the District Court's instructions on culpability, and therefore the jury's finding of municipal liability, failed to capture is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 11
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

whether Burns' background made his use of excessive force in making an arrest a plainly obvious consequence of the hiring decision. The Court of Appeals' affirmance of the jury's finding of municipal liability depended on its view that the jury could have found that "inadequate screening of *a deputy* could likely result in the violation of *citizens' constitutional rights.*" 67 F.3d, at 1185 (emphasis added). Beyond relying on a risk of violations of unspecified constitutional rights, the Court of Appeals also posited that Sheriff Moore's decision reflected indifference to "the public's welfare." *Id.,* at 1184.

Even assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, the evidence in this case was insufficient to support a finding that, in hiring Burns, Sheriff Moore disregarded a known or obvious risk of injury. To test the link between Sheriff Moore's hiring decision and respondent's injury, we must ask whether a full review of Burns' record reveals that Sheriff Moore should have concluded that Burns' use of excessive force would be a plainly obvious consequence of the *413 hiring decision.[FN1] On this point, **1393 respondent's showing was inadequate. To be sure, Burns' record reflected various misdemeanor infractions. Respondent claims that the record demonstrated such a strong propensity for violence that Burns' application of excessive force was highly likely. The primary charges on which respondent relies, however, are those arising from a fight on a college campus where Burns was a student. In connection with this single incident, Burns was charged with assault and battery, resisting arrest, and public drunkenness.[FN2] In January 1990, when he pleaded *414 guilty to those charges, Burns also pleaded guilty to various driving-related offenses, including nine moving violations and a charge of driving with a suspended license. In addition, Burns had previously pleaded guilty to being in actual physical control of a vehicle while intoxicated.

FN1. In suggesting that our decision complicates this Court's § 1983 municipal liability jurisprudence by altering the understanding of culpability, Justice SOUTER and Justice BREYER misunderstand our approach. *Post,* at 1397; *post,* at 1401, 1403. We do not suggest that a plaintiff in an inadequate screening case must show a higher degree of culpability than the "deliberate indifference" required in

*Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); we need not do so, because, as discussed below, respondent has not made a showing of deliberate indifference here. See *infra,* at 1392-1393. Furthermore, in assessing the risks of a decision to hire a particular individual, we draw no distinction between what is "so obvious" or "so likely to occur" and what is "plainly obvious." The difficulty with the lower courts' approach is that it fails to connect the background of the particular officer hired in this case to the particular constitutional violation the respondent suffered. *Supra,* at 1392. Ensuring that lower courts link the background of the officer to the constitutional violation alleged does not complicate our municipal liability jurisprudence with degrees of "obviousness," but seeks to ensure that a plaintiff in an inadequate screening case establishes a policymaker's deliberate indifference-that is, conscious disregard for the known and obvious consequences of his actions.

FN2. Justice SOUTER implies that Burns' record reflected assault and battery charges arising from more than one incident. *Post,* at 1400. There has never been a serious dispute that a single misdemeanor assault and battery conviction arose out of a single campus fight. Nor did petitioner's expert testify that the record reflected any assault charge without a disposition, see 9 Record 535-536, although Justice SOUTER appears to suggest otherwise, *post,* at 1400, n. 6. In fact, respondent's own expert witness testified that Burns' record reflected a single assault conviction. 7 Record 318; see also *id.,* at 320. Petitioner has repeatedly so claimed. See, *e.g.,* Suggestion for Rehearing En Banc in No. 93-5376 (CA5), p. 12 ("Burns had one misdemeanor assault conviction stemming from a campus fight"); Pet. for Rehearing of Substituted Opinion in No. 93-5376 (CA5), p. 11 (same); 3 Record 927 (Brief in Support of Defendants' Motion for Judgment Notwithstanding the Verdict 10); Pet. for Cert. 16 ("Burns pled guilty to assault and battery" as a result of "one campus fight").
Respondent has not once contested this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                          Page 12
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

characterization. See, *e.g.,* 3 Record 961 (Brief in Support of Plaintiff's Response to Defendants' Motion for Judgment Notwithstanding the Jury Verdict 4); Brief for Appellee/Cross-Appellant Brown et al. in No. 93-5376 (CA5), pp. 3-4; Brief in Opposition 1. Indeed, since the characterization is reflected in the county's petition for certiorari, under this Court's Rule 15(2) respondent would have had an obligation in her brief in opposition to correct "any perceived misstatement" in the petition. She did not. Involvement in a single fraternity fracas does not demonstrate "a proclivity to violence against the person." *Post,* at 1400, n. 6.

The fact that Burns had pleaded guilty to traffic offenses and other misdemeanors may well have made him an extremely poor candidate for reserve deputy. Had Sheriff Moore fully reviewed Burns' record, he might have come to precisely that conclusion. But unless he would necessarily have reached that decision *because* Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision, Sheriff Moore's inadequate scrutiny of Burns' record cannot constitute "deliberate indifference" to respondent's federally protected right to be free from a use of excessive force.

Justice SOUTER's reading of the case is that the jury believed that Sheriff Moore in fact read Burns' entire record. *Post,* at 1399. That is plausible, but it is also irrelevant. It is not sufficient for respondent to show that Sheriff Moore read Burns' record and therefore hired Burns with knowledge of his background. Such a decision may reflect indifference**415** to Burns' *record,* but what is required is deliberate indifference to a plaintiff's constitutional right. That is, whether Sheriff Moore failed to examine Burns' record, partially examined it, or fully examined it, Sheriff Moore's hiring decision could not have been "deliberately indifferent" unless in light of that record Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision. Because there was insufficient evidence on which a jury could base a finding that Sheriff Moore's decision to hire Burns reflected conscious disregard of an obvious risk that a use of excessive force would follow, the District Court erred in submitting respondent's inadequate screening claim to the jury.

III

[15] Cases involving constitutional injuries allegedly traceable to an ill-considered **\*\*1394** hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose. Cf. *Canton v. Harris,* 489 U.S., at 392, 109 S.Ct., at 1206. Bryan County is not liable for Sheriff Moore's isolated decision to hire Burns without adequate screening, because respondent has not demonstrated that his decision reflected a conscious disregard for a high risk that Burns would use excessive force in violation of respondent's federally protected**\*416** right. We therefore vacate the judgment of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOUTER, with whom Justice STEVENS and Justice BREYER join, dissenting.

In *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), we held a municipality liable under 42 U.S.C. § 1983 for harm caused by the single act of a policymaking officer in a matter within his authority but not covered by a policy previously identified. The central question presented here is whether that rule applies to a single act that itself neither violates nor commands a violation of federal law. The answer is yes if the single act amounts to deliberate indifference to a substantial risk that a violation of federal law will result. With significant qualifications, the Court assumes so, too, in theory, but it raises such skeptical hurdles to reaching any such conclusion in practice that it virtually guarantees its disposition of this case: it holds as a matter of law that the sheriff's act could not be thought to reflect deliberate indifference to the risk that his subordinate would violate the Constitution by using excessive force. I respectfully

117 S.Ct. 1382                                                                                                    Page 13
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
(Cite as: 520 U.S. 397, 117 S.Ct. 1382)

dissent as much from the level of the Court's skepticism as from its reversal of the judgment.

I

_Monell v. New York City Dept. of Social Servs.,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), overruled _Monroe v. Pape,_ 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as _Monroe_ had held § 1983 inapplicable to governments beneath the state level ("municipal," for short). _Monell, supra,_ at 663, 98 S.Ct., at 2022.   At the same time that we decided Congress meant municipalities to be persons subject to § 1983, however, we also concluded that municipal liability under the statute could not be based on the traditional theory of _respondeat superior._ 436 U.S., at 691, 98 S.Ct., at 2036.  We said that for **417** purposes of § 1983 an act could not be attributed to a municipality merely because it was an act of a municipal agent performed in the course of exercising a power delegated to the municipality by local law, and we reasoned instead that "it is [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." _Id.,_ at 694, 98 S.Ct., at 2037-2038;  see _Pembaur, supra,_ at 480, 106 S.Ct., at 1298.

In assigning municipal liability under _Monell,_ we accordingly distinguish an act of a municipal agent without independent authority to establish policy from the act of one authorized to set policy under local law, and we likewise distinguish the acts of lower level employees depending on whether they do or do not implement or manifest a policy set by those with the authority to set it.    The act of the municipality is the act only of an authorized policymaker or of an employee following the policymaker's lead.    "The 'official policy' requirement was intended to distinguish acts of the _municipality_ from acts of _employees_ of the municipality, and thereby **1395** make clear that municipal liability is limited to action for which the municipality is actually responsible." _Pembaur, supra,_ at 479-480, 106 S.Ct., at 1298.

While this overview indicates that the policy requirement may be satisfied in more than one way, there are in fact three alternatives discernible in our prior cases.   It is certainly met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.    _Monell_ exemplified these circumstances, where city agencies had issued a rule requiring pregnant employees to take unpaid leaves of absence before any medical need arose. _Monell, supra,_ at 660-661, 98 S.Ct., at 2020-2021.

We have also held the policy requirement satisfied where no rule has been announced as "policy" but federal law has **418** been violated by an act of the policymaker itself.   In this situation, the choice of policy and its implementation are one, and the first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting.   See _Pembaur, supra,_ at 480-481, 106 S.Ct., at 1298-1299;  cf.  _Newport v. Fact Concerts, Inc.,_ 453 U.S. 247, 250-252, 101 S.Ct. 2748, 2751-2752, 69 L.Ed.2d 616 (1981) (implicitly assuming that a policymaker's single act can sustain § 1983 action); _Owen v. Independence,_ 445 U.S. 622, 625-630, 100 S.Ct. 1398, 1402-1405, 63 L.Ed.2d 673 (1980) (same).   It does not matter that the policymaker may have chosen "a course of action tailored [only] to a particular situation and not intended to control decisions in later situations." _Pembaur,_ 475 U.S., at 481, 106 S.Ct., at 1299;  if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, "it surely represents an act of official government 'policy' " and "the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly," _ibid._

We have, finally, identified a municipal policy in a third situation, even where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." _Canton v. Harris,_ 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).   Where, in the most obvious example, the policymaker sits on his hands after repeated, unlawful acts of subordinate officers and that failure "evidences a 'deliberate indifference' to the rights of [the municipality's] inhabitants," _id.,_ at 389, 109 S.Ct., at 1205, the policymaker's toleration of the subordinates' behavior establishes a policy-in-practice just as readily attributable to the municipality as the one-act policy-in-practice described above. Such a policy choice may be inferred even without a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                         Page 14
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference. *Id., at 390, n. 10, 109 S.Ct., at 1205, n. 10.*

**\*419** Deliberate indifference is thus treated, as it is elsewhere in the law,[FN1] as tantamount to intent, so that inaction by a policymaker deliberately indifferent to a substantial risk of harm is equivalent to the intentional action that setting policy presupposes. Compare *Pembaur, supra, at 483, 106 S.Ct., at 1300* (plurality opinion of Brennan, J.) ("deliberate **\*\*1396** choice" by policymaker), and *Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)* (plurality opinion of rEHNQUIST, J.) (" 'policy' generally implies a course of action consciously chosen"), with *Canton, supra, at 389, 109 S.Ct., at 1205* ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom' ... actionable under § 1983").

> FN1. See, *e.g.,* American Law Institute, Model Penal Code § 2.02(2)(c) (1985) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct"); *J.I. Case Credit Corp. v. First Nat. Bank of Madison Cty., 991 F.2d 1272, 1278 (C.A.7 1993)* ("To consciously ignore or to deliberately close one's eyes to a manifest danger is recklessness, a mental state that the law commonly substitutes for intent or actual knowledge"). Cf. *Estelle v. Gamble, 429 U.S. 97, 105-106, 97 S.Ct. 285, 291-292, 50 L.Ed.2d 251 (1976)* (deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment); *United States v. Giovannetti, 919 F.2d 1223, 1228 (C.A.7 1990)* (a "deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires"); *United States v. Jewell, 532 F.2d 697, 700(CA9),* cert. denied, *426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976)* ("[D]eliberate ignorance and positive knowledge are equally culpable").

Under this prior law, Sheriff Moore's failure to screen out his 21-year-old great-nephew Burns on the basis of his criminal record, and the decision instead to authorize Burns to act as a deputy sheriff, constitutes a policy choice attributable to Bryan County under § 1983. There is no serious dispute that Sheriff Moore is the designated policymaker for implementing the sheriff's law enforcement powers and recruiting officers to exercise them, or that he "has final authority to act for the municipality in hiring matters." *Ante,* at 1390. As the authorized policymaker, Sheriff Moore is the county **\*420** for purposes of § 1983 municipal liability arising from the sheriff's department's exercise of law enforcement authority. As I explain in greater detail below, it was open to the jury to find that the sheriff knew of the record of his nephew's violent propensity, but hired him in deliberate indifference to the risk that he would use excessive force on the job, as in fact he later did. That the sheriff's act did not itself command or require commission of a constitutional violation (like the order to perform an unlawful entry and search in *Pembaur* ) is not dispositive under § 1983, for we have expressly rejected the contention that "only unconstitutional policies are actionable" under § 1983, *Canton, supra,* at 387, 109 S.Ct., at 1204, and have never suggested that liability under the statute is otherwise limited to policies that facially violate other federal law. The sheriff's policy choice creating a substantial risk of a constitutional violation therefore could subject the county to liability under existing precedent.[FN2]

> FN2. Given the sheriff's position as law enforcement policymaker, it is simply off the point to suggest, as the Court does, that there is some significance in either the fact that Sheriff Moore's failure to screen may have been a "deviation" from his ordinary hiring practices or that a pattern of injuries resulting from his past practices is absent. See *ante,* at 1390. *Pembaur* made clear that a single act by a designated policymaker is sufficient to establish a municipal policy, see *Pembaur v. Cincinnati, 475 U.S. 469, 480-481, 106 S.Ct. 1292, 1298-1299, 89 L.Ed.2d 452 (1986),* and *Canton* explained, as the Court recognizes, see *ante,* at 1390-1391, that evidence of a single violation of federal rights can trigger municipal liability under § 1983, see *Canton v. Harris, 489 U.S. 378, 390, n. 10, 109 S.Ct. 1197, 1205, n. 10, 103 L.Ed.2d 412 (1989).* See Part II-B, *infra.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                      Page 15
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

## II

At the level of theory, at least, the Court does not disagree, and it assumes for the sake of deciding the case that a single, facially neutral act of deliberate indifference by a policymaker could be a predicate to municipal liability if it led to an unconstitutional injury inflicted by subordinate officers. See *ante,* at 1392. At the level of practice, however, the tenor of the Court's opinion is decidedly different: it suggests that **\*421** the trial court insufficiently appreciated the specificity of the risk to which such indifference must be deliberate in order to be actionable; it expresses deep skepticism that such appreciation of risk could ever reasonably be attributed to the policymaker who has performed only a single unsatisfactory, but not facially unconstitutional, act; and it finds the record insufficient to make any such showing in this case. The Court is serially mistaken. This case presents no occasion to correct or refine the District Court's jury instructions on the degree of risk required for deliberate indifference; the Court's skepticism converts a newly demanding formulation of the standard of fault into a virtually categorical impossibility of showing it in a case like this; and the record in this case is perfectly sufficient to support the jury's verdict even on the Court's formulation of the high degree of risk that must be shown.

## A

The Court is certainly correct in emphasizing the need to show more than mere negligence on the part of the policymaker, for at **\*\*1397** the least the element of deliberateness requires both subjective appreciation of a risk of unconstitutional harm, and a risk substantial enough to justify the heightened responsibility that deliberate indifference generally entails. The Court goes a step further, however, in requiring that the "particular" harmful consequence be "plainly obvious" to the policymaker, *ante,* at 1392, a characterization of deliberate indifference adapted from dicta set forth in a footnote in *Canton,* see 489 U.S., at 390, n. 10, 109 S.Ct., at 1205, n. 10. *Canton,* as mentioned above, held that a municipal policy giving rise to liability under § 1983 may be inferred even when the policymaker has failed to act affirmatively at all, so long as a need to control the agents of the government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." *Id.,* at 390, 109

S.Ct., at 1205. While we speculated in *Canton* that **\*422** "[i]t could ... be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need," see *id.,* at 390, n. 10, 109 S.Ct., at 1205, n. 10, we did not purport to be defining the fault of deliberate indifference universally as the failure to act in relation to a "plainly obvious consequence" of harm. Nor did we, in addressing the requisite risk that constitutional violations will occur, suggest that the deliberate indifference necessary to establish municipal liability must be, as the Court says today, indifference to the particular constitutional violation that in fact occurred.

The Court's formulation that deliberate indifference exists only when the risk of the subsequent, particular constitutional violation is a plainly obvious consequence of the hiring decision, see *ante,* at 1392, while derived from *Canton,* is thus without doubt a new standard. See *post,* at 1402-1403 (BREYER, JJJJJJJJJJJJ., dissenting). As to the "particular" violation, the Court alters the understanding of deliberate indifference as set forth in *Canton,* where we spoke of constitutional violations generally.[FN3] As to "plainly obvious consequence," the Court's standard appears to be somewhat higher, for example, than the standard for "reckless" fault in the criminal law, where the requisite indifference to risk is defined as that which "consciously disregards a substantial and unjustifiable risk that the material element exists or will result ... [and] involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." See American Law Institute, Model Penal Code § 2.02(2)(c) (1985).

> FN3. The Court's embellishment on the deliberate indifference standard is, in any case, no help in resolving this case because there has never been any suggestion that Deputy Burns's criminal background, including charges of assault and battery, indicated that he would commit a constitutional violation different from the one he in fact committed.

**\*423** That said, it is just possible that our prior understanding of the requisite degree of fault and the standard as the Court now states it may in practice turn out to amount to much the same thing, but I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 16
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

would have preferred an argument addressing the point before ruling on it. There was, however, no such argument here for the simple reason that petitioner never asked that deliberate indifference be defined to occur only when the particular constitutional injury was the plainly obvious consequence of the policymaker's act. Petitioner merely asked the District Court to instruct the jury to determine whether Sheriff Moore acted with "conscious indifference," see 2 Record 342, and made no objection to the District Court's charge that "Sheriff B.J. Moore would have acted with deliberate indifference in adopting an otherwise constitutional hiring policy for a deputy sheriff if the need for closer scrutiny of Stacy Burns' background was so obvious and the inadequacy of the scrutiny given so likely to result in violations of constitutional rights, that Sheriff B.J. Moore can be reasonably said to have been deliberately indifferent to the constitutional needs of the Plaintiff." 10 Record 800-801. If, as it appears, today's standard does raise the threshold of municipal liability, it does so quite independently**1398 of any issue posed or decided in the trial court.

### B

The Court's skepticism that the modified standard of fault can ever be met in a single-act case of inadequate screening without a patently unconstitutional policy, *ante,* at 1392-1393, both reveals the true value of the assumption that in theory there might be municipal liability in such a case, and dictates the result of the Court's review of the record in the case before us. It is skepticism gone too far.

It is plain enough that a facially unconstitutional policy is likely to produce unconstitutional injury, see, *e.g., Pembaur,* 475 U.S., at 480-481, 106 S.Ct., at 1298-1299; *Monell,* 436 U.S., at 660-661, 98 S.Ct., at 2020-2021, and obvious, too, that many facially neutral policy decisions evince **424 no such clear portents. Written standards for hiring law enforcement personnel might be silent on the significance of a prior criminal record without justifying much worry about employing axe murderers (who are unlikely to apply) or subjecting the public to attacks by someone with a 30-year-old assault conviction (who has probably grown up). But a policymaker need not mandate injury to be indifferent to its risk when obvious, and, because a particular hiring decision may raise a very high probability of harm down the line, it simply ignores

the issue before us to lump together in one presumptively benign category every singular administrative act of a policymaker that does not expressly command or constitute unconstitutional behavior. Thus, a decision to give law enforcement authority to a scofflaw who had recently engaged in criminal violence presents a very different risk from hiring someone who once drove an overweight truck. While the decision to hire the violent scofflaw may not entail harm to others as unquestionably as an order to "go out and rough-up some suspects," it is a long way from neutral in the risk it creates.

While the Court should rightly be skeptical about predicating municipal or individual liability merely on a failure to adopt a crime-free personnel policy or on a particular decision to hire a guilty trucker, why does it extend that valid skepticism to the quite unsound point of doubting liability for hiring the violent scofflaw? The Court says it fears that the latter sort of case raises a danger of liability without fault, *ante,* at 1390. But if the Court means fault generally (as distinct from the blame imputed on classic *respondeat superior* doctrine), it need only recall that whether a particular violent scofflaw is violent enough or scoffing enough to implicate deliberate indifference will depend on applying the highly demanding standard the Court announces: plainly obvious consequence of particular injury. It is the high threshold of deliberate indifference that will ensure that municipalities be held liable only for considered acts with **425 substantial risks. That standard will distinguish single-act cases with only a mild portent of injury from single-act cases with a plainly obvious portent, and from cases in which the harm is only the latest in a series of injuries known to have followed from the policymaker's action. The Court has fenced off the slippery slope.

A second stated reason of the skeptical majority is that, because municipal liability under *Monell* cannot rest on *respondeat superior, ante,* at 1391, 1394, "a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged," *ante,* at 1391. But that is simply to say that the tortious act must be proximately caused by the policymaker. The policy requirement is the restriction that bars straightforward *respondeat superior* liability, and the need to "test the link" is merely the need to apply the law that defines what a cognizable link is. The restriction on imputed fault that saves municipalities from liability has no need of categorical immunization in single-act cases.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                  Page 17
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

In short, the Court's skepticism is excessive in ignoring the fact that some acts of a policymaker present substantial risks of constitutional harm even though the acts are not unconstitutional *per se.* And the Court's purported justifications for its extreme skepticism are washed out by the very standards employed to limit liability.

C

For demonstrating the extreme degree of the Court's inhospitality to single-act municipal liability, this is a case on point, for even **\*\*1399** under the "plainly obvious consequence" rule the evidence here would support the verdict. There is no dispute that before the incident in question the sheriff ordered a copy of his nephew's criminal record. While the sheriff spoke euphemistically on the witness stand of a "driving record," the scope of the requested documentation included crimes beyond motor vehicle violations and the sheriff\*426 never denied that he knew this. He admitted that he read some of that record; he said he knew it was "long"; he said he was sure he had noticed charges of driving with a suspended license; and he said that he had taken the trouble to make an independent search for any outstanding warrant for Burns's arrest. As he put it, however, he somehow failed to "notice" charges of assault and battery or the list of offenses so long as to point either to contempt for law or to incapacity to obey it. Although the jury might have accepted the sheriff's disclaimer, no one who has read the transcript would assume that the jurors gave any credit to that testimony,[FN4] and it was open to them to find that the sheriff **\*427** was simply lying under oath about his limited perusal. The Court of Appeals noted this possibility, see 67 F.3d 1174, 1184 (C.A.5 1995), which is more likely than any other reading of the evidence. Law enforcement officers, after all, are not characteristically so devoid of curiosity as to lose interest part way through the criminal record of a subject of personal investigation.

FN4. After Sheriff Moore testified that he knew Burns had been charged with driving while intoxicated, the following exchange with respondent's counsel took place:
"Q. And how did you obtain that information?
"A. I don't remember now how I got it.
"Q. Did you make an inquiry with the proper authorities in Oklahoma to get a copy

of Mr. Burns' rap sheet?
"A. I run his driving record, yes.
"Q. All right.   And you can get that rap sheet immediately, can't you?
"A. It don't take long.
"Q. All right.   And did you not see on there where Mr. Burns had been arrested for assault and battery.   Did you see that one on there?
"A. I never noticed it, no.
"Q. Did you notice on there he'd been arrested or charged with [Driving While License Suspended] on several occasions?
. . . . .
"A. I'm sure I did.
"Q. All right.   Did you notice on there that he'd been arrested and convicted for possession of false identification?
"A. No, I never noticed that.
"Q. Did you notice on there where he had been arrested for public drunk?
"A. He had a long record.
"Q. Did you notice on there where he had been arrested for resisting arrest?
"A. No, I didn't.
"Q. Did you make any inquiries after you got that information to determine exactly what the disposition of those charges were?
"A. No, I didn't.
"Q. Did you not make any attempt to find out the status of Mr. Burns' criminal record at that time?
"A. As far as him having a criminal record, I don't believe he had a criminal record.   It was just all driving and-most of it was, misdemeanors.
"Q. Well, did you make any attempts to determine whether or not Mr. Burns was on probation at the time you placed him out there?
"A. I didn't know he was on probation, no.
"Q. Did you make any effort to find out?
"A. I didn't have no idea he was on probation, no.
"Q. Well, you saw on his rap sheet where he had been charged with [Driving Under the Influence], didn't you?
"A. I had heard about that.   I don't remember whether I had seen it on the rap sheet or not.
"Q. So you'd heard about it?
. . . . .
"A. I don't know remember whether I seen it on the rap sheet or heard about it.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                  Page 18
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

"Q. All right. Well, whichever way you, it came to your attention, you didn't check to find out with the proper authorities as to what the disposition of that charge was, did you?

. . . . .

"A. I don't really know. I can't say.

"Q. Did you check to see if Mr. Burns had an arrest warrant out for him?

"A. We-I run him through [the National Crime Information Center] and there wasn't-didn't show no warrant, no." 9 Record 672-675.

If, as is likely, the jurors did disbelieve the sheriff and concluded he had read the whole record, they certainly could have eliminated any possibility that the sheriff's decision to **\*428** employ his relative was an act of mere negligence or poor judgment. He did not even claim, for example, that he thought any assault must have been just a youthful peccadillo magnified out of proportion by the criminal charge, or that he had evaluated the assault as merely eccentric behavior in a young man of sound character, or that he **\*\*1400** was convinced that wild youth had given way to discretion. There being no such evidence of reasonable but mistaken judgment, the jury could readily have found that the sheriff knew his nephew's proven propensities, that he thought the thrust of the evidence was so damaging that he would lie to protect his reputation and the county treasury, and that he simply chose to put a family member on the payroll (the third relative, in fact [FN5]) disregarding the risk to the public.

> FN5. Burns is the son of Sheriff Moore's nephew and Burns's grandfather had been involved with the sheriff's department for 16 years. See 67 F.3d 1174, 1184 (C.A.5 1995).

At trial, petitioner's expert witness stated during cross-examination that Burns's rap sheet listed repeated traffic violations, including driving while intoxicated and driving with a suspended license, resisting arrest, and more than one charge of assault and battery. The witness further testified that Burns pleaded guilty to assault and battery and other charges 16 months before he was hired by Sheriff Moore.[FN6]   **\*429** Respondent's expert witness testified that Burns's arrest record showed a "blatant disregard for the law and problems that may show themselves in abusing the public or using excessive

force," 7 Record 316, and petitioner's own expert agreed that Burns's criminal history should have caused concern. When asked if he would have hired Burns, he replied that it was "doubtful." 9 Record 537. On this evidence, the jury could have found that the string of arrests and convictions revealed "that Burns had [such] a propensity for violence and a disregard for the law," see 67 F.3d, at 1184, n. 20, that his subsequent resort to excessive force was the plainly obvious consequence of hiring him as a law enforcement officer authorized to employ force in performing his duties.

> FN6. The Court points out that Burns had only one conviction for assault and battery, that respondent has never claimed otherwise, and that her expert witness so testified. See *ante*, at 1393, n. 2. This is entirely correct. But the issue here is not what might have been learned by thoroughly investigating Burns's behavior;   the issue is the sufficiency of the evidence to support the jury's finding that the sheriff acted with deliberate indifference when he hired Burns. Specifically, assuming the jury found that the sheriff looked at Burns's criminal record, an assumption the Court acknowledges is "plausible," see *ante*, at 1393, what does the evidence show that the sheriff learned from this examination?   The criminal record was not itself introduced into evidence in written form, but it was, in relevant part, read to the jury by petitioner's expert witness Ken Barnes.   According to Barnes's testimony, this criminal record's list of numerous charges included four references to assault and battery, two of which the witness said were duplicative, though he conceded this was not necessarily so. See 9 Record 532-533. The upshot was that if the jury found that the sheriff looked at the written record, it could have found that he read four separate references to assault and battery charges. That is not to say that four assaults necessarily occurred, but only that the record refers four times to such charges before listing one conviction for assault and battery. Barnes also testified that the record does not contain a disposition for all the charges listed, and that a sheriff reviewing such a record should have investigated further to determine the disposition of such charges. See *id.*, at 536.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-00110-WC    Document 25    Filed 10/31/2006    Page 21 of 145

117 S.Ct. 1382                                                                Page 19
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

In my judgment, the evidence would have been sufficient (under the majority's test) if it had shown no more than one complaint and conviction for assault and battery, given the mixture of charges of resisting an officer, public drunkenness, and multiple traffic offenses over a 4-month period ending only 16 months before Burns was hired. The inference to be drawn would have been that a repeatedly lawless young man had shown a proclivity to violence against the person. But, as it turns out, the evidentiary record is ostensibly more damaging than that.

### III

The county escapes from liability through the Court's untoward application of an enhanced fault standard to a record of inculpatory evidence showing a contempt for constitutional obligations as blatant as the nepotism that apparently occasioned it. The novelty of this escape shows something **\*430** unsuspected (by me, at least) until today. Despite arguments that _Monell_'s policy requirement was an erroneous reading of § 1983, see _Oklahoma City v. Tuttle,_ 471 U.S., at 834, 105 S.Ct., at 2441 (STEVENS, J., dissenting), I had not previously thought that there was sufficient reason to unsettle the precedent of _Monell._ Now it turns out, however, that _Monell_ is hardly settled. That being so, Justice BREYER's powerful call to reexamine § 1983 municipal liability afresh finds support in the Court's own readiness to rethink the matter.

I respectfully dissent.

**\*\*1401** Justice BREYER, with whom Justice STEVENS and Justice GINSBURG join, dissenting. In _Monell v. New York City Dept. of Social Servs.,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), this Court said that municipalities cannot be held liable for constitutional torts under 42 U.S.C. § 1983 "on a _respondeat superior_ theory," but they can be held liable "when execution of" a municipality's "policy or custom ... inflicts the injury." 436 U.S., at 691, 694, 98 S.Ct., at 2036, 2037. That statement has produced a highly complex body of interpretive law. Today's decision exemplifies the law's complexity, for it distinguishes among a municipal action that "_itself_ violates federal law," _ante,_ at 1388, an action that "intentionally deprive[s] a plaintiff of a federally protected right," _ibid.,_ and one that "has caused an employee to do so," _ante,_ at 1389. It then

elaborates this Court's requirement that a consequence be "_so likely_" to occur that a policymaker could "_reasonably be said to have been deliberately indifferent_" with respect to it, _Canton v. Harris,_ 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (emphasis added), with an admonition that the unconstitutional consequence must be "plainly obvious," _ante,_ at 1392. The majority fears that a contrary view of prior precedent would undermine _Monell_'s basic distinction. That concern, however, rather than leading us to spin ever finer distinctions as we try to apply _Monell_'s basic distinction between liability that rests upon policy and liability that is vicarious, suggests **\*431** that we should reexamine the legal soundness of that basic distinction itself.

I believe that the legal prerequisites for reexamination of an interpretation of an important statute are present here. The soundness of the original principle is doubtful. The original principle has generated a body of interpretive law that is so complex that the law has become difficult to apply. Factual and legal changes have divorced the law from the distinction's apparent original purposes. And there may be only a handful of individuals or groups that have significantly relied upon perpetuation of the original distinction. If all this is so, later law has made the original distinction, not simply wrong, but obsolete and a potential source of confusion. Cf., e.g., _Continental T. V., Inc. v. GTE Sylvania Inc.,_ 433 U.S. 36, 47-49, 97 S.Ct. 2549, 2556-2557, 53 L.Ed.2d 568 (1977) (reexamining Sherman Act's interpretation set forth in _United States v. Arnold, Schwinn & Co.,_ 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)); _Hubbard v. United States,_ 514 U.S. 695, 697-715, 115 S.Ct. 1754, 1756-1765, 131 L.Ed.2d 779 (1995) (reexamining interpretation of 18 U.S.C. § 1001 set forth in _United States v. Bramblett,_ 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955)); _Monell,_ supra, at 664-690, 695-701, 98 S.Ct., at 2022-2036, 2038-2041 (reexamining interpretation of 42 U.S.C. § 1983 set forth in _Monroe v. Pape,_ 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). See also _United States v. Gaudin,_ 515 U.S. 506, 521-522, 115 S.Ct. 2310, 2318-2319, 132 L.Ed.2d 444 (1995).

First, consider _Monell_'s original reasoning. The _Monell_ "no vicarious liability" principle rested upon a historical analysis of § 1983 and upon § 1983's literal language-language that imposes liability upon (but only upon) any "person." Justice sTEVENS has clearly explained why neither of these rationales is

117 S.Ct. 1382                                                                    Page 20
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

sound. *Oklahoma City v. Tuttle,* 471 U.S. 808, 834-844, 105 S.Ct. 2427, 2441-2447, 85 L.Ed.2d 791 (1985) (dissenting opinion); *Pembaur v. Cincinnati,* 475 U.S. 469, 489-491, 106 S.Ct. 1292, 1303-1304, 89 L.Ed.2d 452 (1986) (opinion concurring in part and concurring in judgment). Essentially, the history on which *Monell* relied consists almost exclusively of the fact that the Congress that enacted § 1983 rejected an amendment (called the Sherman amendment) that would have made municipalities vicariously liable for the marauding **\*432** acts of *private citizens. Monell, supra,* at 666-667, 694, 98 S.Ct., at 2023-2024, 2037. Cf. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 726-729, 109 S.Ct. 2702, 2718-2720, 105 L.Ed.2d 598 (1989) (plurality opinion). That fact, as Justice sTEVENS and others have pointed out, does not argue against vicarious liability for the act of municipal *employees*-particularly since municipalities, at the time, were vicariously liable for many of the acts of their employees. See **\*\*1402***Tuttle, supra,* at 836, n. 8, 105 S.Ct., at 2444, n. 8 (sTEVENS, J., dissenting) (citing cases); *Pembaur, supra,* at 489-490, 106 S.Ct., at 1303-1304 (sTEVENS, J., concurring in part and concurring in judgment). See also, *e.g.,* Kramer & Sykes, Municipal Liability Under § 1983: A Legal and Economic Analysis, 1987 S.Ct.Rev. 249, 256-265; Mead, 42 U.S.C. § 1983 Municipal Liability: The *Monell* Sketch Becomes a Distorted Picture, 65 N.C.L.Rev. 517, 535-537 (1987). But see Welch & Hofmeister, *Praprotnik,* Municipal Policy and Policymakers: The Supreme Court's Constriction of Municipal Liability, 13 S. Ill. U.L.J. 857, 881 (1989) (adopting *Monell ' s* reading of the legislative history).

Without supporting history, it is difficult to find § 1983's words "[e]very person" inconsistent with *respondeat superior* liability. In 1871 "bodies politic and corporate," such as municipalities, were "person[s]." See Act of Feb. 25, ch. 71, § 2, 16 Stat. 431 (repealed 1939); *Monell, supra,* at 688-689, 98 S.Ct., at 2034-2035. Section 1983 requires that the "person" either "subjec[t]" or "caus[e]" a different person "to be subjected" to a "deprivation" of a right. As a purely linguistic matter, a municipality, which can act only through its employees, might be said to have "subject[ed]" a person or to have "cause[d]" that person to have been "subjected" to a loss of rights when a municipality's employee acts within the scope of his or her employment. See *Restatement (Second) of Agency § 219 (1957);* W. Landes & R. Posner, The Economic Structure of Tort Law 120-121 (1987). Federal courts on occasion have

interpreted the word "person" or the equivalent in other statutes as authorizing forms of vicarious liability. See, *e.g.,* **\*433***American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1429-1434 (C.A.3 1994), cert. denied, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995) (Lanham Act); *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (Sherman Act); *United States v. A & P Trucking Co.,* 358 U.S. 121, 124-125, 79 S.Ct. 203, 206-207, 3 L.Ed.2d 165 (1958) (criminal statute). See also *Tuttle, supra,* at 835, 105 S.Ct., at 2442 (sTEVENS, J., dissenting).

Second, *Monell 's* basic effort to distinguish between vicarious liability and liability derived from "policy or custom" has produced a body of law that is neither readily understandable nor easy to apply. Today's case provides a good example. The District Court in this case told the jury it must find (1) Sheriff Moore's screening "*so likely* to result in violations of constitutional rights" that he could "*reasonably [be] said to have been deliberately indifferent* to the constitutional needs of the Plaintiff" and (2) that the "inadequate hiring ... policy *directly caused* the Plaintiff's injury." App. 123a (emphasis added). This instruction comes close to repeating this Court's language in *Canton v. Harris.* In *Canton,* the Court said (of the city's failure to train officers in the use of deadly force):

"[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy *so likely* to result in the violation of constitutional rights, that the policymakers of the city can *reasonably be said to have been deliberately indifferent* to the need." 489 U.S., at 390, 109 S.Ct., at 1205 (emphasis added).

The majority says that the District Court and the Court of Appeals did not look closely enough at the specific facts of this case. It also adds that the harm must be a "*plainly obvious consequence* " of the "decision to hire" Burns. *Ante,* at 1392. But why elaborate *Canton 's* instruction in this way? The Court's verbal formulation is slightly different; and that being so, a lawyer or judge will ignore the Court's precise **\*434** words at his or her peril. Yet those words, while adding complexity, do not seem to reflect a difference that significantly helps one understand the difference between "vicarious" liability and "policy." Cf. *ante,* at 1396-1397 (sOUTER, J., dissenting). Even if the Court means only that the record evidence does not meet *Canton 's*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-00110-WC    Document 25    Filed 10/31/2006    Page 23 of 145

117 S.Ct. 1382                                                                                    Page 21
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

standard, it will be difficult for juries, and for judges, to understand just why that is so. It will be difficult for them to apply today's elaboration of *Canton*-except perhaps in the limited context of police force **\*\*1403** hiring decisions that are followed by a recruit's unconstitutional conduct.

Consider some of the other distinctions that this Court has had to make as it has sought to distinguish liability based upon policymaking from liability that is "vicarious." It has proved necessary, for example, to distinguish further, between an exercise of *policymaking authority* and an exercise of *delegated discretionary policy-implementing authority*. See *St. Louis v. Praprotnik,* 485 U.S. 112, 126-127, 108 S.Ct. 915, 925-926, 99 L.Ed.2d 107 (1988) (plurality opinion). Compare *Tuttle,* 471 U.S., at 817, 105 S.Ct., at 2432-2433 (plurality opinion), with *Canton, supra,* at 389-390, 109 S.Ct., at 1205-1206. Without some such distinction, "municipal liability [might] collaps[e] into *respondeat superior,*" *ante,* at 1391, for the law would treat similarly (and hold municipalities responsible for) both a police officer's decision about how much force to use when making a particular arrest and a police chief's decision about how much force to use when making a particular *kind* of arrest. But the distinction is not a clear one. It requires federal courts to explore state and municipal law that distributes different state powers among different local officials and local entities. *Praprotnik, supra,* at 125-126, 127-131, 108 S.Ct., at 925-926, 926-928 (plurality opinion); *Jett, supra,* at 737-738, 109 S.Ct., at 2723-2724. That law is highly specialized; it may or may not say just where policymaking authority lies, and it can prove particularly difficult to apply in light of the Court's determination that a decision can be "policymaking" even though it applies only to a single instance. *Pembaur,* 475 U.S., at 481, 106 S.Ct., at 1299. See also **\*435** *Praprotnik, supra,* at 143, 108 S.Ct., at 934 (Brennan, J., concurring in judgment); Schnapper, A *Monell* Update: Clarity, Conflict, and Complications, Practising Law Institute, Litigation and Administrative Practice Series, No. 381, Vol. 2, p. 36 (1989); Schuck, Municipal Liability Under Section 1983: Some Lessons From Tort Law and Organization Theory, 77 Geo. L.J. 1753, 1774-1779 (1989).

It is not surprising that results have sometimes proved inconsistent. Compare *ante,* at 1390 (sheriff was final policymaker in hiring matters), with *Greensboro Professional Fire Fighters Assn., Local 3157 v. Greensboro,* 64 F.3d 962, 965-966 (C.A.4 1995) (fire chief was not policymaker with respect to hiring and firing), and *Harris v. Pagedale,* 821 F.2d 499, 505-508 (CA8) (municipality was deliberately indifferent to charges of sexual assault), cert. denied, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987) with *Wilson v. Chicago,* 6 F.3d 1233, 1240-1241 (C.A.7 1993) (municipal policymaker was not deliberately indifferent to charges of abuse of pretrial detainees), cert. denied, 511 U.S. 1088, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994). See also *Auriemma v. Rice,* 957 F.2d 397, 400-401 (C.A.7 1992) (describing confusion in courts).

Nor does the location of "policymaking" authority pose the only conceptually difficult problem. Lower courts must also decide whether a failure to make policy was "deliberately indifferent," rather than "grossly negligent." *Canton, supra,* at 388, n. 7, 109 S.Ct., at 1205, n. 7. And they must decide, for example, whether it matters that some such failure occurred in the officer-training, rather than the officer-hiring, process. *Ante,* at 1390-1391.

Given the basic *Monell* principle, these distinctions may be necessary, for without them, the Court cannot easily avoid a "municipal liability" that "collaps[es] into *respondeat superior.*" *Ante,* at 1391. But a basic legal principle that requires so many such distinctions to maintain its legal life may not deserve such longevity. See Mead, 65 N.C.L.Rev., at 542 (describing the "confusion and uncertainty" in the lower courts "caused by the *Monell* Court's choice of the **\*436** policy or custom causation requirement"); Schuck, *supra,* at 1783 (noting the "extraordinary unpredictability of the 'official policy' test").

Finally, relevant legal and factual circumstances may have changed in a way that affects likely reliance upon *Monell* 's liability limitation. The legal complexity just described makes it difficult for municipalities to predict just when they will be held liable based upon "policy or custom." Moreover, their potential liability is, in a sense, greater than that of individuals, for they cannot assert the "qualified immunity" defenses that **\*\*1404** individuals may raise. *Owen v. Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Further, many States have statutes that appear to, in effect, mimic *respondeat superior* by authorizing indemnification of employees found liable under § 1983 for actions within the scope of their employment. See, *e.g.,* Conn. Gen.Stat. § 7-465 (1997); Idaho Code § 6-903 (1990); Ill. Comp. Stat., ch. 745, § 10/2-302 (1994); Kan. Stat. Ann. § 75-6109 (1989);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-00110-WC   Document 25   Filed 10/31/2006   Page 24 of 145

117 S.Ct. 1382                                                                                                Page 22
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

Minn.Stat. § 466.07 (1994); Mont.Code Ann. § 2-9-305 (1994); Nev.Rev.Stat. § 41.0349 (1989); N.H.Rev.Stat. Ann. § 29-A:2 (1988); N.D. Cent.Code § 32-12.1-04(4) (Supp.1993); Okla. Stat., Tit. 51, § 162 (Supp.1995); 42 Pa. Cons.Stat. § 8548 (1982); S.D. Codified Laws § 3-19-1 (1994); Utah Code Ann. § 63-30-36 (1993); W. Va.Code § 29-12A-11 (1992); Wis. Stat. § 895.46 (1993-1994). These statutes-valuable to government employees as well as to civil rights victims-can provide for payments from the government that are similar to those that would take place in the absence of *Monell* 's limitations.     To the extent that they do so, municipal reliance upon the continuation of *Monell* 's "policy" limitation loses much of its significance.

Any statement about reliance, of course, must be tentative, as we have not heard argument on the matter.     We do not know the pattern of indemnification: how often, and to what extent, States now indemnify their employees, and which of their employees they indemnify.   I also realize that there may be other reasons, constitutional and otherwise, that I **\*437** have not discussed that argue strongly for reaffirmation of *Monell* 's holding. See, *e.g.*, Gerhardt, The *Monell* Legacy:     Balancing Federalism Concerns and Municipal Accountability under Section 1983, 62 S. Cal. L.Rev. 539 (1989) (discussing federalism);    Nahmod, Constitutional Accountability in Section 1983 Litigation, 68 Iowa L.Rev. 1, 24-25 (1982) (describing *Monell* as having the "proper approach to local government accountability under section 1983" and describing a fault-based interpretation of § 1983);   Welch & Hofmeister, 13 S. Ill. U.L. J., at 883, n. 176 (discussing disadvantages of an "expansive view of municipal liability," including lack of insurance coverage).

Nonetheless, for the reasons I have set forth, I believe the case for reexamination is a strong one. Today's decision underscores this need.     Consequently, I would ask for further argument that would focus upon the continued viability of *Monell* 's distinction between vicarious municipal liability and municipal liability based upon policy and custom.

U.S. (Tex.),1997.
Board of County Com'rs of Bryan County, Okl. v. Brown
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033, 97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405

Briefs and Other Related Documents (Back to top)

• 1996 WL 656502 (Oral Argument) Oral Argument (Nov. 05, 1996)
• 1996 WL 484436 (Appellate Brief) REPLY BRIEF FOR PETITIONER (Aug. 26, 1996)
• 1996 WL 413766 (Appellate Brief) BRIEF OF NOW LEGAL DEFENSE AND EDUCATION FUND, CALIFORNIA WOMEN LAWYERS, CONNECTICUT WOMEN'S EDUCATION AND LEGAL FUND, INC., EQUAL RIGHTS ADVOCATES, NATIONAL COALITION OF 100 BLACK WOMEN, INC., NATIONAL ORGANIZATION FOR WOMEN FOUNDATION, NORTHWEST WO MEN'S LAW CENTER, WOMEN EMPLOYED, WOMEN'S EQUAL RIGHTS LEGAL DEFENSE AND EDUCATION FUND, WOMEN'S LAW PROJECT, AND WOMEN'S LEGAL DEFENSE FUND AS AMICI CURIAE IN SUPPORT OF RESPONDENT (Jul. 24, 1996)
• 1996 WL 419725 (Appellate Brief) BRIEF FOR RESPONDENT (Jul. 24, 1996)
• 1996 WL 341550 (Appellate Brief) BRIEF OF WASHINGTON LEGAL FOUNDATION AND ALLIED EDUCATIONAL FOUNDATION AS AMICI CURIAE IN SUPPORT OF PETITIONER (Jun. 21, 1996)
• 1996 WL 345580 (Appellate Brief) BRIEF FOR PETITIONER (Jun. 21, 1996)
• 1996 WL 345589 (Appellate Brief) BRIEF OF THE NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, U.S. CONFERENCE OF MAYORS, INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION, AND INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION AS AMICI CURIAE IN SUPPORT OF PETITIONER (Jun. 21, 1996)
• 1996 WL 341545 (Appellate Brief) BRIEF FOR AMICUS CURIAE, THE CITY OF NEW YORK (Jun. 20, 1996)
• 1996 WL 33413821 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jan. 05, 1996) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:58:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | SCTFIND |
| Citation Text: | 117 S.Ct. 1382 |
| Lines: | 1717 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

117 S.Ct. 1382                                                                                    Page 1
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

▷

Briefs and Other Related Documents
Board of County Com'rs of Bryan County, Okl. v.
BrownU.S. (Tex.),1997.
Supreme Court of the United States
BOARD OF the COUNTY COMMISSIONERS OF
BRYAN COUNTY, OKLAHOMA, Petitioner,
v.
Jill BROWN et al.
**No. 95-1100.**

Argued Nov. 5, 1996.
Decided April 28, 1997.
Rehearing Denied June 16, 1997. See 520 U.S. 1283,
117 S.Ct. 2472.

Arrestee brought § 1983 action against county,
county sheriff, and reserve deputy, in which she
sought to recover for injuries sustained when she was
forcibly removed from automobile after it was
stopped.   The United States District Court for the
Eastern District of Texas, Paul N. Brown, J., entered
judgment on jury verdict for plaintiff, and county
appealed.   The Court of Appeals for the Fifth
Circuit, 67 F.3d 1174, affirmed, finding that county
was subject to municipal liability for sheriff's single
decision to hire deputy after inadequate background
check.   After petition for certiorari was granted, the
Supreme Court, Justice O'Connor, held that: (1) §
1983 plaintiff may not establish municipal policy
giving rise to liability merely by identifying
policymaker's conduct that is properly attributable to
municipality, but must also demonstrate that, through
its deliberate conduct, municipality was "moving
force" behind injury alleged, and (2) evidence failed
to establish that sheriff's isolated failure to perform
adequate screening reflected deliberate indifference
to high risk that deputy would use excessive force.

Vacated and remanded.

Justice Souter dissented and filed an opinion in which
Justice Stevens and Justice Breyer joined.

Justice Breyer dissented and filed an opinion in
which Justice Stevens and Justice Ginsburg joined.
West Headnotes
**[1] Civil Rights 78 ⟲1351(1)**

78 Civil Rights

78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other
Governmental Bodies
        78k1351 Governmental Ordinance, Policy,
Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
        (Formerly 78k206(3))
Municipality may not be held liable under § 1983
solely because it employs tort-feasor, and instead,
plaintiff must identify municipal "policy" or
"custom" that caused plaintiff's injury. 42 U.S.C.A. §
1983.

**[2] Civil Rights 78 ⟲1351(1)**

78 Civil Rights

78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other
Governmental Bodies
        78k1351 Governmental Ordinance, Policy,
Practice, or Custom
            78k1351(1) k. In General. Most Cited
Cases
        (Formerly 78k206(3))
Act performed pursuant to "custom" that has not
been formally approved by appropriate decision
maker may fairly subject municipality to liability
under § 1983 on theory that relevant practice is so
widespread as to have force of law. 42 U.S.C.A. §
1983.

**[3] Civil Rights 78 ⟲1420**

78 Civil Rights

78III Federal Remedies in General
    78k1416 Weight and Sufficiency of Evidence
        78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
        (Formerly 78k242(5))
Evidence failed to establish that sheriff's isolated
decision to hire deputy without performing adequate
screening reflected deliberate indifference by sheriff
to high risk that deputy would use excessive force,
and thus, county could not be held liable for sheriff's
decision in § 1983 action brought by automobile
passenger who was injured when deputy used
excessive force in removing her from vehicle after it
was stopped; while deputy's record may have made
him poor candidate for position, it did not create

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                          Page 2
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

obvious risk of use of excessive force, as primary charges in deputy's record arose from single incident while he was college student. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ⚖1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
It is not enough for § 1983 plaintiff merely to identify conduct properly attributable to municipality against which action is brought, and plaintiff must also demonstrate that, through its deliberate conduct, municipality was "moving force" behind the injury alleged; that is, plaintiff must show that municipal action was taken with requisite degree of culpability and must demonstrate direct causal link between municipal action and deprivation of federal rights. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⚖1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
Where plaintiff in § 1983 action claims that particular municipal action itself violates federal law, or directs employee to do so, resolving issues of whether municipality had requisite degree of culpability and whether direct causal link existed between municipal action and deprivation of federal rights is straightforward, as § 1983 contains no state-of-mind requirement independent of that necessary to state violation of underlying federal right. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⚖1031**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1031 k. In General. Most Cited Cases
            (Formerly 78k110.1)
In any § 1983 suit, plaintiff must establish state of mind required to prove underlying violation of his or her federal rights. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⚖1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))

**Civil Rights 78 ⚖1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
            (Formerly 78k206(1))
Proof that municipality's legislative body or authorized decision maker has intentionally deprived plaintiff of federally protected right necessarily establishes that municipality acted culpably, as is required to allow recovery in § 1983 action. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⚖1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))

**Civil Rights 78 ⚖1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
            (Formerly 78k206(1))
Conclusion that action taken or directed by municipality or its authorized decision maker itself violates federal law will also determine that municipal action was moving force behind injury of which plaintiff complains, as is required to allow

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033, 97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

recovery in § 1983 action. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ☜1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General;  Vicarious Liability and Respondeat Superior in General. Most Cited Cases
            (Formerly 78k206(2.1))
Where § 1983 plaintiff claims that municipality has not directly inflicted injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that municipality is not held liable solely for actions of its employee. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ☜1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
To the extent that cause of action is recognized under § 1983 based on single decision attributable to municipality, action is recognized only where evidence that municipality has acted and that plaintiff has suffered deprivation of federal rights must also prove fault and causation. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ☜1401**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
            78k1401 k. In General. Most Cited Cases
            (Formerly 78k240(1))
That plaintiff has suffered deprivation of federal rights at hands of municipal employee will not alone permit inference of municipal culpability and causation in § 1983 action, as plaintiff will simply have shown that employee acted culpably. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ☜1343**

78 Civil Rights
    78III Federal Remedies in General

        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
"Deliberate indifference" to plaintiff's federally protected rights, showing of which on part of municipality is required in order for plaintiff to recover in § 1983 action, is stringent standard of fault, requiring proof that municipal actor disregarded known or obvious consequence of his action. 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 ☜1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of Officers and Employees in General;  Vicarious Liability and Respondeat Superior in General. Most Cited Cases
            (Formerly 78k206(2.1))
Plaintiff must demonstrate that municipal hiring decision reflects deliberate indifference to risk that violation of particular constitutional or statutory right will follow decision in order to establish that municipality acted with deliberate indifference and may be held liable in § 1983 action based on inadequate screening, and only where adequate scrutiny of applicant's background would lead reasonable policymaker to conclude that plainly obvious consequence of decision to hire applicant would be deprivation of third party's federally protected right can official's failure to adequately scrutinize applicant's background constitute "deliberate indifference." 42 U.S.C.A. § 1983.

**[14] Civil Rights 78 ☜1088(1)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(1) k. In General. Most Cited Cases
            (Formerly 78k132.1)
Finding of culpability on part of municipality in § 1983 action based on failure to perform adequate screening prior to hiring of employee cannot depend on mere probability that any officer inadequately screened will inflict any constitutional injury; rather, it must depend on finding that particular employee in question was highly likely to inflict particular injury

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                      Page 4
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

suffered by plaintiff, and connection between background of particular applicant and specific constitutional violation alleged must be strong. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ⟷1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
            (Formerly 78k206(1))
Congress did not intend municipalities to be held liable under § 1983 unless deliberate action attributable to municipality directly caused deprivation of federal rights. 42 U.S.C.A. § 1983.
**\*\*1384 Syllabus** [FN\*]

        FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*397** Jill Brown (hereinafter respondent) brought this 42 U.S.C. § 1983 damages action against petitioner county, alleging, among other things, that its Deputy Burns had arrested her with excessive force, and that it was liable for her injuries because its Sheriff Moore had hired Burns without adequately reviewing his background. Burns had pleaded guilty to various driving infractions and other misdemeanors, including assault and battery. Moore, whom the county stipulated was its Sheriff's Department policymaker, testified that he had obtained Burns' driving and criminal records, but had not closely reviewed either before hiring Burns. The District Court denied the county's motions for judgment as a matter of law, which asserted that a policymaker's single **\*\*1385** hiring decision could not give rise to § 1983 municipal liability. Respondent prevailed following a jury trial, and the Fifth Circuit affirmed, holding that the county was properly found liable based on Moore's decision to hire Burns.

*Held:* The county is not liable for Sheriff Moore's isolated decision to hire Burns without adequate screening, because respondent has not demonstrated that the decision reflected a conscious disregard for a high risk that Burns would use excessive force in violation of respondent's federally protected right.

Pp. 1387–1394.

(a) A municipality may not be held liable under § 1983 solely because it employs a tortfeasor, see, *e.g.,* Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611. Instead, the plaintiff must identify a municipal "policy" or "custom" that caused the injury. See, *e.g.,* Pembaur v. Cincinnati, 475 U.S. 469, 480-481, 106 S.Ct. 1292, 1298-1299, 89 L.Ed.2d 452. Contrary to respondent's contention, a "policy" giving rise to liability cannot be established merely by identifying a policymaker's conduct that is properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. See Monell, supra, at 694, 98 S.Ct., at 2027. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. Pp. 1387-1388.

**\*398** b) Respondent's claim that a policymaker's single facially lawful hiring decision can trigger municipal liability presents difficult problems of proof. This Court has recognized a § 1983 cause of action based on a single decision attributable to a municipality only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation. See, *e.g.,* Pembaur, supra, at 481, 106 S.Ct., at 1299. In relying heavily on *Pembaur,* respondent blurs the distinction between § 1983 cases that present no difficult fault and causation questions and those that do. Claims such as the present, which do not involve an allegation that the municipal action itself violated federal law or directed or authorized the deprivation of federal rights, require application of rigorous culpability and causation standards in order to ensure that the municipality is not held liable solely for its employees' actions. In Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, for example, the Court held that a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action-there, an allegedly inadequate training *program*-has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was not simply negligent, but was taken with "deliberate indifference" as to its known or obvious consequences. Id., at 388, 109 S.Ct., at 1204. Respondent's reliance on Canton for an analogy between failure-to-train cases and inadequate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                        Page 5
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

screening cases is not persuasive. In leaving open the possibility that municipal liability could be triggered by evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, *id.*, at 390, and n. 10, 109 S.Ct., at 1205 and n. 10, the *Canton* Court simply hypothesized that, in this narrow range of circumstances, the violation may be a highly predictable consequence of the failure to train and thereby justify a finding of "deliberate indifference" by policymakers. Predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult. Only where adequate scrutiny of the applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference." Neither the District Court nor the Court of Appeals directly tested whether Burns' background made his use of excessive force in making an arrest a plainly obvious consequence of the hiring decision. Pp. 1388-1392.

**\*\*1386** (c) Even assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, Moore's failure to scrutinize Burns' record cannot constitute "deliberate indifference"**\*399** to respondent's federally protected right to be free from the use of excessive force. To test the link between Moore's action and respondent's injury, it must be asked whether a full review of Burns' record reveals that Moore should have concluded that Burns' use of excessive force would be a plainly obvious consequence of his decision to hire Burns. Respondent's showing on this point was inadequate because the primary infractions on which she relies to prove Burns' propensity for violence arose from a single college fight. A full review of Burns' record might well have led Moore to conclude that Burns was an extremely poor deputy candidate, but he would not necessarily have reached that decision *because* Burns' use of excessive force would have been a plainly obvious consequence of the decision to hire him. The District Court therefore erred in submitting the inadequate screening theory to the jury. Pp. 1392-1394.

67 F.3d 1174 (CA5), vacated and remanded.

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, J., and BREYER, JJ., joined, *post*, p. 1394. BREYER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 1401.

Wallace B. Jefferson, San Antonio, TX, for petitioner.
Brian Serr, Waco, TX, for respondents.For U.S. Supreme Court briefs, see:1996 WL 345580 (Pet.Brief)1996 WL 419725 (Resp.Brief)1996 WL 484436 (Reply.Brief)

Justice O'CONNOR delivered the opinion of the Court.

Respondent Jill Brown brought a claim for damages against petitioner Bryan County under Rev. Stat. § 1979, 42 U.S.C. § 1983. She alleged that a county police officer used **\*400** excessive force in arresting her, and that the county itself was liable for her injuries based on its sheriff's hiring and training decisions. She prevailed on her claims against the county following a jury trial, and the Court of Appeals for the Fifth Circuit affirmed the judgment against the county on the basis of the hiring claim alone. 67 F.3d 1174 (1995). We granted certiorari. We conclude that the Court of Appeals' decision cannot be squared with our recognition that, in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the "moving force" behind the plaintiff's deprivation of federal rights. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2027, 56 L.Ed.2d 611 (1978).

I

In the early morning hours of May 12, 1991, Jill Brown (hereinafter respondent) and her husband were driving from Grayson County, Texas, to their home in Bryan County, Oklahoma. After crossing into Oklahoma, they approached a police checkpoint. Mr. Brown, who was driving, decided to avoid the checkpoint and return to Texas. After seeing the Browns' truck turn away from the checkpoint, Bryan County Deputy Sheriff Robert Morrison and Reserve Deputy Stacy Burns pursued the vehicle. Although the parties' versions of events differ, at trial both deputies claimed that their patrol car reached speeds

117 S.Ct. 1382
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

Page 6

in excess of 100 miles per hour. Mr. Brown testified that he was unaware of the deputies' attempts to overtake him. The chase finally ended four miles south of the police checkpoint.

After he got out of the squad car, Deputy Sheriff Morrison pointed his gun toward the Browns' vehicle and ordered the Browns to raise their hands. Reserve Deputy Burns, who was unarmed, rounded the corner of the vehicle on the passenger's side. Burns twice ordered respondent from the vehicle. When she did not exit, he used an "arm bar" technique, grabbing respondent's arm at the wrist and elbow, **\*401** pulling her from the vehicle,**\*\*1387** and spinning her to the ground. Respondent's knees were severely injured, and she later underwent corrective surgery. Ultimately, she may need knee replacements.

Respondent sought compensation for her injuries under 42 U.S.C. § 1983 and state law from Burns, Bryan County Sheriff B.J. Moore, and the county itself. Respondent claimed, among other things, that Bryan County was liable for Burns' alleged use of excessive force based on Sheriff Moore's decision to hire Burns, the son of his nephew. Specifically, respondent claimed that Sheriff Moore had failed to adequately review Burns' background. Burns had a record of driving infractions and had pleaded guilty to various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness. Oklahoma law does not preclude the hiring of an individual who has committed a misdemeanor to serve as a peace officer. See Okla. Stat., Tit. 70, § 3311(D)(2)(a) (1991) (requiring that the hiring agency certify that the prospective officer's records do not reflect a felony conviction). At trial, Sheriff Moore testified that he had obtained Burns' driving record and a report on Burns from the National Crime Information Center, but had not closely reviewed either. Sheriff Moore authorized Burns to make arrests, but not to carry a weapon or to operate a patrol car.

In a ruling not at issue here, the District Court dismissed respondent's § 1983 claim against Sheriff Moore prior to trial. App. 28. Counsel for Bryan County stipulated that Sheriff Moore "was the policy maker for Bryan County regarding the Sheriff's Department." *Id.,* at 30. At the close of respondent's case and again at the close of all of the evidence, Bryan County moved for judgment as a matter of law. As to respondent's claim that Sheriff Moore's decision to hire Burns triggered municipal liability, the county argued that a single hiring decision by a municipal policymaker could not give rise to municipal liability under § 1983. *Id.,* at 59-60. **\*402** The District Court denied the county's motions. The court also overruled the county's objections to jury instructions on the § 1983 claim against the county. *Id.,* at 125-126, 132.

To resolve respondent's claims, the jury was asked to answer several interrogatories. The jury concluded that Stacy Burns had arrested respondent without probable cause and had used excessive force, and therefore found him liable for respondent's injuries. It also found that the "hiring policy" and the "training policy" of Bryan County "in the case of Stacy Burns as instituted by its policymaker, B.J. Moore," were each "so inadequate as to amount to deliberate indifference to the constitutional needs of the Plaintiff." *Id.,* at 135. The District Court entered judgment for respondent on the issue of Bryan County's § 1983 liability. The county appealed on several grounds, and the Court of Appeals for the Fifth Circuit affirmed. 67 F.3d 1174 (1995). The court held, among other things, that Bryan County was properly found liable under § 1983 based on Sheriff Moore's decision to hire Burns. *Id.,* at 1185. The court addressed only those points that it thought merited review; it did not address the jury's determination of county liability based on inadequate training of Burns, *id.,* at 1178, nor do we. We granted certiorari, 517 U.S. 1154, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996), to decide whether the county was properly held liable for respondent's injuries based on Sheriff Moore's single decision to hire Burns. We now reverse.

II

[1] Title 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured**\*403** in an action at law, suit in equity, or other proper proceeding for redress."

We held in *Monell v. New York City Dept. of Social Servs.,* 436 U.S., at 689, 98 S.Ct., at 2035, that municipalities and other local governmental bodies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                      Page 7
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
(Cite as: 520 U.S. 397, 117 S.Ct. 1382)

are "persons" within the **1388 meaning of § 1983. We also recognized that a municipality may not be held liable under § 1983 solely because it employs a tortfeasor. Our conclusion rested partly on the language of § 1983 itself. In light of the statute's imposition of liability on one who "subjects [a person], or causes [that person] to be subjected," to a deprivation of federal rights, we concluded that it "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.,* at 692, 98 S.Ct., at 2036. Our conclusion also rested upon the statute's legislative history. As stated in *Pembaur v. Cincinnati, 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986),* "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others* " (citing *Monell, supra,* at 665-683, 98 S.Ct., at 2022-2032). We have consistently refused to hold municipalities liable under a theory of *respondeat superior.* See *Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985) (plurality opinion); *id.,* at 828, 105 S.Ct., at 2438 (opinion of BRENNAN, J.); *Pembaur, supra,* at 478-479, 106 S.Ct., at 1297-1298; *St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality opinion); *id.,* at 137, 108 S.Ct., at 931 (opinion of BRENNAN, J.); *Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).

[2] Instead, in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. See *Monell, supra,* at 694, 98 S.Ct., at 2027; *Pembaur, supra,* at 480-481, 106 S.Ct., at 1298-1299; *Canton, supra,* at 389, 109 S.Ct., at 1205. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts *404 may fairly be said to be those of the municipality. *Monell, supra,* at 694, 98 S.Ct., at 2027. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. 436 U.S., at 690-691, 98 S.Ct., at 2035-2036 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613-1614, 26 L.Ed.2d

142 (1970)).

[3] The parties join issue on whether, under *Monell* and subsequent cases, a single hiring decision by a county sheriff can be a "policy" that triggers municipal liability. Relying on our decision in *Pembaur,* respondent claims that a single act by a decisionmaker with final authority in the relevant area constitutes a "policy" attributable to the municipality itself. So long as a § 1983 plaintiff identifies a decision properly attributable to the municipality, respondent argues, there is no risk of imposing *respondeat superior* liability. Whether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time is immaterial. Rather, under respondent's theory, identification of an act of a proper municipal decisionmaker is all that is required to ensure that the municipality is held liable only for its own conduct. The Court of Appeals accepted respondent's approach.

[4] As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

[5][6][7][8] Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.*405 Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. **1389*Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                  Page 8
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

complains.

[9] Sheriff Moore's hiring decision was itself legal, and Sheriff Moore did not authorize Burns to use excessive force. Respondent's claim, rather, is that a single facially lawful hiring decision can launch a series of events that ultimately cause a violation of federal rights. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. See *Canton, supra,* at 489 U.S., at 391-392, 109 S.Ct., at 1206-1207; *Tuttle, supra,* at 824, 105 S.Ct., at 2436 (plurality opinion). See also *Springfield v. Kibbe,* 480 U.S. 257, 270-271, 107 S.Ct. 1114, 1121-1122, 94 L.Ed.2d 293 (1987) (*per curiam*) (dissent from dismissal of writ as improvidently granted).

[10] In relying heavily on *Pembaur,* respondent blurs the distinction between § 1983 cases that present no difficult questions of fault and causation and those that do. To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation. For example, *Owen v. Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), and **\*406***Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), involved formal decisions of municipal legislative bodies. In *Owen,* the city council allegedly censured and discharged an employee without a hearing. 445 U.S., at 627-629, 633, and n. 13, 100 S.Ct., at 1403-1404, 1406, and n. 13. In *Fact Concerts,* the city council canceled a license permitting a concert following a dispute over the performance's content. 453 U.S., at 252, 101 S.Ct., at 2752. Neither decision reflected implementation of a generally applicable rule. But we did not question that each decision, duly promulgated by city lawmakers, could trigger municipal liability if the decision itself were found to be unconstitutional. Because fault and causation were obvious in each case, proof that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury.

Similarly, *Pembaur v. Cincinnati* concerned a decision by a county prosecutor, acting as the county's final decisionmaker, 475 U.S., at 485, 106 S.Ct., at 1301, to direct county deputies to forcibly enter petitioner's place of business to serve *capiases* upon third parties. Relying on *Owen* and *Newport,* we concluded that a final decisionmaker's adoption of a course of action "tailored to a particular situation and not intended to control decisions in later situations" may, in some circumstances, give rise to municipal liability under § 1983. 475 U.S., at 481, 106 S.Ct., at 1299. In *Pembaur,* it was not disputed that the prosecutor had specifically directed the action resulting in the deprivation of petitioner's rights. The conclusion that the decision was that of a final municipal decisionmaker and was therefore properly attributable to the municipality established municipal liability. No questions of fault or causation arose.

[11] Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the **\*407** *employee* acted culpably. We recognized these difficulties in **\*\*1390***Canton v. Harris,* where we considered a claim that inadequate training of shift supervisors at a city jail led to a deprivation of a detainee's constitutional rights. We held that, quite apart from the state of mind required to establish the underlying constitutional violation-in that case, a violation of due process, 489 U.S. at 388-389, n. 8, 109 S.Ct., at 1205, n. 8-a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. *Id.,* at 388, 109 S.Ct., at 1204. A showing of simple or even heightened negligence will not suffice.

We concluded in *Canton* that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." *Id.,* at 387, 109 S.Ct., at 1204. We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. *Id.,* at 390, 109 S.Ct., at 1205. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                    Page 9
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the "deliberate indifference"-necessary to trigger municipal liability. *Id.,* at 390, n. 10, 109 S.Ct., at 1205, n. 10 ("It could ... be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *id.,* at 397, 109 S.Ct., at 1209 (o'CONNOR, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ..."). In addition, the existence of a pattern of *408 tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury. See *id.,* at 390-391, 109 S.Ct., at 1205-1206.

Before trial, counsel for Bryan County stipulated that Sheriff Moore "was the policy maker for Bryan County regarding the Sheriff's Department." App. 30. Indeed, the county sought to avoid liability by claiming that its Board of Commissioners participated in no policy decisions regarding the conduct and operation of the office of the Bryan County Sheriff. *Id.,* at 32. Accepting the county's representations below, then, this case presents no difficult questions concerning whether Sheriff Moore has final authority to act for the municipality in hiring matters. Cf. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Respondent does not claim that she can identify any pattern of injuries linked to Sheriff Moore's hiring practices. Indeed, respondent does not contend that Sheriff Moore's hiring practices are generally defective. The only evidence on this point at trial suggested that Sheriff Moore had adequately screened the backgrounds of all prior deputies he hired. App. 106-110. Respondent instead seeks to trace liability to what can only be described as a deviation from Sheriff Moore's ordinary hiring practices. Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high.

Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the *409 plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

**1391 In *Canton,* we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability. 489 U.S., at 390, and n. 10, 109 S.Ct., at 1205, and n. 10 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). Respondent purports to rely on *Canton,* arguing that Burns' use of excessive force was the plainly obvious consequence of Sheriff Moore's failure to screen Burns' record. In essence, respondent claims that this showing of "obviousness" would demonstrate both that Sheriff Moore acted with conscious disregard for the consequences of his action and that the Sheriff's action directly caused her injuries, and would thus substitute for the pattern of injuries ordinarily necessary to establish municipal culpability and causation.

The proffered analogy between failure-to-train cases and inadequate screening cases is not persuasive. In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree *410 of predictability may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                    Page 10
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable.

Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, however, there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

[12] In attempting to import the reasoning of *Canton* into the hiring context, respondent ignores the fact that predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult than predicting what might flow from the failure to train a single law enforcement officer as to a specific skill necessary to the discharge of his duties. As our decision in *Canton* makes clear, "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Unlike the risk from a particular glaring omission in a training regimen, the risk from a single instance of inadequate screening of an applicant's background is not "obvious" in the abstract; rather, it depends upon the background of the applicant. A lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly. But that is only a generalized showing of risk. The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone **\*411** give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation. After all, a full screening of an applicant's background might reveal no cause for concern at all; if so, a hiring official who failed to scrutinize the applicant's background cannot be said to have consciously disregarded an obvious risk **\*\*1392** that the officer would subsequently inflict a particular constitutional injury.

[13] We assume that a jury could properly find in this case that Sheriff Moore's assessment of Burns' background was inadequate. Sheriff Moore's own testimony indicated that he did not inquire into the underlying conduct or the disposition of any of the misdemeanor charges reflected on Burns' record before hiring him. But this showing of an instance of inadequate screening is not enough to establish "deliberate indifference." In layman's terms, inadequate screening of an applicant's record may reflect "indifference" to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the *relevant* "indifference." A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

Neither the District Court nor the Court of Appeals directly tested the link between Burns' actual background and the risk that, if hired, he would use excessive force. The District Court instructed the jury on a theory analogous to that reserved in *Canton.* The court required respondent to prove that Sheriff Moore's inadequate screening of Burns' background was "so likely to result in *violations of constitutional\*412 rights* " that the Sheriff could "reasonably [be] said to have been deliberately indifferent to the *constitutional needs* of the Plaintiff." App. 123 (emphasis added). The court also instructed the jury, without elaboration, that respondent was required to prove that the "inadequate hiring ... policy directly caused the Plaintiff's injury." *Ibid.*

[14] As discussed above, a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong. What the District Court's instructions on culpability, and therefore the jury's finding of municipal liability, failed to capture is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                      Page 11
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

whether Burns' background made his use of excessive force in making an arrest a plainly obvious consequence of the hiring decision. The Court of Appeals' affirmance of the jury's finding of municipal liability depended on its view that the jury could have found that "inadequate screening of *a deputy* could likely result in the violation of *citizens' constitutional rights.*" 67 F.3d, at 1185 (emphasis added). Beyond relying on a risk of violations of unspecified constitutional rights, the Court of Appeals also posited that Sheriff Moore's decision reflected indifference to "the public's welfare." *Id.,* at 1184.

Even assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability, the evidence in this case was insufficient to support a finding that, in hiring Burns, Sheriff Moore disregarded a known or obvious risk of injury. To test the link between Sheriff Moore's hiring decision and respondent's injury, we must ask whether a full review of Burns' record reveals that Sheriff Moore should have concluded that Burns' use of excessive force would be a plainly obvious consequence of the *413 hiring decision.[FN1] On this point, **1393 respondent's showing was inadequate. To be sure, Burns' record reflected various misdemeanor infractions. Respondent claims that the record demonstrated such a strong propensity for violence that Burns' application of excessive force was highly likely. The primary charges on which respondent relies, however, are those arising from a fight on a college campus where Burns was a student. In connection with this single incident, Burns was charged with assault and battery, resisting arrest, and public drunkenness.[FN2] In January 1990, when he pleaded *414 guilty to those charges, Burns also pleaded guilty to various driving-related offenses, including nine moving violations and a charge of driving with a suspended license. In addition, Burns had previously pleaded guilty to being in actual physical control of a vehicle while intoxicated.

> FN1. In suggesting that our decision complicates this Court's § 1983 municipal liability jurisprudence by altering the understanding of culpability, Justice SOUTER and Justice BREYER misunderstand our approach. *Post,* at 1397; *post,* at 1401, 1403. We do not suggest that a plaintiff in an inadequate screening case must show a higher degree of culpability than the "deliberate indifference" required in

*Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); we need not do so, because, as discussed below, respondent has not made a showing of deliberate indifference here. See *infra,* at 1392-1393. Furthermore, in assessing the risks of a decision to hire a particular individual, we draw no distinction between what is "so obvious" or "so likely to occur" and what is "plainly obvious." The difficulty with the lower courts' approach is that it fails to connect the background of the particular officer hired in this case to the particular constitutional violation the respondent suffered. *Supra,* at 1392. Ensuring that lower courts link the background of the officer to the constitutional violation alleged does not complicate our municipal liability jurisprudence with degrees of "obviousness," but seeks to ensure that a plaintiff in an inadequate screening case establishes a policymaker's deliberate indifference-that is, conscious disregard for the known and obvious consequences of his actions.

FN2. Justice SOUTER implies that Burns' record reflected assault and battery charges arising from more than one incident. *Post,* at 1400. There has never been a serious dispute that a single misdemeanor assault and battery conviction arose out of a single campus fight. Nor did petitioner's expert testify that the record reflected any assault charge without a disposition, see 9 Record 535-536, although Justice SOUTER appears to suggest otherwise, *post,* at 1400, n. 6.
In fact, respondent's own expert witness testified that Burns' record reflected a single assault conviction. 7 Record 318; see also *id.,* at 320. Petitioner has repeatedly so claimed. See, *e.g.,* Suggestion for Rehearing En Banc in No. 93-5376 (CA5), p. 12 ("Burns had one misdemeanor assault conviction stemming from a campus fight"); Pet. for Rehearing of Substituted Opinion in No. 93-5376 (CA5), p. 11 (same); 3 Record 927 (Brief in Support of Defendants' Motion for Judgment Notwithstanding the Verdict 10); Pet. for Cert. 16 ("Burns pled guilty to assault and battery" as a result of "one campus fight").
Respondent has not once contested this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                          Page 12
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

characterization. See, *e.g.*, 3 Record 961 (Brief in Support of Plaintiff's Response to Defendants' Motion for Judgment Notwithstanding the Jury Verdict 4); Brief for Appellee/Cross-Appellant Brown et al. in No. 93-5376 (CA5), pp. 3-4; Brief in Opposition 1. Indeed, since the characterization is reflected in the county's petition for certiorari, under this Court's Rule 15(2) respondent would have had an obligation in her brief in opposition to correct "any perceived misstatement" in the petition. She did not. Involvement in a single fraternity fracas does not demonstrate "a proclivity to violence against the person." *Post,* at 1400, n. 6.

The fact that Burns had pleaded guilty to traffic offenses and other misdemeanors may well have made him an extremely poor candidate for reserve deputy. Had Sheriff Moore fully reviewed Burns' record, he might have come to precisely that conclusion. But unless he would necessarily have reached that decision *because* Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision, Sheriff Moore's inadequate scrutiny of Burns' record cannot constitute "deliberate indifference" to respondent's federally protected right to be free from a use of excessive force.

Justice SOUTER's reading of the case is that the jury believed that Sheriff Moore in fact read Burns' entire record. *Post,* at 1399. That is plausible, but it is also irrelevant. It is not sufficient for respondent to show that Sheriff Moore read Burns' record and therefore hired Burns with knowledge of his background. Such a decision may reflect indifference **\*415** to Burns' *record,* but what is required is deliberate indifference to a plaintiff's constitutional right. That is, whether Sheriff Moore failed to examine Burns' record, partially examined it, or fully examined it, Sheriff Moore's hiring decision could not have been "deliberately indifferent" unless in light of that record Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision. Because there was insufficient evidence on which a jury could base a finding that Sheriff Moore's decision to hire Burns reflected conscious disregard of an obvious risk that a use of excessive force would follow, the District Court erred in submitting respondent's inadequate screening claim to the jury.

III

[15] Cases involving constitutional injuries allegedly traceable to an ill-considered **\*\*1394** hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose. Cf. *Canton v. Harris,* 489 U.S., at 392, 109 S.Ct., at 1206. Bryan County is not liable for Sheriff Moore's isolated decision to hire Burns without adequate screening, because respondent has not demonstrated that his decision reflected a conscious disregard for a high risk that Burns would use excessive force in violation of respondent's federally protected **\*416** right. We therefore vacate the judgment of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOUTER, with whom Justice STEVENS and Justice BREYER join, dissenting.
In *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), we held a municipality liable under 42 U.S.C. § 1983 for harm caused by the single act of a policymaking officer in a matter within his authority but not covered by a policy previously identified. The central question presented here is whether that rule applies to a single act that itself neither violates nor commands a violation of federal law. The answer is yes if the single act amounts to deliberate indifference to a substantial risk that a violation of federal law will result. With significant qualifications, the Court assumes so, too, in theory, but it raises such skeptical hurdles to reaching any such conclusion in practice that it virtually guarantees its disposition of this case: it holds as a matter of law that the sheriff's act could not be thought to reflect deliberate indifference to the risk that his subordinate would violate the Constitution by using excessive force. I respectfully

117 S.Ct. 1382                                                                    Page 13
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

dissent as much from the level of the Court's skepticism as from its reversal of the judgment.

## I

_Monell v. New York City Dept. of Social Servs.,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), overruled _Monroe v. Pape,_ 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as _Monroe_ had held § 1983 inapplicable to governments beneath the state level ("municipal," for short). _Monell, supra,_ at 663, 98 S.Ct., at 2022. At the same time that we decided Congress meant municipalities to be persons subject to § 1983, however, we also concluded that municipal liability under the statute could not be based on the traditional theory of _respondeat superior._ 436 U.S., at 691, 98 S.Ct., at 2036. We said that for *417 purposes of § 1983 an act could not be attributed to a municipality merely because it was an act of a municipal agent performed in the course of exercising a power delegated to the municipality by local law, and we reasoned instead that "it is [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." _Id.,_ at 694, 98 S.Ct., at 2037-2038; see _Pembaur, supra,_ at 480, 106 S.Ct., at 1298.

In assigning municipal liability under _Monell,_ we accordingly distinguish an act of a municipal agent without independent authority to establish policy from the act of one authorized to set policy under local law, and we likewise distinguish the acts of lower level employees depending on whether they do or do not implement or manifest a policy set by those with the authority to set it. The act of the municipality is the act only of an authorized policymaker or of an employee following the policymaker's lead. "The 'official policy' requirement was intended to distinguish acts of the _municipality_ from acts of _employees_ of the municipality, and thereby **1395 make clear that municipal liability is limited to action for which the municipality is actually responsible." _Pembaur, supra,_ at 479-480, 106 S.Ct., at 1298.

While this overview indicates that the policy requirement may be satisfied in more than one way, there are in fact three alternatives discernible in our prior cases. It is certainly met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. _Monell_ exemplified these circumstances, where city agencies had issued a rule requiring pregnant employees to take unpaid leaves of absence before any medical need arose. _Monell, supra,_ at 660-661, 98 S.Ct., at 2020-2021.

We have also held the policy requirement satisfied where no rule has been announced as "policy" but federal law has *418 been violated by an act of the policymaker itself. In this situation, the choice of policy and its implementation are one, and the first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting. See _Pembaur, supra,_ at 480-481, 106 S.Ct., at 1298-1299; cf. _Newport v. Fact Concerts, Inc.,_ 453 U.S. 247, 250-252, 101 S.Ct. 2748, 2751-2752, 69 L.Ed.2d 616 (1981) (implicitly assuming that a policymaker's single act can sustain § 1983 action); _Owen v. Independence,_ 445 U.S. 622, 625-630, 100 S.Ct. 1398, 1402-1405, 63 L.Ed.2d 673 (1980) (same). It does not matter that the policymaker may have chosen "a course of action tailored [only] to a particular situation and not intended to control decisions in later situations," _Pembaur,_ 475 U.S., at 481, 106 S.Ct., at 1299; if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, "it surely represents an act of official government 'policy' " and "the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly," _ibid._

We have, finally, identified a municipal policy in a third situation, even where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." _Canton v. Harris,_ 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Where, in the most obvious example, the policymaker sits on his hands after repeated, unlawful acts of subordinate officers and that failure "evidences a 'deliberate indifference' to the rights of [the municipality's] inhabitants," _id.,_ at 389, 109 S.Ct., at 1205, the policymaker's toleration of the subordinates' behavior establishes a policy-in-practice just as readily attributable to the municipality as the one-act policy-in-practice described above. Such a policy choice may be inferred even without a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference. *Id.*, at 390, n. 10, 109 S.Ct., at 1205, n. 10.

**\*419** Deliberate indifference is thus treated, as it is elsewhere in the law,[FN1] as tantamount to intent, so that inaction by a policymaker deliberately indifferent to a substantial risk of harm is equivalent to the intentional action that setting policy presupposes. Compare *Pembaur, supra,* at 483, 106 S.Ct., at 1300 (plurality opinion of Brennan, J.) ("deliberate **\*\*1396** choice" by policymaker), and *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion of rEHNQUIST, J.) (" 'policy' generally implies a course of action consciously chosen"), with *Canton, supra,* at 389, 109 S.Ct., at 1205 ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom' ... actionable under § 1983").

> FN1. See, *e.g.,* American Law Institute, Model Penal Code § 2.02(2)(c) (1985) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct"); *J.I. Case Credit Corp. v. First Nat. Bank of Madison Cty.,* 991 F.2d 1272, 1278 (C.A.7 1993) ("To consciously ignore or to deliberately close one's eyes to a manifest danger is recklessness, a mental state that the law commonly substitutes for intent or actual knowledge"). Cf. *Estelle v. Gamble,* 429 U.S. 97, 105-106, 97 S.Ct. 285, 291-292, 50 L.Ed.2d 251 (1976) (deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment); *United States v. Giovannetti,* 919 F.2d 1223, 1228 (C.A.7 1990) (a "deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires"); *United States v. Jewell,* 532 F.2d 697, 700(CA9), cert. denied, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976) ("[D]eliberate ignorance and positive knowledge are equally culpable").

Under this prior law, Sheriff Moore's failure to screen out his 21-year-old great-nephew Burns on the basis of his criminal record, and the decision instead to authorize Burns to act as a deputy sheriff, constitutes a policy choice attributable to Bryan County under § 1983. There is no serious dispute that Sheriff Moore is the designated policymaker for implementing the sheriff's law enforcement powers and recruiting officers to exercise them, or that he "has final authority to act for the municipality in hiring matters." *Ante,* at 1390. As the authorized policymaker, Sheriff Moore is the county **\*420** for purposes of § 1983 municipal liability arising from the sheriff's department's exercise of law enforcement authority. As I explain in greater detail below, it was open to the jury to find that the sheriff knew of the record of his nephew's violent propensity, but hired him in deliberate indifference to the risk that he would use excessive force on the job, as in fact he later did. That the sheriff's act did not itself command or require commission of a constitutional violation (like the order to perform an unlawful entry and search in *Pembaur* ) is not dispositive under § 1983, for we have expressly rejected the contention that "only unconstitutional policies are actionable" under § 1983, *Canton, supra,* at 387, 109 S.Ct., at 1204, and have never suggested that liability under the statute is otherwise limited to policies that facially violate other federal law. The sheriff's policy choice creating a substantial risk of a constitutional violation therefore could subject the county to liability under existing precedent.[FN2]

> FN2. Given the sheriff's position as law enforcement policymaker, it is simply off the point to suggest, as the Court does, that there is some significance in either the fact that Sheriff Moore's failure to screen may have been a "deviation" from his ordinary hiring practices or that a pattern of injuries resulting from his past practices is absent. See *ante,* at 1390. *Pembaur* made clear that a single act by a designated policymaker is sufficient to establish a municipal policy, see *Pembaur v. Cincinnati,* 475 U.S. 469, 480-481, 106 S.Ct. 1292, 1298-1299, 89 L.Ed.2d 452 (1986), and *Canton* explained, as the Court recognizes, see *ante,* at 1390-1391, that evidence of a single violation of federal rights can trigger municipal liability under § 1983, see *Canton v. Harris,* 489 U.S. 378, 390, n. 10, 109 S.Ct. 1197, 1205, n. 10, 103 L.Ed.2d 412 (1989). See Part II-B, *infra.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                                    Page 15
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

II

At the level of theory, at least, the Court does not disagree, and it assumes for the sake of deciding the case that a single, facially neutral act of deliberate indifference by a policymaker could be a predicate to municipal liability if it led to an unconstitutional injury inflicted by subordinate officers. See *ante,* at 1392. At the level of practice, however, the tenor of the Court's opinion is decidedly different: it suggests that **\*421** the trial court insufficiently appreciated the specificity of the risk to which such indifference must be deliberate in order to be actionable; it expresses deep skepticism that such appreciation of risk could ever reasonably be attributed to the policymaker who has performed only a single unsatisfactory, but not facially unconstitutional, act; and it finds the record insufficient to make any such showing in this case. The Court is serially mistaken. This case presents no occasion to correct or refine the District Court's jury instructions on the degree of risk required for deliberate indifference; the Court's skepticism converts a newly demanding formulation of the standard of fault into a virtually categorical impossibility of showing it in a case like this; and the record in this case is perfectly sufficient to support the jury's verdict even on the Court's formulation of the high degree of risk that must be shown.

A

The Court is certainly correct in emphasizing the need to show more than mere negligence on the part of the policymaker, for at **\*\*1397** the least the element of deliberateness requires both subjective appreciation of a risk of unconstitutional harm, and a risk substantial enough to justify the heightened responsibility that deliberate indifference generally entails. The Court goes a step further, however, in requiring that the "particular" harmful consequence be "plainly obvious" to the policymaker, *ante,* at 1392, a characterization of deliberate indifference adapted from dicta set forth in a footnote in *Canton,* see 489 U.S., at 390, n. 10, 109 S.Ct., at 1205, n. 10. *Canton,* as mentioned above, held that a municipal policy giving rise to liability under § 1983 may be inferred even when the policymaker has failed to act affirmatively at all, so long as a need to control the agents of the government "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." *Id.,* at 390, 109 S.Ct., at 1205. While we speculated in *Canton* that **\*422** "[i]t could ... be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need," see *id.,* at 390, n. 10, 109 S.Ct., at 1205, n. 10, we did not purport to be defining the fault of deliberate indifference universally as the failure to act in relation to a "plainly obvious consequence" of harm. Nor did we, in addressing the requisite risk that constitutional violations will occur, suggest that the deliberate indifference necessary to establish municipal liability must be, as the Court says today, indifference to the particular constitutional violation that in fact occurred.

The Court's formulation that deliberate indifference exists only when the risk of the subsequent, particular constitutional violation is a plainly obvious consequence of the hiring decision, see *ante,* at 1392, while derived from *Canton,* is thus without doubt a new standard. See *post,* at 1402-1403 (BREYER, JJJJJJJJJJJ., dissenting). As to the "particular" violation, the Court alters the understanding of deliberate indifference as set forth in *Canton,* where we spoke of constitutional violations generally.[FN3] As to "plainly obvious consequence," the Court's standard appears to be somewhat higher, for example, than the standard for "reckless" fault in the criminal law, where the requisite indifference to risk is defined as that which "consciously disregards a substantial and unjustifiable risk that the material element exists or will result ... [and] involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." See American Law Institute, Model Penal Code § 2.02(2)(c) (1985).

> FN3. The Court's embellishment on the deliberate indifference standard is, in any case, no help in resolving this case because there has never been any suggestion that Deputy Burns's criminal background, including charges of assault and battery, indicated that he would commit a constitutional violation different from the one he in fact committed.

**\*423** That said, it is just possible that our prior understanding of the requisite degree of fault and the standard as the Court now states it may in practice turn out to amount to much the same thing, but I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                          Page 16
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

would have preferred an argument addressing the point before ruling on it. There was, however, no such argument here for the simple reason that petitioner never asked that deliberate indifference be defined to occur only when the particular constitutional injury was the plainly obvious consequence of the policymaker's act. Petitioner merely asked the District Court to instruct the jury to determine whether Sheriff Moore acted with "conscious indifference," see 2 Record 342, and made no objection to the District Court's charge that "Sheriff B.J. Moore would have acted with deliberate indifference in adopting an otherwise constitutional hiring policy for a deputy sheriff if the need for closer scrutiny of Stacy Burns' background was so obvious and the inadequacy of the scrutiny given so likely to result in violations of constitutional rights, that Sheriff B.J. Moore can be reasonably said to have been deliberately indifferent to the constitutional needs of the Plaintiff." 10 Record 800-801. If, as it appears, today's standard does raise the threshold of municipal liability, it does so quite independently**1398 of any issue posed or decided in the trial court.

### B

The Court's skepticism that the modified standard of fault can ever be met in a single-act case of inadequate screening without a patently unconstitutional policy, *ante*, at 1392-1393, both reveals the true value of the assumption that in theory there might be municipal liability in such a case, and dictates the result of the Court's review of the record in the case before us. It is skepticism gone too far.

It is plain enough that a facially unconstitutional policy is likely to produce unconstitutional injury, see, *e.g.*, *Pembaur*, 475 U.S., at 480-481, 106 S.Ct., at 1298-1299; *Monell*, 436 U.S., at 660-661, 98 S.Ct., at 2020-2021, and obvious, too, that many facially neutral policy decisions evince *424 no such clear portents. Written standards for hiring law enforcement personnel might be silent on the significance of a prior criminal record without justifying much worry about employing axe murderers (who are unlikely to apply) or subjecting the public to attacks by someone with a 30-year-old assault conviction (who has probably grown up). But a policymaker need not mandate injury to be indifferent to its risk when obvious, and, because a particular hiring decision may raise a very high probability of harm down the line, it simply ignores

the issue before us to lump together in one presumptively benign category every singular administrative act of a policymaker that does not expressly command or constitute unconstitutional behavior. Thus, a decision to give law enforcement authority to a scofflaw who had recently engaged in criminal violence presents a very different risk from hiring someone who once drove an overweight truck. While the decision to hire the violent scofflaw may not entail harm to others as unquestionably as an order to "go out and rough-up some suspects," it is a long way from neutral in the risk it creates.

While the Court should rightly be skeptical about predicating municipal or individual liability merely on a failure to adopt a crime-free personnel policy or on a particular decision to hire a guilty trucker, why does it extend that valid skepticism to the quite unsound point of doubting liability for hiring the violent scofflaw? The Court says it fears that the latter sort of case raises a danger of liability without fault, *ante*, at 1390. But if the Court means fault generally (as distinct from the blame imputed on classic *respondeat superior* doctrine), it need only recall that whether a particular violent scofflaw is violent enough or scoffing enough to implicate deliberate indifference will depend on applying the highly demanding standard the Court announces: plainly obvious consequence of particular injury. It is the high threshold of deliberate indifference that will ensure that municipalities be held liable only for considered acts with *425 substantial risks. That standard will distinguish single-act cases with only a mild portent of injury from single-act cases with a plainly obvious portent, and from cases in which the harm is only the latest in a series of injuries known to have followed from the policymaker's action. The Court has fenced off the slippery slope.

A second stated reason of the skeptical majority is that, because municipal liability under *Monell* cannot rest on *respondeat superior*, *ante*, at 1391, 1394, "a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged," *ante*, at 1391. But that is simply to say that the tortious act must be proximately caused by the policymaker. The policy requirement is the restriction that bars straightforward *respondeat superior* liability, and the need to "test the link" is merely the need to apply the law that defines what a cognizable link is. The restriction on imputed fault that saves municipalities from liability has no need of categorical immunization in single-act cases.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 17
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

In short, the Court's skepticism is excessive in ignoring the fact that some acts of a policymaker present substantial risks of unconstitutional harm even though the acts are not unconstitutional *per se.* And the Court's purported justifications for its extreme skepticism are washed out by the very standards employed to limit liability.

C

For demonstrating the extreme degree of the Court's inhospitality to single-act municipal liability, this is a case on point, for even **1399 under the "plainly obvious consequence" rule the evidence here would support the verdict. There is no dispute that before the incident in question the sheriff ordered a copy of his nephew's criminal record. While the sheriff spoke euphemistically on the witness stand of a "driving record," the scope of the requested documentation included crimes beyond motor vehicle violations and the sheriff*426 never denied that he knew this. He admitted that he read some of that record; he said he knew it was "long"; he said he was sure he had noticed charges of driving with a suspended license; and he said that he had taken the trouble to make an independent search for any outstanding warrant for Burns's arrest. As he put it, however, he somehow failed to "notice" charges of assault and battery or the list of offenses so long as to point either to contempt for law or to incapacity to obey it. Although the jury might have accepted the sheriff's disclaimer, no one who has read the transcript would assume that the jurors gave any credit to that testimony,[FN4] and it was open to them to find that the sheriff *427 was simply lying under oath about his limited perusal. The Court of Appeals noted this possibility, see 67 F.3d 1174, 1184 (C.A.5 1995), which is more likely than any other reading of the evidence. Law enforcement officers, after all, are not characteristically so devoid of curiosity as to lose interest part way through the criminal record of a subject of personal investigation.

FN4. After Sheriff Moore testified that he knew Burns had been charged with driving while intoxicated, the following exchange with respondent's counsel took place:
"Q. And how did you obtain that information?
"A. I don't remember now how I got it.
"Q. Did you make an inquiry with the proper authorities in Oklahoma to get a copy

of Mr. Burns' rap sheet?
"A. I run his driving record, yes.
"Q. All right.    And you can get that rap sheet immediately, can't you?
"A. It don't take long.
"Q. All right.    And did you not see on there where Mr. Burns had been arrested for assault and battery.    Did you see that one on there?
"A. I never noticed it, no.
"Q. Did you notice on there he'd been arrested or charged with [Driving While License Suspended] on several occasions?
 .    .    .    .    .
"A. I'm sure I did.
"Q. All right.    Did you notice on there that he'd been arrested and convicted for possession of false identification?
"A. No, I never noticed that.
"Q. Did you notice on there where he had been arrested for public drunk?
"A. He had a long record.
"Q. Did you notice on there where he had been arrested for resisting arrest?
"A. No, I didn't.
"Q. Did you make any inquiries after you got that information to determine exactly what the disposition of those charges were?
"A. No, I didn't.
"Q. Did you not make any attempt to find out the status of Mr. Burns' criminal record at that time?
"A. As far as him having a criminal record, I don't believe he had a criminal record.    It was just all driving and-most of it was, misdemeanors.
"Q. Well, did you make any attempts to determine whether or not Mr. Burns was on probation at the time you placed him out there?
"A. I didn't know he was on probation, no.
"Q. Did you make any effort to find out?
"A. I didn't have no idea he was on probation, no.
"Q. Well, you saw on his rap sheet where he had been charged with [Driving Under the Influence], didn't you?
"A. I had heard about that.    I don't remember whether I had seen it on the rap sheet or not.
"Q. So you'd heard about it?
 .    .    .    .    .
"A. I don't know remember whether I seen it on the rap sheet or heard about it.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
(Cite as: 520 U.S. 397, 117 S.Ct. 1382)

Page 18

"Q. All right. Well, whichever way you, it came to your attention, you didn't check to find out with the proper authorities as to what the disposition of that charge was, did you?

. . . . .

"A. I don't really know. I can't say.

"Q. Did you check to see if Mr. Burns had an arrest warrant out for him?

"A. We-I run him through [the National Crime Information Center] and there wasn't-didn't show no warrant, no." 9 Record 672-675.

If, as is likely, the jurors did disbelieve the sheriff and concluded he had read the whole record, they certainly could have eliminated any possibility that the sheriff's decision to *428 employ his relative was an act of mere negligence or poor judgment. He did not even claim, for example, that he thought any assault must have been just a youthful peccadillo magnified out of proportion by the criminal charge, or that he had evaluated the assault as merely eccentric behavior in a young man of sound character, or that he **1400 was convinced that wild youth had given way to discretion. There being no such evidence of reasonable but mistaken judgment, the jury could readily have found that the sheriff knew his nephew's proven propensities, that he thought the thrust of the evidence was so damaging that he would lie to protect his reputation and the county treasury, and that he simply chose to put a family member on the payroll (the third relative, in fact [FN5]) disregarding the risk to the public.

FN5. Burns is the son of Sheriff Moore's nephew and Burns's grandfather had been involved with the sheriff's department for 16 years. See 67 F.3d 1174, 1184 (C.A.5 1995).

At trial, petitioner's expert witness stated during cross-examination that Burns's rap sheet listed repeated traffic violations, including driving while intoxicated and driving with a suspended license, resisting arrest, and more than one charge of assault and battery. The witness further testified that Burns pleaded guilty to assault and battery and other charges 16 months before he was hired by Sheriff Moore.[FN6]     *429 Respondent's expert witness testified that Burns's arrest record showed a "blatant disregard for the law and problems that may show themselves in abusing the public or using excessive

force." 7 Record 316, and petitioner's own expert agreed that Burns's criminal history should have caused concern. When asked if he would have hired Burns, he replied that it was "doubtful." 9 Record 537. On this evidence, the jury could have found that the string of arrests and convictions revealed "that Burns had [such] a propensity for violence and a disregard for the law," see 67 F.3d, at 1184, n. 20, that his subsequent resort to excessive force was the plainly obvious consequence of hiring him as a law enforcement officer authorized to employ force in performing his duties.

FN6. The Court points out that Burns had only one conviction for assault and battery, that respondent has never claimed otherwise, and that her expert witness so testified. See ante, at 1393, n. 2. This is entirely correct. But the issue here is not what might have been learned by thoroughly investigating Burns's behavior;   the issue is the sufficiency of the evidence to support the jury's finding that the sheriff acted with deliberate indifference when he hired Burns. Specifically, assuming the jury found that the sheriff looked at Burns's criminal record, an assumption the Court acknowledges is "plausible," see ante, at 1393, what does the evidence show that the sheriff learned from this examination? The criminal record was not itself introduced into evidence in written form, but it was, in relevant part, read to the jury by petitioner's expert witness Ken Barnes. According to Barnes's testimony, this criminal record's list of numerous charges included four references to assault and battery, two of which the witness said were duplicative, though he conceded this was not necessarily so. See 9 Record 532-533. The upshot was that if the jury found that the sheriff looked at the written record, it could have found that he read four separate references to assault and battery charges. That is not to say that four assaults necessarily occurred, but only that the record refers four times to such charges before listing one conviction for assault and battery. Barnes also testified that the record does not contain a disposition for all the charges listed, and that a sheriff reviewing such a record should have investigated further to determine the disposition of such charges. See id., at 536.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033, 97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

In my judgment, the evidence would have been sufficient (under the majority's test) if it had shown no more than one complaint and conviction for assault and battery, given the mixture of charges of resisting an officer, public drunkenness, and multiple traffic offenses over a 4-month period ending only 16 months before Burns was hired. The inference to be drawn would have been that a repeatedly lawless young man had shown a proclivity to violence against the person. But, as it turns out, the evidentiary record is ostensibly more damaging than that.

### III

The county escapes from liability through the Court's untoward application of an enhanced fault standard to a record of inculpatory evidence showing a contempt for constitutional obligations as blatant as the nepotism that apparently occasioned it. The novelty of this escape shows something **\*430** unsuspected (by me, at least) until today. Despite arguments that *Monell 's* policy requirement was an erroneous reading of § 1983, see *Oklahoma City v. Tuttle,* 471 U.S., at 834, 105 S.Ct., at 2441 (STEVENS, J., dissenting), I had not previously thought that there was sufficient reason to unsettle the precedent of *Monell.* Now it turns out, however, that *Monell* is hardly settled. That being so, Justice BREYER's powerful call to reexamine § 1983 municipal liability afresh finds support in the Court's own readiness to rethink the matter.

I respectfully dissent.

**\*\*1401** Justice BREYER, with whom Justice STEVENS and GINSBURG join, dissenting. In *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), this Court said that municipalities cannot be held liable for constitutional torts under 42 U.S.C. § 1983 "on a *respondeat superior* theory," but they can be held liable "when execution of" a municipality's "policy or custom ... inflicts the injury." 436 U.S., at 691, 694, 98 S.Ct., at 2036, 2037. That statement has produced a highly complex body of interpretive law. Today's decision exemplifies the law's complexity, for it distinguishes among a municipal action that "*itself* violates federal law," *ante,* at 1388, an action that "intentionally deprive[s] a plaintiff of a federally protected right," *ibid.,* and one that "has caused an employee to do so," *ante,* at 1389. It then

elaborates this Court's requirement that a consequence be "*so likely*" to occur that a policymaker could "*reasonably be said to have been deliberately indifferent*" with respect to it, *Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (emphasis added), with an admonition that the unconstitutional consequence must be "plainly obvious," *ante,* at 1392. The majority fears that a contrary view of prior precedent would undermine *Monell 's* basic distinction. That concern, however, rather than leading us to spin ever finer distinctions as we try to apply *Monell 's* basic distinction between liability that rests upon policy and liability that is vicarious, suggests **\*431** that we should reexamine the legal soundness of that basic distinction itself.

I believe that the legal prerequisites for reexamination of an interpretation of an important statute are present here. The soundness of the original principle is doubtful. The original principle has generated a body of interpretive law that is so complex that the law has become difficult to apply. Factual and legal changes have divorced the law from the distinction's apparent original purposes. And there may be only a handful of individuals or groups that have significantly relied upon perpetuation of the original distinction. If all this is so, later law has made the original distinction, not simply wrong, but obsolete and a potential source of confusion. Cf., *e.g., Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 47-49, 97 S.Ct. 2549, 2556-2557, 53 L.Ed.2d 568 (1977) (reexamining Sherman Act's interpretation set forth in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)); *Hubbard v. United States,* 514 U.S. 695, 697-715, 115 S.Ct. 1754, 1756-1765, 131 L.Ed.2d 779 (1995) (reexamining interpretation of 18 U.S.C. § 1001 set forth in *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955)); *Monell, supra,* at 664-690, 695-701, 98 S.Ct., at 2022-2036, 2038-2041 (reexamining interpretation of 42 U.S.C. § 1983 set forth in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). See also *United States v. Gaudin,* 515 U.S. 506, 521-522, 115 S.Ct. 2310, 2318-2319, 132 L.Ed.2d 444 (1995).

First, consider *Monell 's* original reasoning. The *Monell* "no vicarious liability" principle rested upon a historical analysis of § 1983 and upon § 1983's literal language-language that imposes liability upon (but only upon) any "person." Justice sTEVENS has clearly explained why neither of these rationales is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                                                            Page 20
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

sound. _Oklahoma City v. Tuttle,_ 471 U.S. 808, 834-844, 105 S.Ct. 2427, 2441-2447, 85 L.Ed.2d 791 (1985) (dissenting opinion); _Pembaur v. Cincinnati,_ 475 U.S. 469, 489-491, 106 S.Ct. 1292, 1303-1304, 89 L.Ed.2d 452 (1986) (opinion concurring in part and concurring in judgment). Essentially, the history on which _Monell_ relied consists almost exclusively of the fact that the Congress that enacted § 1983 rejected an amendment (called the Sherman amendment) that would have made municipalities vicariously liable for the marauding**432** acts of _private citizens._ _Monell, supra,_ at 666-667, 694, 98 S.Ct., at 2023-2024, 2037.    Cf. _Jett v. Dallas Independent School Dist.,_ 491 U.S. 701, 726-729, 109 S.Ct. 2702, 2718-2720, 105 L.Ed.2d 598 (1989) (plurality opinion). That fact, as Justice sTEVENS and others have pointed out, does not argue against vicarious liability for the act of municipal _employees_-particularly since municipalities, at the time, were vicariously liable for many of the acts of their employees. See **1402**_Tuttle, supra,_ at 836, n. 8, 105 S.Ct., at 2444, n. 8 (sTEVENS, J., dissenting) (citing cases); _Pembaur, supra,_ at 489-490, 106 S.Ct., at 1303-1304 (sTEVENS, J., concurring in part and concurring in judgment). See also, _e.g.,_ Kramer & Sykes, Municipal Liability Under § 1983: A Legal and Economic Analysis, 1987 S.Ct.Rev. 249, 256-265; Mead, 42 U.S.C. § 1983 Municipal Liability: The _Monell_ Sketch Becomes a Distorted Picture, 65 N.C.L.Rev. 517, 535-537 (1987). But see Welch & Hofmeister, _Praprotnik,_ Municipal Policy and Policymakers: The Supreme Court's Constriction of Municipal Liability, 13 S. Ill. U.L.J. 857, 881 (1989) (adopting _Monell ' s_ reading of the legislative history).

Without supporting history, it is difficult to find § 1983's words "[e]very person" inconsistent with _respondeat superior_ liability. In 1871 "bodies politic and corporate," such as municipalities, were "person[s]." See Act of Feb. 25, ch. 71, § 2, 16 Stat. 431 (repealed 1939); _Monell, supra,_ at 688-689, 98 S.Ct., at 2034-2035. Section 1983 requires that the "person" either "subjec[t]" or "caus[e]" a different person "to be subjected" to a "deprivation" of a right. As a purely linguistic matter, a municipality, which can act only through its employees, might be said to have "subject[ed]" a person or to have "cause[d]" that person to have been "subjected" to a loss of rights when a municipality's employee acts within the scope of his or her employment. See _Restatement (Second) of Agency § 219 (1957);_ W. Landes & R. Posner, The Economic Structure of Tort Law 120-121 (1987). Federal courts on occasion have

interpreted the word "person" or the equivalent in other statutes as authorizing forms of vicarious liability. See, _e.g.,_ **433**_American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.,_ 42 F.3d 1421, 1429-1434 (C.A.3 1994), cert. denied, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995) (Lanham Act); _American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,_ 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (Sherman Act); _United States v. A & P Trucking Co.,_ 358 U.S. 121, 124-125, 79 S.Ct. 203, 206-207, 3 L.Ed.2d 165 (1958) (criminal statute). See also _Tuttle, supra,_ at 835, 105 S.Ct., at 2442 (sTEVENS, J., dissenting).

Second, _Monell 's_ basic effort to distinguish between vicarious liability and liability derived from "policy or custom" has produced a body of law that is neither readily understandable nor easy to apply. Today's case provides a good example. The District Court in this case told the jury it must find (1) Sheriff Moore's screening "_so likely_ to result in violations of constitutional rights" that he could "_reasonably [be] said to have been deliberately indifferent_ to the constitutional needs of the Plaintiff" and (2) that the "inadequate hiring ... policy _directly caused_ the Plaintiff's injury." App. 123a (emphasis added). This instruction comes close to repeating this Court's language in _Canton v. Harris._ In _Canton,_ the Court said (of the city's failure to train officers in the use of deadly force):

"[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy _so likely_ to result in the violation of constitutional rights, that the policymakers of the city can _reasonably be said to have been deliberately indifferent_ to the need." 489 U.S., at 390, 109 S.Ct., at 1205 (emphasis added).

The majority says that the District Court and the Court of Appeals did not look closely enough at the specific facts of this case. It also adds that the harm must be a "_plainly obvious consequence_ " of the "decision to hire" Burns. _Ante,_ at 1392. But why elaborate _Canton 's_ instruction in this way? The Court's verbal formulation is slightly different; and that being so, a lawyer or judge will ignore the Court's precise **434** words at his or her peril. Yet those words, while adding complexity, do not seem to reflect a difference that significantly helps one understand the difference between "vicarious" liability and "policy." Cf. _ante,_ at 1396-1397 (sOUTER, J., dissenting). Even if the Court means only that the record evidence does not meet _Canton 's_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                    Page 21
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

standard, it will be difficult for juries, and for judges, to understand just why that is so. It will be difficult for them to apply today's elaboration of *Canton*-except perhaps in the limited context of police force **\*\*1403** hiring decisions that are followed by a recruit's unconstitutional conduct.

Consider some of the other distinctions that this Court has had to make as it has sought to distinguish liability based upon policymaking from liability that is "vicarious." It has proved necessary, for example, to distinguish further, between an exercise of *policymaking authority* and an exercise of *delegated discretionary policy-implementing authority.* See *St. Louis v. Praprotnik,* 485 U.S. 112, 126-127, 108 S.Ct. 915, 925-926, 99 L.Ed.2d 107 (1988) (plurality opinion). Compare *Tuttle,* 471 U.S., at 817, 105 S.Ct., at 2432-2433 (plurality opinion), with *Canton, supra,* at 389-390, 109 S.Ct., at 1205-1206. Without some such distinction, "municipal liability [might] collaps[e] into *respondeat superior," ante,* at 1391, for the law would treat similarly (and hold municipalities responsible for) both a police officer's decision about how much force to use when making a particular arrest and a police chief's decision about how much force to use when making a particular *kind* of arrest. But the distinction is not a clear one. It requires federal courts to explore state and municipal law that distributes different state powers among different local officials and local entities. *Praprotnik, supra,* at 125-126, 127-131, 108 S.Ct., at 925-926, 926-928 (plurality opinion); *Jett, supra,* at 737-738, 109 S.Ct., at 2723-2724. That law is highly specialized; it may or may not say just where policymaking authority lies, and it can prove particularly difficult to apply in light of the Court's determination that a decision can be "policymaking" even though it applies only to a single instance. *Pembaur,* 475 U.S., at 481, 106 S.Ct., at 1299. See also \*435 *Praprotnik, supra,* at 143, 108 S.Ct., at 934 (Brennan, J., concurring in judgment); Schnapper, A *Monell* Update: Clarity, Conflict, and Complications, Practising Law Institute, Litigation and Administrative Practice Series, No. 381, Vol. 2, p. 36 (1989); Schuck, Municipal Liability Under Section 1983: Some Lessons From Tort Law and Organization Theory, 77 Geo. L.J. 1753, 1774-1779 (1989).

It is not surprising that results have sometimes proved inconsistent. Compare *ante,* at 1390 (sheriff was final policymaker in hiring matters), with *Greensboro Professional Fire Fighters Assn., Local 3157 v. Greensboro,* 64 F.3d 962, 965-966 (C.A.4

1995) (fire chief was not policymaker with respect to hiring and firing), and *Harris v. Pagedale,* 821 F.2d 499, 505-508 (CA8) (municipality was deliberately indifferent to charges of sexual assault), cert. denied, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987) with *Wilson v. Chicago,* 6 F.3d 1233, 1240-1241 (C.A.7 1993) (municipal policymaker was not deliberately indifferent to charges of abuse of pretrial detainees), cert. denied, 511 U.S. 1088, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994). See also *Auriemma v. Rice,* 957 F.2d 397, 400-401 (C.A.7 1992) (describing confusion in courts).

Nor does the location of "policymaking" authority pose the only conceptually difficult problem. Lower courts must also decide whether a failure to make policy was "deliberately indifferent," rather than "grossly negligent." *Canton, supra,* at 388, n. 7, 109 S.Ct., at 1205, n. 7. And they must decide, for example, whether it matters that some such failure occurred in the officer-training, rather than the officer-hiring, process. *Ante,* at 1390-1391.

Given the basic *Monell* principle, these distinctions may be necessary, for without them, the Court cannot easily avoid a "municipal liability" that "collaps[es] into *respondeat superior." Ante,* at 1391. But a basic legal principle that requires so many such distinctions to maintain its legal life may not deserve such longevity. See Mead, 65 N.C.L.Rev., at 542 (describing the "confusion and uncertainty" in the lower courts "caused by the *Monell* Court's choice of the **\*436** policy or custom causation requirement"); Schuck, *supra,* at 1783 (noting the "extraordinary unpredictability of the 'official policy' test").

Finally, relevant legal and factual circumstances may have changed in a way that affects likely reliance upon *Monell* 's liability limitation. The legal complexity just described makes it difficult for municipalities to predict just when they will be held liable based upon "policy or custom." Moreover, their potential liability is, in a sense, greater than that of individuals, for they cannot assert the "qualified immunity" defenses that **\*\*1404** individuals may raise. *Owen v. Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Further, many States have statutes that appear to, in effect, mimic *respondeat superior* by authorizing indemnification of employees found liable under § 1983 for actions within the scope of their employment. See, *e.g,* Conn. Gen.Stat. § 7-465 (1997); Idaho Code § 6-903 (1990); Ill. Comp. Stat., ch. 745, § 10/2-302 (1994); Kan. Stat. Ann. § 75-6109 (1989);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

117 S.Ct. 1382                                                                                   Page 22
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033,
97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405
**(Cite as: 520 U.S. 397, 117 S.Ct. 1382)**

Minn.Stat. § 466.07 (1994); Mont.Code Ann. § 2-9-305 (1994); Nev.Rev.Stat. § 41.0349 (1989); N.H.Rev.Stat. Ann. § 29-A:2 (1988); N.D. Cent.Code § 32-12.1-04(4) (Supp.1993); Okla. Stat., Tit. 51, § 162 (Supp.1995); 42 Pa. Cons.Stat. § 8548 (1982); S.D. Codified Laws § 3-19-1 (1994); Utah Code Ann. § 63-30-36 (1993); W. Va.Code § 29-12A-11 (1992); Wis. Stat. § 895.46 (1993-1994). These statutes-valuable to government employees as well as to civil rights victims-can provide for payments from the government that are similar to those that would take place in the absence of *Monell* 's limitations.     To the extent that they do so, municipal reliance upon the continuation of *Monell* 's "policy" limitation loses much of its significance.

Any statement about reliance, of course, must be tentative, as we have not heard argument on the matter.     We do not know the pattern of indemnification:   how often, and to what extent, States now indemnify their employees, and which of their employees they indemnify.     I also realize that there may be other reasons, constitutional and otherwise, that I **\*437** have not discussed that argue strongly for reaffirmation of *Monell* 's holding. See, *e.g.*, Gerhardt, The *Monell* Legacy:     Balancing Federalism Concerns and Municipal Accountability under Section 1983, 62 S. Cal. L.Rev. 539 (1989) (discussing federalism);     Nahmod, Constitutional Accountability in Section 1983 Litigation, 68 Iowa L.Rev. 1, 24-25 (1982) (describing *Monell* as having the "proper approach to local government accountability under section 1983" and describing a fault-based interpretation of § 1983); Welch & Hofmeister, 13 S. Ill. U.L. J., at 883, n. 176 (discussing disadvantages of an "expansive view of municipal liability," including lack of insurance coverage).

Nonetheless, for the reasons I have set forth, I believe the case for reexamination is a strong one.     Today's decision underscores this need.     Consequently, I would ask for further argument that would focus upon the continued viability of *Monell* 's distinction between vicarious municipal liability and municipal liability based upon policy and custom.

U.S. (Tex.),1997.
Board of County Com'rs of Bryan County, Okl. v. Brown
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626, 65 USLW 4286, 12 IER Cases 1217, 97 Cal. Daily Op. Serv. 3033, 97 Daily Journal D.A.R. 5311, 97 CJ C.A.R. 582, 10 Fla. L. Weekly Fed. S 405

Briefs and Other Related Documents (Back to top)

• 1996 WL 656502 (Oral Argument) Oral Argument (Nov. 05, 1996)
• 1996 WL 484436 (Appellate Brief) REPLY BRIEF FOR PETITIONER (Aug. 26, 1996)
• 1996 WL 413766 (Appellate Brief) BRIEF OF NOW LEGAL DEFENSE AND EDUCATION FUND, CALIFORNIA WOMEN LAWYERS, CONNECTICUT WOMEN'S EDUCATION AND LEGAL FUND, INC., EQUAL RIGHTS ADVOCATES, NATIONAL COALITION OF 100 BLACK WOMEN, INC., NATIONAL ORGANIZATION FOR WOMEN FOUNDATION, NORTHWEST WO MEN'S LAW CENTER, WOMEN EMPLOYED, WOMEN'S EQUAL RIGHTS LEGAL DEFENSE AND EDUCATION FUND, WOMEN'S LAW PROJECT, AND WOMEN'S LEGAL DEFENSE FUND AS AMICI CURIAE IN SUPPORT OF RESPONDENT (Jul. 24, 1996)
• 1996 WL 419725 (Appellate Brief) BRIEF FOR RESPONDENT (Jul. 24, 1996)
• 1996 WL 341550 (Appellate Brief) BRIEF OF WASHINGTON LEGAL FOUNDATION AND ALLIED EDUCATIONAL FOUNDATION AS AMICI CURIAE IN SUPPORT OF PETITIONER (Jun. 21, 1996)
• 1996 WL 345580 (Appellate Brief) BRIEF FOR PETITIONER (Jun. 21, 1996)
• 1996 WL 345589 (Appellate Brief) BRIEF OF THE NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, U.S. CONFERENCE OF MAYORS, INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION, AND INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION AS AMICI CURIAE IN SUPPORT OF PETITIONER (Jun. 21, 1996)
• 1996 WL 341545 (Appellate Brief) BRIEF FOR AMICUS CURIAE, THE CITY OF NEW YORK (Jun. 20, 1996)
• 1996 WL 33413821 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jan. 05, 1996) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:31:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | AL-ST-ANN |
| Citation Text: | AL ST s 11-43-231 |
| Lines: | 36 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Code of Alabama Currentness
  Title 11. Counties and Municipal Corporations. (Refs & Annos)
    Subtitle 2. Provisions Applicable to Municipal Corporations Only. (Refs & Annos)
      ⁿ⬛ Chapter 43. Mayor and Council, Other Officers, Employees, Departments, Etc.
        ⁿ⬛ Article 11. Due Process for Municipal Law Enforcement Officers. (Refs & Annos)

### ➡ § 11-43-231. "Law enforcement officer" defined.

As used in this article, the term "law enforcement officer" shall mean an official who is certified by the Alabama Peace Officers' Standards and Training Commission who has authority to make arrests and who is employed by any municipality in the state as a permanent and regular employee with law enforcement duties, including police chiefs and deputy police chiefs. The term does not include any person elected by popular vote, any person who is serving a probationary period of employment, or any person whose term of office has expired.


Federal Rules of Civil Procedure Rule 56

United States Code Annotated Currentness

Federal Rules of Civil Procedure . for the United States District Courts (Refs & Annos)
ⁿ⬛VII. Judgment
## ➡Rule 56. Summary Judgment

**(a) For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.


**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.


**(c) Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.


**(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**(f) When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(g) Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:54:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | SCTFIND |
| Citation Text: | 106 S.Ct. 1571 |
| Lines: | 508 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# Westlaw.

106 S.Ct. 1571
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

Page 1

▷

Briefs and Other Related Documents
City of Los Angeles v. HellerU.S.Cal.,1986.
Supreme Court of the United States
CITY OF LOS ANGELES et al.
v.
Ronald HELLER.
**No. 85-531.**

April 21, 1986.

Plaintiff brought civil rights action against city, members of city police commission, and two city police officers. He claimed damages by reason of having been arrested without probable cause and having been the victim of excessive force in the making of the arrest. One of the police officers was granted summary judgment. After the jury returned a general verdict for the remaining police officer, the United States District Court for the Central District of California dismissed the action against the city and members of the police commission, and plaintiff appealed. The Court of Appeals, 759 F.2d 1371, reversed and remanded. Certiorari was granted. The Supreme Court held that the jury's finding that the police officer inflicted no constitutional injury on the plaintiff removed any basis for liability against the city and members of police commission.

Reversed and remanded.

Justice Marshall dissented from the summary disposition.

Justice Stevens dissented and filed an opinion in which Justice Marshall joined.
West Headnotes
**[1] Federal Civil Procedure 170A ☞2181**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(G) Instructions
         170Ak2181 k. Construction and Operation in General. Most Cited Cases

**Federal Courts 170B ☞799**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)3 Presumptions

         170Bk799 k. Verdict. Most Cited Cases
Theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with instructions given them and that they do not consider and base their decisions on legal questions with respect to which they are not charged.

**[2] Civil Rights 78 ☞1424**

78 Civil Rights
   78III Federal Remedies in General
      78k1424 k. Trial in General. Most Cited Cases
      (Formerly 78k243.1, 78k243, 78k13.14)
Jury's verdict for city police officer and against civil rights plaintiff who claimed he was the victim of excessive force during course of an arrest removed any basis for liability on part of city and members of its police commission; jury's finding that officer inflicted no constitutional injury on plaintiff was not only conclusive as to officer, but also as to city and its police commission.

**[3] Civil Rights 78 ☞1348**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1348 k. Criminal Law Enforcement; Prisons. Most Cited Cases
      (Formerly 78k206(2.1), 78k206(2), 78k13.7)
An award of damages against a municipal corporation based on actions of one of its police officers is not authorized when jury has concluded that officer inflicted no constitutional harm; moreover, if a plaintiff has suffered no constitutional injury at hands of the officer, fact that departmental regulations might have authorized use of constitutionally excessive force is beside the point.

**\*797 \*\*1572 PER CURIAM.**
Respondent Ronald Heller sued petitioners, city of Los Angeles, and individual members of the Los Angeles Police Commission, and two Los Angeles police officers in the United States District Court for the Central District of California under the provisions of 42 U.S.C. § 1983. He claimed damages by reason of having been arrested without probable cause and having been the victim of excessive force in the making of the arrest. The incident arose as a result of the two Los Angeles police officers stopping

him because of a suspicion that he was driving while intoxicated. In the words of the Court of Appeals for the Ninth Circuit:

"The officers administered a series of field sobriety tests. Apparently dissatisfied with the results, the officers decided to take Heller to the station to undergo a breath test. When notified that he was under arrest, however, Heller became belligerent. One of the defendants, Officer Bushey, attempted to handcuff him. An altercation ensued. In the course of the struggle, Heller fell through a plate glass window." Heller v. Bushey, 759 F.2d 1371, 1372-1373 (CA9 1985).

The District Court held a bifurcated trial, and first heard respondent's claims against one of the individual police officers.<u>FN*</u> The jury was instructed that Heller would make out his constitutional claim if he were arrested without reasonable cause, or if he were arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. Id., at 1374. The jury was not instructed on any affirmative defenses that might have been asserted by **\*798** the individual police officer. Tr. in No. 80-2643 (CD Cal.), pp. 803-822, 843. The jury returned a verdict for the defendant police officer and against respondent. The District Court then dismissed the action against petitioners, concluding that if the police officer had been exonerated by the jury there could be no basis for assertion of liability against the city or the persons constituting its Police Commission.

> FN* The second of the two police officers named as defendants was granted summary judgment by the District Court.

Respondent appealed to the Court of Appeals for the Ninth Circuit, and that court reversed the judgment of the District Court dismissing respondent's case against petitioners even though it did not disturb the verdict for the defendant police officer. Respondent urged, and the Court of Appeals apparently agreed, that "the jury could have believed that Bushey, having followed Police Department regulations, was entitled in substance to a defense of good faith. Such a belief would not negate the existence of a constitutional injury" (footnote omitted). 759 F.2d, at 1373-1374.

[1][2] The difficulty with this position is that the jury was not charged on any affirmative**\*1573** defense such as good faith which might have been availed of

by the individual police officer. Respondent contends in his brief in opposition to certiorari that even though no issue of qualified immunity was presented to the jury, the jury might nonetheless have considered evidence which would have supported a finding of such immunity. But the theory under which jury instructions are given by trial counsel and reviewed on appeal is that juries act in accordance with the instructions given them, see Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985), and that they do not consider and base their decisions on legal questions with respect to which they are not charged. We think that the Court of Appeals' search for ambiguity in the verdict was unavailing; as that court itself noted later in its opinion, "[b]ecause the instructions required a verdict for [respondent] if either the due process or the excessive force claim was found, the jury's **\*799** verdict for the defendant required a negative finding on both claims." 759 F.2d, at 1374, n. 3. This negative, it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent.

[3] The Court of Appeals also stated:
"We must conclude that the general verdict does not foreclose a finding that Heller suffered a constitutional deprivation. Heller's Monell claim survived the general verdict.... The jury verdict, of course, conclusively determined that there was probable cause to arrest Heller. On the other hand, it is equally clear that whether the application of force in accordance with Police Department regulations in this case exceeded constitutional limits has not been determined." Id., at 1374-1375.

But this was an action for damages, and neither Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

 **\*800** Justice BRENNAN took no part in the consideration or decision of this case.

Justice MARSHALL dissents from this summary disposition, which has been ordered without affording the parties prior notice or an opportunity to file briefs on the merits.   See *Cuyahoga Valley R. Co. v. Transportation Union,* 474 U.S. 3, 8, 106 S.Ct. 286, ----, 88 L.Ed.2d 2 (1985) (MARSHALL, J., dissenting); *Maggio v. Fulford,* 462 U.S. 111, 120-121, 103 S.Ct. 2261, 2265-2266, 76 L.Ed.2d 794 (1983) (MARSHALL, J., dissenting).

Justice STEVENS, with whom Justice MARSHALL joins, dissenting.

Whenever the Court decides a case without the benefit of briefs or argument on the merits, there is a danger that it will issue an opinion without the careful deliberation and explication that the issues require.   Today's "*per curiam* " opinion is a fair illustration of the problem.   The two important issues presented in this case are not even identified in that document.   The District Court's decision to dismiss the action against the city, the Police Department, and the Police Commissioners necessarily rested on two assumptions:   (1) there **\*\*1574** was an inherent inconsistency between the jury verdict in favor of Officer Bushey and a possible verdict against the municipal defendants and (2) that inconsistency required the dismissal of the action against the municipal defendants.     Far from specifically addressing those issues, however, the District Court dismissed the action against the city on the ground that it had "become moot." [FN1]   In a similar vein, this **\*801** Court rests its summary decision on the maxim that "juries act in accordance with the instructions given them." *Ante,* at 1573.   In my view, neither of the necessary assumptions for the District Court's action-and for this Court's reinstatement of its decision-is remotely present in this case.

> FN1. See 8 Record 844 ("With respect to the Monell cause of action, which was bifurcated from the initial trial, the Court is now convinced that has become moot by reason of the verdict in favor of the defendant and the Court is ordering dismissal of that cause of action at this time"); 2 *id.,* Doc. No. 209, dismissal order

("the plaintiff's theory of liability against the defendants, CITY OF LOS ANGELES, LOS ANGELES BOARD OF POLICE COMMISSIONERS and LOS ANGELES POLICE DEPARTMENT, based on the case of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ] ... is moot").

I

The first necessary assumption is that there would be an inevitable inconsistency between the jury verdict of no liability for Officer Bushey and a possible verdict of liability against the municipal entities;   in the absence of such an inconsistency, the District Court's decision, and this Court's reinstatement of it, are simply inexplicable.

It is undisputed that Ronald Heller crashed through a plate-glass window after some kind of an altercation with Officer Bushey.     He had been stopped on suspicion of driving while intoxicated and given sobriety tests. [FN2]   In his claim against the municipal entities, Heller contended that the city and the Police Department had adopted a policy of condoning excessive force in making arrests, that the policy was unlawful, and that he had been injured by the application of that policy at the time of his arrest.   In his claim against Officer Bushey, Heller contended that his constitutional rights were violated because Officer Bushey had employed "unreasonable force" in arresting him.

> FN2. After the altercation, Heller was given an alcohol level test, and was found to have one-tenth the level of alcohol in his body necessary for a finding of driving while intoxicated under California law.   5 *id.,* at 134-136.   Heller was never charged with driving while intoxicated. *Ibid.*

On the day before trial, the District Judge bifurcated the trial into two phases-the first against Officer Bushey and the second against the municipal entities. The record contains no explanation for this decision, but it does reveal that Heller's counsel opposed bifurcation. [FN3]

> FN3. See 5 *id.,* Doc. No. 203, minutes of chambers conference (Oct. 18, 1982) ("Court confers with Counsel re:   Pretrial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1571
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
(Cite as: 475 U.S. 796, 106 S.Ct. 1571)

Page 4

order, Jury trial on 10/19/82, Jury Instructions, Defendant's amended witness list and bifurcation of case. Plaintiff counsel opposes Bifurcation. Defendant does not oppose bifurcation").

**\*802** In the proceeding against Officer Bushey, considerable evidence of the Los Angeles Police Department's policy and custom on the use of force was introduced. An expert witness testified regarding Los Angeles' officially sanctioned use of "escalating force," culminating in the use of the notorious "chokehold." [FN4] Officer Bushey **\*1575** himself testified that Heller's flight through the window resulted from his attempt to impose a chokehold, and that he was carefully following official Police Department policy.[FN5] Officer Bushey's superior, Sergeant Shrader, also testified that Officer Bushey's actions were in complete compliance with official Police Department policy.[FN6] Finally, Officer Bushey's attorney repeatedly **\*803** emphasized that his client's actions were entirely consistent with established Department policy.[FN7]

> FN4. See 5, *id.,* at 157-158 (testimony of James Fyfe) ("The Los Angeles Police Department employs a scale of escalation in the use of force.... [T]he Los Angeles Police Department varies from every other major police department I know of. The Los Angeles Police Department says that if that compliance to hold fails to work the next degree of force to be used is a chokehold or, as the police department calls them, a carotid control hold and modified carotid hold and bar arm control holds"). Cf. *Los Angeles v. Lyons,* 461 U.S. 95, 97, n. 1, 103 S.Ct. 1660, 1663, n. 1, 75 L.Ed.2d 675 (1983) (describing chokehold); *id.,* at 114-119, 103 S.Ct. at 1671-1674 (MARSHALL, J., dissenting) (reviewing Los Angeles Police Department's use of chokeholds and noting that 16 deaths had resulted from chokeholds since 1975). At the time of Heller's trial, *Lyons* was pending before this Court.

> FN5. 5 Record 99-100 ("As he began his two steps forward I applied-I put my left arm around his-the portion I tried to get was the front part of his throat. You use the blade of your wrist on the person's throat. As we are supposed to when we are trying to

take someone into custody use verbal commands of first asking verbally and then demanding verbally. If that does not work we use what is called a pain compliance, which is trying to twist someone's wrist where the pain hurts them and they'll comply with your request.... I tried to get the blade of my wrist around to his throat to apply pressure to his throat, which is also a pain compliance hold").

> FN6. See 6 *id.,* at 279-281 (testimony of Sergeant Shrader) (describing Police Department's "accelerated force theory" and concluding that Officer Bushey's use of a chokehold would have been "within the policy").

> FN7. See, *e.g.,* 5 *id.,* at 170 ("[T]he carotid hold was a hold that was being taught to the Los Angeles Police Department"); 6 *id.,* at 279 (referring to "the accelerated force theory that the police department has"); *id.,* at 281 (referring to "the policy of what police department officers do"). See also Officer Bushey's counsel's closing argument, 7 *id.,* at 699 ("In this case it's not the City that's the defendant. It's Officer Bushey"); *id.,* at 706 (citing "testimony concerning our own policies and procedures as to the Los Angeles Police Department"); *ibid.* ("[T]he procedures which Officer Bushey followed are exactly what he's taught and the reasons he's taught to do it"); *id.,* at 716 ("It's Officer Bushey who's the defendant"); *id.,* at 718 ("Officer Bushey was trying to do his job").

In submitting the claim against Officer Bushey to the jury, the trial judge gave an instruction that simply stated that whether or not the force used in making an arrest is unreasonable "is an issue to be determined in the light of all the surrounding circumstances." [FN8] After deliberating several hours, the jury returned a general verdict in favor of the officer.

> FN8. "Whether or not the force used in making an arrest, preventing an escape, or overcoming resistance was expressive [*sic*], unreasonable or violent is an issue to be determined in the light of all the surrounding circumstances." 8 *id.,* at 815-816.

Thus, despite the majority's summary assertion to the

contrary, it is perfectly obvious that the general verdict rejecting the excessive force claim against Officer Bushey did not necessarily determine the constitutionality of the city's "escalating force" policy-a subject on which the jury had received no instructions at all.   The verdict merely determined that the officer's action was not unreasonable "in the light of all the surrounding circumstances"-which, of course, included the evidence that Officer Bushey was merely obeying orders and following established Police Department policy.

As a result, there was no necessary inconsistency between the verdict for Officer Bushey and a possible verdict of liability**804** against the municipal defendants.   On that basis alone, the District Court plainly erred in dismissing as "moot" the suit against the municipal defendants, and the Court of Appeals was plainly correct to reverse the dismissal.[FN9]

> FN9. The Court of Appeals concluded:
> "The jury, in substance, was instructed that Heller was deprived of liberty without due process if he was arrested without reasonable cause.   The jurors were further instructed that Heller's constitutional rights were violated if he was arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest.   The jury's verdict for the defendant therefore embodies a finding that Heller was arrested for reasonable cause *and* that the amount of force used was not unreasonable or excessive.   The difficulty is that the conclusion that the force was reasonable could have been derived either from Police Department regulations, which incorporate a theory of 'escalating force,' or from a constitutional standard entirely independent of such regulations.   We cannot say which with assurance." *Heller v. Bushey,* 759 F.2d 1371, 1374 (CA9 1985) (footnote omitted).

**1576 II

In view of the fact that the Court of Appeals correctly concluded that there was no necessary inconsistency between a verdict exonerating Officer Bushey and a verdict holding the city and Police Department liable for the "escalating force" policy, it did not have to consider the appropriate response to a possible inconsistency in the context of a bifurcated trial.

Inconsistent verdicts are, of course, a familiar

phenomenon.   In a criminal case, a jury's apparently inconsistent verdict is allowed to stand.[FN10]   In a civil case, the rule is less **805** clear.[FN11]   Nevertheless, in contrast to the Court's blithe assumption today, it is far from certain that the District Court's action-the dismissal-was an appropriate response, even if somehow a verdict against the municipal entities might have created an inconsistency.   First, the Court ignores the **806** fact that, in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand.[FN12]   Second, the Court ignores the fact that, when faced with an apparently inconsistent verdict, a court has a duty to attempt to read the verdict in a manner that will resolve inconsistencies.[FN13]   Third, the Court ignores the **1577 fact that, upon receiving an apparently inconsistent verdict, the trial judge has the responsibility, not to retain half of the verdict, but to resubmit the question to the jury.[FN14]   Finally, the Court ignores the fact that, if verdicts are genuinely inconsistent and if the evidence might support either of the "inconsistent" verdicts, the appropriate remedy is ordinarily, not simply to accept one verdict and dismiss the other, but to order an entirely new trial.[FN15]

> FN10. See *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (reaffirming general rule that inconsistent verdicts can stand); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside"); *Hoag v. New Jersey,* 356 U.S. 464, 472, 78 S.Ct. 829, 835, 2 L.Ed.2d 913 (1958) ("[J]ury verdicts are sometimes inconsistent or irrational"); *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943) ("Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial.   Juries may indulge in precisely such motives or vagaries"); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) ( "Consistency in the verdict is not necessary").   Cf. *Ulster County Court v. Allen,* 442 U.S. 140, 168, 99 S.Ct. 2213, 2230, 60 L.Ed.2d 777 (1979) (BURGER, C.J., concurring) ("Courts have long held that in the practical business of deciding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cases the factfinders, not unlike negotiators, are permitted the luxury of verdicts reached by compromise").

FN11. See, *e.g.*, Bickel, Judge and Jury-Inconsistent Verdicts in the Federal Courts, 63 Harv.L.Rev. 649, 654 (1950) ("[T]here is not in a civil case the equivalent of a precedent such as *Dunn* [*v. United States, supra* ] to overrule in upsetting inconsistent verdicts. The argument outlined against extending the *Dunn* rule to civil cases is thus quite a plausible one. But it is not unanswerable") (footnote omitted).

FN12. Indeed, in explaining why an apparently inconsistent verdict in a civil case should not be disturbed, Justice Brandeis cited the leading case on the permissibility of inconsistent verdicts in a criminal context. See *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933) (citing *Dunn v. United States* ). See also F. James & G. Hazard, Civil Procedure 384 (3d ed. 1985) ("[T]he refusal of a trial court to set aside a verdict obviously representing a compromise has frequently, and quite properly, been upheld"); *id.,* at 394 ("One of the great values of jury trial ... is its ability to reflect the community sense of over-all fairness, and this may not in all cases coincide with the written law and the instructions which the court must give"); *Karcesky v. Laria,* 382 Pa. 227, 235, 114 A.2d 150, 154 (1955) ("Where the evidence of negligence, or contributory negligence, or both, is conflicting or not free from doubt, a trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict, and to sustain a verdict which is substantial"); *Jayne v. Mason & Dixon Lines, Inc.,* 124 F.2d 317, 319 (CA2 1941) (L. Hand) ("We do not mean to imply however that we should have thought it fatal to the wife's recovery if no rational reconciliation of the verdicts was possible. *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356 (1932) ]"). Cf. Note, Inconsistent Verdicts in Civil Trials, 45 Harv.L.Rev. 1230, 1234 (1932) (observing that, in some jurisdictions, "a master can not complain solely because the servant was exonerated at the same trial. If the evidence is sufficient to support the

verdict against the master, his appeal will be denied") (footnote omitted).

FN13. See *Gallick v. Baltimore & Ohio R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (In considering jury answers to questions in a special verdict, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them.... We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's special verdict and remand the case for a new trial"); *Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way"); *Affolder v. New York, Chi. & St. L. R. Co.,* 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950); *Fairmount Glass Works,* 287 U.S., at 485, 53 S.Ct., at 255 (Brandeis, J.) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct"); *Union Pacific R. Co. v. Hadley,* 246 U.S. 330, 334, 38 S.Ct. 318, 319, 62 L.Ed. 751 (1918) (Holmes, J.) ("[S]ince the [jury] finding was possible on the evidence it cannot be attributed to disregard of duty.... Beyond the question of attributing misconduct to the jury we are not concerned to inquire whether its reasons were right or wrong").

FN14. See, *e.g., Dickerson v. Pritchard,* 706 F.2d 256, 259 (CA7 1983) ("[T]he trial court properly resubmitted the inconsistent verdicts to the jury for reconsideration"); *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (CA5 1974) ("[I]f the jury returns two inconsistent verdicts, the trial court may resubmit the issue to them for clarification"); *Hopkins v. Coen,* 431 F.2d 1055, 1059 (CA6 1970) (upon receipt of inconsistent verdicts, trial court could have sent jury "back to the jury room to further deliberate with appropriate instructions to bring back consistent verdicts"); *Alston v. West,* 340 F.2d 856, 858 (CA7 1965) (when jury returned an inconsistent verdict, "the court properly

exercised its discretion in resubmitting the case to the jury").

FN15. See, *e.g.*, *Malley-Duff & Associates v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (CA3) ("We conclude that the answers to Questions 1, 2(A), and 2(B) must be considered inconsistent.... We will vacate the $900,000 verdict in the state law claims and order a new trial"), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Global Van Lines, Inc. v. Nebeker*, 541 F.2d 865, 868 (CA10 1976) (citing "the rule which says that inconsistencies which show jury confusion serve to mandate a new trial"); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 175 (CA5 1975) ("Where verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate and may even be required"). Cf. Fed.Rule Civ.Proc. 49(b) (appropriate remedy for inconsistent special verdicts and general verdict is resubmission to the jury, or a new trial).

**\*807** Although the Court fails to address it, the question this case raises (if, in fact, the initial view of inevitable inconsistency is accepted) is whether a different set of principles should apply in a bifurcated trial-more narrowly, in a trial that was bifurcated over the objection of the plaintiff. Because the question has not been argued, I do not foreclose the possibility that bifurcation should make a difference, but it is not immediately apparent to me why it should. In this case, the same jury would have passed on the municipal entities' liability, and would have relied on the evidence adduced in the first phase of the trial as well as that presented in the second phase. At the very least, it is unclear to me why the normal devices for addressing an apparently inconsistent verdict-construing the verdict in a manner that resolves the inconsistency; resubmitting the case to the jury for *it* to resolve the inconsistency; or even ordering a new trial-should be unavailable in a bifurcated context.

If the Court's unprecedented, ill-considered, and far-reaching decision happens to be correct, defendants as a class have been presented with a tactical value of great value. By persuading trial judges to bifurcate trials in which both the principal and its agents are named as defendants, and to require the jury to bring in its verdict on the individual claim first, they may obtain the benefit of whatever intangible factors have prompted juries to bring in a multitude of inconsistent verdicts in past years;

defendants will no longer have to abide the mechanisms that courts have used to mitigate **\*808** and resolve apparent inconsistencies.[FN16] Perhaps that is an appropriate**\*1578** response to the current widespread concern about the potential liabilities of our municipalities, but I doubt it. Cf. *Oklahoma City v. Tuttle*, 471 U.S. 808, 843-844, 105 S.Ct. 2427, 2446-2447, 85 L.Ed.2d 791 (1985) (STEVENS, J., dissenting).

FN16. Cf. *Alston v. West, supra* (in negligence suit against flower shop and driver for automobile accident, jury initially returned verdict of liability for flower shop and no liability for driver; after case was resubmitted, jury returned liability verdicts against both employer and driver).

III

The Court today reverses an interlocutory decision in a constitutional rights case on the basis of assumptions that dramatically conflict with the record and with settled legal principles. The Court mistakenly assumes that there was a necessary inconsistency between the verdict of no liability against the individual officer and a possible verdict against the municipal defendants; it then mistakenly assumes that dismissal was an appropriate response to the perceived inconsistency. Perhaps not coincidentally, the Court achieves these results without the aid of briefs or argument, and relies on an anonymous author to explain what it has done.

I respectfully dissent.

U.S.Cal.,1986.
City of Los Angeles v. Heller
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806

Briefs and Other Related Documents (Back to top)

• 1985 WL 694791 (Appellate Petition, Motion and Filing) Petition (Sep. 25, 1985)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:54:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | SCTFIND |
| Citation Text: | 106 S.Ct. 1571 |
| Lines: | 508 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

106 S.Ct. 1571                                                                                                    Page 1
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

▷

Briefs and Other Related Documents
City of Los Angeles v. HellerU.S.Cal.,1986.
Supreme Court of the United States
CITY OF LOS ANGELES et al.
v.
Ronald HELLER.
**No. 85-531.**

April 21, 1986.

Plaintiff brought civil rights action against city,
members of city police commission, and two city
police officers. He claimed damages by reason of
having been arrested without probable cause and
having been the victim of excessive force in the
making of the arrest. One of the police officers was
granted summary judgment. After the jury returned
a general verdict for the remaining police officer, the
United States District Court for the Central District of
California dismissed the action against the city and
members of the police commission, and plaintiff
appealed. The Court of Appeals, 759 F.2d 1371,
reversed and remanded. Certiorari was granted.
The Supreme Court held that the jury's finding that
the police officer inflicted no constitutional injury on
the plaintiff removed any basis for liability against
the city and members of police commission.

Reversed and remanded.

Justice Marshall dissented from the summary
disposition.

Justice Stevens dissented and filed an opinion in
which Justice Marshall joined.
West Headnotes
**[1] Federal Civil Procedure 170A ☞2181**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(G) Instructions
            170Ak2181 k. Construction and Operation
in General. Most Cited Cases

**Federal Courts 170B ☞799**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions

170Bk799 k. Verdict. Most Cited Cases
Theory under which jury instructions are given by
trial courts and reviewed on appeal is that juries act
in accordance with instructions given them and that
they do not consider and base their decisions on legal
questions with respect to which they are not charged.

**[2] Civil Rights 78 ☞1424**

78 Civil Rights
    78III Federal Remedies in General
        78k1424 k. Trial in General. Most Cited Cases
        (Formerly 78k243.1, 78k243, 78k13.14)
Jury's verdict for city police officer and against civil
rights plaintiff who claimed he was the victim of
excessive force during course of an arrest removed
any basis for liability on part of city and members of
its police commission; jury's finding that officer
inflicted no constitutional injury on plaintiff was not
only conclusive as to officer, but also as to city and
its police commission.

**[3] Civil Rights 78 ☞1348**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1348 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
            (Formerly 78k206(2.1), 78k206(2), 78k13.7)
An award of damages against a municipal
corporation based on actions of one of its police
officers is not authorized when jury has concluded
that officer inflicted no constitutional harm;
moreover, if a plaintiff has suffered no constitutional
injury at hands of the officer, fact that departmental
regulations might have authorized use of
constitutionally excessive force is beside the point.

**\*797 \*\*1572 PER CURIAM.**
Respondent Ronald Heller sued petitioners, city of
Los Angeles, and individual members of the Los
Angeles Police Commission, and two Los Angeles
police officers in the United States District Court for
the Central District of California under the provisions
of 42 U.S.C. § 1983. He claimed damages by
reason of having been arrested without probable
cause and having been the victim of excessive force
in the making of the arrest. The incident arose as a
result of the two Los Angeles police officers stopping

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1571
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
**(Cite as: 475 U.S. 796, 106 S.Ct. 1571)**

Page 2

him because of a suspicion that he was driving while intoxicated. In the words of the Court of Appeals for the Ninth Circuit:

"The officers administered a series of field sobriety tests. Apparently dissatisfied with the results, the officers decided to take Heller to the station to undergo a breath test. When notified that he was under arrest, however, Heller became belligerent. One of the defendants, Officer Bushey, attempted to handcuff him. An altercation ensued. In the course of the struggle, Heller fell through a plate glass window." _Heller v. Bushey,_ 759 F.2d 1371, 1372-1373 (CA9 1985).

The District Court held a bifurcated trial, and first heard respondent's claims against one of the individual police officers.[FN*] The jury was instructed that Heller would make out his constitutional claim if he were arrested without reasonable cause, or if he were arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. _Id.,_ at 1374. The jury was not instructed on any affirmative defenses that might have been asserted by **\*798** the individual police officer. Tr. in No. 80-2643 (CD Cal.), pp. 803-822, 843. The jury returned a verdict for the defendant police officer and against respondent. The District Court then dismissed the action against petitioners, concluding that if the police officer had been exonerated by the jury there could be no basis for assertion of liability against the city or the persons constituting its Police Commission.

> FN* The second of the two police officers named as defendants was granted summary judgment by the District Court.

Respondent appealed to the Court of Appeals for the Ninth Circuit, and that court reversed the judgment of the District Court dismissing respondent's case against petitioners even though it did not disturb the verdict for the defendant police officer. Respondent urged, and the Court of Appeals apparently agreed, that "the jury could have believed that Bushey, having followed Police Department regulations, was entitled in substance to a defense of good faith. Such a belief would not negate the existence of a constitutional injury" (footnote omitted). 759 F.2d, at 1373-1374.

[1][2] The difficulty with this position is that the jury was not charged on any affirmative\*\*1573 defense such as good faith which might have been availed of

by the individual police officer. Respondent contends in his brief in opposition to certiorari that even though no issue of qualified immunity was presented to the jury, the jury might nonetheless have considered evidence which would have supported a finding of such immunity. But the theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with the instructions given them, see _Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,_ 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985), and that they do not consider and base their decisions on legal questions with respect to which they are not charged. We think that the Court of Appeals' search for ambiguity in the verdict was unavailing; as that court itself noted later in its opinion, "[b]ecause the instructions required a verdict for [respondent] if _either_ the due process _or_ the excessive force claim was found, the jury's **\*799** verdict for the defendant required a negative finding on both claims." 759 F.2d, at 1374, n. 3. This negative, it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent.

[3] The Court of Appeals also stated:

"We must conclude that the general verdict does not foreclose a finding that Heller suffered a constitutional deprivation. Heller's _Monell_ claim survived the general verdict.... The jury verdict, of course, conclusively determined that there was probable cause to arrest Heller. On the other hand, it is equally clear that whether the application of force in accordance with Police Department regulations in this case exceeded constitutional limits has not been determined." _Id.,_ at 1374-1375.

But this was an action for damages, and neither _Monell v. New York City Dept. of Social Services,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have _authorized_ the use of constitutionally excessive force is quite beside the point.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**\*800** Justice BRENNAN took no part in the consideration or decision of this case.

Justice MARSHALL dissents from this summary disposition, which has been ordered without affording the parties prior notice or an opportunity to file briefs on the merits. See *Cuyahoga Valley R. Co. v. Transportation Union,* 474 U.S. 3, 8, 106 S.Ct. 286, ----, 88 L.Ed.2d 2 (1985) (MARSHALL, J., dissenting); *Maggio v. Fulford,* 462 U.S. 111, 120-121, 103 S.Ct. 2261, 2265-2266, 76 L.Ed.2d 794 (1983) (MARSHALL, J., dissenting).

Justice STEVENS, with whom Justice MARSHALL joins, dissenting.

Whenever the Court decides a case without the benefit of briefs or argument on the merits, there is a danger that it will issue an opinion without the careful deliberation and explication that the issues require. Today's *"per curiam "* opinion is a fair illustration of the problem. The two important issues presented in this case are not even identified in that document. The District Court's decision to dismiss the action against the city, the Police Department, and the Police Commissioners necessarily rested on two assumptions: (1) there **\*\*1574** was an inherent inconsistency between the jury verdict in favor of Officer Bushey and a possible verdict against the municipal defendants and (2) that inconsistency required the dismissal of the action against the municipal defendants. Far from specifically addressing those issues, however, the District Court dismissed the action against the city on the ground that it had "become moot." [FN1] In a similar vein, this **\*801** Court rests its summary decision on the maxim that "juries act in accordance with the instructions given them." *Ante,* at 1573. In my view, neither of the necessary assumptions for the District Court's action-and for this Court's reinstatement of its decision-is remotely present in this case.

> FN1. See 8 Record 844 ("With respect to the Monell cause of action, which was bifurcated from the initial trial, the Court is now convinced that has become moot by reason of the verdict in favor of the defendant and the Court is ordering dismissal of that cause of action at this time"); 2 *id.,* Doc. No. 209, dismissal order

("the plaintiff's theory of liability against the defendants, CITY OF LOS ANGELES, LOS ANGELES BOARD OF POLICE COMMISSIONERS and LOS ANGELES POLICE DEPARTMENT, based on the case of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ] ... is moot").

I

The first necessary assumption is that there would be an inevitable inconsistency between the jury verdict of no liability for Officer Bushey and a possible verdict of liability against the municipal entities; in the absence of such an inconsistency, the District Court's decision, and this Court's reinstatement of it, are simply inexplicable.

It is undisputed that Ronald Heller crashed through a plate-glass window after some kind of an altercation with Officer Bushey. He had been stopped on suspicion of driving while intoxicated and given sobriety tests. [FN2] In his claim against the municipal entities, Heller contended that the city and the Police Department had adopted a policy of condoning excessive force in making arrests, that the policy was unlawful, and that he had been injured by the application of that policy at the time of his arrest. In his claim against Officer Bushey, Heller contended that his constitutional rights were violated because Officer Bushey had employed "unreasonable force" in arresting him.

> FN2. After the altercation, Heller was given an alcohol level test, and was found to have one-tenth the level of alcohol in his body necessary for a finding of driving while intoxicated under California law. 5 *id.,* at 134-136. Heller was never charged with driving while intoxicated. *Ibid.*

On the day before trial, the District Judge bifurcated the trial into two phases-the first against Officer Bushey and the second against the municipal entities. The record contains no explanation for this decision, but it does reveal that Heller's counsel opposed bifurcation. [FN3]

> FN3. See 5 *id.,* Doc. No. 203, minutes of chambers conference (Oct. 18, 1982) ("Court confers with Counsel re: Pretrial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1571
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806
(Cite as: 475 U.S. 796, 106 S.Ct. 1571)

Page 4

order, Jury trial on 10/19/82, Jury Instructions, Defendant's amended witness list and bifurcation of case.    Plaintiff counsel opposes Bifurcation.    Defendant does not oppose bifurcation").

**\*802** In the proceeding against Officer Bushey, considerable evidence of the Los Angeles Police Department's policy and custom on the use of force was introduced.    An expert witness testified regarding Los Angeles' officially sanctioned use of "escalating force," culminating in the use of the notorious "chokehold." [FN4] Officer Bushey **\*\*1575** himself testified that Heller's flight through the window resulted from his attempt to impose a chokehold, and that he was carefully following official Police Department policy.[FN5]    Officer Bushey's superior, Sergeant Shrader, also testified that Officer Bushey's actions were in complete compliance with official Police Department policy.[FN6]    Finally, Officer Bushey's attorney repeatedly **\*803** emphasized that his client's actions were entirely consistent with established Department policy.[FN7]

FN4. See 5, *id.,* at 157-158 (testimony of James Fyfe) ("The Los Angeles Police Department employs a scale of escalation in the use of force.... [T]he Los Angeles Police Department varies from every other major police department I know of.    The Los Angeles Police Department says that if that compliance hold fails to work the next degree of force to be used is a chokehold or, as the police department calls them, a carotid control hold and modified carotid hold and bar arm control holds").    Cf. *Los Angeles v. Lyons,* 461 U.S. 95, 97, n. 1, 103 S.Ct. 1660, 1663, n. 1, 75 L.Ed.2d 675 (1983) (describing chokehold); *id.,* at 114-119, 103 S.Ct. at 1671-1674 (MARSHALL, J., dissenting) (reviewing Los Angeles Police Department's use of chokeholds and noting that 16 deaths had resulted from chokeholds since 1975).    At the time of Heller's trial, *Lyons* was pending before this Court.

FN5. 5 Record 99-100 ("As he began his two steps forward I applied-I put my left arm around his-the portion I tried to get was the front part of his throat.    You use the blade of your wrist on the person's throat.    As we are supposed to when we are trying to

take someone into custody use verbal commands of first asking verbally and then demanding verbally.    If that does not work we use what is called a pain compliance, which is trying to twist someone's wrist where the pain hurts them and they'll comply with your request....    I tried to get the blade of my wrist around to his throat to apply pressure to his throat, which is also a pain compliance hold").

FN6. See 6 *id.,* at 279-281 (testimony of Sergeant Shrader) (describing Police Department's "accelerated force theory" and concluding that Officer Bushey's use of a chokehold would have been "within the policy").

FN7. See, *e.g.,* 5 *id.,* at 170 ("[T]he carotid hold was a hold that was being taught to the Los Angeles Police Department"); 6 *id.,* at 279 (referring to "the accelerated force theory that the police department has"); *id.,* at 281 (referring to "the policy of what police department officers do").    See also Officer Bushey's counsel's closing argument, 7 *id.,* at 699 ("In this case it's not the City that's the defendant.    It's Officer Bushey"); *id.,* at 706 (citing "testimony concerning our own policies and procedures as to the Los Angeles Police Department"); *ibid.* ("[T]he procedures which Officer Bushey followed are exactly what he's taught and the reasons he's taught to do it"); *id.,* at 716 ("It's Officer Bushey who's the defendant"); *id.,* at 718 ("Officer Bushey was trying to do his job").

In submitting the claim against Officer Bushey to the jury, the trial judge gave an instruction that simply stated that whether or not the force used in making an arrest is unreasonable "is an issue to be determined in the light of all the surrounding circumstances." [FN8] After deliberating several hours, the jury returned a general verdict in favor of the officer.

FN8. "Whether or not the force used in making an arrest, preventing an escape, or overcoming resistance was expressive [*sic*], unreasonable or violent is an issue to be determined in the light of all the surrounding circumstances." 8 *id.,* at 815-816.

Thus, despite the majority's summary assertion to the

contrary, it is perfectly obvious that the general verdict rejecting the excessive force claim against Officer Bushey did not necessarily determine the constitutionality of the city's "escalating force" policy-a subject on which the jury had received no instructions at all. The verdict merely determined that the officer's action was not unreasonable "in the light of all the surrounding circumstances"-which, of course, included the evidence that Officer Bushey was merely obeying orders and following established Police Department policy.

As a result, there was no necessary inconsistency between the verdict for Officer Bushey and a possible verdict of liability*804 against the municipal defendants. On that basis alone, the District Court plainly erred in dismissing as "moot" the suit against the municipal defendants, and the Court of Appeals was plainly correct to reverse the dismissal.[FN9]

> FN9. The Court of Appeals concluded:
> "The jury, in substance, was instructed that Heller was deprived of liberty without due process if he was arrested without reasonable cause. The jurors were further instructed that Heller's constitutional rights were violated if he was arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. The jury's verdict for the defendant therefore embodies a finding that Heller was arrested for reasonable cause *and* that the amount of force used was not unreasonable or excessive. The difficulty is that the conclusion that the force was reasonable could have been derived either from Police Department regulations, which incorporate a theory of 'escalating force,' or from a constitutional standard entirely independent of such regulations. We cannot say which with assurance." *Heller v. Bushey,* 759 F.2d 1371, 1374 (CA9 1985) (footnote omitted).

**\*\*1576** II

In view of the fact that the Court of Appeals correctly concluded that there was no necessary inconsistency between a verdict exonerating Officer Bushey and a verdict holding the city and Police Department liable for the "escalating force" policy, it did not have to consider the appropriate response to a possible inconsistency in the context of a bifurcated trial.

Inconsistent verdicts are, of course, a familiar

phenomenon. In a criminal case, a jury's apparently inconsistent verdict is allowed to stand.[FN10] In a civil case, the rule is less **\*805** clear.[FN11] Nevertheless, in contrast to the Court's blithe assumption today, it is far from certain that the District Court's action-the dismissal-was an appropriate response, even if somehow a verdict against the municipal entities might have created an inconsistency. First, the Court ignores the **\*806** fact that, in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand.[FN12] Second, the Court ignores the fact that, when faced with an apparently inconsistent verdict, a court has a duty to attempt to read the verdict in a manner that will resolve inconsistencies.[FN13] Third, the Court ignores the **\*\*1577** fact that, upon receiving an apparently inconsistent verdict, the trial judge has the responsibility, not to retain half of the verdict, but to resubmit the question to the jury.[FN14] Finally, the Court ignores the fact that, if verdicts are genuinely inconsistent and if the evidence might support either of the "inconsistent" verdicts, the appropriate remedy is ordinarily, not simply to accept one verdict and dismiss the other, but to order an entirely new trial.[FN15]

> FN10. See *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (reaffirming general rule that inconsistent verdicts can stand); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside"); *Hoag v. New Jersey,* 356 U.S. 464, 472, 78 S.Ct. 829, 835, 2 L.Ed.2d 913 (1958) ("[J]ury verdicts are sometimes inconsistent or irrational"); *United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943) ("Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries"); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) ( "Consistency in the verdict is not necessary"). Cf. *Ulster County Court v. Allen,* 442 U.S. 140, 168, 99 S.Ct. 2213, 2230, 60 L.Ed.2d 777 (1979) (BURGER, C.J., concurring) ("Courts have long held that in the practical business of deciding

cases the factfinders, not unlike negotiators, are permitted the luxury of verdicts reached by compromise").

FN11. See, *e.g.*, Bickel, Judge and Jury-Inconsistent Verdicts in the Federal Courts, 63 Harv.L.Rev. 649, 654 (1950) ("[T]here is not in a civil case the equivalent of a precedent such as *Dunn* [*v. United States, supra* ] to overrule in upsetting inconsistent verdicts. The argument outlined against extending the *Dunn* rule to civil cases is thus quite a plausible one. But it is not unanswerable") (footnote omitted).

FN12. Indeed, in explaining why an apparently inconsistent verdict in a civil case should not be disturbed, Justice Brandeis cited the leading case on the permissibility of inconsistent verdicts in a criminal context. See *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1932) (citing *Dunn v. United States* ). See also F. James & G. Hazard, Civil Procedure 384 (3d ed. 1985) ("[T]he refusal of a trial court to set aside a verdict obviously representing a compromise has frequently, and quite properly, been upheld"); *id.,* at 394 ("One of the great values of jury trial .. is its ability to reflect the community sense of over-all fairness, and this may not in all cases coincide with the written law and the instructions which the court must give"); *Karcesky v. Laria,* 382 Pa. 227, 235, 114 A.2d 150, 154 (1955) ("Where the evidence of negligence, or contributory negligence, or both, is conflicting or not free from doubt, a trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict, and to sustain a verdict which is substantial"); *Jayne v. Mason & Dixon Lines, Inc.,* 124 F.2d 317, 319 (CA2 1941) (L. Hand) ("We do not mean to imply however that we should have thought it fatal to the wife's recovery if no rational reconciliation of the verdicts was possible. *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356 (1932) ]"). Cf. Note, Inconsistent Verdicts in Civil Trials, 45 Harv.L.Rev. 1230, 1234 (1932) (observing that, in some jurisdictions, "a master can not complain solely because the servant was exonerated at the same trial. If the evidence is sufficient to support the

verdict against the master, his appeal will be denied") (footnote omitted).

FN13. See *Gallick v. Baltimore & Ohio R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (In considering jury answers to questions in a special verdict, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them.... We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's special verdict and remand the case for a new trial"); *Atlantic & Gulf Stevedores, Inc., v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way"); *Affolder v. New York, Chi. & St. L. R. Co.,* 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950); *Fairmount Glass Works,* 287 U.S., at 485, 53 S.Ct., at 255 (Brandeis, J.) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct"); *Union Pacific R. Co. v. Hadley,* 246 U.S. 330, 334, 38 S.Ct. 318, 319, 62 L.Ed. 751 (1918) (Holmes, J.) ("[S]ince the [jury] finding was possible on the evidence it cannot be attributed to disregard of duty.... Beyond the question of attributing misconduct to the jury we are not concerned to inquire whether its reasons were right or wrong").

FN14. See, *e.g., Dickerson v. Pritchard,* 706 F.2d 256, 259 (CA7 1983) ("[T]he trial court properly resubmitted the inconsistent verdicts to the jury for reconsideration"); *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 547 (CA5 1974) ("[I]f the jury returns two inconsistent verdicts, the trial court may resubmit the issue to them for clarification"); *Hopkins v. Coen,* 431 F.2d 1055, 1059 (CA6 1970) (upon receipt of inconsistent verdicts, trial court could have sent jury "back to the jury room to further deliberate with appropriate instructions to bring back consistent verdicts"); *Alston v. West,* 340 F.2d 856, 858 (CA7 1965) (when jury returned an inconsistent verdict, "the court properly

exercised its discretion in resubmitting the case to the jury").

FN15. See, *e.g.*, *Malley-Duff & Associates v. Crown Life Ins. Co.*, 734 F.2d 133, 145 (CA3) ("We conclude that the answers to Questions 1, 2(A), and 2(B) may be considered inconsistent.... We will vacate the $900,000 verdict in the state law claims and order a new trial"), cert. denied, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Global Van Lines, Inc. v. Nebeker*, 541 F.2d 865, 868 (CA10 1976) (citing "the rule which says that inconsistencies which show jury confusion serve to mandate a new trial"); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 175 (CA5 1975) ("Where verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate and may even be required"). Cf. Fed.Rule Civ.Proc. 49(b) (appropriate remedy for inconsistent special verdicts and general verdict is resubmission to the jury, or a new trial).

**\*807** Although the Court fails to address it, the question this case raises (if, in fact, the initial view of inevitable inconsistency is accepted) is whether a different set of principles should apply in a bifurcated trial-more narrowly, in a trial that was bifurcated over the objection of the plaintiff. Because the question has not been argued, I do not foreclose the possibility that bifurcation should make a difference, but it is not immediately apparent to me why it should. In this case, the same jury would have passed on the municipal entities' liability, and would have relied on the evidence adduced in the first phase of the trial as well as that presented in the second phase. At the very least, it is unclear to me why the normal devices for addressing an apparently inconsistent verdict-construing the verdict in a manner that resolves the inconsistency; resubmitting the case to the jury for *it* to resolve the inconsistency; or even ordering a new trial-should be unavailable in a bifurcated context.

If the Court's unprecedented, ill-considered, and far-reaching decision happens to be correct, defendants as a class have been presented with a tactical weapon of great value. By persuading trial judges to bifurcate trials in which both the principal and its agents are named as defendants, and to require the jury to bring in its verdict on the individual claim first, they may obtain the benefit of whatever intangible factors have prompted juries to bring in a multitude of inconsistent verdicts in past years;

defendants will no longer have to abide the mechanisms that courts have used to mitigate **\*808** and resolve apparent inconsistencies.[FN16] Perhaps that is an appropriate**\*\*1578** response to the current widespread concern about the potential liabilities of our municipalities, but I doubt it. Cf. *Oklahoma City v. Tuttle*, 471 U.S. 808, 843-844, 105 S.Ct. 2427, 2446-2447, 85 L.Ed.2d 791 (1985) (STEVENS, J., dissenting).

FN16. Cf. *Alston v. West, supra* (in negligence suit against flower shop and driver for automobile accident, jury initially returned verdict of liability for flower shop and no liability for driver; after case was resubmitted, jury returned liability verdicts against both employer and driver).

III

The Court today reverses an interlocutory decision in a constitutional rights case on the basis of assumptions that dramatically conflict with the record and with settled legal principles. The Court mistakenly assumes that there was a necessary inconsistency between the verdict of no liability against the individual officer and a possible verdict against the municipal defendants; it then mistakenly assumes that dismissal was an appropriate response to the perceived inconsistency. Perhaps not coincidentally, the Court achieves these results without the aid of briefs or argument, and relies on an anonymous author to explain what it has done.

I respectfully dissent.

U.S.Cal.,1986.
City of Los Angeles v. Heller
475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806

Briefs and Other Related Documents (Back to top)

• 1985 WL 694791 (Appellate Petition, Motion and Filing) Petition (Sep. 25, 1985)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:54:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 408 F.3d 763 |
| Lines: | 598 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

## Westlaw.

408 F.3d 763                                                                    Page 1
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L. Weekly Fed. C 507
(Cite as: 408 F.3d 763)

▷

Briefs and Other Related Documents
Vessels v. Atlanta Independent SystemC.A.11 (Ga.),2005.
United States Court of Appeals,Eleventh Circuit.
Gordon VESSELS, Plaintiff-Appellant,
v.
ATLANTA INDEPENDENT SCHOOL SYSTEM, Defendant-Appellee.
**No. 04-13729.**

May 9, 2005.

**Background:** White employee brought action against school system, alleging that it failed to promote him to coordinator position on an interim or permanent basis on the basis of his race. The United States District Court for the Northern District of Georgia, No. 01-02035-CV-JTC-1,Jack T. Camp, J., granted summary judgment in favor of school system, and employee appealed.

**Holdings:** The Court of Appeals held that:

(1) school system articulated sufficient race-neutral justifications for its actions;

(2) genuine issue of material fact existed as to whether school system's articulated reasons for rejecting male employee for interim coordinator position were pretextual; and

(3) employee's focus on interview panelists' overall racial composition failed to raise genuine factual issues as to whether the panelists' critique of his excessive focus on department's problems, as opposed to strategies for change, was a pretext for racial preference in appointing black candidate to permanent coordinator position.

Affirmed in part and reversed in part.
West Headnotes
**[1] Civil Rights 78 ⟶1135**

78 Civil Rights
    78II Employment Practices
        78k1135   k.   Promotion,   Demotion,   and

Transfer. Most Cited Cases
Where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff, in order to establish a prima facie case of discrimination under *McDonnell Douglas* framework, need not show that he applied for the position, only that the employer had some reason to consider him for the post. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[2] Civil Rights 78 ⟶1135**

78 Civil Rights
    78II Employment Practices
        78k1135   k.   Promotion,   Demotion,   and
Transfer. Most Cited Cases

**Civil Rights 78 ⟶1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
To demonstrate that he was qualified for the position, a Title VII plaintiff seeking to establish prima facie failure to promote claim need only show that he or she satisfied an employer's objectively verifiable qualifications; employer may then introduce its subjective evaluations of the plaintiff at the later stages of the *McDonnell Douglas* framework. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights 78 ⟶1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
School system articulated sufficient race-neutral justifications for its actions in refusing to promote white male employee on an interim or permanent basis to a coordinator position; interview panel members stated preference for black female was due

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L. Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

to a desire for a seamless transition, their appraisal of male employee's leadership qualities, and his negative focus on the department's problems, as opposed to strategies for change. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[4] Federal Civil Procedure 170A ⟲2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
Evidence of racially tinged statements by school system's decision-makers, the relative superiority of white male employee's qualifications over successful black female candidate, school system's disregard of its own employment regulations, and white employee's rebuttal of many of school system's proffered justifications raised a genuine issue of material fact as to whether school system's articulated reasons for rejecting white employee for interim coordinator position were pretextual, precluding summary judgment in favor of school system on white employee's race discrimination claim based on failure to promote him to interim coordinator position. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § § 1981, 1983.

**[5] Civil Rights 78 ⟲1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases

  **Civil Rights 78 ⟲1535**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1535 k. In General. Most Cited Cases
Where an employee seeks to prove through qualifications alone that race-neutral reasons for failure to promote were pretextual, the difference in qualifications must be so glaring that no reasonable

impartial person could have chosen the candidate selected for the promotion in question over the employee; however, where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ⟲1234**

78 Civil Rights
   78II Employment Practices
      78k1232 Reverse Discrimination
         78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
White employee's focus on interview panelists' overall racial composition failed to raise genuine factual issues as to whether the panelists' critique of his excessive focus on department's problems, as opposed to strategies for change, was a pretext for racial preference in appointing black candidate to permanent coordinator position. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § § 1981, 1983.

**\*765** Matthew C. Billips, Miller, Billips & Ates, P.C., Atlanta, GA, for Plaintiff-Appellant.
Rodney Gregory Moore, Kimberly N. Royal, Atlanta Pub. Schools, Legal Dept., Atlanta, GA, for Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before BARKETT, KRAVITCH and FARRIS[FN*], Circuit Judges.

      FN* Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:
Gordon Vessels ("Vessels") appeals the district court's grant of summary judgment to his employer, the Atlanta Independent School System ("AISS"), on his claims that AISS failed to promote him on the basis of his race, in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 2000e (2005) ("Title VII"). Vessels asserts separate claims based on two independent employment actions: (i) AISS's decision not to promote him on an interim basis to the Coordinator of Psychological Services position; and (ii) AISS's decision not to promote him to that same

408 F.3d 763                                                                                          Page 3
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

position on a permanent basis. While the district court conceded that he had made out his prima facie case as to both claims, it found that AISS proffered race-neutral justifications for its employment actions, which Vessels failed to show were pretextual.

On appeal, Vessels argues that genuine issues of material fact remain as to whether AISS has even discharged its burden to assert a race-neutral justification, as well as whether any legitimate grounds AISS has asserted to support its decision were in fact a pretext for racial preference. Although we agree that AISS was entitled to summary judgment on Vessels' claims relating to the permanent position, material issues of disputed fact remain as to whether AISS's articulated reasons for failing to promote Vessels to the interim position were pretextual. Accordingly, we affirm the grant of summary judgment as to Vessels' permanent position claim, and remand for further proceedings solely on Vessels' claim relating to the interim position.

## BACKGROUND

In June of 1999, Dr. Arletta Brinson ("Brinson") announced that she was leaving her position as the Coordinator of Psychological Services for AISS. When Brinson was asked to recommend someone to fill the position on an interim basis, she chose Jill Fields ("Fields"), an AISS school psychologist who was black. Brinson asserts several reasons why she chose to recommend Fields:     (i) Fields had occasionally filled in for Brinson's predecessor, and thus had a working knowledge of operational procedures that could help provide continuity during the search for a permanent replacement; (ii) Fields had experience as part of the Office of Youth Services' Leadership Team;  and (iii) Fields had assisted with Brinson's processing of referrals and communication with other departments, and had represented her at various meetings. While Brinson considered Vessels for the interim position, she claims she found that: (i) his **\*766** experience with the AISS system and chains of command was inferior to Fields' experience; (ii) Vessels lacked experience relative to Fields' in interfacing with the human resources department;  and (iii) Vessels' leadership style tended to be too unilateral and potentially disrespectful of the schools the department served. Brinson also asserts that she took into account past incidents in which Vessels conducted an unauthorized survey of staff members' reports. Brinson conceded that Vessels had more education,

theoretical knowledge, and state certifications than Fields.   While AISS regulations would require someone with Vessels' level of qualification for the position on a permanent basis, those regulations only deemed it "desirable" that an interim appointee met those criteria.  Those regulations also limited interim appointments to 60 days, absent action by the school board.  Brinson ultimately considered Fields to be the best recommendation.

Brinson's supervisor, also hoping for a seamless transition, approved Brinson's recommendation of Fields for the interim position and forwarded the recommendation to the deputy superintendent, Gloria Patterson ("Patterson").   Patterson approved the recommendation, placing Fields in the Coordinator of Psychological Services position on an interim basis until such time as the position could be filled permanently.  Patterson's actions contravened AISS regulations allowing interim appointments for a maximum of only 60 days, unless the school board took action.  While Patterson cannot recall the exact circumstances surrounding her approval of Fields, she attests that she generally does not blindly accept recommendations, but rather asks about the recommended candidate to ensure the best person has been put forward.

After Fields began serving in the coordinator position on an interim basis, AISS posted the vacancy announcement for a permanent position three times: in October of 1999, August of 2000, and September of 2001.  The announcement was re-posted because both the first and second announcements yielded a small applicant pool, and AISS regulations required that three applicants be interviewed.   Ultimately, AISS human resources administrators identified three applicants who would be interviewed by a panel of AISS personnel:     Vessels;    Fields;    and Dr. Gwendolyn Jones ("Jones"), who like Fields, was also a black woman.

Dr. Lucinda Sullivan ("Sullivan"), Executive Director of the Office of Student Programs and Services, oversaw the interview process.    Sullivan assembled a panel of six interviewers, and provided them with a job description, the candidates' resumes, and interview questions she had developed.[FN1]  She did not provide them with model answers or instructions on how to rate the candidates.  Instead they were to draw on their experience and understanding of the job description.    The panel consisted of one white man, one white woman, and four black women.  Sullivan asserts that the panel's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

racial and gender diversity was representative of a cross-section of the AISS departments that work with the psychological services department. One of the panelists was chosen by lottery to ensure that no preference was given to any candidate.

> FN1. Originally, candidates were also scheduled to complete a writing exercise. However, that portion of the evaluation process was not counted towards the final scores after Vessels complained that his lack of computer skills placed him at an unfair disadvantage.

The panel's aggregate scores placed Jones at 124, Vessels at 106, and Fields at 86. The panelists' written evaluations, which they prepared without consulting one another, reflected a shared concern *767 that Vessels was overly negative and too focused on AISS's problems. Sullivan accepted the panel's recommendation of Jones, and passed it along to the deputy superintendent, who in turn approved Jones and recommended her to the superintendent and school board. Jones replaced Fields on a permanent basis in January 2002. Vessels voluntarily resigned effective January 1, 2003.

The district court, adopting the magistrate's report and recommendation, found that while Vessels made out a prima facie case of race discrimination, AISS had proffered legitimate non-discriminatory reasons for its employment decisions. The district court rejected Vessels' contention that because several of the individuals in the decision-making chain had no independent recollection of the specific reasons for their decision when they were deposed, AISS had not successfully asserted race-neutral reasons for its actions. Furthermore, the district court found that Vessels had not shown AISS's reasons to be pretextual. The district court held that while Vessels may have presented evidence to question whether AISS's decision was correct, there was no dispute as to whether AISS's proffered reasons were sincerely held.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, viewing all the evidence, and drawing all reasonable inferences, in favor of the non-moving party. *Hulsey v. Pride Restaurants, LLC,* 367 F.3d 1238, 1243 (11th Cir.2004). We will

affirm the grant of summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

Vessels' disparate treatment claims, brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent. As Vessels attempts to prove discriminatory intent by circumstantial evidence, his claims are subject to the *McDonnell Douglas* methods of proof.[FN2] *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir.1995); *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998).

> FN2. Though the district court did not explicitly consider it, the magistrate had rejected Vessels' direct evidence of racial preference, finding it too remote in time and unrelated to Vessels' promotion. Vessels' direct evidence focused on his allegations that soon after he began working at AISS in 1987, he overheard Brinson make comments that suggested that she felt black school psychologists were preferable to whites, as they were familiar with the culture of the predominantly African-American school population that AISS served. Vessels also relied on certain comments he claims were made by AISS officials about the desirability of having the employee population mirror the racial composition of the AISS schools. The magistrate found such evidence to be too remote to constitute sufficient direct evidence of discrimination, particularly where Brinson was not the final decision-maker. Vessels has not raised the issue of direct evidence on appeal, focusing exclusively on the *McDonnell Douglas* framework for circumstantial evidence. Accordingly, we do not pass on Vessels' direct evidence of discrimination, except where relevant to proving discriminatory intent circumstantially.

Under the familiar *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination through his prima facie case. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 F.3d 763                                                                    Page 5
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action. *768*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Where the plaintiff succeeds in discrediting the employer's proffered reasons, the trier of fact may conclude that the employer intentionally discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### VESSELS' PRIMA FACIE CASE

[1] In order to establish a prima facie case, and thus raise an inference of discriminatory intent, the plaintiff must demonstrate only that: (i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class.[FN3] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position-only that the employer had some reason to consider him for the post. *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 533 (11th Cir.1992).

> FN3. We emphasize that the *McDonnell Douglas* burden-shifting framework remains only one method by which the plaintiff can prove discrimination by circumstantial evidence. *McDonnell Douglas* is not the exclusive means of proof. *See Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

Initially, we agree with the district court that Vessels successfully established a prima facie case, and reject AISS's argument that Vessels failed to establish the second and fourth elements thereof. The fourth

element of the *McDonnell Douglas* test requires only that a plaintiff show that an individual outside his protected class was promoted. We find AISS's summary assertion that Vessels has not satisfied this fourth element entirely baseless. It is undisputed that Vessels is a white male. AISS ultimately appointed Fields, who AISS concedes is a black female, to the interim position. Under these circumstances, AISS's unsubstantiated assertion that Vessels has not satisfied the fourth element of his prima facie case is meritless.

AISS also argues that Vessels' prima facie case is lacking because Vessels failed to show that he was qualified. Specifically, AISS contends that Vessels was unqualified because he lacked the leadership style which AISS preferred. We agree with the district court that Vessels demonstrated that he was qualified for the interim position. Though AISS had no formal list of qualifications for the interim position, its regulations deemed it "desirable" that the interim appointee hold the qualifications necessary for the position on a permanent basis. It is undisputed that Vessels had the requisite education, years of experience, and state certification levels that AISS specified for even the permanent position. While AISS argues that he was unqualified because he lacked the leadership style they preferred and could not provide a seamless transition,[FN4] such *769 subjective criteria have no place in the plaintiff's initial prima facie case.

> FN4. In addition to being entirely subjective, AISS's articulated criteria for the interim position are entirely ex post, as there were no formal selection criteria for the interim position at the time that position was filled.

[2] Rather, to demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications. The employer may then introduce its subjective evaluations of the plaintiff at the later stages of the *McDonnell Douglas* framework. A contrary rule, under which an employer's subjective evaluation could defeat the plaintiff's initial prima facie case, cannot be squared with the structure and purpose of the *McDonnell Douglas* framework. Specifically, we have made clear that the prima facie case is designed to include only evidence that is *objectively verifiable* and either easily obtainable or within the plaintiff's possession. *Walker v. Mortham,* 158 F.3d 1177, 1192-93 (11th Cir.1998). This

408 F.3d 763                                                                    Page 6
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
(Cite as: 408 F.3d 763)

permits the plaintiff who lacks direct evidence of invidious intent to force the employer to articulate its motives for the challenged employment action so that the plaintiff has an opportunity to show intentional discrimination by circumstantial evidence. *Id.* If we were to hold an employer's subjective evaluations sufficient to defeat the prima facie case, the court's inquiry would end, and plaintiff would be given no opportunity to demonstrate that the subjective evaluation was pretextual. Such a blind acceptance of subjective evaluations is at odds with the intent that underlies the *McDonnell Douglas* framework. This is particularly important because we have emphasized that subjective criteria can be a ready vehicle for race-based decisions. *See, e.g., Miles v. M.N.C. Corp., 750 F.2d 867, 871 (11th Cir.1985).* Furthermore, we cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his prima facie case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's prima facie burden is not onerous. *Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); see also Isenbergh v. Knight-Ridder Newspaper Sales, 97 F.3d 436, 439 (11th Cir.1996)* (characterizing plaintiff's prima facie burden as "light"). Thus, subjective evaluations play no part in the plaintiff's prima facie case. Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as part of the court's pretext inquiry. *Accord Fowle v. C & C Cola, 868 F.2d 59, 65 (3d Cir.1989); Medina v. Ramsey Steel Co., 238 F.3d 674, 681 (5th Cir.2001); Wexler v. White's Fine Furniture, 317 F.3d 564, 575 (6th Cir.2003)* (en banc); *Javasinghe v. Bethlehem Steel Corp., 760 F.2d 132, 135 (7th Cir.1985); Legrand v. Trustees of Univ. of Ark., 821 F.2d 478, 481 (8th Cir.1987); Lynn v. Regents of Univ. of Cal., 656 F.2d 1337, 1344-45 (9th Cir.1981); Burrus v. United Tel. Co., 683 F.2d 339, 342 (10th Cir.1982); Stewart v. Ashcroft, 211 F.Supp.2d 166, 170-71 (D.D.C.2002), aff'd 352 F.3d 422 (D.C.Cir.2003); LaFleur v. Wallace State Community. College, 955 F.Supp. 1406, 1418 (M.D.Ala.1996).*

We agree with the district court that Vessels has established a prima facie case as to both positions, and we proceed to the second step in the *McDonnell Douglas* framework.

AISS'S BURDEN OF PRODUCTION

An employer's burden to articulate a non-discriminatory reason for failing to promote an employee is a burden of production, not of persuasion. *Burdine, 450 U.S. at 254, 101 S.Ct. 1089.* As this burden involves no credibility determination, **770***St. Mary's Honor Center, 509 U.S. at 509, 113 S.Ct. 2742,* it has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co., 698 F.2d 1138, 1141 (11th Cir.1983).* So long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Burdine, 450 at 254-55, 101 S.Ct. 1089.*

[3] Vessels asserts that AISS has not met its burden of producing a non-discriminatory justification for its employment actions because: (i) some of the decision makers, particularly those at the upper levels, have no independent recollection of the basis on which they accepted their subordinates' recommendations; and (ii) some of the members of the interview panel likewise have no independent recollection of their reasons for rating Jones above Vessels.

We reject these arguments because the record demonstrates that AISS has articulated sufficient race-neutral justifications for its actions. For the interim position, Brinson articulated numerous non-discriminatory reasons for her preference for Fields over Vessels, particularly her desire for a seamless transition and her appraisal of Vessels' leadership qualities. Brinson's supervisor gave reasons based on similar grounds. For the permanent position, members of the interview panel likewise articulated non-discriminatory reasons for their preference for Jones, including Vessels' negative focus on the department's problems, as opposed to strategies for change. While some of the upper level supervisors who approved these personnel actions do not now have an independent recollection of the exact basis for their approval, this does not negate the fact that *AISS*-through its lower-ranking employees who were primarily responsible for making the decisions-has articulated a sufficient race-neutral justification. As the district court noted, this is not a case where an upper-level manager overruled a subordinate manager's recommendation or decision without explanation. Rather, Brinson, Foster, Sullivan, and the interview panelists all articulated non-discriminatory reasons for their decisions not to promote Vessels, and no one in the management hierarchy exercised their authority to overrule that decision. While Vessels relies on cases such as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 F.3d 763                                                                                                                  Page 7
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

*Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989) and *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir.1989), where we have held that the motivations of multiple managers are relevant to our disparate treatment inquiry, neither of these cases are relevant to whether a race-neutral justification has been *articulated.* We require this articulation merely to allow defendants to "meet the prima facie case and to frame the factual inquiry with sufficient clarity so that the plaintiff will have a full and fair ability to demonstrate pretext." *Burdine,* 450 U.S. at 255-56, 101 S.Ct. 1089.

Similarly, two of the interview panel members' inability to recall the specific basis on which they scored Jones higher than Vessels for the permanent position is unavailing to Vessels. Both of the panelists who cannot now recall the basis for their preference (Baker and Ordu-Riely) took notes on their interview evaluation forms, making clear that their preference for Jones stemmed from the overly negative approach which Vessels took during the interview. We agree with the district court that those notes, along with the testimony of the other panelists as to their non-discriminatory reasons for preferring Jones, provide the requisite clear and reasonably specific bases for the AISS panel's subjective preference. *See Chapman v. AI Transport,* 229 F.3d 1012, 1034-35 (11th Cir.2000) (en banc) (employer's non-discriminatory justification can be based on subjective evaluations, so long as they *771 are clear and reasonably specific). Vessels arguments thus fail to persuade us that AISS has not discharged its burden of production, and we proceed to the pretext analysis.

EVIDENCE OF PRETEXT

Once the employer meets its burden to produce a non-discriminatory reason for its actions, the presumption of discrimination is eliminated. *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097. To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. *Id.; see also, Chapman,* 229 F.3d at 1024. This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.,* 390 F.3d 695,

725 (11th Cir.2004).

[4] As to the interim position, we find that Vessels' evidence creates a genuine issue of material fact as to whether AISS's articulated reasons were pretextual. Vessels' evidence of pretext includes statements he claims that AISS officials made regarding the desirability of having black employees in a school system serving a predominantly black population. Vessels also relies on a statement he alleges Brinson made regarding the superiority of black school psychologists' performance in serving black schoolchildren. Even where such evidence of race bias proves insufficient to prove an employee's case through direct evidence, it can be relevant in the circumstantial framework to show that the employer's proffered reasons were pretextual. *Ross v. Rhodes Furniture,* 146 F.3d 1286, 1291 (11th Cir.1998).

In addition, Vessels raises genuine issues of material fact as to sincerity of the bulk of AISS's proffered race-neutral reasons for the decision. First, Vessels directly disputes whether Fields had experience "filling in" for Brinson's predecessor which Vessels lacked. Taking the evidence in the light most favorable to Vessels, Brinson knew that neither Fields nor Vessels formally "filled in" but rather performed one task or another on an ad hoc basis when necessary. Vessels' evidence thus directly disputes Brinson's asserted reasons.

Second, Vessels disputes whether the incidents of unprofessionalism upon which Brinson claimed to rely actually occurred. Admittedly, this would fail to demonstrate pretext if Vessels only disputed that the incidents occurred, without calling into question Brinson's sincere belief that they occurred. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1471 (11th Cir.1991) (employee failed to show pretext where he presented evidence suggesting that allegations were untrue, but failed to present evidence suggesting that employer's belief in those allegations was unworthy of credence). However, Brinson claims that she had multiple conferences about the incidents with Vessels. Vessels directly denies that any such conferences, or the incidents which precipitated them, even occurred. Brinson does not claim to have relied on information which may or may not be true. Instead, because the conferences, and the discussions which would have occurred therein would be within Brinson's personal knowledge, Vessels raises issues of fact as to whether this asserted reason was pretextual.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 F.3d 763                                                                                                      Page 8
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

Third, Vessels points out that AISS violated its own personnel procedures in the selection and appointment of Fields. Specifically, AISS regulations permitted an interim appointment for only sixty days. *772 However, Fields remained in the position for more than two years. Taken in the light most favorable to Vessels, the finder of fact could infer that this extended appointment enabled Fields to obtain the necessary certifications to qualify for the permanent position. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir.1998) (evidence that established rules were bent or broken to give candidate an advantage is probative of pretext). Furthermore, AISS regulations deem it "desirable" that the interim appointee hold the qualifications required for a permanent appointee to the position. It is undisputed that Vessels held the state leadership certification which was required of a permanent appointee, while Fields did not. The criteria for the permanent position also stated that a doctoral degree was desirable. Vessels held a doctoral degree, while Fields did not. Though not determinative, AISS's choice of Fields over Vessels when AISS's own regulations appear to favor someone of Vessels' qualifications contributes to Vessels' showing of pretext. *See Bass v. Bd. of County Comm'rs.,* 256 F.3d 1095, 1108 (11th Cir.2001) ("[T]he fact that [the employer] promoted ... an employee who was unqualified by [the employer's] own criteria over [an employee who was so qualified] supports an inference of discrimination.").

[5] Furthermore, in addition to holding leadership certification and a terminal degree in the field, Vessels was a published author and as AISS concedes, had a greater understanding of psychological theory and methodology than Fields. Admittedly, our precedent makes clear that where an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff. *Alexander v. Fulton County,* 207 F.3d 1303, 1340 (11th Cir.2000). However, where the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext. *See Bass,* 256 F.3d at 1107 ("Hiring a less qualified person can support an inference of discriminatory motivation.").

Taken together and viewed in the light most favorable to Vessels, the evidence of racially tinged statements by AISS decision-makers, the relative superiority of Vessels' qualifications, AISS's disregard of its own employment regulations, and Vessels' rebuttal of many of AISS's proffered justifications raise a genuine issue of material fact as to whether AISS's articulated reasons for rejecting Vessels for the *interim* position were pretextual. Summary judgment for AISS on Vessels' *interim* position claim was thus inappropriate.

[6] By contrast, Vessels' arguments that the interview panelists' proffered reasons for preferring Jones for the *permanent* position fall short of creating a genuine issue as to pretext. Vessels argues that Sullivan deliberately skewed the interview panel in favor of black and female employees, and failed to give the panelists explicit instructions, permitting their racial preferences to manifest themselves in the subjective rankings. However, one of the panel members was chosen by lottery. Furthermore, four of the six panelists, including the white male panelist, ranked Jones highest, while only two of the panelists, including a black panelist, ranked Vessels highest. The panelists who disfavored Vessels, without consulting one another, made similar comments as to Vessels' excessive focus on problems without addressing solutions. Vessels focus on the panelists' overall racial composition fails to raise genuine factual issues as to whether the panelists' critique of his excessive focus on problems was a pretext for racial preference.*773 For the permanent position, we thus agree with the district court that Vessels failed to create a genuine issue as to pretext, and that summary judgment for AISS on Vessels' claims arising from the permanent position appointment was appropriate.[FN5]

> FN5. Because we remand the case for further proceedings, we need not address the magistrate's alternative holdings (not reached by the district court) as to AISS's liability under § 1981 and § 1983.

AFFIRMED in part, REVERSED in part.

C.A.11 (Ga.),2005.
Vessels v. Atlanta Independent School System
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L. Weekly Fed. C 507

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 F.3d 763                                                                    Page 9
408 F.3d 763, 95 Fair Empl.Prac.Cas. (BNA) 1245, 87 Empl. Prac. Dec. P 42,157, 198 Ed. Law Rep. 45, 18 Fla. L.
Weekly Fed. C 507
**(Cite as: 408 F.3d 763)**

• 2004 WL 4965356 (Appellate Brief) Reply Brief of
Appellant (Nov. 30, 2004)
• 2004 WL 4965355 (Appellate Brief) Appellee's
Brief (Nov. 9, 2004)
• 2004 WL 4965354 (Appellate Brief) Brief of
Appellants (Sep. 30, 2004)
• 04-13729 (Docket) (Jul. 27, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:53:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 31 F.3d 209 |
| Lines: | 510 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

31 F.3d 209
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
**(Cite as: 31 F.3d 209)**

Page 1

▷

Briefs and Other Related Documents
Tyndall v. National Educ. Centers, Inc. of
CaliforniaC.A.4 (Va.),1994.
    United States Court of Appeals,Fourth Circuit.
    Mary M. TYNDALL, Plaintiff-Appellant,
                    v.
    NATIONAL EDUCATION CENTERS,
    INCORPORATED OF CALIFORNIA, t/a Kee
    Business College Campus; National Education
    Centers, Incorporated, Defendants-Appellees.
                **No. 93-2511.**

            Argued May 10, 1994.
            Decided Aug. 3, 1994.

Former instructor, who suffered from lupus
erythematosus, an autoimmune system disorder,
brought action against business college alleging that
termination of her employment violated Americans
with Disabilities Act (ADA) and Virginians with
Disabilities Act (VDA).   The United States District
Court for the Eastern District of Virginia, Robert R.
Merhige, Jr., Senior District Judge, entered summary
judgment for employer, and instructor appealed.
The Court of Appeals, Wilkinson, Circuit Judge, held
that: (1) instructor was not "qualified for position";
(2) college did not unlawfully discriminate against
instructor based on her association with her disabled
son; and (3) even if instructor was qualified, college
did not unlawfully discriminate against her based on
her own disability.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ☜1217**

78 Civil Rights
    78II Employment Practices
        78k1215   Discrimination   by   Reason   of
Handicap, Disability, or Illness
            78k1217 k. Practices Prohibited or Required
in General;  Elements. Most Cited Cases
            (Formerly 78k173.1)
In order to establish employment discrimination
under ADA, plaintiff must have disability, plaintiff
must be qualified for job, and defendant's termination
of plaintiff's employment must constitute unlawful
discrimination. Americans with Disabilities Act of
1990, § 102(a), 42 U.S.C.A. § 12112(a).

**[2] Civil Rights 78 ☜1218(4)**

78 Civil Rights
    78II Employment Practices
        78k1215   Discrimination   by   Reason   of
Handicap, Disability, or Illness
            78k1218 Who Is Disabled;   What Is
Disability
                78k1218(4)       k.       Employment
Qualifications, Requirements, or Tests. Most Cited
Cases
            (Formerly 78k173.1)
To determine whether disabled employee is
"qualified" for her position within meaning of ADA,
court must decide whether she could perform
essential functions of job, that is, functions that bear
more than marginal relationship to job at issue and, if
not, whether any reasonable accommodation by
employer would enable her to perform those
functions. Americans with Disabilities Act of 1990,
§ § 101(8), 102(a), 42 U.S.C.A. § § 12111(8),
12112(a).

**[3] Civil Rights 78 ☜1540**

78 Civil Rights
    78V   Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1540 k. Discrimination by Reason of
Handicap, Disability, or Illness. Most Cited Cases
            (Formerly 78k173.1)
Plaintiff in action under ADA bears burden of
demonstrating that she could perform essential
functions of her job with reasonable accommodation.
Americans with Disabilities Act of 1990, § 101(8),
42 U.S.C.A. § 12111(8).

**[4] Civil Rights 78 ☜1218(4)**

78 Civil Rights
    78II Employment Practices
        78k1215   Discrimination   by   Reason   of
Handicap, Disability, or Illness
            78k1218 Who Is Disabled;   What Is
Disability
                78k1218(4)       k.       Employment
Qualifications, Requirements, or Tests. Most Cited
Cases
            (Formerly 78k173.1)

31 F.3d 209                                                                                                    Page 2
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
**(Cite as: 31 F.3d 209)**

Employee who cannot meet attendance requirements of job at issue cannot be considered "qualified" individual protected by ADA; except in unusual case where employee can perform all work-related duties at home, employee who does not come to work cannot perform any of his job functions, essential or otherwise. Americans with Disabilities Act of 1990, § § 101(8), 102(a), 42 U.S.C.A. § § 12111(8), 12112(a).

## [5] Civil Rights 78 ☞1218(4)

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1218 Who Is Disabled; What Is Disability
                78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases
                    (Formerly 78k173.1)
Business college instructor, who suffered from lupus erythematosus, an autoimmune system disorder, was not "qualified" for her position within meaning of ADA, even though she received "excellent" and "good" performance evaluations; position required that instructor teach assigned courses during scheduled class times and spend time with her students, instructor missed more than 40 days of work in seven months, missed crucial beginning of instructional cycle twice, and informed college that she would miss beginning of cycle third time, and college's extensive accommodations of instructor's condition did not improve her attendance level. Americans with Disabilities Act of 1990, § § 101(8), 102(a), 42 U.S.C.A. § § 12111(8), 12112(a).

## [6] Civil Rights 78 ☞1230

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1230 k. Association or Relationship with the Disabled. Most Cited Cases
                (Formerly 78k173.1)
Termination of business college instructor's employment was not discrimination, in violation of ADA, based on her association with her disabled son; supervisor responded to instructor's record of extended absences in connection with son's care and to instructor's actual statement that she would, in fact, have to miss additional work in order to be with son,

rather than making unfounded assumption that instructor would have to miss work to take care of son, and ADA did not require college to restructure instructor's work schedule to enable her to care for disabled son. Americans with Disabilities Act of 1990, § 102(b)(4), 42 U.S.C.A. § 12112(b)(4).

## [7] Civil Rights 78 ☞1230

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1230 k. Association or Relationship with the Disabled. Most Cited Cases
                (Formerly 78k173.1)
The ADA provision prohibiting discrimination based on association with disabled individual does not require employer to restructure employee's work schedule to enable employee to care for relative with disability. Americans with Disabilities Act of 1990, § 102(b)(4), 42 U.S.C.A. § 12112(b)(4).

## [8] Civil Rights 78 ☞1540

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1540 k. Discrimination by Reason of Handicap, Disability, or Illness. Most Cited Cases
                (Formerly 78k240(2))
Strong inference of nondiscrimination arises, in action under ADA provision prohibiting employers from discharging employee based on need for reasonable accommodation for disability, when person who discharged employee is same person who hired employee, knowing of her disability. Americans with Disabilities Act of 1990, § 102(b)(5)(B), 42 U.S.C.A. § 12112(b)(5)(B).

## [9] Civil Rights 78 ☞1221

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1221 k. Motive or Intent; Pretext. Most Cited Cases
                (Formerly 78k173.1)

### Civil Rights 78 ☞1225(3)

31 F.3d 209                                                                      Page 3
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
**(Cite as: 31 F.3d 209)**

<u>78</u> Civil Rights
  <u>78II</u> Employment Practices
    <u>78k1215</u> Discrimination by Reason of Handicap, Disability, or Illness
      <u>78k1225</u> Accommodations
        <u>78k1225(3)</u> k. Particular Cases. <u>Most Cited Cases</u>
          (Formerly 78k173.1)
Business college instructor, who suffered from lupus erythematosus, an autoimmune system disorder, failed to establish that her discharge was motivated by bias against disabled employees or by desire to avoid making reasonable accommodations, even though supervisor warned instructor that she was missing too much time from work, and commented, at meeting at which she was discharged, that she "didn't sound too great" and that her health and that of her family seemed more important to her than her job; supervisor hired instructor with full knowledge of her disability, supervisor fully accommodated her and fired her only when informed that she would have to take indefinite amount of time off just one week after returning from one-month leave of absence, and supervisor's comments were unexceptional remarks regarding instructor's work performance and general welfare. Americans with Disabilities Act of 1990, § 102(b)(5)(B), <u>42 U.S.C.A. § 12112(b)(5)(B)</u>.

**[10] Civil Rights 78 ☜1017**

<u>78</u> Civil Rights
  <u>78I</u> Rights Protected and Discrimination Prohibited in General
    <u>78k1016</u> Handicap, Disability, or Illness
      <u>78k1017</u> k. In General. <u>Most Cited Cases</u>
        (Formerly 78k107(1))
Standards for liability under Virginians with Disabilities Act (VDA) follow standards established in Rehabilitation Act and adopted in ADA. <u>Va.Code 1950, § 51.5-40</u> et seq.; Rehabilitation Act of 1973, § 2 et seq., <u>29 U.S.C.A. § 701</u> et seq.; Americans with Disabilities Act of 1990, § 2 et seq., <u>42 U.S.C.A. § 12101</u> et seq.

**\*211 ARGUED:** <u>Blackwell Nixon Shelley, Jr.</u>, Manning, Davis & Kirby, Richmond, VA, for appellant. <u>Donald Lester Creach</u>, Hunton & Williams, Richmond, VA, for appellees.

Before <u>RUSSELL</u> and <u>WILKINSON</u>, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
Affirmed by published opinion. Circuit Judge <u>WILKINSON</u>, wrote the opinion, in which Circuit Judge <u>DONALD RUSSELL</u> and Senior Circuit Judge CHAPMAN joined.

**OPINION**
<u>WILKINSON</u>, Circuit Judge:
The question in this case is whether an employer violated the Americans with Disabilities Act ("ADA"), <u>42 U.S.C. § 12101</u> *et seq.*, by discharging a disabled employee who was frequently absent from work due to her disability and the disability of a family member. Because plaintiff was unable to meet the attendance requirements of her job, despite her employer's efforts to accommodate her disabling condition, we hold that she was not a "qualified individual with a disability" protected by the ADA. *See* <u>42 U.S.C. § 12112(a)</u>. In addition, we find that plaintiff failed to overcome the strong inference of nondiscrimination arising from the fact that the same individual who discharged her had hired her with full knowledge of her disability only two years earlier. We accordingly affirm the district court's grant of summary judgment to the employer.

I.

Plaintiff Mary Tyndall suffers from lupus erythematosus, an autoimmune system disorder that causes joint pain and inflammation, fatigue, and urinary and intestinal disorders. In 1989, Tyndall enrolled in a career training program in medical assisting at the Kee Business College Campus ("Kee"), a school in Richmond, Virginia owned by defendant National Education Centers ("NEC"). Tyndall successfully completed her coursework in January 1990. At that time, Dale Seay, the head of Kee's Allied Health Department, hired Tyndall as a parttime instructor in the medical assisting program. Seay and the other Kee staff members knew of Tyndall's disability when she was hired.

During Tyndall's tenure at Kee, the school made every effort to accommodate her lupus condition. Kee permitted Tyndall to take sick leave, to come into work late or leave early, and to take breaks from ongoing classes whenever she felt ill. If Tyndall became ill during the work day, Seay and other colleagues would accompany her to the rest room to help her, and would offer her a ride home. Indeed, Tyndall admitted that she never made a request for accommodation of her lupus condition that Kee refused.

In 1992, Tyndall began missing work with increasing frequency. From January until July 15, 1992, she

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

missed nineteen days of work: one day to help a friend with legal work, ten days because of her lupus condition, and eight days to take care of her son, Kevin, who suffered from gastro-esophageal reflux disease. Kee approved each of those absences. However, Seay mentioned in a meeting with Tyndall that she had been missing a lot of work.

In mid-July, Tyndall submitted a request for a leave of absence from July 23 to August 17, 1992, because her son was undergoing surgery in Birmingham, Alabama. Again, Kee approved the leave of absence. On August 10, after returning home from Birmingham, Tyndall called Seay to confirm that she would return to work on August 17 as scheduled. However, she informed Seay that she would need to take off more time in order to take care of her son's post-operative problems. Seay responded by asking Tyndall to meet with her and Zoe Thompson, the Executive Director of Kee, regarding the additional*212 leave of absence. That meeting took place on August 12.

At the meeting, Tyndall stated that she could teach for a week beginning August 17 before taking more time off to accompany her son on a post-operative trip to Birmingham. Tyndall said she was not sure how long she would be gone on that trip. Seay told Tyndall that she could return to work on August 17 as scheduled and continue to work, but that she could not take additional time off. Seay explained that the additional leave of absence would cause Tyndall to miss the beginning of an instructional cycle for the third time in a row. Because students in Tyndall's classes and teachers who had to work overtime to cover her classes had complained about her absences, Seay was concerned that another absence would further disrupt the operations of the school. When Tyndall insisted that she had to take her son to Birmingham, Seay suggested that Tyndall resign because of everything that was going on in her life. Seay prepared a report explaining that the separation was "mutual," and Tyndall signed it. Before Tyndall left the meeting, Thompson encouraged her to apply to Kee for re-employment when she was ready to return to work.

Later in August, Tyndall filed a claim with the EEOC contending that NEC and Kee violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. The EEOC issued a determination that the evidence did not establish a violation of the ADA. In May 1993, Tyndall filed a four-count complaint against NEC in Virginia federal court. The complaint alleged that (1) NEC discriminated against

her based on her known association with her disabled son, see 42 U.S.C. § 12112(b)(4), (2) NEC failed to make reasonable accommodations for her disability prior to her termination, see 42 U.S.C. § 12112(b)(5)(A), (3) NEC discriminated against her based on her own disability in terminating her, see 42 U.S.C. § 12112(b)(5)(B), and (4) NEC violated the Virginians with Disabilities Act ("VDA"), Va. Code § 51.5-41, in terminating her and in failing to make reasonable accommodations for her disability.

In October 1993, the district court granted summary judgment to NEC on all four counts. With respect to Counts One and Three, the federal ADA discrimination claims, the court found that NEC articulated a nondiscriminatory reason for terminating Tyndall-namely, that her frequent absences were disruptive to Kee's operations-and that Tyndall could offer no proof that this articulated reason was a mere pretext for discrimination. The court dismissed Count Two, the reasonable accommodations claim, on the ground that Tyndall herself admitted that NEC had never refused any request for accommodation. Finally, the court dismissed Count Four on the ground that the VDA does not apply to NEC.

Tyndall now appeals the district court's summary judgment rulings on Counts One and Three, the federal ADA discrimination claims, and Count Four, the state VDA claim. We address each issue in turn.

II.

[1] Tyndall first challenges her termination under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). In order to establish a violation of this section, three criteria must be met: first, Tyndall must have a "disability"; second, Tyndall must be "qualified" for the job; and third, Kee's termination of Tyndall must constitute an unlawful "discrimination" based on her disability. Because it is undisputed that Tyndall's lupus condition constituted a "disability" under the ADA, we need address only the latter two elements.

A.

[2][3] Under the ADA, only persons who are "qualified" for the job in question may state a claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 F.3d 209                                                                                     Page 5
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
(Cite as: 31 F.3d 209)

for discrimination. The ADA defines "qualified individual with a disability" as
an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment*213 position that such individual holds or desires.

42 U.S.C. § 12111(8).[FN1] The Supreme Court has interpreted this provision to mean that a "qualified" person must be "able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Accordingly, to determine whether Tyndall was qualified for the teaching position, we must decide (1) whether she could "perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [her] to perform those functions." *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir.1993). Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation. *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990).

> FN1. This language tracks the definition of "qualified individual with handicap" under the Rehabilitation Act of 1973. *See* 29 C.F.R. § 1614.203(a)(6) (defining "qualified individual with handicap" as "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others"). Because the ADA expressly requires its provisions to be interpreted in a way that "prevents imposition of inconsistent or conflicting standards for the same requirements" under the two statutes, 42 U.S.C. § 12117(b), we rely on case law interpreting the Rehabilitation Act's "qualified" requirement in determining whether Tyndall was "qualified."

[4] Tyndall contends that she was qualified for her job because she could perform all of her teaching duties and received "excellent" and "good" performance evaluations at Kee. We agree, and NEC does not dispute, that the quality of Tyndall's performance when she was working was more than adequate. However, an evaluation of the quality of

Tyndall's performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd*, 831 F.2d 298 (6th Cir.1987). Therefore, a regular and reliable level of attendance is a necessary element of most jobs. *See, e.g., Carr v. Reno*, 23 F.3d 525, 529 (D.C.Cir.1994) (holding that "coming to work regularly" is an "essential function"); *Law v. United States Postal Serv.*, 852 F.2d 1278, 1279-80 (Fed.Cir.1988) (holding that attendance is a minimum function of any job); *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (holding that "reasonably regular and predictable attendance is necessary for many [jobs]"), *aff'd*, 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple Univ.*, 739 F.Supp. 974, 979 (E.D.Pa.1990) ("attendance is necessarily the fundamental prerequisite to job qualification"), *aff'd*, 928 F.2d 396 (3d Cir.1991). An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA. *See Carr*, 23 F.3d at 529-30; *Walders*, 765 F.Supp. at 314; *Santiago*, 739 F.Supp. at 979.

[5] Here, Tyndall held a job that could not be performed away from the Kee campus; her position required that she teach the assigned courses during the scheduled class times and spend time with her students. Despite this obvious need for regular attendance, Tyndall missed almost forty days of work during a seven-month period. Moreover, she missed the beginning of an instructional cycle twice in a row and requested permission to be absent for yet a third time, even though the start of an instructional period is a crucial time for Kee's operations. Accordingly, regardless of the fact that she possessed the necessary teaching skills and performed well when she was at work, Tyndall's frequent absences rendered her unable to function effectively as a teacher. *See Matzo v. Postmaster Gen.*, 685 F.Supp. 260, 263 (D.D.C.1987) (holding that a legal secretary's poor attendance rendered her unqualified for job, even though she possessed fine secretarial skills), *aff'd*, 861 F.2d 1290 (D.C.Cir.1988).

*214 Furthermore, Kee's extensive accommodations of Tyndall's lupus condition did not improve her attendance level. From the beginning of Tyndall's

tenure at Kee, Seay permitted her to take sick leave, come into work late, leave early, and take mid-class breaks when necessary to alleviate her condition. Despite the numerous attempts to assist her, Tyndall continued to miss an excessive number of days from work. Indeed, Kee's accommodations of Tyndall's disability could not have significantly improved Tyndall's attendance level, as a majority of her absences were not related to her own disability. Rather, they were caused by her personal need to tend to her son's disability, which an employer is not obligated to accommodate through scheduling modifications. *See* 29 C.F.R. § 1630, App. ("[A]n employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for [a family member] with a disability."). Because Tyndall's attendance problems rendered her unable to fulfill the essential functions of her job, and because these problems occurred even with Kee's more than reasonable accommodations for her own disability, we hold that she was not a "qualified individual with a disability," as required by § 12112(a) of the ADA.

### B.

Even if Tyndall were a "qualified" employee covered by the ADA, she nonetheless could not recover under the Act because she has failed to show that Kee in any way discriminated against her. Tyndall alleges that Kee discriminated against her in two different ways, but neither of her claims has merit.

First, Tyndall contends that Kee's termination constituted discrimination based on her association with her disabled son. The ADA prohibits employers from taking adverse employment action "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). More specifically, the Interpretive Guidelines to the ADA provide that an employer may not make decisions based on the "belie[f] that the [employee] would have to miss work" in order to take care of a disabled person. 29 C.F.R. § 1630, App. Tyndall contends that Seay's decision to terminate her stemmed from the assumption that Tyndall would have to take additional time off in order to take care of her disabled son, Kevin.

[6][7] We find no merit in this argument. Seay did not make an unfounded assumption that Tyndall would have to miss work to take care of Kevin. Rather, Seay responded to Tyndall's record of

extended absences in connection with Kevin's care and her actual statement that she would, in fact, have to miss additional work in order to be with her son. It is undisputed that when Seay informed Tyndall she could not take another leave of absence at the start of an instructional cycle, Tyndall replied that she had to take Kevin back to Birmingham for post-operative treatment. The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability. *See* 29 C.F.R. § 1630, App. Because Tyndall's termination was not based on any assumption regarding future absences related to Kevin's care, but instead resulted from her record of past absences and her clear indication that she needed additional time off, we hold that Kee's actions did not constitute discrimination based on Tyndall's association with a disabled individual.

Second, Tyndall maintains that even if Kee did not discriminate against her based on her association with her son, Kee's termination violated § 12112(b)(5)(B), which prohibits employers from taking adverse employment action "based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B). In evaluating Tyndall's claim that her disability was a motivating factor for her termination, we must focus on the undisputed fact that Seay, the person responsible for terminating Tyndall, is the same person who hired Tyndall with full knowledge of her disability. *See Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991). In *Proud,* this court noted that "[w]hen the hirer and firer are the same individual, there *215 is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer...." *Id.* at 798; *see Mitchell v. Data General Corp.,* 12 F.3d 1310, 1318 (4th Cir.1993) (same). At least two other circuits have taken a similar view, holding that employees who were discharged by the same person who had earlier hired or promoted them were not victims of age discrimination. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 847 (1st Cir.1993); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174-75 (8th Cir.1992).

[8][9] While *Proud* addressed a claim of age-based discrimination, the strong inference of nondiscrimination when the hirer and firer are the same person applies to disability discrimination claims as well. An employer who intends to discriminate against disabled individuals or holds unfounded assumptions that such persons are not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-00110-WC    Document 25    Filed 10/31/2006    Page 84 of 145

31 F.3d 209                                                                                    Page 7
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
**(Cite as: 31 F.3d 209)**

good employees would not be apt to employ disabled persons in the first place. *See Proud,* 945 F.2d at 797. Moreover, recognizing a strong inference of nondiscrimination in same hirer/firer situations advances the primary purpose of the ADA: to encourage employers to take on qualified individuals, regardless of their disability. The inference of nondiscrimination accords credit to employers who abide by the statute and hire individuals with disabilities, and thereby avoids the "grave risk that employers who otherwise would have no bias against [disabled] workers will now refuse to hire them in order to avoid meritless but costly [ADA] actions." *Id.* at 798. Here, Seay not only hired Tyndall, but actively encouraged her to apply for the teaching position at Kee, despite having full knowledge of her lupus condition. Seay fully accommodated Tyndall's disability during her employment with Kee, and discharged Tyndall only when informed that she had to take an indefinite amount of time off just a week after returning from a leave of absence nearly a month long. These undisputed facts create a strong inference that Tyndall's termination was not motivated by bias against disabled workers or by a desire to avoid making reasonable accommodations for Tyndall's disability.

Viewed against this strong presumption of nondiscrimination, Tyndall's evidence is plainly inadequate to establish that discrimination motivated her termination. Tyndall relies on three pieces of evidence to argue that considerations of her disability played a role in Kee's decision: (1) after Tyndall returned from a sick leave in July, Seay warned Tyndall that she was missing a lot of time from work; (2) at the August 12 meeting at which Tyndall was terminated, Seay commented that Tyndall "didn't sound too great" and asked if she was doing okay, and (3) at the same meeting, Thompson told Tyndall that her health and the health of her family seemed more important than her job. Far from disclosing discriminatory motive, however, these statements are unexceptional remarks regarding Tyndall's work performance or general welfare. Seay's comment about Tyndall "not sounding great," for example, was prompted by Tyndall's cold symptoms, not by her disability. More basically, an employer must feel free to explore workplace problems with an employee without fear of making actionable statements at every turn. The civil rights laws prohibit discrimination, not discussion. The ADA does not discontinue the dialogue on problems such as substandard job performance or absence from work.

## III.

[10] Tyndall next contends that Kee violated the Virginians with Disabilities Act ("VDA"), Va. Code § 51.5-40 *et seq.,* by failing to make reasonable accommodations to her disability and by terminating her. The VDA provides, in relevant part, that

A. No employer shall discriminate in employment or promotion practices against an otherwise qualified person with a disability solely because of such disability....

C. An employer shall make reasonable accommodation to the known physical and mental impairments of an otherwise qualified person with a disability....

Va. Code § 51.5-41. The VDA does not, however, prohibit employers from taking adverse employment action against an unqualified person, *i.e.,* an employee "who, because of his disability, is unable to adequately perform **\*216** his duties...." Va. Code § 51.5-41(D). The VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA. *See Eastman v. Virginia Polytechnic Institute,* 732 F.Supp. 665, 666 (W.D.Va.1990), *aff'd on other grounds,* 939 F.2d 204 (4th Cir.1991). Accordingly, for the reasons set forth in our analysis of Tyndall's ADA claims, we hold that Tyndall's VDA claims must also fail. [FN2]

> FN2. The district court dismissed Tyndall's VDA claim on the ground that the VDA does not apply to NEC. Because we hold that Tyndall's evidence is insufficient to establish a VDA violation, we have no occasion to address whether the VDA applies to NEC.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

C.A.4 (Va.),1994.
Tyndall v. National Educ. Centers, Inc. of California
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227

Briefs and Other Related Documents (Back to top)

• 1994 WL 16014564 (Appellate Brief) Reply Brief of Appellant (Feb. 23, 1994) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:06-cv-00110-WC    Document 25    Filed 10/31/2006    Page 85 of 145

31 F.3d 209                                                                 Page 8
31 F.3d 209, 93 Ed. Law Rep. 517, 3 A.D. Cases 868, 6 A.D.D. 20, 5 NDLR P 227
**(Cite as: 31 F.3d 209)**

Document with Appendix (PDF)
• 1994 WL 16014563 (Appellate Brief) Brief of
Appellees (Feb. 09, 1994) Original Image of this
Document (PDF)
• 1994 WL 16014562 (Appellate Brief) Brief of
Appellant (Jan. 10, 1994) Original Image of this
Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:52:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FSFIND |
| Citation Text: | 396 F.Supp.2d 1290 |
| Lines: | 553 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

396 F.Supp.2d 1290
396 F.Supp.2d 1290
(Cite as: 396 F.Supp.2d 1290)

**c**
Briefs and Other Related Documents
Lloyd v. Hi-Ridge TransportM.D.Ala.,2005.
United States District Court,M.D. Alabama, Northern
Division.
James Earl LLOYD, Plaintiff,
v.
HI-RIDGE TRANSPORT, Defendant.
**Civ.A. 205CV07T.**

Oct. 18, 2005.

**Background:** African-American terminated
employer sued employer under § 1981 and Fair
Labor Standards Act (FLSA). Employer moved for
summary judgment.

**Holdings:** The District Court, Myron H. Thompson,
J., held that:

(1) white employee who was not terminated was
valid comparator to African-American employee, and

(2) employee's work of checking tire pressure and
putting tires on trucks was subject to FLSA's motor-
carrier exemption, so long as it was not de minimis.

Motion denied.
West Headnotes
**[1] Civil Rights 78 ⬤➞1107**

78 Civil Rights
    78II Employment Practices
        78k1107 k. Discrimination by Reason of Race,
Color, Ethnicity, or National Origin, in General. Most
Cited Cases

**Civil Rights 78 ⬤➞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
Section 1981 prohibits employers from engaging in
intentional racial discrimination. 42 U.S.C.A. §
1981.

**[2] Civil Rights 78 ⬤➞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
The test for intentional discrimination suits under §
1981 is the same as the formulation used for
disparate-treatment cases under Title VII. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.; 42 U.S.C.A. § 1981.

**[3] Civil Rights 78 ⬤➞1405**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and
Burdens of Proof
            78k1405 k. Employment Practices. Most
Cited Cases
In an employee's race discrimination action under §
1981, the employer has the burden of production, not
of persuasion, and thus does not have to persuade a
court that it was actually motivated by the reason
advanced. 42 U.S.C.A. § 1981.

**[4] Civil Rights 78 ⬤➞1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited
Cases
A § 1981 plaintiff may prove a prima-facie case of
discriminatory discharge by showing: (1) he belongs
to a protected group; (2) he experienced an adverse-
employment action; (3) the employer treated
similarly situated employees outside his protected
group more favorably; and (4) he was qualified for
his job. 42 U.S.C.A. § 1981.

**[5] Civil Rights 78 ⬤➞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
White employee who was not terminated was valid
comparator to African-American employee who was
terminated for tardiness, for purposes of African-
American employee's § 1981 claim, in that African-
American employee was terminated for tardiness
rather than absences, quality of white employee's

396 F.Supp.2d 1290
396 F.Supp.2d 1290
**(Cite as: 396 F.Supp.2d 1290)**

Page 2

tardiness was nearly identical to African-American employee's, and quantity of white employee's tardiness may have been greater. 42 U.S.C.A. § 1981.

## [6] Civil Rights 78 ⟜1138

78 Civil Rights
  78II Employment Practices
    78k1138 k. Disparate Treatment. Most Cited Cases
Only the conduct that served as basis for employer's decision to terminate African-American employee was relevant in determining if white employee was similarly situated for purposes of § 1981 claim. 42 U.S.C.A. § 1981.

## [7] Civil Rights 78 ⟜1118

78 Civil Rights
  78II Employment Practices
    78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
The appropriate focus of a prima-facie case under § 1981 in the discipline context is the nature of the misconduct and the discipline imposed. 42 U.S.C.A. § 1981.

## [8] Federal Civil Procedure 170A ⟜2497.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employment Discrimination, Actions Involving
          170Ak2497.1 k. In General. Most Cited Cases
Genuine issues of material fact existed as to whether employer's recently adopted position that it terminated African-American employee because of his absences was unworthy of belief, whether its statement that it fired him for his tardiness was pretextual, and whether kinship, rather than race, was more likely explanation for its differing treatment of employee and white coemployee, precluding summary judgment in § 1981 action. 42 U.S.C.A. § 1981; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

## [9] Labor and Employment 231H ⟜2290(1)

231H Labor and Employment
  231HXIII Wages and Hours
    231HXIII(B) Minimum Wages and Overtime

Pay
      231HXIII(B)3 Exemptions
        231Hk2285 Carriers
          231Hk2290    Motor    Carriers'
Employees
            231Hk2290(1) k. In General. Most Cited Cases
Not only must an employer qualify as a motor carrier for the FLSA's motor-carrier exemption to apply, but the specific employee must also engage in activities that directly affect the safe operation of motor vehicles in interstate transportation. Fair Labor Standards Act of 1938, § 13(b)(1), 29 U.S.C.A. § 213(b)(1); 29 C.F.R. § 782.2(a).

## [10] Labor and Employment 231H ⟜2385(8)

231H Labor and Employment
  231HXIII Wages and Hours
    231HXIII(B) Minimum Wages and Overtime
Pay
      231HXIII(B)6 Actions
        231Hk2383 Evidence
          231Hk2385 Presumptions and Burden of Proof
            231Hk2385(5) Exemptions
              231Hk2385(8)    k    Other
Particular Exemptions. Most Cited Cases
As with all exemptions under the FLSA, the employer bears burden of proving that the motor-carrier exemption applies to a particular employee. Fair Labor Standards Act of 1938, § 13(b)(1), 29 U.S.C.A. § 213(b)(1).

## [11] Statutes 361 ⟜219(1)

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k219 Executive Construction
          361k219(1) k. In General. Most Cited Cases
The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.

## [12] Labor and Employment 231H ⟜2290(3)

231H Labor and Employment
  231HXIII Wages and Hours
    231HXIII(B) Minimum Wages and Overtime
Pay

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

396 F.Supp.2d 1290
396 F.Supp.2d 1290
**(Cite as: 396 F.Supp.2d 1290)**

Page 3

231HXIII(B)3 Exemptions
231Hk2285 Carriers
231Hk2290    Motor    Carriers'
Employees
231Hk2290(3)   k.   Particular
Employees in General. Most Cited Cases
Employee's work of installing brake pads on trucks
was menial and non-discretionary, and thus was not
subject to FLSA's motor-carrier exemption, in that
his work was always reviewed by mechanic after it
was completed. Fair Labor Standards Act of 1938, §
13(b)(1), 29 U.S.C.A. § 213(b)(1); 29 C.F.R. §
782.6(c)(1).

## [13] Labor and Employment 231H ⟜2290(3)

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime
Pay
            231HXIII(B)3 Exemptions
                231Hk2285 Carriers
                    231Hk2290    Motor    Carriers'
Employees
                        231Hk2290(3)   k.   Particular
Employees in General. Most Cited Cases
Employee's work of checking tire pressure and
putting tires on trucks was subject to FLSA's motor-
carrier exemption, so long as it was not de minimis,
in that such work was rarely, if ever, reviewed, and it
affected safety. Fair Labor Standards Act of 1938, §
13(b)(1), 29 U.S.C.A. § 213(b)(1).

## [14] Federal Civil Procedure 170A ⟜2498

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment
Discrimination, Actions Involving
                    170Ak2498 k. Fair Labor Standards
Act Cases. Most Cited Cases
Genuine issue of material fact existed as to
proportion of work week that employee spent on
activities that would affect safety of operation of
trucks, precluding summary judgment as to whether
such work was de minimis, so as not to qualify for
FLSA's motor-carrier exemption.    Fair Labor
Standards Act of 1938, §   13(b)(1), 29 U.S.C.A. §
213(b)(1).

**\*1291** David Randall Arendall, Stephanie S.

Woodard, Arendall & Associates, Birmingham, AL,
for Plaintiff.
Donald R. Jones, Jr., Attorney at Law, PC,
Montgomery, AL, for Defendant.

ORDER
MYRON H. THOMPSON, District Judge.
Plaintiff James Earl Lloyd, an African-American
man, brings this lawsuit against defendant Hi-Ridge
Transport under the Civil Rights Act of 1866 (42
U.S.C.A. § 1981) and the Fair Labor Standards Act
of 1938 (FLSA) (29 U.S.C.A. § § 201-219).[FN1]
Lloyd alleges that he was terminated because of his
race and that he was not paid overtime in violation of
the FLSA. Jurisdiction over both claims is proper
under 28 U.S.C.A. § 1331 (federal question);
Lloyd's § 1981 claim is also proper under 28
U.S.C.A. § 1343 (civil rights), and his FLSA claim is
also proper under 29 U.S.C.A. § 216(b).

FN1. Pursuant to an order dated September
15, 2005 (Doc. No. 15), Lloyd's claims
under Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C.A. § § 1981a,
2000e through 2000e-17, have been
dismissed.

**\*1292** This case is currently before the court on Hi-
Ridge's motion for summary judgment.    For the
reasons that follow, Hi-Ridge's motion will be
denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings,
depositions,    answers    to    interrogatories,    and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c).
Under Rule 56, the party seeking summary judgment
must first inform the court of the basis for the motion,
and the burden then shifts to the non-moving party to
demonstrate why summary judgment would not be
proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also
Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17
(11th Cir.1993) (discussing burden-shifting under
Rule 56). The non-moving party must affirmatively
set forth specific facts showing a genuine issue for
trial and may not rest upon the mere allegations or
denials in the pleadings. Fed.R.Civ.P. 56(e).

396 F.Supp.2d 1290                                                                                      Page 4
396 F.Supp.2d 1290
(Cite as: 396 F.Supp.2d 1290)

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

The following facts are construed in Lloyd's favor as the non-moving party: Lloyd began working at Hi-Ridge, a company that hauls petroleum in interstate commerce, as a laborer in June 2004.[FN2] His duties included cutting the grass, sweeping the shop, and working on trucks, including changing tires, checking tire air pressure, changing oil, and changing brake pads.[FN3] His brake work was always "checked behind" by a mechanic, but mechanics rarely checked his work changing tires, checking tire pressure, and changing oil. [FN4] In September 2004, Lloyd was told he could begin training as a mechanic once he purchased tools.[FN5] Although Lloyd sometimes worked more than 40 hours a week, he was not paid overtime for the hours he worked in excess of 40 each week.[FN6]

> FN2. Defendant's motion for summary judgment (Doc. No. 9), Ex. A, Affidavit of Dana Elrod ("Elrod affidavit"), ¶¶ 2-3.

> FN3. Plaintiff's evidentiary submission in opposition to motion for summary judgment (Doc. No. 13), Ex. 1, Deposition of James Earl Lloyd ("Lloyd deposition"), pp. 31, 37.

> FN4. *Id.*, pp. 68-69, 71-73.

> FN5. *Id.*, pp. 45, 76.

> FN6. *Id.*, p. 68.

During the course of his employment, Lloyd was tardy five times, by anywhere from 5 minutes to one hour. Lloyd also missed an entire day of work on several occasions, including November 15, 2004, when he attended the funeral of a cousin. If Lloyd were going to be absent for an entire day, he always called at his regular start time to inform his

supervisor.[FN7] Hi-Ridge's employee manual describes possible disciplinary action for excessive absences or tardiness as follows:

> FN7. *Id.*, pp. 47-50.

"V. Attendance Policy"
"Regular attendance is necessary for good operations and employee moral *1293 [sic]. If you are unable to work for whatever reason, you are to call your supervisor no later than your normal start time.... Absence must be for a valid reason and kept to a minimum. Excessive absence will result in termination of employment...."
"X. Employee Conduct"
"The following are nonexclusive examples of misconduct, which will subject the employee to disciplinary action, including dismissal...."
1. Failing to report at the regularly scheduled time unless instructed otherwise by supervisory personnel.
2. Failing to report an absence prior to normal starting time. Employees must personally call unless physically unable to do so....
5. Excessive absences or tardiness." [FN8]

> FN8. Defendant's motion for summary judgment (Doc. No. 9), Ex. C, Employee Handbook, pp. 5, 11-12.

When Lloyd arrived an hour late to work on November 18, 2004, his supervisor terminated him. The supervisor stated that he was being fired for excessive tardiness; the supervisor never mentioned Lloyd's absences from work during this conversation.[FN9] Lloyd's position was filled by a white male. [FN10]

> FN9. *Id.*, p. 50-51, 63.

> FN10. Defendant's motion for summary judgment (Doc. No. 9), Ex. F, Answers to Interrogatories, ¶ 4.

Shane McCullough, a white employee who worked as a mechanic, regularly reported for work 15 to 30 minutes after 7 a.m., which was the starting time for all company employees. On at least one occasion, McCullough arrived an hour late. McCullough was repeatedly warned by his supervisor, who was also his father, that he needed to start getting to work on time, but he was not terminated.[FN11] McCullough is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

396 F.Supp.2d 1290
396 F.Supp.2d 1290
(Cite as: 396 F.Supp.2d 1290)

Page 5

the nephew of the owner of Hi-Ridge. <sup>FN12</sup>

FN11. *Id.*, pp. 40-44, 62-63.

FN12. Elrod affidavit, ¶ 12.

### III. DISCUSSION

Lloyd claims that Hi-Ridge's decision to terminate him was discriminatory because McCullough, a white employee, was regularly late and was not terminated. Lloyd also claims that he was entitled to overtime for the hours he worked in excess of 40 each week. The court will consider each claim in turn.

### A. § 1981 Discriminatory Discharge

[1][2] Section 1981 prohibits employers from engaging in intentional racial discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The test for intentional discrimination suits under § 1981 is the same as the formulation used for disparate-treatment cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § § 1981a, 2000e through 2000e-17. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Standard v. A.B.E.L. Servs.,* 161 F.3d 1318, 1330 (11th Cir.1998).

[3] Because Lloyd has not presented direct evidence of discrimination, this case is governed by the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. 1817; *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988). If the plaintiff establishes a prima-*1294 facie case, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See, e.g., Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 253-55, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

Once the employer satisfies this burden of production, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.' " *Chapman,* 229 F.3d at 1024 (citations omitted). The plaintiff may meet this burden by persuading the court that a discriminatory reason more than likely motivated the defendant or by demonstrating that the proffered reason for the employment decision is not worthy of belief. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *see also Young,* 840 F.2d at 828.

### 1. Prima-Facie Case

[4] Lloyd may prove a prima-facie case of discriminatory discharge by showing: (1) he belongs to a protected group, (2) he experienced an adverse-employment action, (3) Hi-Ridge treated similarly situated employees outside his protected group more favorably, and (4) he was qualified for his job. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Lloyd is a member of a protected group and was terminated. No evidence in the record suggests that he was unqualified for his job. In fact, in support of an inference that he had done his job adequately, he was preparing to take on greater responsibilities working as a mechanic. Thus, only the third element, the like-to-like issue, requires substantive analysis.

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Id.* "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999).

[5][6][7] Hi-Ridge contends that McCullough is not a valid comparator because he was never absent from work. "In determining whether employees are similarly situated for purposes of establishing a prima-facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield,* 115 F.3d at 1562. Implicit in *Holifield* is the understanding that courts should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

396 F.Supp.2d 1290
396 F.Supp.2d 1290
(Cite as: 396 F.Supp.2d 1290)

compare only the conduct for which the plaintiff was actually disciplined to conduct for which non-minority employees were not disciplined. The Eleventh Circuit Court of Appeals adopted this approach in *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306 (11th Cir.1998). There, the court compared the misconduct of non-minority employees with the misconduct that the plaintiff had been informed, *at the time of her termination*, were the grounds for her termination. *Id.* at 1309-13. Thus, only the conduct which served as a basis for Hi-Ridge's decision to terminate Lloyd is relevant in determining if McCullough is similarly situated.[FN13] *1295 Lloyd's supervisor did not mention absences when he fired Lloyd; in its answer to Lloyd's complaint, Hi-Ridge acknowledged that Lloyd was terminated for being tardy and failed to mention his absences;[FN14] in fact, Hi-Ridge mentions Lloyd's absences as a basis for his termination for the first time in its answer to plaintiff's requests for admission, dated April 5, 2005.[FN15] Drawing all reasonable inferences in Lloyd's favor, this inconsistency suggests that Lloyd was terminated only for his tardiness and not his absences. Accordingly, McCullough is a valid comparator if he engaged in misconduct nearly identical to the misconduct that was the basis for Lloyd's termination, excessive tardiness.[FN16]

> FN13. This conclusion is consistent with Eleventh Circuit case law on pretext. *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1332 (11th Cir.1998) (noting that employees can prove pretext in the discipline context by showing that the reasons offered by the employer at their termination differ from those offered at summary judgment). It is also inescapable for the practical reason that Lloyd can also prove a prima-facie case of discriminatory discharge by showing: (1) he belongs to a protected group, (2) he experienced an adverse-employment action, (3) Hi-Ridge replaced him with someone outside the protected class, and (4) he was qualified for his job. *See Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656-57 (11th Cir.1998). Had Lloyd proceeded under this formulation of his prima-facie case, he could have unquestionably challenged Hi-Ridge's explanation that it fired him for his absences as pretextual under *Standard.* Given the number of ways that a plaintiff can prove a prima-facie case,

the particular formulation should not substantively affect the outcome, particularly when the *defendant* sets out the particular formulation of the prima-facie case as the party moving for summary judgment.

> FN14. Answer (Doc. No. 4), ¶ 14.

> FN15. Defendant's motion for summary judgment (Doc. No. 9), Ex. F, Requests for Admission, ¶ 10. Apparently, Hi-Ridge needed six months of reflection and input from its lawyers before concluding that Lloyd was terminated for his absences.

> FN16. Although McCullough and Lloyd held different jobs and McCullough was a relative of management while Lloyd was not, the appropriate focus of a prima-facie case in the discipline context is the nature of the misconduct and the discipline imposed. *See Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir.1992).

The evidence viewed in the light most favorable to Lloyd reveals that McCullough reported late to work on a daily basis, sometimes by as much as an hour, and was not fired.[FN17] Lloyd was late five times, by anywhere from five minutes to an hour, and was fired. The quality of McCullough's misconduct is nearly identical to Lloyd's, and the quantity may have been greater. *See Maniccia*, 171 F.3d at 1368. Lloyd has therefore established a prima-facie case of discriminatory discharge because he was terminated while McCullough was not.

> FN17. Hi-Ridge suggests McCullough may have had a different work schedule, but that argument is not supported in the record. Moreover, McCullough's supervisor's admonition that he needed to start coming to work on time supports an inference to the contrary.

2. Pretext

"Under the established rule of law in this Circuit, [after establishing a prima-facie case of discrimination] a plaintiff can survive a motion for summary judgment ... simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v.*

*McClain of Georgia, Inc.,* 131 F.3d 957, 964-65 (11th Cir.1997). "[O]nce the plaintiff introduces evidence sufficient to permit the factfinder to disbelieve the employer's proffered explanations, summary judgment is not appropriate, because 'issues of fact and sufficiency of evidence are properly reserved for the jury.'" *1296*Combs v. Plantation Patterns, Meadowcraft, Inc.,* 106 F.3d 1519, 1530 (11th Cir.1997) (quoting *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 921 (11 Cir.1993)).

[8] Hi-Ridge attempts to rebut the presumption of discrimination raised by Lloyd's prima-facie case by arguing that it was justified in firing Lloyd because of his absences and tardiness, each of which is a legitimate, non-discriminatory ground for termination. As already noted, a reasonable fact-finder could conclude that Hi-Ridge's recently adopted position that it fired Lloyd because of his absences is not worthy of belief because it is inconsistent with the reason given to Lloyd when he was terminated. *See Standard,* 161 F.3d at 1332. A reasonable fact-finder could also conclude that Hi-Ridge's decision to fire Lloyd for his tardiness is pretextual because McCullough, a white employee, was guilty of nearly identical, if not worse, misconduct but was not terminated.

Hi-Ridge makes the argument that, because McCullough's relatives were managers and executives at Hi-Ridge, kinship, as opposed to race, is the more likely explanation for its different treatment of McCullough and Lloyd. However, Hi-Ridge also argued that McCullough was not late, and is not similarly situated to Lloyd, because he had a different work schedule.[FN18] In light of the obvious inconsistency of these arguments, such a question of intent is more appropriately left for a jury to evaluate, *see Combs,* 106 F.3d at 1530.

FN18. *See supra* note 17.

Lloyd has presented sufficient evidence for a reasonable fact-finder to conclude that the non-discriminatory reasons offered by Hi-Ridge to rebut Lloyd's prima-facie case of discriminatory termination are not worthy of belief. Accordingly, the court will deny Hi-Ridge's motion for summary judgment on Lloyd's discriminatory discharge claim.

B. FLSA

Congress enacted the FLSA to help eliminate the existence of labor conditions that are detrimental to health, efficiency, and welfare of workers in the United States. 29 U.S.C.A. § 202(a). Toward that end, the FLSA includes a maximum-hour provision, which requires that employers pay employees at least one and one-half their regular pay for hours worked in excess of 40 hours a week. 29 U.S.C.A. § 207(a)(1). However, the FLSA exempts certain workers from its overtime requirements.

One such exemption is the so-called "motor-carrier exemption." Employers subject to the jurisdiction of the Secretary of Transportation pursuant to 49 U.S.C.A. § 31502, which includes motor carriers involved in the interstate transportation of goods, 49 U.S.C.A. § 13501, are exempt from the FLSA's overtime provisions. 29 U.S.C.A. § 213(b)(1). Hi-Ridge satisfies this element of the motor-carrier exemption because it transports petroleum in interstate commerce.

[9][10] Not only must the employer qualify as a motor carrier for the exemption to apply, but the specific employee must also engage in activities that directly affect the safe operation of motor vehicles in interstate transportation. 29 C.F.R. § 782.2(a) (citing *United States v. American Trucking Ass'ns.,* 310 U.S. 534, 553, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). Only certain classes of workers affect safety: drivers, driver's helpers, loaders, and mechanics. 29 C.F.R. § 782.2(b)(1) (citing *Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 708, 67 S.Ct. 954, 91 L.Ed. 1184 (1947)). In determining whether a *1297* specific employee falls within an exempt class, neither the title of the position or name given to the duties is controlling. 29 C.F.R. § 782.2(b)(2) (citing *Pyramid,* 330 U.S. at 707, 67 S.Ct. 954). Instead, the character of the duties involved in the performance of the job are determinative. 29 C.F.R. § 782.2(b)(2). As with all exemptions under the FLSA, the employer bears burden of proving that the motor-carrier exemption applies to a particular employee. *Avery v. City of Talladega,* 24 F.3d 1337, 1340 (11th Cir.1994).

[11] Hi-Ridge contends that Lloyd is subject to the exemption because he was a mechanic. The regulations implementing the FLSA explain that employees are subject to the motor-carrier exemption as mechanics only if they actually perform "inspection, adjustment, repair or maintenance work on the motor vehicles themselves (including trucks, tractors and trailers, and buses) and are, when so engaged, directly responsible for creating or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

maintaining physical conditions essential to the safety of the vehicles on the highways through the correction or prevention of defects which have a direct causal connection with the safe operation of the unit as a whole." 29 C.F.R. § 782.6(a). [FN19] The inspection, repair, adjustment, and maintenance of brakes, wheels, and axles directly affect safety of operation. *Id.* Likewise, inspecting tires, checking air pressure in tires, and changing tires directly affect the safety of operation. *Id.* Among the activities that do not directly affect safety are filling radiators, checking batteries, and the "usual work of ... garage employees performing menial nondiscretionary tasks or disassembling work." 29 C.F.R. § 782.6(c)(1). The exemption applies even if employees perform some tasks that directly affect safety and others that do not, unless the safety-affecting duties are de minimis. *See* 29 C.F.R. § 782.2(b)(3) (noting that "where the continuing duties of an employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual or insignificant as to be de minimis," the motor-carrier exemption will not apply); *see also Pyramid,* 330 U.S. at 708, 67 S.Ct. 954 (noting that certain duties "may form so trivial, casual or occasional a part of an employee's activities" that the exemption will not apply).

> FN19. The agency interpretation of what constitutes a mechanic is persuasive authority because "[t]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (internal quotations omitted).

[12][13] Of the various duties performed by Lloyd, only his work on brakes and tires is directly related to safety of operation and might subject him to the motor-carrier exemption. Although he was not always supervised by a mechanic when installing brake pads, he had no discretion in this task because his brake work was always reviewed by a mechanic after it was completed. Lloyd's brake work is therefore "menial" and "non-discretionary," 29 C.F.R. § 782.6(c)(1), and would not make Lloyd a mechanic for the purposes of the FLSA. In contrast, when Lloyd checked tire pressure and put tires on trucks, his work was rarely, if ever, reviewed. Such work affects safety because a tire that is not installed properly or a tire that goes flat or blows out could

cause an accident. This task qualifies as mechanic's duties under the FLSA because Lloyd exercised discretion and was solely responsible for safely maintaining the trucks' tires, which directly affects highway safety.

*1298 [14] Therefore, the motor-carrier exemption will apply to Lloyd unless his safety-affecting tire work was de minimis. The court cannot make that determination, however, because it is unclear how much time Lloyd spent on these safety-affecting tasks. *See Morris v. McComb,* 332 U.S. 422, 430, 68 S.Ct. 131, 92 L.Ed. 44 (1947) ("There is nothing in the record showing the extent to which the respective garagemen and laborers devoted themselves to the several classes of work [that affect safety] and, if this were an action to recover overtime compensation for individual employees, it would be necessary to determine that fact."). The only evidence in the record that sheds light on this question is the following exchange from Lloyd's deposition:

"Q. So but you put air in tires and gauged the pressure before you sent the trucks out on the road, didn't you?"

"A. Well, I probably would even put the tire on the truck first."

.   .   .   .

"Q. And you've checked the pressure in the tires before trucks went on the road before, haven't you?"

"A. Yes, I have."

"Q. That was something that you did on a fairly regular basis, wasn't it?"

"A. Not too regular." [FN20]

> FN20. Lloyd deposition, p. 73.

This answer is far too ambiguous to serve as a basis to decide whether Lloyd's safety-related duties were de minimis. Hi-Ridge has therefore not borne its burden to prove that the motor-carrier exemption applies to Lloyd. [FN21]

> FN21. The record in this case is significantly sparser than that in *Walling v. Palmer,* 67 F.Supp. 12, 15 (M.D.Pa.1946), where the court decided whether certain garage laborers were exempt under the FLSA only after reciting a minute-by-minute breakdown of the tasks they performed throughout the day. *See also McComb,* 332 U.S. at 427, 68

396 F.Supp.2d 1290
396 F.Supp.2d 1290
(Cite as: 396 F.Supp.2d 1290)

S.Ct. 131; *Kimball v. Goodyear Tire and Rubber Co.,* 504 F.Supp. 544, 546 (E.D.Tex.1980); and *Neely v. Ecolab Inc.,* 2004 U.S. Dist. LEXIS 28428, at *7 (M.D. Fla. June 23, 2004) (all deciding whether the de minimis rule of the motor-carrier exemption applied to truck drivers only after reviewing substantial data on how many trips were taken by the drivers in interstate versus intrastate commerce).

In sum, a genuine issue of material fact remains to be resolved:  what proportion of his work week did Lloyd spend on activities that would affect the safety of operation of Hi-Ridge's trucks?  Because the court cannot make that finding based on the current record and that finding is critical to the de minimis inquiry under the FLSA's motor-carrier exemption, Hi-Ridge's motion for summary judgment with respect to the FLSA claim will be denied.

### IV. CONCLUSION

For the foregoing reasons, it is ORDERED that defendant Hi-Ridge Transport's motion for summary judgment (Doc. No. 9) is denied.

M.D.Ala.,2005.
Lloyd v. Hi-Ridge Transport
396 F.Supp.2d 1290

Briefs and Other Related Documents (Back to top)

• 2005 WL 2303049 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Oppqstion to Defendant'S Motion for Summary Judgment (Jul. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 447579 (Trial Pleading) Answer (Jan. 31, 2005) Original Image of this Document (PDF)
• 2005 WL 176313 (Trial Pleading) Complaint (Jan. 4, 2005) Original Image of this Document (PDF)
• 2:05cv00007 (Docket) (Jan. 04, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:49:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 232 F.3d 836 |
| Lines: | 548 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# Westlaw.

232 F.3d 836                                                                 Page 1
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

**H**

Briefs and Other Related Documents

Rice-Lamar v. City of Ft. Lauderdale, Fla.C.A.11
(Fla.),2000.

United States Court of Appeals,Eleventh Circuit.
Deborah RICE-LAMAR, Plaintiff-Appellant,

v.

CITY OF FORT LAUDERDALE, FLORIDA, a
municipality, George Hanbury, individually, Pete
Witschen, Asst. City Attorney, individually, Bruce
Larkin, individually, John Panoch, individually,
Defendants-Appellees.
**No. 99-12951.**

Nov. 8, 2000.

African-American female who held position as city's
affirmative action specialist brought action against
city and city managers, alleging that her termination
constituted race and sex discrimination and infringed
her First Amendment right to free speech. The United
States District Court for the Southern District of
Florida, No. 97-07007-CV-WPD, William P.
Dimitrouleas, J., granted summary judgment for
defendants, and plaintiff appealed. The Court of
Appeals, Tjoflat, Circuit Judge, held that: (1)
termination of plaintiff for her refusal to alter
personal commentary which she inserted in
affirmative action report to city commission did not
violate her right of free speech under the First
Amendment, and (2) plaintiff failed to show that
city's proffered explanation for discharging was a
pretext for race and sex discrimination.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟶776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited
Cases
Court of Appeals reviews de novo orders granting a
motion for summary judgment.

**[2] Constitutional Law 92 ⟶90.1(7.2)**

92 Constitutional Law

92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press
        92k90.1 Particular Expressions and
Limitations
            92k90.1(7) Labor Matters
                92k90.1(7.2) k. Public Employment.
Most Cited Cases
State may not discharge a public employee in
retaliation for public speech. U.S.C.A.
Const.Amend. 1.

**[3] Constitutional Law 92 ⟶90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases
In order to determine whether public employee has
been discharged in retaliation for public speech, court
must first determine whether the speech may be fairly
characterized as involving matter of public concern,
and if so court must weigh employee's First
Amendment interests against interests of
governmental unit as employer in promoting
efficiency of public services; should employee
prevail on balancing test, fact finder must determine
whether employee's speech played substantial part in
government's decision to demote or discharge, and if
so public employer must prove by preponderance of
evidence that it would have reached same decision
even in absence of protected conduct. U.S.C.A.
Const.Amend. 1.

**[4] Constitutional Law 92 ⟶90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases

**Municipal Corporations 268 ⟶218(3)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<u>268</u> Municipal Corporations
   <u>268V</u> Officers, Agents, and Employees
      <u>268V(C)</u> Agents and Employees
         <u>268k218</u> Removal, Discharge, Transfer or
Demotion
           <u>268k218(3)</u> k. Grounds. <u>Most Cited</u>
<u>Cases</u>
Termination of city affirmative action specialist for
her refusal to alter personal commentary which she
inserted in affirmative action report to city
commission did not violate her right of free speech
under the First Amendment; even assuming that the
commentary was speech on a matter of public
concern, employee's First Amendment interests were
outweighed by city's interest in producing an official
document that conformed to the city's expectations.
<u>U.S.C.A. Const.Amend. 1.</u>

**[5] Civil Rights 78 1118**

<u>78</u> Civil Rights
   <u>78II</u> Employment Practices
      <u>78k1118</u> k. Practices Prohibited or Required in
General; Elements. <u>Most Cited Cases</u>
         (Formerly 78k141)
A plaintiff can establish a prima facie case that she
was discriminated against in violation of Title VII by
showing: (1) she is a member of a protected class;
(2) she was subjected to adverse employment action;
(3) her employer treated similarly situated employees
who are not members of the plaintiff's class more
favorably; and (4) she was qualified for the job or
job benefit at issue. Civil Rights Act of 1964, § 701
et seq., <u>42 U.S.C.A. § 2000e</u> et seq.

**[6] Civil Rights 78 1137**

<u>78</u> Civil Rights
   <u>78II</u> Employment Practices
      <u>78k1137</u> k. Motive or Intent; Pretext. <u>Most</u>
<u>Cited Cases</u>
         (Formerly 78k153)

**Civil Rights 78 1171**

<u>78</u> Civil Rights
   <u>78II</u> Employment Practices
      <u>78k1164</u> Sex Discrimination in General
         <u>78k1171</u> k. Motive or Intent; Pretext. <u>Most</u>
<u>Cited Cases</u>
           (Formerly 78k159)
African-American female failed to show that city's
proffered explanation for discharging her from

position of affirmative action specialist was a pretext
for race and sex discrimination; city stated that it
discharged her for refusing to alter personal
commentary she inserted in official report, and she
presented no evidence indicating that other
insubordinate employees were treated more
favorably.

**\*837** <u>Reginald J. Clyne,</u>Clyne & Self, P.A., Coral
Gables, FL, for Plaintiff-Appellant.
John A. Walker, Debra M. Leder, <u>Gordon D. Rogers,</u>
Muller, Mintz, Kornreich, Caldwell, Casey, Crosland
& Bramnick, P.A., Miami, FL, for Defendants-
Appellees.

Appeal from the United States District Court for the
Southern District of Florida.

Before <u>TJOFLAT,</u> <u>MARCUS</u> and CUDAHY[FN\*],
Circuit Judges.

      FN\* Honorable <u>Richard D. Cudahy,</u> U.S.
      Circuit Judge for the Seventh Circuit, sitting
      by designation.
<u>TJOFLAT,</u> Circuit Judge:

I.

A.

The City Manager's Office (the "CMO") in the City
of Ft. Lauderdale, Florida, oversees a large and
complex bureaucratic structure. Under the CMO,
which includes not only the City Manager, himself,
but also Assistant City Managers and various other
personnel, are seven City Departments: Police,
Public Services, Fire Rescue and Building,
Administrative Services, Finance, Parks and
Recreation, and Planning and Economic
Development. Each Department is comprised of
several Divisions. One such Division within each of
the Departments is the Personnel Division.

The City Manager serves at the pleasure of an elected
City Commission. In order to ensure racial, ethnic,
and gender diversity in the City's hiring practices, the
Ft. Lauderdale City Commission requested that the
CMO prepare annual reports detailing the City's
progress in hiring and retaining minority employees.
The CMO assigned this task to the Affirmative
Action Specialist, who reports to the Director of
Personnel in the Administrative Services Department.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836                                                                                                          Page 3
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

On June 20, 1988, Deborah Rice-Lamar, an African-American female, was hired to be the City's Affirmative Action Specialist.    Rice-Lamar's job description stated that one of her principal tasks was to "advise[ ] departmental and personnel officials as well as the City Manager on potential EEO liabilities and on strategies for achieving ... long term [affirmative action] goals." [FN1]    Though her "work [was to be] performed with considerable independent judgment, discretion and initiative," the job description made clear that it was also to be "reviewed by an administrative superior through conferences, periodic reports, and observation of results achieved."    Rice-Lamar presented the 1996 Affirmative Action Report at a Department meeting on June 19, 1996.    Entitled "Economic **\*838** Integration:    Affirmative Action for the New Millennium," the report included a dramatic personal commentary by Rice-Lamar, which stated:

> FN1.  Specifically, Rice-Lamar's "Work Plan" (a document that was separate from the job description) stated that one of her principal tasks was to compile "Annual City-Wide Updates" regarding affirmative action in City employment.

[W]e are still a City plagued with racism, glass ceilings for women and brick walls for people of color, a tolerance for perceptions of unfairness and a proverbial silence about it all.    We make plans for valuing and managing diversity initiatives within the City which should create an environment where differences are valued as an advantage[,] not just tolerated.    However, differences must first be acknowledged before either tolerated or valued.    Recommendations on the City's diversity initiative are forthcoming;    however, I will take this opportunity to foretell that they will acknowledge our need to address some basic problem of "ism" while moving toward an environment which values diversity and manages diversity for the betterment of all.

Also included were statistical graphs indicating the number of African-American, Hispanic, and female City employees in management and professional positions.

George Hanbury, the City Manager, Pete Witschen, an Assistant City Manager, Bruce Larkin, the Director of the Administrative Services Department, and John Panoch, the Director of the Personnel

Division of the Administrative Services Department, all expressed serious reservations about the content of the report, and requested that Rice-Lamar make various substantive changes before the report was delivered to the City Commission.    In particular, Rice-Lamar's superiors directed her to remove the personal commentary, and to draft a report that focused on the statistical data collected on minority and female representation in the City workforce.    Rice-Lamar refused to alter the report substantially.    On July 22, 1996, she left a revised copy of the report in Larkin's and Panoch's respective offices, with a message that it was ready for printing and distribution.    The report still contained much of the personal commentary that her superiors had directed her to remove.[FN2]

> FN2. The revised report stated:
> [W]e are still a City plagued with real and/or perceptions of racism, glass ceilings for women and walls for people of color.    These issues whether real or perceived must be discussed.    For that reason we make plans for valuing and managing diversity initiatives within the City which should create an environment where differences are valued as an advantage[,] not just tolerated.    However, differences must first be acknowledged before either tolerated or valued[;] therein lies the need for discussion.    Recommendations on the City's diversity initiative are forthcoming and will acknowledge our need to address some basic problem of "ism" while moving toward an environment which values diversity and manages diversity for the betterment of all.

On July 26, Larkin met with Rice-Lamar and offered her the opportunity to resign.    She refused, stating in a letter to Larkin that

[t]he Affirmative Action Report ... honestly and objectively outlines racial problems and tensions in the City.

Apparently, your concern over public image have [sic] led you to suppress the publication of my report and request my resignation.

On July 29, without Larkin's review or approval, Rice-Lamar distributed the report to Hanbury, and all but one of the Department heads.    On August 12, Rice-Lamar was notified by memorandum from Panoch of possible disciplinary action against her, based, in part, on the fact that "numerous deadlines

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836                                                                                                 Page 4
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

[had been] missed and instructions [were] not followed" with regard to the "Affirmative Action presentation and report."    After affording Rice-Lamar an opportunity to be heard, Larkin recommended to the City Manager that she be discharged.    The City Manager accepted the recommendation and discharged her effective October 21, 1996.

### B.

Rice-Lamar brought this suit against the City of Ft. Lauderdale, Hanbury, Witschen,**\*839** Larkin, and Panoch in the United States District Court for the Southern District of Florida.    In a twelve-count complaint,[FN3] she sought money damages and, alternatively, reinstatement and back pay, against the City and the individual defendants for discriminating against her on account of her race and sex, in violation of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (1994),[FN4] and 42 U.S.C. § 1981 (1994),[FN5] and for infringing her First Amendment right to free speech.[FN6]    As a vehicle for recovery, Rice-Lamar invoked 42 U.S.C. § 1983 (1994).[FN7] Finally, she claimed that the individual defendants had conspired to discriminate against her on account of her race and sex in violation of 42 U.S.C. § 1985(3) (1994).[FN8]

FN3. We refer to Rice-Lamar's second amended complaint as the complaint.

FN4. 42 U.S.C. § 2000e-2(a) makes it unlawful for an employer:
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
We realize that Title VII only allows suits against an "employer."    We mention Rice-Lamar's Title VII claims against the

individual defendants, who are not Rice-Lamar's employers, for the sake of completeness only.

FN5. 42 U.S.C. § 1981 provides:
(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
We assume without implying any view on the matter that the individual defendants can be properly sued under section 1981 in these circumstances.

FN6. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...."    U.S. Const. amend.    I. This right was made applicable to the states by the Fourteenth Amendment. *Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947).

FN7. 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836                                                                                              Page 5
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

FN8. 42 U.S.C. § 1985(3) provides:
If two or more persons in any State or
Territory conspire or go in disguise on the
highway or on the premises of another, for
the purpose of depriving, either directly or
indirectly, any person or class of persons of
the equal protection of the laws, or of equal
privileges and immunities under the laws;
or for the purpose of preventing or hindering
the constituted authorities of any State or
Territory from giving or securing to all
persons within such State or Territory the
equal protection of the laws; or if two or
more persons conspire to prevent by force,
intimidation, or threat, any citizen who is
lawfully entitled to vote, from giving his
support or advocacy in a legal manner,
toward or in favor of the election of any
lawfully qualified person as an elector for
President or Vice President, or as a Member
of Congress of the United States; or to
injure any citizen in person or property on
account of such support or advocacy; in any
case of conspiracy set forth in this section, if
one or more persons engaged therein do, or
cause to be done, any act in furtherance of
the object of such conspiracy, whereby
another is injured in his person or property,
or deprived of having and exercising any
right or privilege of a citizen of the United
States, the party so injured or deprived may
have an action for the recovery of damages
occasioned by such injury or deprivation,
against any one or more of the conspirators.

**\*840** In their answers to Rice-Lamar's complaint, the
defendants denied liability and the individual
defendants claimed qualified immunity from suit.

Following discovery, the defendants moved for
summary judgment. The district court granted their
motions, concluding that Rice-Lamar failed to make
out a case under any of her theories of liability. The
court also concluded that the individual defendants
were immune from suit under the doctrine of
qualified immunity. We now affirm the court's
judgment. We do so on the basis that the record
before the district court was insufficient as a matter
of law to establish any of Rice-Lamar's claims for
relief. (We therefore do not reach the question
whether any individual defendant is entitled to
qualified immunity.)

II.

[1] We review *de novo* orders granting a motion for
summary judgment. *Warren v. Crawford*, 927 F.2d
559, 561 (11th Cir.1991). "The district court's
conclusion[s] of law [are] subject to complete and
independent review by this court." *In re Sure-Snap
Corp.*, 983 F.2d 1015, 1017 (11th Cir.1993).

A party seeking summary judgment must
demonstrate that "there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c).
The moving party bears the initial burden of
informing the court of the basis for its motion and of
identifying those materials that demonstrate the
absence of a genuine issue of material fact. *See
Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106
S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). When
the non-moving party bears the burden of proof on an
issue at trial, the moving party need not "support its
motion with affidavits or other similar material
*negating* the opponent's claim," *id.* at 323, 106 S.Ct.
at 2553, in order to discharge this initial
responsibility. Instead, the moving party simply
may " 'show[ ]'-that is, point[ ] out to the district
court-that there is an absence of evidence to support
the nonmoving party's case." *Id.* at 325, 106 S.Ct. at
2554 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S.
144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142
(1970)).

In response to a properly supported motion for
summary judgment, "an adverse party may not rest
upon the mere allegations or denials of the adverse
party's pleadings, but ... must set forth specific facts
showing that there is a genuine issue for trial."
Fed.R.Civ.P. 56(e). If the non-moving party fails to
"make a sufficient showing on an essential element
of her case with respect to which she has the burden
of proof," then the court must enter summary
judgment for the moving party. *Celotex*, 477 U.S. at
323, 106 S.Ct. at 2552. In determining whether
genuine issues of material fact exist, we resolve all
ambiguities and draw all justifiable inferences in
favor of the non-moving party. *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct.
2505, 2513, 91 L.Ed.2d 202 (1986).

III.

We first address Rice-Lamar's First Amendment free

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836                                                                                                    Page 6
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

speech claim. Second, we address her claim that she was discriminated against on the basis of her race and sex.

A.

[2][3] It is well established that a state may not discharge a public employee in retaliation for public speech. **\*841**_Rankin v. McPherson,_ 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). This circuit employs a four-part test to determine whether a state (or, as in this case, a city) has done so.

First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. _Connick v. Myers,_ 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); _Rankin,_ 483 U.S. at 384, 107 S.Ct. at 2896; _Morgan v. Ford,_ 6 F.3d 750, 754 (11th Cir.1993), _cert. denied,_ 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994) (citing _Bryson v. City of Waycross,_ 888 F.2d 1562, 1565 (11th Cir.1989)). Speech addresses a matter of public concern when the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." _Connick,_ 461 U.S. at 146, 103 S.Ct. at 1690....

Second, a court must weigh the employee's "[F]irst [A]mendment interests" against the interest of the City, as an employer, "in promoting the efficiency of the public services it performs through its employees." _Morgan,_ 6 F.3d at 754. In performing this balancing test, a court must consider several factors: (1) whether the speech at issue impeded the government's ability to perform its duties effectively; (2) the manner, time and place of the speech; and (3) the context within which the speech was made. _Connick,_ 461 U.S. at 151-55, 103 S.Ct. at 1692-94; _Morales v. Stierheim,_ 848 F.2d 1145, 1149 (11th Cir.1988), _cert. denied,_ 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989)....

Third, a court must determine whether the speech in question played a "substantial part" in the government's decision to discharge the employee....

Fourth, if the employee shows that the speech was a substantial motivating factor in the decision to discharge him, the City must prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct.

_Fikes v. City of Daphne,_ 79 F.3d 1079, 1083-85 (11th Cir.1996).

[4] We will assume without deciding that Rice-Lamar's expression constitutes speech on a matter of public concern, and dispose of the issue on the ground that her First Amendment interests are outweighed by the City's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees." _Morgan,_ 6 F.3d at 754 (internal quotation marks omitted).[FN9]

> FN9. The question of whether a plaintiff's First Amendment interests outweigh the employer's interest in promoting the efficiency of the public services it performs is a question of law subject to _de novo_ review. _See Connick,_ 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10.

[I]n weighing the State's interest in [disciplining] an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.

_Rankin v. McPherson,_ 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). In the instant case, one of Rice-Lamar's primary responsibilities within the Ft. Lauderdale Department of Administrative Services was to write an annual Affirmative Action Report to be presented to the City Commission. Although her job description stated that Rice-Lamar was to perform her job "with considerable independent judgment," all of her work was ultimately to be "reviewed by an administrative superior through conferences, periodic reports, and observation of results achieved." Because Rice-Lamar refused to alter the report in accordance with her superiors' instructions, any First Amendment interest she may have had in publishing her views is outweighed by the City's **\*842** interest in producing an official document that conformed to the City's expectations.

As Justice Brennan stated in his dissent in _Connick,_ [p]erhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and

232 F.3d 836                                                    Page 7
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

as such it may serve as the basis for a lawful
dismissal.

_Connick,_ 461 U.S. at 163 n. 3, 103 S.Ct. at 1699 n. 3
(Brennan, J., dissenting).    Contrary to Rice-Lamar's
perception, her job with the City did not involve
utilizing the City's resources to crusade for her
personal vision of social justice;    her job was to
follow her superiors' lawful instructions.         By
declining to alter the Affirmative Action Report after
she was given a direct order to do so, Rice-Lamar
flatly refused to perform a lawful task within the
scope of her duties.  "Such refusal to abide by a valid
order is closely connected with, and can be classified
as insubordination."   _Hankard v. Town of Avon,_ 126
F.3d 418, 423 (2d Cir.1997) (holding that employees
could be fired for refusing to obey government
employer's order to alter a report concerning racial
discrimination    allegedly    committed    by    another
employee).

In a very real sense, the report cannot even be
classified as Rice-Lamar's speech at all.    The report
was the _City's_ document.       Although Rice-Lamar
collected the statistics and wrote the words contained
in the report, she did so at the behest of her employer;
and the report was subject to her superiors' approval
before it could be distributed to the City Commission.
Just as a government employer has only a limited
right to control its employees' speech, employees also
have very little right to control the content of their
employer's speech.[FN10]

> FN10.  Our notice of the fact that the
> Affirmative Action Report may not be
> accurately characterized as _Rice-Lamar's_
> speech (as opposed to the _City's_ speech)
> heightens our doubt that the speech at issue
> should receive any First Amendment
> protection.  _See Youker v. Schoenenberger,_
> 22 F.3d 163, 166 (7th Cir.1994) ("[T]he
> speech in the present case is not protected
> because it was not speech as a citizen
> because [the plaintiff] represented, without
> authority, that it was [the government
> employer's] official speech.").

We caution that this would be a different case if
Rice-Lamar had used a means of communication that
was not under the exclusive control of her employer.
Although we intimate no view concerning the
outcome of such a case, different considerations
would obviously come to the fore if Rice-Lamar had,

for example, written an editorial for a local
newspaper, or even if she had attempted to
communicate her concerns privately to the City
Commission.    In the instant case, however, Rice-
Lamar attempted to publish her personal views in a
document that was both under the control, and vested
with the authority, of her employer, the City of Ft.
Lauderdale.    Civil servants cannot cry foul when
they attempt to use their government employers as
stage dummies, and are then disciplined for it.


                        B.

Rice-Lamar also contends that the district court erred
in granting summary judgment to all the defendants
on her claims of discrimination under Title VII of the
Civil Rights Act of 1964, and 42 U.S.C. § § 1981,
1983, and 1985(3).

[5]  Under _McDonnell Douglas Corp. v. Green,_ 411
U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668
(1973), a plaintiff can establish a _prima facie_ case
that she was discriminated against in violation of
Title VII by showing:    (1) she is a member of a
protected class;    (2) she was subjected to adverse
employment    action;      (3) her    employer    treated
similarly situated employees who are not members of
the plaintiff's class more favorably;    and (4) she was
**843** qualified for the job or job benefit at issue.  _See
Holifield v. Reno,_ 115 F.3d 1555, 1561-62 (11th
Cir.1997).   Once a _prima facie_ case is shown,
the defendant must clearly set forth, through the
introduction of admissible evidence, the reasons for
the plaintiff's rejection.      The explanation provided
must be legally sufficient to justify a judgment for the
defendant.    If the defendant carries this burden of
production, the presumption raised by the prima facie
case is rebutted, and the factual inquiry proceeds to a
new level of specificity....
... [The plaintiff] now must have the opportunity to
demonstrate that the proffered reason was not the true
reason for the employment decision.    This burden
now merges with the ultimate burden of persuading
the court that she has been the victim of intentional
discrimination.       She may succeed in this either
directly by persuading the court that a discriminatory
reason more likely motivated the employer or
indirectly by showing that the employer's proffered
explanation is unworthy of credence.

_Texas Dept. of Community Affairs v. Burdine,_ 450
U.S. 248, 255-56, 101 S.Ct. 1089, 1094-95, 67
L.Ed.2d 207 (1981).[FN11]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836                                                                                      Page 8
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

FN11. The elements of a section 1983 claim of race or gender discrimination are the same as the elements of a Title VII disparate treatment action. *See Cross v. Alabama*, 49 F.3d 1490, 1507-08 (11th Cir.1995). The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1412 n. 13 (11th Cir.1998).

[6] In the instant case, the district court found that even though

there are genuine issues of material facts with respect to whether [Rice-Lamar] has established her prima facie case ... [,] there are no genuine issues of material facts as to whether the City's stated legitimate, nondiscriminatory reasons for its actions were pretextual.... [I]t is undisputed that [Rice-Lamar] was disciplined for refusing to follow her supervisors' instructions. Although the subject matter of the dispute between [Rice-Lamar] and her supervisors involved race and gender discrimination, the City's actions with respect to [Rice-Lamar] herself were not due to her race or gender. Rather, they were due to her insistence on including her own conclusions in the Affirmative Action Reports against her supervisors' wishes.

*Rice-Lamar v. City of Ft. Lauderdale*, 54 F.Supp.2d 1137, 1146 (S.D.Fla.1998) (footnote omitted).

Rice-Lamar does not dispute that she refused to alter substantially the Affirmative Action Report, and she has failed to present any evidence indicating that other insubordinate employees were treated more favorably. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2107, 147 L.Ed.2d 105 (2000) (finding error in grant of judgment as a matter of law to defendant in an age discrimination claim, in part because plaintiff "made a substantial showing that [defendant's] explanation [for the adverse employment action] was false"). In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). [FN12] Because Rice-Lamar has failed to present any evidence demonstrating that the City's proffered explanation is pretextual, the district court did not err

in granting summary judgment **\*844** to the defendants on her discrimination claims. [FN13]

FN12. Rice-Lamar argues that the defendants never alerted her that part of the City's nondiscriminatory rationale for her discharge was her insubordination in connection with the 1996 Affirmative Action Report. Defendants' answer to plaintiff's complaint, however, states that "Defendants admit that Plaintiff was suspended and then terminated for distributing the 1996 Affirmative Action Report ... to senior management employees without obtaining the prior approval of her supervisors."

FN13. Our disposition of Rice-Lamar's discrimination claims obviates the need for us to address her conspiracy claim under 42 U.S.C. § 1985(3).
We affirm without discussion the district court's denial of Rice-Lamar's motion to amend her complaint to state a claim of retaliation under Title VII.

IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the defendants on all claims.

AFFIRMED.

C.A.11 (Fla.),2000.
Rice-Lamar v. City of Ft. Lauderdale, Fla.
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L. Weekly Fed. C 134

Briefs and Other Related Documents (Back to top)

• 2000 WL 33990556 (Appellate Brief) Reply Brief of Appellant, Deborah Rice-Lamar (Jan. 03, 2000) Original Image of this Document (PDF)
• 1999 WL 33618044 (Appellate Brief) Answer Brief of Appellees (Dec. 02, 1999) Original Image of this Document (PDF)
• 1999 WL 33618045 (Appellate Brief) Brief of Appellant, Deborah Rice-Lamar (Nov. 10, 1999) Original Image of this Document (PDF)
• 99-12951 (Docket) (Aug. 19, 1999)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

232 F.3d 836    Page 9
232 F.3d 836, 84 Fair Empl.Prac.Cas. (BNA) 426, 79 Empl. Prac. Dec. P 40,291, 16 IER Cases 1638, 14 Fla. L.
Weekly Fed. C 134
**(Cite as: 232 F.3d 836)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:49:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 392 F.3d 1283 |
| Lines: | 1222 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

## Westlaw.

392 F.3d 1283                                                                            Page 1
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92
**(Cite as: 392 F.3d 1283)**

**C**
Briefs and Other Related Documents
McDowell v. BrownC.A.11 (Ga.),2004.
United States Court of Appeals,Eleventh Circuit.
Roderic R. McDOWELL, Plaintiff-Appellant,
v.
Pernell BROWN, John Doe, No. 1, Wexford Health
Sources, Inc., et al., Defendants-Appellees.
**No. 04-10272.**

Dec. 8, 2004.

**Background:** Former inmate of county jail brought
§ 1983 Eighth Amendment action against county,
alleging improper failure to treat emergency medical
condition, and asserted state-law medical negligence
claims against jail's health services subcontractor and
against nurse employed by subcontractor. The United
States District Court for the Northern District of
Georgia, No. 99-02364-CV-JOF-1,J. Owen Forrester,
J., granted summary judgment for county, and
dismissed claims against subcontractor and nurse.
Inmate appealed.

**Holdings:** The Court of Appeals, Fay, Circuit Judge,
held that:

(1) county board's alleged underfunding of jail did
not satisfy "custom or policy" prong of § 1983 claim
against county;

(2) causation prong of § 1983 claim was also
unsatisfied;

(3) neurosurgeons who had treated inmate at hospital
after transfer from jail were competent to testify as to
standard of care for nurses employed by
subcontractor; but

(4) requirements of *Daubert* were unsatisfied as to
neurosurgeons' proffered testimony, given lack of
support for theory that delay in treatment had caused
inmate's partial paraplegia.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ☞1345**

**78** Civil Rights
    **78III** Federal Remedies in General
        **78k1342** Liability of Municipalities and Other
Governmental Bodies
            **78k1345** k. Acts of Officers and Employees
in General;  Vicarious Liability and Respondeat
Superior in General. Most Cited Cases
Local government entities, while considered
potentially liable "persons" under § 1983, cannot be
liable on theory of respondeat superior. 42 U.S.C.A.
§ 1983.

**[2] Civil Rights 78 ☞1351(1)**

**78** Civil Rights
    **78III** Federal Remedies in General
        **78k1342** Liability of Municipalities and Other
Governmental Bodies
            **78k1351** Governmental Ordinance, Policy,
Practice, or Custom
                **78k1351(1)** k. In General. Most Cited
Cases
To impose § 1983 liability on municipality, plaintiff
must show that: (1) his constitutional rights were
violated; (2) municipality had custom or policy that
constituted deliberate indifference to that
constitutional right; and (3) policy or custom caused
violation. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ☞1351(4)**

**78** Civil Rights
    **78III** Federal Remedies in General
        **78k1342** Liability of Municipalities and Other
Governmental Bodies
            **78k1351** Governmental Ordinance, Policy,
Practice, or Custom
                **78k1351(4)** k. Criminal Law
Enforcement; Prisons. Most Cited Cases
County jail's staffing problems, allegedly resulting
from county board's custom of inadequate budgeting
for sheriff's office and jail, did not satisfy "custom or
policy" prong of inmate's § 1983 Eighth Amendment
action against county alleging failure to transport him
to hospital during medical emergency and consequent
paralysis; jail had policy to call ambulance to
transport inmates with emergency medical needs if
jail personnel were unable to do so, inmate presented
no evidence of any other occasion when
understaffing contributed to medical condition,
inmate neither identified any pattern of injuries

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

392 F.3d 1283
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92
**(Cite as: 392 F.3d 1283)**

Page 2

linked to board's budget decisions nor alleged defective accounting practices, and there was no evidence that board was aware of any health consequences of its budget decisions.    U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

## [4] Civil Rights 78 ☞1343

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
In § 1983 action alleging that municipality's facially valid actions violated plaintiff's constitutional rights, plaintiff must demonstrate that municipality's lawful action was taken with deliberate indifference as to its known or obvious consequences.    42 U.S.C.A. § 1983.

## [5] Civil Rights 78 ☞1351(4)

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
Causation prong was unsatisfied in county jail inmate's § 1983 Eighth Amendment action against county alleging county board's custom of inadequate budgeting for sheriff's office and jail, resulting in understaffing, and in turn leading to failure to transport inmate to hospital during medical emergency and consequent paralysis; although injury to inmate may not have occurred "but for" budget decisions, there was no showing that those decisions were highly likely to inflict particular injury in question, especially since jail personnel were instructed to request ambulances to transport inmates with emergency medical needs if jail personnel were unable to do so. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

## [6] Civil Rights 78 ☞1343

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In General. Most Cited Cases
To satisfy causation prong of § 1983 action against

municipality, plaintiff must prove that municipality's deliberate conduct was moving force behind injury. 42 U.S.C.A. § 1983.

## [7] Federal Courts 170B ☞823

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk823 k. Reception of Evidence. Most Cited Cases
Court of Appeals reviews for abuse of discretion district court's ruling on admissibility of expert testimony.

## [8] Federal Courts 170B ☞416

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk416 k. Evidence Law. Most Cited Cases
Admissibility of expert testimony in federal action is matter of federal, rather than state procedure.

## [9] Federal Courts 170B ☞416

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk416 k. Evidence Law. Most Cited Cases
In medical malpractice action heard in federal court, court first determines if expert witness is competent to testify to state-law substantive issue of case, e.g. standard of care, then screens witness's testimony under federal rule governing expert witnesses to determine if it is otherwise admissible expert testimony.    Fed.Rules Evid.Rules 601, 702, 28 U.S.C.A.

## [10] Health 198H ☞611

198H Health
    198HV Malpractice, Negligence, or Breach of Duty
        198HV(B) Duties and Liabilities in General
            198Hk611 k. Elements of Malpractice or Negligence in General. Most Cited Cases
In order to prove medical malpractice under Georgia law, plaintiff must prove: (1) duty inherent in health care provider-patient relationship; (2) breach of that duty by failing to exercise requisite degree of skill

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and care; and (3) that this failure is proximate cause of injury sustained.

[11] Health 198H 🔑821(3)

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(G) Actions and Proceedings
         198Hk815 Evidence
            198Hk821 Necessity of Expert Testimony
               198Hk821(3) k. Proximate Cause.
Most Cited Cases
In order to prove causation prong of medical malpractice action under Georgia law, plaintiff must present medical testimony.

[12] Evidence 157 🔑538

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k538 k. Due Care and Proper Conduct in General. Most Cited Cases
Under Georgia law, neurosurgeons who had treated county jail inmate at hospital after transfer from jail were competent to testify as to standard of care for nurses employed by jail's health services subcontractor, in inmate's medical malpractice claim against subcontractor and against nurse who had failed to call ambulance to transport inmate to hospital. West's Ga.Code Ann. § 9-11-9.1(a).

[13] Evidence 157 🔑555.2

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
Reliability prong of *Daubert* analysis requires that proffered expert testimony be "scientific," i.e. grounded in methods and procedures of science, and constitute "knowledge," i.e. be something more than subjective belief or unsupported assumptions. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[14] Evidence 157 🔑555.2

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts

         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
Factors in reliability prong of *Daubert* analysis include: (1) whether expert's methodology has been tested or is capable of being tested; (2) whether technique has been subjected to peer review and publication; (3) known and potential error rate of methodology; and (4) whether technique has been generally accepted in proper scientific community. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[15] Evidence 157 🔑555.10

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.10 k. Medical Testimony. Most Cited Cases
Requirements of *Daubert* were unsatisfied as to neurosurgeons' proffered testimony that delay in treating patient suffering spinal cord compression had caused or worsened resulting partial paraplegia, precluding admission of that testimony in patient's medical malpractice action against nurse responsible for part of delay and against her employer; physicians based causation conclusion on common-sense "the earlier, the better" theory within average juror's knowledge, and on single study concerning delay that was over twice as long as that in patient's case, and conclusion thus lacked testing, peer review, potential error rate and general acceptance. Fed.Rules Evid.Rule 702, 28 U.S.C.A.; West's Ga.Code Ann. § 51-1-27.

*1285 John G. Mabrey, Bird & Mabrey, P.C., John E. Floyd, Corey Fleming Hirokawa, Bondurant, Mixson & Elmore, Atlanta, GA, for Plaintiff-Appellant.
Deana Simon Johnson, Cruser & Mitchell, LLP, Norcross, GA, Stephen C. Greenberg, Scott Everett Morris, Holt, Ney, Zatcoff & Wasserman, LLP, Atlanta, GA, William J. Linkous, III, Charles G. Hicks, DeKalb County Law Dept., Decatur, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON, Chief Judge, FAY, Circuit Judge, and CORRIGAN[FN*], District Judge.

FN* Honorable Timothy J. Corrigan, United

392 F.3d 1283
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92
(Cite as: 392 F.3d 1283)

States District Judge for the Middle District of Florida, sitting by designation.

FAY, Circuit Judge:
This litigation involves claims asserted by Roderic McDowell against government and medical defendants resulting from the delayed treatment of his illness while detained as an inmate at Dekalb County Jail in June 1997. The district court granted summary judgment in favor of Dekalb County, Georgia, on Mr. McDowell's § 1983 claims. The district court also granted summary judgment to defendants Wexford Health Sources, Inc., and Pernell Brown on his state law medical negligence claims. No other claims were left pending before the district court. Mr. McDowell's appeal raises the following issues: (1) *1286 whether Mr. McDowell demonstrated a § 1983 claim against a municipality under *Board of County Commissioners v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); and (2) whether the district court erred in excluding all of Mr. McDowell's expert witnesses, which resulted in the dismissal of the claims against Wexford and Brown. We answer both questions in the negative, and affirm the district court's grant of summary judgments in favor of the defendants.

*I. Facts*

The Dekalb County Sheriff's Office maintains the Dekalb County Jail (the "Jail"). This appeal involves two divisions at the Jail: the jail division, which manages the daily operations, and the field division, which handles medical transports to Grady Memorial Hospital ("Grady"). Additionally, the Jail contracted its health services out to Wexford Health Sources, Inc. ("Wexford"). Wexford, in turn, employed doctors and nurses to attend to the inmates' medical needs. The Jail's policy required its staff to call an Emergency Medical Services ambulance should medical personnel determine an inmate's condition to be an emergency.

Plaintiff, Roderic McDowell, was detained as an inmate at the Dekalb County Jail in May and June 1997 pending disposition of a warrant for failure to report to his probation officer. Two weeks into his detention, at the end of May 1997, Mr. McDowell began to suffer pain in his lower back. Over the course of several days, Wexford's nurses treated Mr. McDowell's condition. On June 5, 1997, the Jail's field division transported Mr. McDowell to Grady to evaluate his back pain and other symptoms. Mr. McDowell was treated and returned to the Jail the same day.

At 9:30 p.m. the following day, June 6, 1997, Mr. McDowell reported that he could not urinate and had difficulty walking. Pernell Brown ("Nurse Brown"), a Wexford nurse in the Jail's medical clinic, examined Mr. McDowell, and determined that he needed to return to Grady for treatment. Nurse Brown completed a referral form directing the Jail to send Mr. McDowell to Grady in order to rule out pneumonia or "acute abdomen." At 9:50 p.m., Nurse Brown gave the referral form to Sergeant Hutchinson with the Sheriff's Office. There is some dispute as to whether Nurse Brown informed Sergeant Hutchinson of either the urgency of Mr. McDowell's condition or the time frame in which Mr. McDowell needed medical attention. Sergeant Hutchinson testified during his deposition that Nurse Brown gave no such instructions, while Nurse Brown maintained in her deposition that she told Sergeant Hutchinson to transport Mr. McDowell to Grady "within the hour." Nurse Brown did not inform the Wexford doctor on call of the situation, and left the Jail shortly after seeing Mr. McDowell.

Sergeant Hutchinson and another officer moved Mr. McDowell from the Jail's clinic to its intake area to await transport by field division officers because the transport area was closed. Sergeant Hutchinson then distributed copies of Mr. McDowell's referral form to various Sheriff's Office staff, communications personnel, and the intake area nurse. The communications officer reported that dispatch had sent a field division unit to handle Mr. McDowell's transport to Grady. At the end of his shift, Sergeant Hutchinson informed the following shift's supervisor that Mr. McDowell was waiting in the intake area for transport to Grady by the field division.

A nurse monitored Mr. McDowell's condition while he waited in the intake area, and provided care for his infirmities. When a field division deputy arrived, another inmate, suffering severe facial trauma*1287 from an altercation, also required transport to Grady. The transport deputy could only take one inmate because policy mandated that the deputy wait with the inmate at Grady. The deputy consulted the intake nurse and took the other inmate to Grady. Jail staff then took Mr. McDowell back to the medical clinic so he could lie down, and to allow Wexford nurses to monitor his condition and arrange for ambulance transport if Mr. McDowell's condition deteriorated.

In the early morning hours of June 7, 1997, the field

division performed several mental health transports. Mr. McDowell's condition was not considered an emergency, and the Jail's policy places priority on mental health transports over non-emergency transports. The morning watch commander notified the Jail that his shift could not transport Mr. McDowell to the hospital; Mr. McDowell's transport would be accomplished by the day shift, which began at 8:00 a.m. When the day watch deputy arrived to take Mr. McDowell to Grady, he was no longer in the intake area. The field division sergeant told the Jail to inform him when Mr. McDowell was ready for transport. At 9:00 a.m. that morning, Mr. McDowell told an officer that he had no feeling in his legs. A doctor and nurse examined Mr. McDowell and determined his condition to be emergent. An ambulance was called to take Mr. McDowell to Grady. He arrived there at 12:20 p.m.

By the time he arrived at Grady Hospital, Mr. McDowell was experiencing paralysis in his legs. Mr. McDowell was first examined by Grady doctors at 1:38 p.m. One doctor noted Mr. McDowell's symptoms and diagnosed him as needing to "rule out" spinal cord compression and epidural abscess. For the rest of the day, a battery of tests were performed on Mr. McDowell. By 6:45 p.m., doctors diagnosed Mr. McDowell with spinal cord compression, and transferred him back to the emergency room at 9:20 p.m. Emergency physicians then admitted Mr. McDowell to the neurosurgical department. Mr. McDowell entered surgery for a spinal epidural abscess [FN1] at approximately 10:20 p.m., more than twenty-four hours after he first visited Nurse Brown. The surgery ultimately reversed Mr. McDowell's total paralysis, however, Mr. McDowell remains an incomplete paraplegic.[FN2]

> FN1. A spinal epidural abscess is a pocket or collection of pus which develops in or around the epidural space in the spinal cord.

> FN2. Mr. McDowell needs assistance to walk, but can expel without catheterization.

### II. Proceedings Below

Mr. McDowell filed this case in Georgia state court on June 1, 1999, alleging medical malpractice and constitutional violations against: Dekalb County (the "County" or "Dekalb"), Wexford and Nurse Brown,[FN3] Grady Memorial Hospital, and several doctors and nurses who treated Mr. McDowell at Grady. Mr. McDowell sued Dekalb under 42 U.S.C.

§ 1983 for violation of his Eighth Amendment rights and asserted state-law medical negligence claims against Wexford and Grady.[FN4] The County removed the case to federal district court on September 16, 1999.

> FN3. The medical malpractice claims against Wexford were based on *respondeat superior* liability for the negligence of Wexford's nurses, including Nurse Brown.

> FN4. Mr. McDowell also asserted a § 1983 claim against Wexford, but later dismissed that claim.

On September 25, 2001, the district court determined that McDowell failed to establish that the County's policy, practice or custom resulted in the violation of his Eighth Amendment rights, as required by *1288Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Consequently, the district court granted the County's motion for summary judgment.[FN5] On the same date, the Grady defendants sought to exclude the testimony of McDowell's medical experts, Drs. James Merikangas, M.D. ("Dr. Merikangas"), Rabih O. Darouiche, M.D. ("Dr. Darouiche"), and David Gower, M.D. ("Dr. Gower"). Wexford did not join Grady's motion, and on September 30, 2002, the district court granted Grady's motion and excluded all of McDowell's experts.[FN6]

> FN5. Pursuant to Federal Rule of Civil Procedure 54(b), McDowell requested a certification from the district court, that its ruling was a final judgment with respect to Dekalb. The district court denied that motion.

> FN6. Neither McDowell nor Wexford briefed the admissibility of the experts' testimony with regard to Wexford's negligence. In granting Grady's motion, the district court explained that it only considered the question of whether the expert testimony was admissible as it pertained to the "doctor Defendants." The district court noted, however, that the experts did state that they were not qualified to render an opinion as to the nurses' standard of care.

In March 2003, with the case against the County

dismissed, the district court re-opened discovery to permit McDowell to develop further expert testimony on causation, but it did not permit additional expert discovery with regard to Nurse Brown's negligence. As a result of the district court's prior exclusion of McDowell's medical experts and its determination that they could not testify as to the proper standard of care for a nurse, McDowell was left with no expert testimony regarding the standard of care or causation with respect to Wexford. Therefore, the district court granted summary judgment in favor of Wexford on March 23, 2003.

McDowell's case proceeded against the Grady Defendants, eventually reaching a settlement in August 2003. McDowell dismissed his claims against the individual Grady nurses and doctors and against Grady itself. As such, none of the Grady Defendants are part of this appeal. Therefore, the claims pertinent to this appeal concern the § 1983 claim against the County, and the state law medical negligence claims against Wexford. McDowell challenges the district court's grant of summary judgment to the County, and the exclusion of his medical experts against Wexford. We will address each issue as it pertains to the particular defendant in turn.

### III. Summary Judgment for Dekalb County

We review a district court's grant of summary judgment to DeKalb County de novo, and apply the same legal standards used by the district court. See O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir.2001). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." See Nolen v. Boca Raton Cmty. Hosp., Inc., 373 F.3d 1151, 1154 (11th Cir.2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir.2003). If the evidence could not lead a rational fact-finder to find for the nonmoving party, and

where the nonmoving party fails to make a sufficient showing to demonstrate**1289** an element essential to that party's case, on which that party bears the burden of proof at trial, then no genuine issue of material fact exists, and summary judgment should be granted. Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548; see Holbrook v. City of Alpharetta, 112 F.3d 1522, 1525-26 (11th Cir.1997). Finally, genuine disputes are "those in which the evidence is such that a reasonable jury could return a verdict for the nonmovant. For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir.1996).

[1][2] Mr. McDowell argues that Dekalb County's custom of understaffing the Sheriff's Office (and the Jail) delayed the treatment of his condition and thereby violated his rights under the Eighth Amendment. Title 42 U.S.C. § 1983 provides that: Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Although the Supreme Court has held that counties (and other local government entities) are "persons" within the scope of § 1983, and subject to liability, McDowell cannot rely upon the theory of respondeat superior to hold the County liable.[FN7] See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); Pembaur v. Cincinnati, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "It is only when the 'execution of the government's policy or custom ... inflects the injury' that the municipality may be held liable." City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A county does not incur § 1983 liability for injuries caused solely by its employees. Monell, 436 U.S. at 694, 98 S.Ct. 2018. Nor does the fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee infer municipal culpability and causation. Bd. of County Com'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *See Canton,* 489 U.S. at 388, 109 S.Ct. 1197.

> FN7. Mr. McDowell conceded that the sheriff's deputies he named in his suit were entitled to qualified immunity in their individual capacities. The district court, therefore, only assessed the liability of Dekalb County resulting from deputies acting in their official capacities. *See Pompey v. Broward County,* 95 F.3d 1543, 1545-46 n. 2 (resolving official capacity claims as those against a county).

No party challenges that McDowell had a severe medical condition which required urgent care and treatment, which he did not receive. This resulted in a violation of McDowell's constitutional rights.[FN8] Our *1290 first inquiry, then, is whether Dekalb's policy or custom was to understaff the field division so as deny McDowell's constitutional rights. In *Wayne v. Jarvis,* 197 F.3d 1098 (11th Cir.1999), we clarified the standard for establishing municipal liability. A plaintiff seeking to hold a municipality liable under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* at 1105 (quoting *Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). We defined custom as "a practice that is so settled and permanent that it takes on the force of the law." *Wayne,* 197 F.3d at 1105 (quoting *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998)). In order for a plaintiff to demonstrate a policy or custom, it is "generally necessary to show a persistent and wide-spread practice." *Id.* (internal quotations and citations omitted). *See also, Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir.1994).

> FN8. As a pre-trial detainee, McDowell's rights exist under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment, which McDowell alleges in this case. *See City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). Nonetheless, McDowell's claims are subject to the same Eighth Amendment scrutiny as

if they had been brought as deliberate indifference claims under the Eighth Amendment. *See Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994); *see also Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985) (holding that "in regard to providing pretrial detainees with such basic necessities as ... medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.").

This threshold identification of a custom or policy "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Brown,* 520 U.S. 403-04, 117 S.Ct. 1382 (citations omitted). This prevents the imposition of liability based upon an isolated incident. *See Depew v. City of St. Marys,* 787 F.2d 1496 (11th Cir.1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy"). Rather, the incident must result from a demonstrated practice. *See Wayne,* 197 F.3d at 1106 (determining that a single decision, "even if erroneous, would not support the inference that the County had a custom or policy" in place). Based on these instructions, McDowell must establish that DeKalb's policy was to understaff the field division, and that this practice left the division unable to execute medical transports.

[3] The Sheriff and the Sheriff's Office of Dekalb County are responsible for the County's law enforcement functions. The Board of Commissioners of Dekalb County (the "Board") approves the Sheriff's Office budget. To demonstrate the Jail's routine understaffing practices, McDowell points to the testimony of numerous Sheriff's Office employees claiming that the Jail lacked adequate manpower. Indeed, the chief of jail operations, Dennis Cheatham, testified in his deposition that despite Sheriff's Office requests for additional personnel, other priorities often took precedent. Moreover, the Jail's former health services coordinator explained that transporting inmates between the Jail and Grady was a "continual problem," which he "constantly [tried] to correct and amend."

Although McDowell produced evidence that the Jail had staffing problems, the record provides no evidence that the field division consistently failed to

transport non-emergency cases to Grady. Additionally, the field division's policy was to call an ambulance to take the inmate to Grady if it could not accomplish the transport itself. While McDowell's case is tragic, he cannot point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition. Simply put, this isolated incident, however unfortunate, **\*1291** does not demonstrate evidence of the County's "persistent" or "widespread" policy of understaffing the Jail so as to delay the transfer of inmates to Grady.

Our next inquiry requires that a municipality's that the municipality's action was "taken with the requisite degree of culpability ... with deliberate indifference to its known or obvious consequences." *Davis ex rel. Doe v. Dekalb County Sch. Dist.,* 233 F.3d 1367, 1375-76 (11th Cir.2000). McDowell cannot rely on a generalized policy of understaffing. *See Anderson v. City of Atlanta,* 778 F.2d 678, 687-88 (11th Cir.1985). The County must have a "deliberate intent" to inadequately staff the field division. *Id.*

In *Brown,* the Supreme Court refined the culpability requirement for municipal liability cases. The Court set forth a scheme whereby a governing body's own intentional acts that violate constitutionally protected rights amount to "per se" § 1983 liability. In such cases, where the "municipal action *itself* violates federal law, or directs an employee to do so ... issues of fault and causation [are] straightforward," and "present no difficult questions...." *Id.* at 405-06, 117 S.Ct. 1382 (examining *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (city council discharged an employee without notice), and *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (city imposed content-based speech regulation, in violation of the First Amendment); *Pembaur,* 475 U.S. at 479, 106 S.Ct. 1292 (prosecutor was a "final municipal decisionmaker" who directed deputies to illegally enter plaintiff's business)).

[4] At the other end of the § 1983 liability spectrum, is where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights. In such a case, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown,* 520 U.S. at 405, 117 S.Ct. 1382. As *Brown* pointed out, "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality

directly caused a deprivation of federal rights." *Id.* at 415, 117 S.Ct. 1382 (emphasis in the original). To meet this burden, a plaintiff must demonstrate that the lawful action was "taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407, 117 S.Ct. 1382 (quoting *Canton,* 489 U.S. at 388, 109 S.Ct. 1197). Plainly stated, a "showing of simple or even heightened negligence is not enough." *Brown,* 520 U.S. at 407, 117 S.Ct. 1382.

Mr. McDowell traces the County's liability to its failure to properly fund the resources necessary to staff the Jail. The Supreme Court has recognized that inadequate training may impose § 1983 liability on a municipality in "limited circumstances." *See Canton,* 489 U.S. at 387, 109 S.Ct. 1197. The Court, however, refused to extend liability to inadequate hiring practices. *See Brown,* 520 U.S. at 409, 117 S.Ct. 1382. McDowell is asking this Court to extend liability to inadequate budgeting practices, but does not identify any "pattern of injuries" linked to the County's budgetary decisions, nor does he insist that its accounting practices are "defective." *Id.* at 408, 117 S.Ct. 1382. McDowell's claim rests upon one incident, which he attempts to trace back to a single decision: a decision that does not represent a violation of federal law on its face. Our precedent does not permit such an attenuated link. If it did, the "danger that a municipality would be held liable without fault is high." *Brown,* 520 U.S. at 408, 117 S.Ct. 1382. The County's decision impacted this single case; it had no notice of the consequences "based on previous violations of federally protected rights." *Id.*

**\*1292** McDowell cannot establish that a reasonable member of the Board would conclude that the County's budget decisions would lead to events that occurred here. *See Davis,* 233 F.3d at 1376. Although the record reflects that several deputies testified that the field division lacked the personnel to move inmates to Grady, no evidence was presented that the County's Board was aware of the health consequences involved. Moreover, the record demonstrated that the field division accomplished non-emergency transfers to Grady within a one-to-two hour window. Finally, the County's policy directed the field division to send all emergency cases to Grady by ambulance, and even non-emergency cases, if transport could not be effected in a timely manner. It was a clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical transportation. With such practices in place,

392 F.3d 1283
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92
(Cite as: 392 F.3d 1283)

McDowell cannot establish or seriously dispute that the Board would anticipate that inmates would not receive timely medical attention. The alleged constitutional violation here was not a "highly predictable consequence" of the County's failure to budget (and hence, adequately staff) the Sheriff's Office. *See Brown, 520 U.S. at 409-410, 117 S.Ct. 1382.*

[5][6] Our final inquiry examines causation. A plaintiff must prove causation by demonstrating that the municipality's "*deliberate* conduct ... was the 'moving force' behind [his] injury...." *Brown, 520 U.S. at 404, 117 S.Ct. 1382* (emphasis in original). *See also Davis,* 233 F.3d at 1376-77. *Brown* noted that "every injury suffered at the hands of a municipal employee can be traced to a hiring decision;" we believe the same holds true for budget decisions. *Id.* at 410, 117 S.Ct. 1382. If we employed such a strict causation analysis, then "but for" the County's budget decision, McDowell would not have suffered the injury. *Id.* at 410, 117 S.Ct. 1382. The Supreme Court warned against such pervasive scrutiny: "To prevent municipal liability for a ... decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.*

We heed the Court's caution and apply it here. While it may be true that the Board's budget decision would make a violation of his constitutional rights "more *likely,*" that alone cannot "give rise to an inference that a policy maker's failure to scrutinize the [budget] ... produced a specific constitutional allegation." *Brown, 520 U.S. at 411, 117 S.Ct. 1382* (emphasis in original). *Brown* determined that the showing of one incident of inadequate employee screening did not establish "deliberate indifference." *Id. Brown* further enunciated that a "finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury." *Id.* At 412. We agree. The County's liability cannot be dependent on the scant likelihood that its budget decisions would trickle down the administrative facets and deprive a person of his constitutional rights. Instead, liability must be premised on a finding that "*this* " budget decision was "highly likely to inflict the *particular* injury" McDowell suffered. *Id.*

To "test the link" between McDowell's injury and the County's conduct, we look to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that McDowell's injuries were a "plainly obvious consequence" of that decision. *Brown, 520 U.S. at 412, 117 S.Ct. 1382.* We find no such revelation. Even making all reasonable inferences in McDowell's favor, we must agree with the district court that he failed to demonstrate *1293 a genuine issue of fact that the County acted with conscious disregard. *See Davis,* 233 F.3d at 1374-75. McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not demonstrate that the County was the "moving force" behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. *Brown, 520 U.S. at 404, 117 S.Ct. 1382.* Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

As a final matter, McDowell insists that *Anderson v. City of Atlanta,* 778 F.2d 678 (11th Cir.1985) is controlling and diminishes his burden of establishing deliberate indifference to one of "proving a policy of deficiencies in staffing or procedures such that [he] is effectively denied access to adequate medical care." *Id.* at 686 n. 12. We find no merit in McDowell's argument, and his situation distinguishable from *Anderson.* In *Anderson,* Atlanta police deputies arrested Larry Anderson and transported him to the city jail. Anderson informed deputies at the time that he needed medical assistance because he had overdosed on drugs. Deputies instead placed Anderson in a holding cell. Anderson remained in the cell throughout the night, and deputies discovered his lifeless body the next morning. The medical examiner determined that Anderson likely died of a drug overdose. A jury held the county liable under § 1983, and awarded damages, but the district court entered a judgment notwithstanding the verdict. We reversed that decision, finding that the City of Atlanta did violate Anderson's constitutional rights.

The facts in *Anderson* demonstrated a complete departure from operating procedure whereby the jail was required to staff healthcare personnel at all times. The jail never hired a nurse for the 11:00 P.M. to 7:00 A.M. shift, when Anderson arrived and later died at the jail. *Anderson,* 778 F.2d at 684.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, the medical examiner testified that deputies probably never checked on Anderson, despite their insistence that they had done so. _Id. at 685._ This Court acknowledged the "gross indifference" that existed. On the other hand, Mr. McDowell was treated by Nurse Brown and other medical staff consistently monitored his condition both in the Jail's clinic and the intake area. The Jail had a policy in place to rectify any understaffing that would result in delay of medical transports. An ambulance would be called to transport the inmates to Grady if either the situation was emergent or the field division lacked manpower to accomplish the transport. McDowell's injuries result more from a breakdown in communication rather than from understaffing or an abrogation of Jail procedure. As _Anderson_ makes clear, "[a] municipality can generally not be liable for a single act of negligence or misconduct." _Id._ at 685.

In the instant case, the record is barren of any evidence of implementation of an intentionally malevolent or impermissible policy by the Board so as to authorize a cause of action against Dekalb County under 42 U.S.C. § 1983. The fact that the Board's budget practices resulted in understaffing does not amount to a purposeful disregard which would violate any citizen's constitutional rights. McDowell "may not infer a policy merely because harm resulted from some interaction with a governmental entity." **\*1294**_Colle v. Brazos County, Texas,_ 981 F.2d 237, 245 (5th Cir.1993) . There is no indication that Dekalb County deliberately invoked a policy to interfere with the Jail's provision of medical care to inmates or to deny inmates access to medical care. McDowell's argument in this case is essentially a medical malpractice claim which is insufficient to establish liability under 42 U.S.C. § 1983. _Estelle v. Gamble,_ 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Accordingly, summary judgment was properly granted to Dekalb County.

### IV. Exclusion of Expert Testimony[FN9]

> FN9. It is necessary to point out that the district court's original order excluding Mr. McDowell's experts applied to the Fulton-Dekalb Hospital Authority and individual doctors and nurses and Grady. The district court's order did not encompass Wexford or Pernell Brown. Nonetheless, the district court stated that each of McDowell's experts testified that he was not qualified to opine as

to the proper actions or the applicable standard of care for nursing.

This issue was reexamined at a hearing on the motion for summary judgment as to Wexford and Nurse Brown. The district court noted again that there was simply no expert testimony with respect to the standard of care for nursing or to show causation.

[7] We review a district court's ruling on the admissibility of expert testimony for abuse of discretion. _General Elec. Co. v. Joiner,_ 522 U.S. 136, 138-39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Often, as is the case here, the ruling may be "outcome determinative," but we do not apply a stricter standard even though the ruling results in a summary judgment.[FN10] See _Allison v. McGhan Med. Corp.,_ 184 F.3d 1300, 1306 (citing _Joiner,_ 522 U.S. at 142-43, 118 S.Ct. 512). "Cases arise where it is very much a matter of discretion with the court whether to receive or exclude evidence; but the appellate court will not reverse in such a case unless the ruling is manifestly erroneous." _Allison,_ 184 F.3d at 1306 (citations omitted). See also, _Stancill v. McKenzie Tank Lines, Inc.,_ 497 F.2d 529, 535 (5th Cir.1974) ("we recognize that the admission or exclusion of expert testimony is a matter within the sound discretion of the trial judge. Only if we determine that his decision is 'manifestly erroneous' may we find that he has abused his discretion and that reversal is required") (citations omitted).[FN11]

> FN10. We review a district court's grant of summary judgment _de novo,_ but here the grant of summary judgment to Wexford was based on the district court's exclusion of McDowell's expert testimony against Wexford, and its subsequent determination that McDowell had no competent expert to testify against Wexford, as required for medical negligence claims under Georgia state law. Mr. McDowell concedes that he does not challenge the grant of summary judgment should we uphold the exclusion of his experts.

> FN11. In _Bonner v. City of Prichard,_ 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[8] The only claims McDowell has remaining against Wexford involve Georgia state medical malpractice

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 11

claims. Because the district court exercised supplemental jurisdiction over these claims when it was removed from state court, state law governs substantive issues and federal law governs procedural issues. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "Proffered expert medical testimony must meet the legal as well substantive issues of the case." *Allison,* 184 F.3d at 1320 (citing *In re Breast Implant Litig.,* 11 F.Supp.2d 1217, 1226 (D.Colo.1998)). Rules of procedure encompass rules of evidence, and therefore, the Federal Rules of Evidence, not state evidentiary laws, apply. *See* 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 4512 (2d ed.1996). Moreover, we wrote that the admissibility of expert testimony is a matter of federal, **\*1295** rather than state procedure. *See United States v. Roark,* 753 F.2d 991, 994 (11th Cir.1985); *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 292 (5th Cir.1975).

[9] Some state evidentiary rules are substantive in nature, and transcend the substance-procedure boundary, creating a potential *Erie* conflict. *See Bradford v. Bruno's, Inc.,* 41 F.3d 625 (11th Cir.1995) (finding that Alabama's collateral source rule is substantive in nature); *Ungerleider v. Gordon,* 214 F.3d 1279, 1282 (11th Cir.2000). In *Legg v. Chopra,* the Sixth Circuit examined the interplay of expert testimony with Tennessee's medical malpractice statute and the Federal Rules of Evidence. 286 F.3d 286 (6th Cir.2002). The Sixth Circuit determined that "state witness competency rules are often intimately intertwined with a state substantive rule. This is especially true with medical malpractice statutes, because expert testimony is usually required to establish the standard of care." *Id.* at 290. *Legg* further announced that the Federal Rules of Evidence settled this potential conflict with Rule 601, which "incorporates the *Erie* mandate by expressly providing that when State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law." *Id.* (citing Fed.R.Evid. 601). *Legg* mandated that "if a witness is deemed competent to testify to the substantive issue in the case, such as the standard of care, his or her testimony should *then* be screened by Rule 702 to determine if it is otherwise admissible expert testimony." *Id.* at 292 (emphasis added).

[10][11] We agree. Here, the "law of Georgia as it pertains to medical malpractice actions is applicable." *Smith v. Am. Transitional Hosps., Inc.,* 330 F.Supp.2d 1358, 1361 (S.D.Ga.2004). In order to prove medical malpractice in Georgia, a plaintiff must prove: "(1) the duty inherent in the health care

provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." *Smith,* 330 F.Supp.2d at 1361 (quoting *Knight v. West Paces Ferry Hosp., Inc.* 262 Ga.App. 220, 585 S.E.2d 104, 105 (2003)). In order to prove the causation prong, a plaintiff "must present medical testimony." *Smith,* 330 F.Supp.2d at 1363 (quoting *Zwiren v. Thompson,* 276 Ga. 498, 578 S.E.2d 862, 866 (2003)). *See also, Smith v. Luckett,* 155 Ga.App. 640, 641, 271 S.E.2d 891 (1980); *Pilzer v. Jones,* 242 Ga.App. 198, 201, 529 S.E.2d 205 (2000). Once a plaintiff has met the burden of producing a competent expert, a district court must still engage in a Rule 702 analysis, since the state law "is directed at establishing a substantive issue in the case," while the gatekeeping structure of Rule 702 is "designed to ensure fair administration" of the case. *Legg,* 286 F.3d at 292. Essentially, "once a witness is deemed competent to testify to the substantive issue of the case, his or her testimony should then be screened by Rule 702 to determine if it is otherwise admissible expert testimony." *Legg,* at 292.[FN12] The analysis we engage in then, is first whether the expert is qualified to render an opinion regarding the standard of care (the competency component), and second, whether the expert's causation theory meets the strictures of Rule 702.

> FN12. The Sixth Circuit noted in *Legg,* that the two Rules, 601 and 702, work in "tandem" because Rule 601 addresses a witness's "*competency,*" making it a substantive rule, while Rule 702 measures an expert's "*qualifications,*" and is "directed at the science and methodology behind the witness's testimony." *Legg,* 286 F.3d at 291 (emphasis in the original).

**\*1296** [12] Accordingly, for McDowell's claim against Wexford to succeed, he first needed to present "competent expert testimony" that Wexford's nursing staff proximately caused his injuries. *Smith,* 330 F.Supp.2d at 1361. "This requisite subsumes the burden of providing expert testimony as to what the applicable standard of care is." *Id.* In its competency determination, the district court excluded McDowell's experts, finding them unqualified to render an opinion as to the standard of care applicable to nurses. Indeed, McDowell's three experts, Drs. Merikangas, Darouiche, and Gower are all experts in the field of neurology, and the district court found them qualified to testify about McDowell's spinal epidural abscess as well as causation on the part of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Grady's doctors. Although the district court did not initially consider the experts' testimony as it pertained to nursing and specifically Nurse Brown's actions, it later extended its findings to include Wexford when it granted summary judgment.

For a witness to "constitute an 'expert competent to testify,' " his realm of expertise must encompass "knowledge of the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiff's malpractice claim is based." _Lee v. Visiting Nurse Health Sys. of Metro. Atlanta,_ 223 Ga.App. 305, 477 S.E.2d 445, 447 (1996) (citing Ga.Code Ann. § 9-11-9.1(a)). Here, the district court determined that the doctors were not sufficiently familiar with the standard of care applicable to nurses, and thus excluded their testimony.   The district court, did not, however, consider Georgia law in making its ruling.    In Georgia, a physician has been found to be competent to testify to the standard of care for licensed practical nurses. _Howard v. City of Columbus,_ 219 Ga.App. 569, 466 S.E.2d 51, 56 (1995).    In _Howard,_ the estate of a deceased inmate sued the city, county, sheriff and medical personnel at a jail for medical malpractice resulting from the failure to treat the inmate's diabetes.    In reversing the trial court's dismissal of the complaint, the appellate court found the plaintiff's expert, a medical doctor, to be competent to testify against the jail's nurses. _Id._ at 56 (citing _Crook v. Funk,_ 214 Ga.App. 213, 447 S.E.2d 60 (1994)).

In McDowell's case, Wexford argues that McDowell's experts do not possess the education, training, or experience that would qualify them to testify against a jail nurse.    Wexford points with specificity to Dr. Dariouche's deposition, and asserts that he his lack of experience in working in a jail renders his opinion unqualified. To the contrary, Dr. Dariouche stated he had not reviewed the _hospital_ nurses' testimony and that he could not provide an opinion regarding those nurses.    Dr. Dariouche did, however, testify as to the standard of care applicable to Wexford nurses, and opined that while she may have acted reasonably, Nurse Brown should have called an ambulance for McDowell.    Dr. Darouiche's opinion stems from a knowledge of medical care, not jail policies.

The standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than hospital.  Wexford has not given us a reason to differentiate between jail nurses and hospital nurses. A physician's area of expertise necessarily

encompasses the standard of care applicable to nurses. _See Crook,_ 447 S.E.2d at 62-63 (physician was competent to testify that nurses were negligent in failing to assist a cardiac patient in need of medical attention);  _Tye v. Wilson,_ 208 Ga.App. 253, 430 S.E.2d 129, 130 (1993) (testimony of medical doctor concerning standard of care in treating and monitoring intubated patient was sufficient to support malpractice claim against nurse; doctor was familiar with standard of care acceptable to medical profession generally,  *1297 and there was no suggestion that medical doctors and nurses were trained to treat intubated patients differently); _Lee,_ 477 S.E.2d at 447 (doctor had knowledge of standard of care to testify against physical therapist). Moreover, Georgia courts have qualified nurses to testify against doctors. _See Avret v. McCormick,_ 246 Ga. 401, 271 S.E.2d 832 (1980).

The district court disqualified all of McDowell's experts on the issue of the standard of care applicable to emergency room medicine, but did not conduct a similar inquiry with regard to Wexford's nurses in the jail.  Instead, the district court dropped a footnote in its order excluding McDowell's experts against Grady stating that "each of McDowell's experts testified that he is not qualified to opine as to the proper actions or the applicable standard of care for nursing."   Only later did the district court rule that because it had closed discovery on the issue of the standard of care and causation with respect to Nurse Brown and Wexford, McDowell had no expert testimony, as Georgia requires for medical malpractice claims. _See, Pilzer v. Hones,_ 242 Ga.App. 198, 201, 529 S.E.2d 205 (2000);  _Smith v. Luckett,_ 155 Ga.App. 640, 641, 271 S.E.2d 891 (1980).

We find this broad ruling to be in error.  "The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." _See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion,_ 345 F.3d 15, 24 (1st Cir.2003). The district court determined that because the experts were not board certified in emergency medicine, they could therefore not render an opinion as to the standard of care applicable to emergency room physicians and nurses.   Wexford would have us extend that decision to its nurses because McDowell's experts do not practice in jails.  An expert, however, "is one who qualifies as such by reason of special knowledge and experience, whether or not he is authorized to practice in his special field under licensing requirement imposed by statute." _See Paradise Prairie Land Co. v. United States,_ 212 F.2d

392 F.3d 1283
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92
**(Cite as: 392 F.3d 1283)**

Page 13

170, 173 (5th Cir.1954).

A review of the record demonstrates that all three of McDowell's experts testified as to the applicable standard of care with regard to Wexford's nurses. Only Dr. Dariouche explicitly stated that he was "not an expert on the standard of care for nurses working in the emergency room." Dr. Dariouche, however, made this statement with regard to the Grady nurses and their emergency room treatment of McDowell. This opinion did not encompass the Wexford nurses and the delay in transporting McDowell to Grady. Moreover, Dr. Merikangas clearly included a discussion on the nurses' standard of care in his deposition testimony, and Dr. Gower offered that the "standard of care really should have elected the most rapid transport" to Grady.    It is true that Drs. Darouiche and Merikangas explained that Nurse Brown may well have acted reasonably, but an opinion that is incompatible with a plaintiff's case alone does not render that expert unqualified.    In accordance with Georgia law, we find the experts competent to render opinions as to the applicable standard of care for Wexford's nurses.

Our inquiry, however, does not end at the competency determination.    In order to survive summary judgment, McDowell's experts must establish both a breach of the standard of care and that Wexford's actions were a proximate cause of his injuries. _Smith_, 330 F.Supp.2d at 1361.    _See also Cannon v. Jeffries_, 250 Ga.App. 371, 551 S.E.2d 777 (2001);    _Bowling v. Foster_, 254 Ga.App. 374, 562 S.E.2d 776 (2002);    O.C.G.A. § 51-1-27. McDowell must prove that Nurse Brown's actions caused the delay in his treatment and exacerbated *1298 his condition.    It is the causation testimony that we evaluate under the guide of Fed.R.Evid. 702.

McDowell bears the burden of demonstrating that each of his proffered experts is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact-here, causation. Fed.R.Evid. 702; _see, e.g., Daubert v. Merrell Dow Pharm._, 43 F.3d 1311, 1316 (9th Cir.), _cert. denied_, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (_Daubert II_).

The district court found all of McDowell's experts qualified to testify as to the issue of causation, i.e., the nature of the spinal epidural abscess and McDowell's resulting paralysis.    Nevertheless, a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions

are based on some recognized scientific method." _See Clark v. Takata Corp._, 192 F.3d 750, 759 n. 5 (7th Cir.1999).    After evaluating the experts' proposed testimony and methodology, the district court excluded the causation testimony.

Federal Rule of Evidence 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court impressed a gatekeeping role upon judges, and directed them to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." _Id._ at 589, 113 S.Ct. 2786.

[13] _Daubert_ put forth a two-pronged analysis, used to determine the admissibility of the proffered expert testimony on scientific issues under Rule 702.    First, the expert testimony must be reliable, so that it must be "scientific," meaning grounded in the methods and procedures of science, and must constitute "knowledge," meaning something more than subjective belief or unsupported assumptions. _Daubert_, 509 U.S. at 590, 113 S.Ct. 2786.

[14] _Daubert's_ reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.    _See Daubert_, 509 U.S. at 593-94, 113 S.Ct. 2786; _Allison v. McGhan Medical Corp._, 184 F.3d 1300, 1312 (11th Cir.1999); _Kumho Tire Co. v. Carmichael_, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).    In addition, other factors that a court may consider in the _Daubert_ analysis are "reliance on anecdotal evidence (as in case reports), temporal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proximity, and improper extrapolation (as in animal studies)." *Allison,* 184 F.3d at 1312. Finally, a court should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate. *Allison,* at 1312 (citing *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786).

The second prong of the *Daubert* analysis requires that the proposed testimony be relevant. To meet this requirement, the expert testimony must be " 'relevant to **\*1299** the task at hand,' … i.e., that it logically advances a material aspect" of the case. *Daubert* at 591, 113 S.Ct. 2786. The relevance requirement is not satisfied where the proffered testimony does not assist the trier of fact. Fed.R.Evid. 702. The relationship must be an appropriate "fit" with respect to the offered opinion and the facts of the case. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786, 125 L.Ed.2d 469. Under *Daubert,* scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786, 125 L.Ed.2d 469. For example, there is no fit where a large analytical leap must be made between the facts and the opinion. *See General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion offered").

A district court is thus required to act as a gatekeeper "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238, (1999). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." *Daubert II,* 43 F.3d at 1315-16.

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and we give that discretion a large degree of deference. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. The Supreme Court did not intend, however, that the gatekeeper role "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence.' " *Allison,* 184 F.3d at 1311-12 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786). The judge's role is to see that the jury hears reliable and relevant evidence because of its ability to assist in factual determinations, its potential to clarify issues, and its probative value. *Id.* Thus, we turn to the district court's conclusions concerning each expert.

### A. Doctor James Merinkangas

[15] Mr. McDowell claims that the delay in treating his spinal epidural abscess caused or worsened his condition. To support this, Dr. Merinkangas proposed that early treatment of a patient with spinal epidural abscess reduced neurological damage. The district court labeled this theory as "the earlier, the better." Additionally, Dr. Merinkangas also opined that the four-hour delay (on the part of the Grady defendants) caused Mr. McDowell's injuries. Dr. Merinkangas based his theory on the common sense and "universal" axiom that expedited treatment is preferable to delayed treatment. Dr. Merinkangas also pointed to a study in SPINAL CORD COMPRESSION, which analyzed the effects of 48-hour delays in treatment. The district court determined that Merinkangas's theory lacked testing, peer review, a potential error rate, and general acceptance. We agree.

The district court was correct in finding that "the earlier, the better" theory was "too vague" to assist the trier the fact. Indeed, the notion of early treatment is well within common knowledge that would be obvious to the average juror, but has **\*1300** nothing to do with causation. Dr. Merinkangas himself stated that "the sooner, the better" is "just simply common understanding, and doesn't rise to the level where someone would bother reporting that because everyone knows that." As such, this "the earlier, the better" theory adds nothing absent some testimony connecting the delay to the causation or aggravation of an injury.

We also agree with the district court's conclusion that Dr. Merinkangas's contention that McDowell's injury could have been prevented had he entered surgery four hours earlier failed the *Daubert* analysis.[FN13] Dr. Merinkangas could not identify any empirical data, survey, study, or literature to support his theory, save the study in SPINAL CORD COMPRESSION, which dealt with a delay of 48 hours, which is more than twice the delay here. Notwithstanding his lack

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of support, Dr. Merinkangas further opined that had McDowell been treated 24 hours earlier, then he would have no resulting paralysis. Taking either of Dr. Merinkangas's propositions (a four-hour delay or twenty-four delay), there is no support addressing anything less than a 48-hour delay.   There is a considerable gap between a 24-hour to a 48-hour delay, and even more so with a 4-hour delay.   This runs afoul of *Allison* 's admonition that a theory should not "leap" from an accepted scientific premise to an unsupported one.   184 F.3d at 1314. Furthermore, an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions, as we have here.   *See General Electric v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). This falls short of "general acceptance" prong of reliability.

> FN13.  The district court excluded Dr. Merinkangas' theory after evaluating it in terms of the Grady defendants. Specifically, the district court weighed the theory as to the delay in surgery at Grady rather than the delay in transport at the Jail, which is the issue here.   Nonetheless, the district court's conclusions are pertinent to our inquiry because the issue, delay in treatment as the cause of injury, is the same.

Finally, Dr. Merinkangas has not tested his own theory nor determined any error rate associated with it.   *See Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Dr. Merinkangas simply made a blanket statement that the delay caused the paralysis, but gave no opinion as to whether the sum of the delays compounded McDowell's injuries, or if just one delay created the damage.   Based on Dr. Merinkangas's opinions, it is impossible to mete out whether the initial delay at the Jail contributed to the cause at all. Thus, without a viable theory with which to link Wexford's negligence to McDowell's injury, the district court properly excluded Dr. Merinkangas's testimony.

### B. Dr. Rabih Darouiche

Like Dr. Merinkangas, Dr. Darouiche concluded that McDowell would have suffered less injury had he been treated earlier.  Also like Dr. Merinkangas, Dr. Dariouche's theory specifically related to the delay in surgery rather than the delay at the Jail.     Dr. Darouiche based his theory on his past experience

and training with spinal patients and on his observation that a more rapid progression of neurological damage indicated that earlier treatment would be successful.     Dr. Darouiche frequently explained that his causation theory lacked empirical evidence or scientific support, and he acknowledged an absence of studies which assess surgery at the four, eight, twelve, eighteen, or twenty-four hour time intervals.   Instead, and in accord with Dr. Merinkangas, Dr. Darouiche relied upon "medical logic" to suggest that *1301 early treatments effects an improved condition.

Dr. Darouiche also admitted that his "logic" theory lacked proof, and he could not quantify what McDowell's condition would have been had surgery occurred at an earlier point.     Additionally, Dr. Darouiche made no attempt to refute, test, or falsify his theory, and did not identify whether the actions of one or many caused McDowell's injury.   Instead, Dr. Darouiche pointed out the condition's rarity and that it lacked observable patients.     Complicating this expert's theory further is the fact that it has never been published or subjected to peer review.     Dr. Darouiche further testified that McDowell may very well have suffered the same injuries had he been treated within six hours.   We agree with the district court that Dr. Darouiche's proffered testimony was more of a guess than a scientific theory.  *Daubert* would permit an expert to draw conclusions from existing data, but in this case the expert drew conclusions where there was no existing data.     *See Joiner*, 522 U.S. at 146, 118 S.Ct. 512.     A mere guess that earlier treatment would either have improved McDowell's condition or rendered it the same simply fails the tests for expert opinion. Without a theory that meets the requirements of Rule 702, the district court properly excluded Dr. Darouiche's testimony.

### C. Dr. David Gower

Dr. Gower's proffered testimony reiterated that of Drs. Merinkangas and Darouiche;  namely, that if McDowell had been treated earlier, his recovery would have been faster.   Dr. Gower could not, however, measure the level that McDowell's improvement might have been, only stating that "instead of taking years, [recovery] might have only taken a couple of months."     Dr. Gower acknowledged that there were no scientific studies that bolstered his theory, but explained that there were significant reports and case studies demonstrating that extended paralysis reduced the

possibility of a full recovery. Dr. Gower, however, could not specifically identify any such articles, case studies or reports to support this premise. Even more telling is that Dr. Gower opined that when compared to other patients who experienced 24-36 hour paralysis, McDowell "seem[ed] better than most," and Gower expressed surprise at McDowell's degree of recovery. In effect, McDowell himself did not fit Dr. Gower's theory. Without any support, Dr. Gower's opinion failed to meet *Daubert 's* reliability requirement, as it had not been tested, subjected to peer review, or assigned a rate of error. We agree with the district court's decision to exclude Dr. Gower's testimony.

In sum, although we find that the district court erred in excluding the experts' testimony as to the applicable standard of care, we hold that the district court did not abuse its discretion in barring the causation testimony against Nurse Brown and Wexford. As the Supreme Court wrote in *Daubert,* scientific evidence must "fit" the plaintiff's theory of causation. 509 U.S. at 591, 113 S.Ct. 2786. In this case, none of the doctors' theories "fit" as evidence relevant to the cause of plaintiffs' injuries.

More importantly, McDowell does not argue that the doctors' causation theories are sound. Instead, McDowell complains that the district court abused its discretion by extending its ruling that the evidence was inadmissible against Grady to the Wexford defendants. Such action by the district court is well within the ambit of its discretion, and McDowell has not demonstrated why the testimony is reliable and admissible under *Daubert, Kumho Tire,* and Fed.R.Evid. 702. We agree with the district court that the testimony "essentially boils down to an opinion that earlier surgical intervention would be preferable." **\*1302** The experts then made the leap from this "presumably accepted scientific principle...to an unsupported scientific principle...that a delay of more than four hours caused Plaintiff's injury." This "leap of faith" was supported by little more than the fact that early treatment begets improved recovery. The experts, however, provided no existing research detailing the extent of injury or recovery at different time intervals.

McDowell has offered no reliable evidence that earlier medical intervention would have prevented or diminished his injury. We hold that the district court did not abuse its discretion in concluding that McDowell's evidence is legally unreliable and inadmissible under the standards set by *Daubert* and

its progeny.

### V. Conclusion

Although Mr. McDowell's circumstances are unfortunate, he has no remedy here. Having held first that Mr. McDowell cannot establish a genuine issue of material fact as to any Dekalb County policy causing or contributing to his injury, the district court's grant of summary judgment to Dekalb County was proper. Second, we hold that the district court did not abuse its discretion in concluding that McDowell's experts simply failed to meet the requirements of the law. Summary judgment in favor of Wexford and Brown was proper. Therefore, we affirm the decisions of the district court.

AFFIRMED.

C.A.11 (Ga.),2004.
McDowell v. Brown
392 F.3d 1283, 18 Fla. L. Weekly Fed. C 92

Briefs and Other Related Documents (Back to top)

• 2004 WL 3208861 (Appellate Brief) Reply Brief of Appellant Roderic R. Mcdowell (Apr. 22, 2004)
• 2004 WL 3208860 (Appellate Brief) Brief of Appellee Dekalb County, Georgia (Apr. 05, 2004)
• 2004 WL 3208862 (Appellate Brief) Brief of Appellees Wexford Wealth Sources Inc. and Pernell Brown, R (Apr. 01, 2004)
• 2004 WL 3208863 (Appellate Brief) Brief of Appellant Roderic R. Mcdowell (Mar. 01, 2004)
• 04-10272 (Docket) (Jan. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:48:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 222 F.3d 891 |
| Lines: | 276 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# Westlaw.

222 F.3d 891                                                                                         Page 1
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003
**(Cite as: 222 F.3d 891)**

▷
Briefs and Other Related Documents
Butts v. County of VolusiaC.A.11 (Fla.),2000.
    United States Court of Appeals,Eleventh Circuit.
    David W. BUTTS, Plaintiff-Appellant,
    v.
    COUNTY OF VOLUSIA, Defendant-Appellee.
    **No. 99-13527.**

    Aug. 14, 2000.

County employee sued county for race discrimination
in violation of § 1981's guarantee of equal rights to
make and enforce contracts. The United States
District Court for the Middle District of Florida, No.
98-00178-CV-ORL-22B,Anne C. Conway, J., 1999
WL 737896, entered summary judgment in favor of
county. Employee appealed. The Court of Appeals,
Black, Circuit Judge, held that § 1981 did not
provide cause of action against state actor,
notwithstanding amendments to § 1981 made by
Civil Rights Act of 1991.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ⬤⇾776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited
Cases
The Court of Appeals reviews de novo the district
court's entry of summary judgment. Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⬤⇾840**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment.
Most Cited Cases
District court did not abuse its discretion in denying
county employee's motion to amend complaint, so as
to add claims under Title VII and Florida Civil Rights
Act (FCRA) to his claim of race discrimination in
violation of § 1981's guarantee of equal rights to
make and enforce contracts; employee conceded that

he failed to comply with district court's scheduling
order and could not demonstrate good cause to
excuse that failure, and his strategic decision to file
separate lawsuit under Title VII and FCRA, which
was dismissed because it contained same allegations
as § 1981 suit, caused much of the delay. 42
U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.; West's F.S.A. §
760.01 et seq.; Fed.Rules Civ.Proc.Rule 16, 28
U.S.C.A.

**[3] Federal Courts 170B ⬤⇾817**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; Pleading. Most
Cited Cases
A denial of a motion to amend a complaint is
reviewed for an abuse of discretion.

**[4] Civil Rights 78 ⬤⇾1350**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1350 k. Other Particular Cases and
Contexts. Most Cited Cases
        (Formerly 78k206(2.1))
A plaintiff who sues a municipality under § 1983 for
a violation of the rights contained in § 1981, which
guarantees equal rights to make and enforce
contracts, may not rely upon the doctrine of
respondeat superior. 42 U.S.C.A. § § 1981, 1983.

**[5] Civil Rights 78 ⬤⇾1313**

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity,
and Exhaustion of Other Remedies
            78k1313 k. Other Particular Cases and
Contexts. Most Cited Cases
        (Formerly 78k194)

**Civil Rights 78 ⬤⇾1330(6)**

78 Civil Rights
    78III Federal Remedies in General

78k1328 Persons Protected and Entitled to Sue
78k1330 Private Right of Action
78k1330(6) k. Other Particular Cases
and Contexts. Most Cited Cases
(Formerly 78k200)

Section 1981, guaranteeing equal rights to make and
enforce contracts, did not provide cause of action
against state actors, and § 1983 constituted exclusive
remedy against state actors for violations of rights
contained in § 1981, notwithstanding that Civil
Rights Act of 1991 amended § 1981 by adding
provision stating that § 1981 rights were protected
against impairment under color of state law. 42
U.S.C.A. § § 1981(c), 1983; Civil Rights Act of
1991, § 1 et seq., 105 Stat. 1071.

**[6] Constitutional Law 92 ⟳70.1(11)**

92 Constitutional Law
92III Distribution of Governmental Powers and
Functions
92III(B) Judicial Powers and Functions
92k70 Encroachment on Legislature
92k70.1 In General
92k70.1(7)     Particular     Subjects,
Application to
92k70.1(11) k. Remedies and
Procedure. Most Cited Cases
The judicial power to imply a remedy should not be
exercised in the face of an express decision by
Congress concerning the scope of remedies available
under a particular statute.

**\*892** Frederick C. Morello,Frederick C. Morello,
P.A., Daytona Beach, FL, for Plaintiff-Appellant.
David V. Kornreich, Jeffrey E. Mandel, Muller,
Mintz, Kornreich, Caldwell, Casey, Crosland &
Bramnick, P.A., Orlando, FL, for Defendant-
Appellee.

Appeal from the United States District Court for the
Middle District of Florida.

Before BLACK, CARNES and KRAVITCH, Circuit
Judges.
BLACK, Circuit Judge:
This case requires us to decide whether 42 U.S.C. §
1981 provides a cause of action against state actors.
We conclude it does not and affirm the order of the
district court.

I. BACKGROUND

Appellant David W. Butts initially sued Appellee
County of Volusia in a one-count complaint alleging
racial discrimination in employment in violation of
42 U.S.C. § 1981. Appellant later filed a separate
lawsuit based on Title VII of the Civil Rights Act of
1964 and the Florida Civil Rights Act of 1992
(FCRA), but the district court dismissed that suit
because it contained the same factual allegations as
the § 1981 suit. Appellant then sought to amend his
§ 1981 suit to add the Title VII and FCRA claims.
The district court denied the motion because
Appellant filed it after the scheduling deadline.

Appellee moved for summary judgment based on the
argument that § 1981 does not provide a cause of
action against state actors. The district court agreed,
following Jett v. Dallas Independent School District,
491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598
(1989), which held a plaintiff must use the remedial
provisions of § 1983 to enforce against state actors
the rights created by § 1981. The court also adopted
the analysis of other district courts in this Circuit and
rejected Appellant's argument that the Civil Rights
Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071,
overruled the Supreme Court's interpretation of §
1981 in Jett. This appeal followed.

II. DISCUSSION

[1][2][3] We review de novo the district court's entry
of summary judgment. See AT&T Wireless PCS,
Inc. v. City of Atlanta, 210 F.3d 1322, 1324 (11th
Cir.2000). Appellant contends the district court
improperly granted Appellee's motion for summary
judgment on Appellant's 42 U.S.C. § 1981 claim.[FN1]
Appellant argues the Civil Rights Act of 1991
amended § 1981 to create a cause of action against
state actors and that such a cause of action may rely
on a respondeat superior theory of liability otherwise
prohibited by § 1983 as interpreted in Jett and
Monell v. Department of Social Services of New
York, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d
611 (1978). We conclude the amendments did not
change § 1981 and § 1983 contains the sole cause of
action against state actors for violations of § 1981.[FN2]

FN1. Appellant could have sued under §
1983 for the alleged violation of § 1981, but
he chose not to do so. Accordingly, this
appeal requires us to decide whether § 1981
contains a cause of action against state
actors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Appellant also argues the district court abused its discretion in denying Appellant's motion to amend the complaint. We review this denial for an abuse of discretion. *See Sosa v. Airprint Sys., 133 F.3d 1417, 1418 (11th Cir.1998).* Appellant concedes he failed to comply with the district court's scheduling order, *see Fed.R.Civ.P. 16,* and cannot demonstrate good cause to excuse that failure. Appellant's strategic decision to file a separate lawsuit before attempting to amend caused much of the delay. Accordingly, the district court did not abuse its discretion. *See Sosa, 133 F.3d at 1418-19.*

Prior to the Civil Rights Act of 1991, § 1981 stated: All persons within the jurisdiction of the United States shall have the same right *893 in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

[4] In *Jett,* the Supreme Court examined the interplay between the pre-amendment § 1981 and § 1983. Justice O'Connor, writing for a plurality, articulated two guiding principles. First, § 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981. *See Jett, 491 U.S. at 731-32, 109 S.Ct. at 2721.* Second, a plaintiff who sues a municipality under § 1983 for a violation of the rights contained in § 1981 may not rely upon the doctrine of respondeat superior. *See id.* at 731-36, 109 S.Ct. at 2721-23.

The plurality considered the relationship between the Civil Rights Act of 1866 and the Civil Rights Act of 1871 (the precursors to § 1981 and § 1983) and concluded the 1866 Act did not contain a remedial provision to create a federal civil cause of action. Rather, the plurality determined Congress enacted the 1871 Act to create a civil remedy for the enforcement of the 1866 Act against state actors. Justice O'Connor explained

That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the "state action" portion of § 1981, where Congress has established its own remedial scheme.

In the context of the application of § 1981 and § 1982 to private actors, we "had little choice but to hold that aggrieved individuals could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*" That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute.

*Id.* at 731-32, 109 S.Ct. at 2721 (citations omitted).

The plurality observed that while Congress had not explained the relationship between § 1981 and § 1983, "there is very strong evidence that the 42nd Congress which enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors." *Id.* at 734, 109 S.Ct. at 2722.

*Jett* therefore determined § 1981 did not contain a cause of action against state actors. If *Jett* remains good law, the district court correctly granted summary judgment. Appellant contends, however, the Civil Rights Act of 1991 legislatively overruled the interpretation of § 1981 contained in *Jett.* Although many district courts in this Circuit, including the district court in this case, have rejected Appellant's claim, we have not yet had the occasion to decide this issue.[FN3]

FN3. Appellee incorrectly claims this Court has previously addressed this question. In *Johnson v. Fort Lauderdale,* 148 F.3d 1228, 1229 n. 2 (11th Cir.1998), we noted the district court had dismissed a § 1981 claim because § 1983 provided the exclusive remedy. We did not reach that issue, however; the opinion only addressed the relationship between § 1983 and Title VII. This Court decided the other two cases relied upon by Appellee based on the law prior to the Civil Rights Act of 1991. *See Pearson v. Macon-Bibb County Hosp. Auth.,* 952 F.2d 1274 (11th Cir.1992); *Busby v. Orlando,* 931 F.2d 764 (11th Cir.1991).

The Civil Rights Act of 1991 amended § 1981 by designating the existing text, quoted above, as § 1981(a) and adding two new subsections. Those new subsections provide:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*894** (b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(b), (c).

Appellant argues subsection (c) demonstrates Congress' intent to provide a cause of action against state actors. Appellant relies almost exclusively on the Ninth Circuit's opinion in *Federation of African American Contractors v. Oakland,* 96 F.3d 1204 (9th Cir.1996). In *Federation,* the Ninth Circuit held that although § 1981(c) did not provide an explicit cause of action against state actors, it contained an implicit remedy. *See Federation,* 96 F.3d at 1210-14.

[5] We disagree with *Federation* [FN4] and concur with the decision of the other Court of Appeals to address this issue. *See Dennis v. County of Fairfax,* 55 F.3d 151, 156 n. 1 (4th Cir.1995) (concluding the Civil Rights Act of 1991 did not affect *Jett* ). As we noted above, in *Jett,* the Supreme Court refused to find in § 1981 an implied cause of action against state actors because Congress had clearly established § 1983 as the remedial scheme against state actors. Nothing in the 1991 amendment to § 1981 evinces Congress' desire to alter the Supreme Court's conclusion in *Jett.* The express language of subsection (c) states that § 1981 protects against racial discrimination by private and state actors. Put another way, § 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation.

> FN4. We note, however, the *Federation* court would also affirm the district court in this case. *Federation* concluded that while § 1981 contains a cause of action against state actors, the limitations on respondeat superior liability from *Monell* apply to § 1981 just as they apply to § 1983. *See Federation,* 96 F.3d at 1214-15. We agree such a limitation would exist if § 1981 contained a cause of action. Because Appellant did not plead a "custom or practice" as required by *Monell,* the district court properly granted

summary judgment even if Appellant could sue under § 1981.

The sparse legislative history of the Civil Rights Act of 1991 does not reveal a contrary intent. The Ninth Circuit recognized in *Federation* that the legislative history "does not explicitly announce an intent to create (or deny) a private right of action against a state actor." *Federation,* 96 F.3d at 1212. Instead, the *Federation* court and others have noted Congress added subsection (c) to codify the Supreme Court's decision in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which established that § 1981 protects against private discrimination as well as discrimination by state actors. *See id.* at 1212; *Anderson v. Conboy,* 156 F.3d 167, 179 (2d Cir.1998); *see also* H.R.Rep. No. 102-40(I), at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630; H.R.Rep. No. 102-40(II), at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 731. Congress provided no indication that it contemplated creating a cause of action against state actors outside of § 1983, nor did it even mention the Supreme Court's opinion in *Jett.*

[6] Accordingly, we conclude *Jett* still governs this case. The Supreme Court held the judicial power to imply a remedy "should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute." *Jett,* 491 U.S. at 732, 109 S.Ct. at 2721. Congress made that express decision in § 1983; nothing in the text or history of the Civil Rights Act of 1991 alters that decision. The district court therefore correctly concluded Appellant\*895 could not proceed with his cause of action based solely on § 1981.

III. CONCLUSION

The district court correctly granted Appellee's motion for summary judgment. In addition, the district court did not abuse its discretion in denying Appellant's motion to amend his complaint.

AFFIRMED.

C.A.11 (Fla.),2000.
Butts v. County of Volusia
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003

Briefs and Other Related Documents (Back to top)

• 2000 WL 33991290 (Appellate Brief) Appellant's

222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003
**(Cite as: 222 F.3d 891)**

Reply Brief (Jan. 19, 2000) Original Image of this
Document (PDF)
• 2000 WL 33991289 (Appellate Brief) Brief of
Appellee (Jan. 03, 2000) Original Image of this
Document (PDF)
• 1999 WL 33618719 (Appellate Brief) Appellant's
Initial Brief (Nov. 01, 1999) Original Image of this
Document (PDF)
• 99-13527 (Docket) (Sep. 20, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:47:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | SCTFIND |
| Citation Text: | 109 S.Ct. 2702 |
| Lines: | 2068 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

## Westlaw.

109 S.Ct. 2702                                                                          Page 1
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

▷

Briefs and Other Related Documents
Jett    v.    Dallas    Independent    School
Dist.U.S.Tex.,1989.
Supreme Court of the United States
Norman JETT, Petitioner,
v.
DALLAS INDEPENDENT SCHOOL DISTRICT.
DALLAS INDEPENDENT SCHOOL DISTRICT,
Petitioner
v.
Norman JETT.
**Nos. 87-2084, 88-214.**

Argued March 28, 1989.
Decided June 22, 1989.

White former athletic director and head football
coach at public high school brought suit under § §
1981 and 1983 against school district and black
principal, alleging discrimination in his reassignment.
The United States District Court for the Northern
District of Texas, Barefoot Sanders, J., entered
judgment against school district and principal in his
individual capacity, and they appealed. The Court of
Appeals for the Fifth Circuit, 798 F.2d 748,reversed
and remanded, and, 837 F.2d 1244, denied rehearing.
Certiorari was granted. The United States Supreme
Court, Justice O'Connor, held that: (1) municipality
may not be held liable for its employees' violations of
§ 1981 under respondeat superior theory, and (2)
instruction that school district could be held liable for
the actions of its board of trustees and delegated
administrative officials such as superintendent and
school principals for wrongful or unconstitutional
action against school district personnel was manifest
error.

Judgment of Court of Appeals affirmed in part and
remanded in part.

Justice Scalia filed opinion concurring in part and
concurring in judgment.

Justice Brennan filed dissenting opinion in which
Justices Marshall, Blackmun, and Stevens joined.

Justice Stevens filed dissenting opinion.
West Headnotes
[1] Civil Rights 78 🔑1307

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity,
and Exhaustion of Other Remedies
            78k1307 k. In General. Most Cited Cases
            (Formerly 78k1313, 78k194, 78k206(2))

### Civil Rights 78 🔑1345

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1345 k. Acts of Officers and Employees
in General;   Vicarious Liability and Respondeat
Superior in General. Most Cited Cases
            (Formerly 78k206(2.1), 78k206(2), 78k13.7)
Municipality may not be held liable for its
employees' violations of § 1981 under respondeat
superior theory; rather, express "action at law" under
§ 1983 provides the exclusive federal damages
remedy for the violation of rights guaranteed by §
1981 when the alleged violation is by a state actor.
42 U.S.C.A. § § 1981, 1983.

### [2] Civil Rights 78 🔑1351(5)

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1351 Governmental Ordinance, Policy,
Practice, or Custom
                78k1351(5) k. Employment Practices.
Most Cited Cases
            (Formerly 78k206(3), 78k13.7)
White former athletic director and head football
coach at public high school could prevail on his claim
for damages against the school district based on
alleged discrimination by black superintendent and
white principal only if athletic director could show
that alleged violation of his "right to make contracts"
protected by § 1981 was caused by a custom or
policy of the school district. 42 U.S.C.A. § § 1981,
1983; U.S.C.A. Const.Amends. 1, 5, 14.

### [3] Civil Rights 78 🔑1438

78 Civil Rights

491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

78III Federal Remedies in General
  78k1433 Instructions
    78k1438 k. Employment Practices. Most Cited Cases
      (Formerly 78k245, 78k13.14)
Instruction that school district could be held liable for the actions of its board of trustees and delegated administrative officials, such as superintendent and school principals, if the actions are wrongful or unconstitutional, was manifest error, in § 1981 suit brought by white former athletic director and head football coach against district claiming that principal and superintendent discriminated against athletic director; instruction apparently rested on assumption that either principal or superintendent were policymakers for school district or that school district was vicariously liable for actions taken by principal and superintendent. 42 U.S.C.A. § § 1981, 1983; U.S.C.A. Const.Amends. 1, 5, 14.

## [4] Civil Rights 78 ☜1426

78 Civil Rights
  78III Federal Remedies in General
    78k1425 Questions of Law or Fact
      78k1426 k. In General. Most Cited Cases
        (Formerly 78k244, 78k13.14)
In determining whether official's decisions represent "official policy" of local governmental unit for which unit can be held liable if policy violates "right to make contracts" protected by § 1981, trial judge must resolve issue as legal question before case is submitted to jury and must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning action alleged to have caused particular constitutional or statutory violation at issue; once such officials have been identified, it is for jury to determine whether their decisions have caused deprivation of rights at issue by policies which affirmatively command that deprivation occur or by acquiescence in longstanding practice or custom which constitutes "standard operating procedure" of local governmental entity. 42 U.S.C.A. § § 1981, 1983.

## [5] Federal Courts 170B ☜462

170B Federal Courts
  170BVII Supreme Court
    170BVII(B) Review of Decisions of Courts of Appeals
      170Bk462 k. Determination and Disposition

of Cause. Most Cited Cases
Whether superintendent of public school district had been delegated authority to make school district policy concerning employee transfers and whether his decisions in such area were final and unreviewable would not be decided by Supreme Court on record before it, on petition for certiorari in action brought by former athletic director claiming that black principal and white superintendent discriminated in reassigning athletic director in violation of § 1981; rather, Court of Appeals, with its greater expertise in Texas law, was in better position to determine whether superintendent possessed final policymaking authority and whether school district should be held responsible for actions of principal in light of superintendent's authority. 42 U.S.C.A. § § 1981, 1983.
***2704 Syllabus** [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.    See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*701 Petitioner Jett, a white male, was employed by respondent Dallas Independent School District (DISD) as a teacher, athletic director, and head football coach at a predominantly black high school. After repeated clashes with the school's Principal Todd, a black man, over school policies and Jett's handling of the school's football program, Todd recommended that Jett be relieved of his duties as athletic director and coach.    The DISD's Superintendent    Wright    affirmed    Todd's recommendation and reassigned Jett to a teaching position in another school, where he had no coaching duties.    Alleging, *inter alia*, that Todd's recommendation was racially motivated, and that the DISD, acting through Todd and Wright, had discriminated against him on the basis of race in violation of 42 U.S.C. § § 1981 and 1983 and the Equal Protection Clause, Jett brought this action in the District Court, which upheld a jury verdict in his favor on all counts.    The Court of Appeals reversed in part and remanded, finding, among other things, that the District Court's jury instructions as to the DISD's liability under § 1983 were deficient, since (1) they did not make clear that, under Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, such liability could be predicated on the actions of Todd or Wright only if those officials had been delegated policymaking

authority or acted pursuant to a well settled custom that represented official policy; and (2) even if Wright could be considered a policymaker for purposes of the transfer of personnel, the jury made no finding that his decision to transfer Jett was either improperly motivated or consciously indifferent to the improper motivations of Todd. The Court of Appeals also rejected the District Court's conclusion that the DISD's § 1981 liability for Todd's actions could be predicated on a *respondeat superior* theory, noting that *Monell* had held that Congress did not intend that municipalities be subject to vicarious liability under § 1983 for the federal constitutional or statutory violations of their employees, and declaring that to impose such liability for only certain wrongs based on § 1981 apparently would contravene the congressional intent behind § 1983.

*702 *Held:* The judgment is affirmed in part, and the cases are remanded.

798 F.2d 748 (CA5 1986), and 837 F.2d 1244 (CA5 1988), affirmed in part and remanded.

Justice O'CONNOR delivered the opinion of the Court with respect to Parts I, III, and IV, concluding that:

1. A municipality may not be held liable for its employees' violations of **2705 § 1981 under a *respondeat superior* theory. The express "action at law" provided by § 1983 for the "deprivation of ... rights secured by the Constitution and laws" provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Cf., *e.g.*, *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402, where the Court, in holding that § 717 of Title VII of the Civil Rights Act of 1964 constitutes the exclusive remedy for racial discrimination in federal employment despite the possibility of an implied damages remedy under § 1981, invoked the general principle that a precisely drawn, detailed statute pre-empts more general remedies. *Monell, supra*, specifically held that a municipality cannot be liable under § 1983 on a *respondeat superior* theory, while the Courts of Appeals in post-*Monell* decisions have unanimously rejected the contention, analogous to petitioner's argument here, that that theory is available against municipalities under a *Bivens*-type action implied directly from the Fourteenth Amendment. Given this Court's repeated recognition that the Fourteenth Amendment was largely intended to embody and

expand the protections of § 1981's statutory predecessor as against state actors, this Court declines petitioner's invitation to imply a damages remedy broader than § 1983 from § 1981's declaration of rights. Creation of such a remedy would allow § 1983's carefully crafted remedial scheme to be circumvented by artful pleading. Nor can a *respondeat superior* standard be implied from 42 U.S.C. § 1988, since, although that statute does authorize district courts in civil rights actions to look to the common law if federal remedies are deficient, the statute specifically withdraws that authority where, as here, the common law remedy is inconsistent with federal law; *i.e.*, with § 1983. See *Moor v. County of Alameda*, 411 U.S. 693, 706, 710, n. 27, 93 S.Ct. 1785, 1794, 1796, n. 27, 36 L.Ed.2d 596. Thus, to prevail against the DISD, petitioner must show that the violation of his § 1981 "right to make contracts" was caused by a custom or policy within the meaning of *Monell* and subsequent cases. Pp. 2721-2723.

2. These cases are remanded to the Court of Appeals to determine whether, in light of the principles enunciated in *Monell, supra*, and clarified in *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452, and *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107, Superintendent Wright possessed final policymaking authority under Texas law in the area of employee transfers, and if so whether a new trial is required to determine the DISD's responsibility for the actions of Principal Todd in light of this determination. Although the Court of Appeals correctly ruled that the District Court's *703 jury instructions constituted manifest error, the case was tried before *Pembaur* and *Praprotnik* were decided, and the Court of Appeals issued its decision before *Praprotnik*. Pp. 2723-2724.

Justice O'CONNOR, joined by THE CHIEF JUSTICE, Justice WHITE, and Justice KENNEDY, concluded in Part II that the text and legislative history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of §§ 1981 and 1983 respectively, demonstrate that § 1981 does not provide an independent federal damages remedy for racial discrimination by local governmental entities; rather, Congress intended that the explicit remedial provisions of § 1983 control in the context of § 1981 damages actions against state actors. Pp. 2711-2716.

(a) The legislative history of the 1866 Act, which was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

originally enacted to implement the Thirteenth Amendment, demonstrates that that Act neither provided an express damages remedy for violation of its provisions nor created any original federal jurisdiction which could support such a remedy against state actors, and that the **\*\*2706** Act's penal section-the only provision explicitly directed at state officials-was designed to punish only the official committing a violation and not the municipality itself. Two congressional actions subsequent to the passage of the 1866 Act-the submission of the Fourteenth Amendment to the States for ratification, which Amendment was based upon, and widely viewed as "constitutionalizing," that Act's protections, and the reenactment of that Act's substance in the Enforcement Act of 1870, a Fourteenth Amendment statute-further evidence the relationship between § § 1981 and 1983 and demonstrate that § 1981 is both a Thirteenth and a Fourteenth Amendment statute. Pp. 2716-2721.

(b) The text and legislative history of the 1871 Act, which was expressly enacted to enforce the Fourteenth Amendment, establish that: (1) unlike any portion of the 1866 Act, that statute explicitly exposed state and local officials to liability for damages in a newly created "action at law" for deprivation of constitutional rights; (2) the Act *expanded* federal jurisdiction by explicitly providing original jurisdiction in the federal courts for prosecution of such actions; and (3) the provision of the Act which is now § 1983 was explicitly modeled on the penal provision of the 1866 Act and was intended to amend and enhance the protections of that provision by providing a parallel civil remedy for the same violations. Thus, Jett's contention that the 1866 Act had *already* created a *broader* federal damages remedy against state actors is unpersuasive. Moreover, the fact that Congress rejected the Sherman amendment to the 1871 Act-which specifically proposed the imposition of vicarious liability on municipal governments for injuries caused by mob violence directed at the enjoyment or exercise of federal civil rights-demonstrates an awareness of, and a desire to comply with, the then-reigning constitutional**\*704** doctrine of "dual sovereignty," which indicated that Congress did not have the power to assign the duty to enforce federal law to state instrumentalities by making them liable for the constitutional violations of others. Given this constitutional background, Jett's contention that the 1866 Act had already silently created a form of vicarious liability against municipal governments is historically untenable. Furthermore, the addition, in

1874, of the phrase "and laws" to the remedial provision of what is now § 1983 indicates an intent that the guarantees contained in what is now § 1981 were to be enforced against state actors through § 1983's express damages remedy. Pp. 2714-2719.

Justice SCALIA concluded that the *respondeat superior* question is properly decided solely on the rudimentary principles of construction that the specific-here, § 1983, which precludes liability on that basis for the precise category of offense at issue-governs the general-here, § 1981-and that, where the text permits, statutes dealing with similar subjects should be interpreted harmoniously. P. 2724.

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and IV, in which REHNQUIST, C.J., and WHITE, SCALIA, and KENNEDY, JJ., joined; the opinion of the Court with respect to Part III, in which REHNQUIST, C.J., and WHITE and KENNEDY, JJ., joined, and in which SCALIA, J., joined, except insofar as that Part relies on legislative history; and an opinion with respect to Part II, in which REHNQUIST, C.J., and WHITE and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p 2724. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 2724. **\*\*2707** STEVENS, J., filed a dissenting opinion, *post*, p. 2732.

*Frank Gilstrap* argued the cause for petitioner in No. 87-2084 and respondent in No. 87-214. With him on the briefs were *Frank Hill* and *Shane Goetz.*
*Leonard J. Schwartz* argued the cause and filed a brief for respondent in No. 87-2084 and petitioner in No. 87-214.†

† Briefs of *amici curiae* urging reversal were filed for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers* and *Eric Schnapper;* and for the National Education Association by *Michael H. Gottesman* and *Jeremiah A. Collins.*
*Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch, Donald B. Ayer, Glen D. Nager,* and *Robert D. Sweeney, Jr.,* filed a brief for the International City Management Association et al. as *amici curiae* urging affirmance.

**\*705** Justice O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion

109 S.Ct. 2702                                                                                                    Page 5
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

with respect to Part II, in which THE CHIEF JUSTICE, Justice WHITE, and Justice KENNEDY join.

The questions before us in these cases are whether 42 U.S.C. § 1981 provides an independent federal cause of action for damages against local governmental entities, and whether that cause of action is broader than the damages remedy available under 42 U.S.C. § 1983, such that a municipality may be held liable for its employees' violations of § 1981 under a theory of *respondeat superior.*

I

Petitioner Norman Jett, a white male, was employed by respondent Dallas Independent School District (DISD) as a teacher, athletic director, and head football coach at South Oak Cliff High School (South Oak) until his reassignment to another DISD school in 1983. Petitioner was hired by the DISD in 1957, was assigned to assistant coaching duties at South Oak in 1962, and was promoted to athletic director and head football coach of South Oak in 1970. During petitioner's lengthy tenure at South Oak, the racial composition of the school changed from predominantly white to predominantly black. In 1975, the DISD assigned Dr. Fredrick Todd, a black, as principal of South Oak. Petitioner and Todd clashed repeatedly over school policies, and in particular over petitioner's handling of the school's football program. These conflicts came to a head following a November 19, 1982, football game between South Oak and the predominantly white Plano High School. Todd objected to petitioner's comparison of the South Oak team with professional teams before the match, and to the fact that petitioner entered the officials' locker room after South Oak lost the game and told two black officials that he would never allow black officials to work another South Oak game. Todd also objected to petitioner's *706 statements, reported in a local newspaper, to the effect that the majority of South Oak players could not meet proposed National Collegiate Athletic Association academic requirements for collegiate athletes.

On March 15, 1983, Todd informed petitioner that he intended to recommend that petitioner be relieved of his duties as athletic director and head football coach at South Oak. On March 17, 1983, Todd sent a letter to John Kincaide, the director of athletics for DISD, recommending that petitioner be removed based on poor leadership and planning skills and petitioner's

comportment before and after the Plano game. Petitioner subsequently met with John Santillo, director of personnel for DISD, who suggested that petitioner should transfer schools because any remaining professional relationship with Principal Todd had been shattered. Petitioner then met with Linus Wright, the superintendent of the DISD. At this meeting, petitioner informed Superintendent Wright that he believed that Todd's criticisms of his performance as head coach were unfounded and that in fact Todd was motivated by racial animus and wished to replace petitioner with a black head coach. Superintendent Wright suggested that the difficulties between Todd and petitioner might preclude petitioner from remaining in his coaching position at South Oak, but **2708 assured petitioner that another position in the DISD would be secured for him.

On March 25, 1983, Superintendent Wright met with Kincaide, Santillo, Todd, and two other DISD officials to determine whether petitioner should remain at South Oak. After the meeting, Superintendent Wright officially affirmed Todd's recommendation to remove petitioner from his duties as coach and athletic director at South Oak. Wright indicated that he felt compelled to follow the recommendation of the school principal. Soon after this meeting, petitioner was informed by Santillo that effective August 4, 1983, he was reassigned as a teacher at the DISD Business Magnet School, a position that did not include any coaching duties. Petitioner's attendance*707 and performance at the Business Magnet School were poor, and on May 5, 1983, Santillo wrote petitioner indicating that he was being placed on "unassigned personnel budget" and being reassigned to a temporary position in the DISD security department. Upon receiving Santillo's letter, petitioner filed this lawsuit in the District Court for the Northern District of Texas. The DISD subsequently offered petitioner a position as a teacher and freshman football and track coach at Jefferson High School. Petitioner did not accept this assignment, and on August 19, 1983, he sent his formal letter of resignation to the DISD.

Petitioner brought this action against the DISD and Principal Todd in his personal and official capacities, under 42 U.S.C. § § 1981 and 1983, alleging due process, First Amendment, and equal protection violations. Petitioner's due process claim alleged that he had a constitutionally protected property interest in his coaching position at South Oak, of which he was deprived without due process of law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                                            Page 6
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Petitioner's First Amendment claim was based on the allegation that his removal and subsequent transfer were actions taken in retaliation for his statements to the press regarding the sports program at South Oak. His equal protection and § 1981 causes of action were based on the allegation that his removal from the athletic director and head coaching positions at South Oak was motivated by the fact that he was white, and that Principal Todd, and through him the DISD, were responsible for the racially discriminatory diminution in his employment status. Petitioner also claimed that his resignation was in fact the product of racial harassment and retaliation for the exercise of his First Amendment rights and thus amounted to a constructive discharge. These claims were tried to a jury, which found for petitioner on all counts. The jury awarded petitioner $650,000 against the DISD, $150,000 against Principal Todd and the DISD jointly and severally, and $50,000 in punitive damages against Todd in his personal capacity.

*708 On motion for judgment notwithstanding the verdict, the defendants argued that liability against the DISD was improper because there was no showing that petitioner's injuries were sustained pursuant to a policy or custom of the school district. App. to Pet. for Cert. in No. 87-2084, p. 46A. The District Court rejected this argument, finding that the DISD Board of Trustees had delegated final and unreviewable authority to Superintendent Wright to reassign personnel as he saw fit. Id., at 47A. In any event, the trial court found that petitioner's claim of racial discrimination was cognizable under § 1981 as well as § 1983, and indicated that "liability is permitted on solely a basis of *respondeat superior* when the claim is one of racial discrimination under § 1981." *Ibid.* The District Court set aside the punitive damages award against Principal Todd as unsupported by the evidence, found the damages award against the DISD excessive and ordered a remittitur of $200,000, but otherwise denied the defendants' motions for judgment n.o.v. and a new trial and upheld the jury's verdict in all respects. Id., at 62A-63A. Principal Todd has reached a settlement with petitioner and is **2709 no longer a party to this action. Id., at 82A-84 A.

On appeal, the Court of Appeals for the Fifth Circuit reversed in part and remanded. 798 F.2d 748 (1986). Initially, the court found that petitioner had no constitutionally protected property interest "in the intangible, noneconomic benefits of his assignment as coach." Id., at 754. Since petitioner had received

both his teacher's and coach's salary after his reassignment, the change in duties did not deprive him of any state law entitlement protected by the Due Process Clause. The Court of Appeals also set aside the jury's finding that petitioner was constructively discharged from his teaching position within the DISD. The court found the evidence insufficient to sustain the claim that petitioner's loss of coaching duties and subsequent offer of reassignment to a lesser coaching position were so humiliating or unpleasant that a reasonable employee would have felt compelled to resign.*709    Id., at 754-756. While finding the question "very close," the Court of Appeals concluded that there was sufficient evidence from which a reasonable jury could conclude that Principal Todd's recommendation that petitioner be transferred from his coaching duties at South Oak was motivated by impermissible racial animus. The court noted that Todd had replaced petitioner with a black coach, that there had been racial overtones in the tension between Todd and petitioner before the Plano game, and that Todd's explanation of his unsatisfactory rating of petitioner was questionable and was not supported by the testimony of other DISD officials who spoke of petitioner's performance in laudatory terms. Id., at 756-757. The court also affirmed the jury's finding that Todd's recommendation that petitioner be relieved of his coaching duties was motivated in substantial part by petitioner's protected statements to the press concerning the academic standing of athletes at South Oak. These remarks addressed matters of public concern, and Todd admitted that they were a substantial consideration in his decision to recommend that petitioner be relieved of his coaching duties.

The Court of Appeals then turned to the DISD's claim that there was insufficient evidence to support a finding of municipal liability under 42 U.S.C. § 1983. The Court of Appeals found that the District Court's instructions as to the school district's liability were deficient in two respects. First, the District Court's instruction did not make clear that the school district could be held liable for the actions of Principal Todd or Superintendent Wright only if those officials were delegated policymaking authority by the school district or acted pursuant to a well settled custom that represented official policy. Second, even if Superintendent Wright could be considered a policymaker for purposes of the transfer of school district personnel, the jury made no finding that Superintendent Wright's decision to transfer petitioner was *710 either improperly motivated or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consciously indifferent to the improper motivations of Principal Todd. *Id., at 759-760.*

The Court of Appeals also rejected the District Court's conclusion that the DISD's liability for Principal Todd's actions could be predicated on a theory of *respondeat superior* under § 1981. The court noted that in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), this Court held that Congress did not intend municipalities to be subject to vicarious liability for the federal constitutional or statutory violations of their employees. The Court of Appeals reasoned that "[t]o impose such vicarious liability for only certain wrongs based on section 1981 apparently would contravene the congressional intent behind section 1983." 798 F.2d, at 762.

The Court of Appeals published a second opinion in rejecting petitioner's suggestion for rehearing en banc in which the panel gave further explanation of its holding that *respondeat superior* liability against local **2710 governmental entities was unavailable under § 1981. 837 F.2d 1244 (1988). The Court of Appeals noted that our decision in *Monell* rested in part on the conclusion that " 'creation of a federal law of *respondeat superior* would have raised all the constitutional problems' " associated with the Sherman amendment which was rejected by the framers of § 1983. 837 F.2d, at 1247, quoting *Monell, supra,* 436 U.S., at 693, 98 S.Ct., at 2037.

Because the Court of Appeals' conclusion that local governmental bodies cannot be held liable under a theory of *respondeat superior* for their employees' violations of the rights guaranteed by § 1981 conflicts with the decisions of other Courts of Appeals, see, *e.g., Springer v. Seaman,* 821 F.2d 871, 880-881 (C.A.1, 1987); *Leonard v. Frankfort Electric and Water Plant Bd.,* 752 F.2d 189, 194, n. 9 (C.A.6, 1985) (dictum), we granted Norman Jett's petition for certiorari in No. 87-2084. 488 U.S. 940, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). We also granted the DISD's cross-petition for certiorari in No. 88-214, *ibid.,* to clarify the application of our decisions in *711St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), and *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion), to the school district's potential liability for the discriminatory actions of Principal Todd.

We note that at no stage in the proceedings has the school district raised the contention that the substantive scope of the "right ... to make ... contracts" protected by § 1981 does not reach the injury suffered by petitioner here. See *Patterson v. McLean Credit Union,* 491 U.S. 164, 176-177, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Instead, the school district has argued that the limitations on municipal liability under § 1983 are applicable to violations of the rights protected by § 1981. Because petitioner has obtained a jury verdict to the effect that Dr. Todd violated his rights under § 1981, and the school district has never contested the judgment below on the ground that § 1981 does not reach petitioner's employment injury, we assume for purposes of these cases, without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment. See *Canton v. Harris,* 489 U.S. 378, 388-389, n. 8, 109 S.Ct. 1197, 1204, n. 8, 103 L.Ed.2d 412 (1989); *United States v. Leon,* 468 U.S. 897, 905, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984). See also this Court's Rule 21.1(a).

II

Title 42 U.S.C. § 1981, as amended, provides that:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other."

In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981. While petitioner concedes that the text *712 of the 1866 Act itself is completely silent on this score, see Brief for Petitioner 26, petitioner contends that a civil remedy was nonetheless intended for the violation of the rights contained in § 1 of the 1866 Act. Petitioner argues that Congress wished to adopt the prevailing approach to municipal liability to effectuate this damages remedy, which was *respondeat superior.* Petitioner concludes that with this federal damages remedy in place in 1866, it was not the intent of the 42d Congress, which passed present day § 1983, to narrow the more sweeping remedy against local governments which Congress

109 S.Ct. 2702                                                                                                          Page 8
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

had created five years earlier.  Since "repeals by implication are not favored," *id.,* at 15 (citations omitted), petitioner concludes that § 1981 **2711 must provide an independent cause of action for racial discrimination against local governmental entities, and that this broader remedy is unaffected by the constraints on municipal liability announced in *Monell.*  In the alternative, petitioner argues that even if § 1981 does not create an express cause of action for damages against local governmental entities, 42 U.S.C. § 1988 invites this Court to craft a remedy by looking to common law principles, which again point to a rule of *respondeat superior.*  Brief for Petitioner 27-29.  To examine these contentions, we must consider the text and history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of § § 1981 and 1983 respectively.

Justice BRENNAN's dissent errs in asserting that we have strayed from the question upon which we granted certiorari.  See *post,* at 2725.  Jett's petition for certiorari asks us to decide "[w]hether a public employee who claims job discrimination on the basis of race must show that the discrimination resulted from official 'policy or custom' in order to recover under 42 U.S.C. § 1981."  Pet. for Cert. in No. 87-2084, p. i.  In answering this question, the lower court looked to the relationship between § § 1981 and 1983, and refused to differentiate "between sections 1981 and 1983 with respect to municipal *respondeat superior* liability."  837 F.2d, at 1247.  In both his petition for certiorari and his brief on the merits *713 in this Court, petitioner Jett took issue with the Court of Appeals' conclusion that the express damages remedy under § 1983 militated against the creation or implication of a broader damages remedy under § 1981.  See Pet. for Cert. in No. 87-2084, pp. 14-16; Brief for Petitioner 14-25.  Moreover, petitioner concedes that "private causes of action under Sections 1981 and 1982 do not arise from the express language of those statutes," Brief for Petitioner 27, and asks this Court to "look to state law or to fashion a single federal rule," of municipal damages liability under § 1981.  *Id.,* at 28-29 (footnote omitted).  We think it obvious that the question whether a federal damages remedy broader than that provided by § 1983 should be implied from § 1981 is fairly included in the question upon which we granted certiorari.

Equally implausible is Justice BRENNAN's suggestion that we have somehow unwittingly answered this question in the past.  See *post,* at 2726.

Most of the cases cited by the dissent involved private conduct, and thus quite obviously could not have considered the propriety of judicial implication of a federal damages remedy under § 1981 in the state action context we address here.  The only two cases cited by Justice BRENNAN which involved state actors, *Takahashi v. Fish and Game Comm'n,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), and *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), are completely inapposite.  See *post,* at 2728.  *Takahashi* involved a mandamus action filed in state court, and thus understandably had nothing to say about federal damages remedies against state actors under § 1981.  *Hurd* also involved only injunctive relief, and could not have considered the relationship of § 1981 to § 1983, since the latter statute did not apply to the District of Columbia at the time of our decision in that case.  See *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

A

On December 18, 1865, the Secretary of State certified that the Thirteenth Amendment had been ratified and become part of the Constitution.  Less than three weeks later, *714 Senator Lyman Trumbull, Chairman of the Senate Judiciary Committee, introduced S. 61, which was to become the Civil Rights Act of 1866.  See Cong. Globe, 39th Cong., 1st Sess., 129 (1866).  The bill had eight sections as introduced, the first three of which are relevant to our inquiry here.  Section 1, as introduced to the Senate by Trumbull, provided:
**2712 "That there shall be no discrimination in civil rights or immunities among the inhabitants of any State or Territory of the United States on account of race, color, or previous condition of slavery; but the inhabitants of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall have the same right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding."  *Id.,* at 474.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                              Page 9
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

On January 29, 1866, Senator Trumbull took the floor to describe S. 61 to his colleagues. Trumbull indicated that "the first section will amount to nothing more than the declaration in the Constitution itself unless we have the machinery to carry it into effect." *Id.,* at 475. The Senator then alluded to the second section of the bill which provided:

"That any person who under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, ...   *715 or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court." *Ibid.*

Senator Trumbull told the Senate: "This is the valuable section of the bill so far as protecting the rights of freedmen is concerned." *Ibid.* This section would allow for criminal prosecution of those who denied the freedman the rights protected by § 1, and Trumbull felt, in retrospect somewhat naively, that, "it will only be necessary to go into the late slaveholding States and subject to fine and imprisonment one or two in a State, and the most prominent ones I should hope at that, to break up this whole business." *Ibid.*

Trumbull then described the third section of the bill, which, as later enacted, provided in pertinent part:

"That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offenses committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever ... such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain

cases,' approved March three, eighteen hundred and sixty three, and all acts amendatory thereof."  14 Stat. 27.

*716 Trumbull described this section as "giving to the courts of the United States jurisdiction over all persons committing offenses against the provisions of this act, and also over the cases of persons who are discriminated against by State laws or customs." Cong. Globe, 39th Cong., 1st Sess., 475 (1866). Much of the debate in both the **2713 Senate and the House over the 1866 Act was taken up with the meaning of the terms "civil rights or immunities" contained in the first sentence of § 1 of the bill as introduced in the Senate. The phrase remained in the bill throughout the Senate's consideration of S. 61, but was stricken by amendment in the House shortly before that body passed the bill.

Discussion of § 2 of the bill focused on both the propriety and constitutionality of subjecting state officers to criminal punishment for effectuating discriminatory state laws. Opponents of the bill consistently referred to criminal punishment and fines being levied against state judges and other state officers for the enforcement of state laws in conflict with § 1. See *id.,* at 475, 499, 500 (Sen. Cowan); *id.,* at 598 (Sen. Davis); *id.,* at 1121 (Rep. Rogers); *id.,* at 1154 (Rep. Eldridge). They never intimated that they understood any part of the bill to create a federal damages remedy against state officers or the political subdivisions of the States.

Debate concerning § 3 focused on the right of removal of civil and criminal proceedings commenced in state court. Senator Howard, an opponent, engaged in a section by section criticism of the bill after its introduction by Trumbull. As to § 3 he gave numerous examples of his perception of its operation. All of these involved removal of actions from state court, and none alluded to original federal jurisdiction except in the case of the exclusive criminal jurisdiction expressly provided for. *Id.,* at 479 ("All such cases will be subject to be removed into the Federal courts"); see also *id.,* at 598 (Sen. Davis) ("Section three provides that all suits brought in State courts that come within the purview of the previous sections may be removed into the Federal courts").  *717 On February 2, 1866, the bill passed the Senate by a vote of 33 to 12 and was sent to the House. *Id.,* at 606-607.

Representative Wilson of Iowa, Chairman of the

House Judiciary Committee, introduced S. 61 in the House on March 1, 1866. Of § 1 of the bill, he said: "Mr. Speaker, I think I may safely affirm that this bill, so far as it declares the equality of all citizens in the enjoyment of civil rights and immunities merely affirms existing law.   We are following the Constitution....   It is not the object of this bill to establish new rights, but to protect and enforce those which already belong to every citizen."   *Id.,* at 1117.

As did Trumbull in the Senate, Wilson immediately alluded to § 2, the criminal provision, as the main enforcement mechanism of the bill.   "In order to accomplish this end, it is necessary to fortify the declaratory portions of this bill with sanctions as will render it effective."   *Id.,* at 1118.

The only discussion of a civil remedy in the House debates surrounding the 1866 Act came in response to Representative Bingham's proposal to send the bill back to the House Judiciary Committee with instructions "to strike out all parts of said bill which are penal and which authorize criminal proceedings, and in lieu thereof to give all citizens of the United States injured by denial or violation of any of the other rights secured or protected by said act, an action in the United States courts, with double costs in all cases of emergency, without regard to the amount of damages."   *Id.,* at 1266, 1291.   Bingham was opposed to the civil rights bill strictly on the grounds that it exceeded the constitutional power of the Federal Government.   As to States "sustaining their full constitutional relation to the Government of the United States," Bingham, along with several other Republicans, doubted the power of the Federal Government to interfere with the reserved powers of the States to define property and other rights.   *Id.,* at 1292.   While Bingham realized that the same constitutional objections applied to his proposal *718 for modification of the bill, he felt that these would make the bill "less oppressive, and therefore less objectionable."   *Id.,* at 1291.

**2714 Representative Wilson responded to his Republican colleague's proposal.   Wilson pointed out that there was no difference in constitutional principle "between saying that the citizen shall be protected by the legislative power of the United States in his rights by civil remedy and declaring that he shall be protected by penal enactments against those who interfere with his rights."   *Id.,* at 1295.   Wilson did however see a difference in the effectiveness of the two remedies.   He stated:

"This bill proposes that the humblest citizen shall have full and ample protection at the cost of the Government, whose duty it is to protect him.   The [Bingham] amendment ... recognizes the principle involved, but it says that the citizen despoiled of his rights, instead of being properly protected by the Government, must press his own way through the courts and pay the bills attendant thereon....   The highest obligation which the Government owes to the citizen in return for the allegiance exacted of him is to secure him in the protection of his rights.   Under the amendment of the gentleman the citizen can only receive that protection in the form of a few dollars in the way of damages, if he shall be so fortunate as to recover a verdict against a solvent wrongdoer.   This is called protection.   This is what we are asked to do in the way of enforcing the bill of rights.   Dollars are weighed against the right of life, liberty and property."   *Ibid.*

Bingham's proposal was thereafter defeated by a vote of 113 to 37.   *Id.,* at 1296.   The Senate bill was subsequently carried in the House, after the removal of the "civil rights and immunities" language in § 1, and an amendment adding a ninth section to the bill providing for a final appeal to the Supreme Court in cases arising under the Act.   *Id.,* at 1366-1367. *719 On March 15, 1866, the Senate concurred in the House amendments without a record vote, see *id.,* at 1413-1416, and the bill was sent to the President.

After holding the bill for a full 10 days, President Johnson vetoed the bill and returned it to the Senate with his objections.   The President's criticisms of § § 2 and 3 of the bill, and Senator Trumbull's responses thereto, are particularly illuminating.   As to § 2, the President declared that it was designed to counteract discriminatory state legislation, "by imposing fine and imprisonment upon the legislators who may pass such ... laws."   *Id.,* at 1680.   As to the third section, the President indicated that it would vest exclusive federal jurisdiction over all civil and criminal cases where the rights guaranteed in § 1 were affected. *Ibid.*

Trumbull took issue with both statements.   As to the charge that § 2 would result in the criminal prosecution of state legislators, Trumbull replied:
"Who is to be punished?   Is the law to be punished? Are the men who make the law to be punished?   Is that the language of the bill?   Not at all.   If any person, 'under color of any law,' shall subject another to the deprivation of a right to which he is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                              Page 11
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

entitled, he is to be punished. Who? The person who, under the color of the law, does the act, not the men who made the law. In some communities in the South a custom prevails by which different punishment is inflicted upon the blacks from that meted out to whites for the same offense. Does this section propose to punish the community where the custom prevails? Or is it to punish the person who, under color of the custom, deprives the party of his right? It is a manifest perversion of the meaning of the section to assert anything else." *Id.*, at 1758.

Trumbull also answered the President's charge that the third section of the bill created original federal jurisdiction in all cases where a freedman was involved in a state court proceeding. He stated:
*720 "So in reference to this third section, the jurisdiction is given to the Federal courts of a case affecting the person that is discriminated against. Now, he is **2715 not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a Legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict with a statute of the United States; and it is not to be presumed that any judge of a State court would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court." *Id.*, at 1759.

Senator Trumbull then went on to indicate that "[i]f it be necessary in order to protect the freedman in his rights that he should have authority to go into the Federal courts in all cases where [of discrimination] prevails in a State ... I think we have the authority to confer that jurisdiction under the second clause of the constitutional amendment." *Ibid.* Two days later, on April 6, 1866, the Senate overrode the President's veto by a vote of 33 to 15. *Id.*, at 1809. On April 9, 1866, the House received both the bill and the President's veto message which were read on the floor. *Id.*, at 1857-1860. The House then promptly overrode the President's veto by a vote of 122 to 41, *id.*, at 1861, and the Civil Rights Act of 1866 became law.

Several points relevant to our present inquiry emerge

from the history surrounding the adoption of the Civil Rights Act of 1866. First, nowhere did the Act provide for an express damages remedy for violation of the provisions of § 1. See *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 414, n. 13, 88 S.Ct. 2186, 2189, n. 13, 20 L.Ed.2d 1189 (1968) (noting "[t]hat 42 U.S.C. § 1982 is couched in declaratory*721 terms and provides no explicit method of enforcement"); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969); *Cannon v. University of Chicago*, 441 U.S. 677, 690, n. 12, 99 S.Ct. 1946, 1954, n. 12, 60 L.Ed.2d 560 (1979); *id.*, at 728, 99 S.Ct., at 1947 (WHITE, J., dissenting). Second, no original federal jurisdiction was created by the 1866 Act which could support a federal damages remedy against state actors. See *Allen v. McCurry*, 449 U.S. 90, 99, n. 14, 101 S.Ct. 411, 417, n. 14, 66 L.Ed.2d 308 (1980) (§ 3 of the 1866 Act embodied remedy of "post-judgment removal for state-court defendants whose civil rights were threatened"); *Georgia v. Rachel*, 384 U.S. 780, 788-789, 86 S.Ct. 1783, 1788-1789, 16 L.Ed.2d 925 (1966); *Strauder v. West Virginia*, 100 U.S. 303, 311-312, 25 L.Ed. 664 (1880). Finally, the penal provision, the only provision explicitly directed at state officials, was, in Senator Trumbull's words, designed to punish the "person who, under the color of the law, does the act," not "the community where the custom prevails." Cong. Globe, 39th Cong., 1st Sess., 1758 (1866).

Two events subsequent to the passage of the 1866 Act bear on the relationship between § § 1981 and 1983. First, on June 13, 1866, just over two months after the passage of the 1866 Act, a joint resolution was passed sending the Fourteenth Amendment to the States for ratification. As we have noted in the past, the first section of the 1866 Act "constituted an initial blueprint of the Fourteenth Amendment." *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982). Many of the Members of the 39th Congress viewed § 1 of the Fourteenth Amendment as "constitutionalizing" and expanding the protections of the 1866 Act and viewed what became § 5 of the Amendment as laying to rest doubts shared by both sides of the aisle concerning the constitutionality of that measure. See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., 2465 (1866) (Rep. Thayer) ("As I understand it, it is but incorporating in the Constitution of the United States the principle of the civil rights bill which has **2716 lately become a law"); *id.*, at 2498 (Rep. Broomall); *id.*, at 2459 (Rep. Stevens); *id.*, at 2461 (Rep. Finck); *id.*, at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2467 *722 Rep. Boyer). See also _Hurd v. Hodge,_ 334 U.S., at 32, 68 S.Ct., at 851 ("[A]s the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land") (footnote omitted).

Second, the 41st Congress reenacted the substance of the 1866 Act in the Fourteenth Amendment statute, the Enforcement Act of 1870. 16 Stat. 144. Section 16 of the 1870 Act was modeled after § 1 of the 1866 Act. Section 17 reenacted with some modification the criminal provisions of § 2 of the earlier civil rights law, and § 18 of the 1870 Act provided that the entire 1866 Act was reenacted. See _Civil Rights Cases,_ 109 U.S. 3, 16-17 (1883). We have thus recognized that present day 42 U.S.C. § 1981 is both a Thirteenth and a Fourteenth Amendment statute. _Runyon v. McCrary,_ 427 U.S. 160, 168-169, n. 8, 96 S.Ct. 2586, 2593-2594, n. 8, 49 L.Ed.2d 415 (1976); _id.,_ at 190, 96 S.Ct., at 2604 (STEVENS, J., concurring); _General Building Contractors, supra,_ at 383-386.

B

What is now § 1983 was enacted as § 1 of "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States and For other Purposes," Act of April 20, 1871, ch. 22, 17 Stat. 13. The immediate impetus for the bill was evidence of widespread acts of violence perpetrated against the freedmen and loyal white citizens by groups such as the Ku Klux Klan. On March 23, 1871, President Grant sent a message to Congress indicating that the Klan's reign of terror in the Southern States had "render [ed] life and property insecure," and that "the power to correct these evils [was] beyond the control of State authorities." Cong. Globe, 42nd Cong., 1st Sess., 244 (1871). A special joint committee consisting of 10 distinguished Republicans, 5 from each House of Congress, was formed in response to President Grant's call for legislation, and drafted the bill that became what is now known as the Ku Klux Act. As enacted, *723 § § 2 through 6 of the bill specifically addressed the problem of the private acts of violence perpetrated by groups like the Klan.

Unlike the rest of the bill, § 1 was not specifically addressed to the activities of the Klan. As passed by the 42d Congress, § 1 provided in full:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases." 17 Stat. 13.

Three points are immediately clear from the face of the Act itself. First, unlike any portion of the 1866 Act, this statute explicitly ordained that any "person" acting under color of state law or custom who was responsible for a deprivation of constitutional rights would "be liable to the party injured in any action at law." Thus, "the 1871 Act was designed to expose state and local officials to a new form of liability." **2717 _Newport v. Fact Concerts, Inc.,_ 453 U.S. 247, 259, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616 (1981). Second, the 1871 Act explicitly provided original federal jurisdiction for prosecution of these civil actions against state *724 actors. See _Will v. Michigan Dept. of State Police,_ 491 U.S. 58, 66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) ("[A] principle purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims"); accord, _Mitchum v. Foster,_ 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972). Third, the first section of the 1871 Act was explicitly modeled on § 2 of the 1866 Act, and was seen by both opponents and proponents as amending and enhancing the protections of the 1866 Act by providing a new civil remedy for its enforcement against state actors. See _Chapman v. Houston Welfare Rights Organization,_ 441 U.S. 600, 610-611, n. 25, 99 S.Ct. 1905, 1912, n. 25, 60 L.Ed.2d 508 (1979) ( "Section 1 of the [1871] Act generated the least concern; it merely added civil remedies to the criminal penalties imposed by the 1866 Civil Rights Act"); _Monroe v. Pape,_ 365 U.S. 167, 185, 81 S.Ct.

109 S.Ct. 2702                                                                                    Page 13
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

473, 483, 5 L.Ed.2d 492 (1961);  *Mitchum, supra,*
407 U.S., at 238, 92 S.Ct., at 2160.

Even a cursory glance at the House and Senate
debates on the 1871 Act makes these three points
clear.    In introducing the bill to the House,
Representative Shellabarger, who served on the joint
committee which drafted the bill, stated:
"The model for it will be found in the second section
of the act of April 9, 1866, known as the 'civil rights
act.'  That section provides a criminal proceeding in
identically the same case as this one provides a civil
remedy for, except that the deprivation under color of
State law must, under the civil rights act, have been
on account of race, color or former slavery."  Cong.
Globe, 42d Cong., 1st Sess., App. 68 (1871).

Representative Shellabarger added that § 1 provided
a civil remedy "on the same state of facts" as § 2 of
the Civil Rights Act of 1866.  *Ibid.*  Obviously
Representative Shellabarger's introduction of § 1 of
the bill to his colleagues would have been altogether
different if he had been of the view that the 39th
Congress, of which he had been a Member, had
*already* created a *broader* federal damages remedy
against state actors in 1866.  The view that § 1 of
the 1871 Act was an amendment of or supplement to
the 1866 Act designed to create a new civil remedy
against state actors was  *725 echoed throughout the
debates in the House.  See *id.,* at 461 (Rep. Coburn);
*id.,* at App. 312-313 (Rep. Burchard).  Opponents of
§ 1 operated on this same understanding.  See *id.,* at
429 (Rep. McHenry) ("The first section of the bill is
intended as an amendment of the civil rights act");
*id.,* at 365 (Rep. Arthur).

Both proponents and opponents in the House viewed
§ 1 as working an *expansion* of federal jurisdiction.
Supporters continually referred to the failure of the
state courts to enforce federal law designed for the
protection of the freedman, and saw § 1 as
remedying this situation by interposing the federal
courts between the State and citizens of the United
States.  See *id.,* at 376 (Rep. Lowe) ("The case has
arisen ... when the Federal Government must resort to
its own agencies to carry its own authority into
execution.  Hence this bill throws open the doors of
the United States courts to those whose rights under
the  Constitution  are  denied  or  impaired").
Opponents recognized the expansion of original
jurisdiction and railed against it on policy and
constitutional grounds.    See *id.,* at 429 (Rep.
McHenry) ("The first section of the bill ... vests in the

Federal courts jurisdiction to determine the individual
rights of citizens of the same State;  a jurisdiction
which of right belongs only to the State tribunals");
*id.,* at App. 50 (Rep. Kerr);  *id.,* at 365-366 (Rep.
Authur);  *id.,* at 373 (Rep. Archer).

The Senate debates on § 1 of the 1871 Act are of a
similar tenor.  Senator Edmunds, Chairman of the
Senate Judiciary Committee, and one of the members
of the **2718 joint committee which drafted the bill,
introduced § 1 to the Senate in the following terms:
"The first section is one that I believe nobody objects
to, as defining the rights secured by the Constitution
of the United States when they are assailed by any
State law or under color of any State law, and it is
merely carrying out the principles of the civil rights
bill, which have  *726 since become a part of the
Constitution."  *Id.,* at 568, quoted in *Monroe v. Pape,
supra,* 365 U.S., at 171, 81 S.Ct., at 475.

Again Senators addressed § 1 of the Act as creating a
new civil remedy and expanding federal jurisdiction
to accommodate it in terms incompatible with the
supposition that the 1866 Act had already created
such a cause of action against state actors.  See
Cong. Globe, 42d Cong., 1st Sess., 653 (1871) (Sen.
Osborn) ("I believe the true remedy lies chiefly in the
United States district and circuit courts.  If the State
courts had proven themselves competent ... we
should not have been called upon to legislate upon
this subject at all.  But they have not done so");  *id.,*
at App. 216 (Sen. Thurman) ("Its whole effect is to
give to the Federal Judiciary that which does not
belong to it-a jurisdiction that may be constitutionally
conferred upon it, I grant, but that has never yet been
conferred upon it");  see also *id.,* at 501 (Sen.
Frelinghuysen).

The final aspect of the history behind the adoption of
present day § 1983 relevant to the question before us
is the rejection by the 42d Congress of the Sherman
amendment, which specifically proposed the
imposition of a form of vicarious liability on
municipal governments.    This history was
thoroughly canvassed in the Court's opinion in
*Monell,* and only its broadest outlines need be traced
here.  Immediately prior to the vote on the bill in the
Senate, Senator Sherman introduced an amendment
which would have constituted a seventh section of
the 1871 Act.  Cong. Globe, 42d Cong., 1st Sess.,
663 (1871).  In its original form, the amendment did
not place liability on municipal corporations *per se,*
but instead rendered the inhabitants of a municipality

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702
Page 14
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

liable in civil damages for injury inflicted to persons or property in violation of federal constitutional and statutory guarantees "by any persons riotously and tumultuously assembled together." The initial Sherman amendment was passed by the Senate, but was rejected by the House and became the subject of a conference committee. The committee draft of the Sherman **727** amendment explicitly provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, "the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense." *Id.,* at 755. Judgments in such actions were to run directly against the municipal corporation, and were to be enforceable through a "lien ... upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof." *Ibid.*

Opposition to the amendment in this form was vehement, and ran across party lines, extending to many Republicans who had voted for § 1 of the 1871 Act, as well as earlier Reconstruction legislation, including the Civil Rights Act of 1866. See *id.,* at 758 (Sen. Trumbull); *id.,* at 798-799 (Rep. Farnsworth).

The Sherman amendment was regarded as imposing a new and theretofore untested form of liability on municipal governments. As Representative Blair put it:
"The proposition known as the Sherman amendment-and to that I shall confine myself in the remarks which I may address to the House-is entirely new. It is altogether without a precedent in this country. Congress has never asserted or attempted to assert, so far as I know, any such authority. That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may **2719** please upon the municipalities, which are the creations of the States alone." *Id.,* at 795 (Rep. Blair), partially quoted in *Monell, 436 U.S.,* at 673-674, 98 S.Ct., at 2026-27.

See also Cong. Globe, 42d Cong., 1st Sess., 758 (1871) (Sen. Trumbull) (referring to the conference committee version of the Sherman amendment as "asserting principles never before exercised, on the part of the United States at any rate").

The strong adverse reaction to the Sherman amendment, and continued references to its complete novelty in the law of **728** the United States, make it

difficult to entertain petitioner's contention that the 1866 Act had already created a form of vicarious liability against municipal governments. Equally important is the basis for opposition. As we noted in *Monell,* a large number of those who objected to the principle of vicarious liability embodied in the Sherman amendment were of the view that Congress did not have the power to assign the duty to enforce federal law to state instrumentalities by making them liable for the constitutional violations of others. See *Monell, supra,* at 674-679, 98 S.Ct., at 2027-30. As Representative Farnsworth put it: "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Cong. Globe, 42d Cong., 1st Sess., 799 (1871). Three decisions of this Court lent direct support to the constitutional arguments of the opponents, see *Collector v. Day,* 11 Wall. 113, 20 L.Ed. 122 (1871); *Kentucky v. Dennison,* 24 How. 66, 16 L.Ed. 717 (1861), and *Prigg v. Pennsylvania,* 16 Pet. 539, 10 L.Ed. 1060 (1842). *Day* and *Prigg* were repeatedly cited in the House debates on the Sherman amendment. See *Monell, supra,* 436 U.S., at 673-683, n. 30, 98 S.Ct., at 2027-32, n. 30. In *Prigg,* perhaps the most famous and most oft cited of this line of cases, Justice Story wrote for the Court that Congress could not constitutionally "insist that the states are bound to provide means to carry into effect the duties of the national government." *Prigg, supra,* 16 Pet., at 616. In *Monell,* we concluded that it was this constitutional objection which was the driving force behind the eventual rejection of the Sherman amendment. *Monell, supra,* 436 U.S., at 676, 98 S.Ct., at 2028.

Although the debate surrounding the constitutional principles established in *Prigg, Dennison,* and *Day* occurred in the context of the Sherman amendment and not § 1 of the 1871 Act, in *Monell* we found it quite inconceivable that the same legislators who opposed vicarious liability on constitutional grounds in the Sherman amendment debates would have silently adopted the same principle in § 1. Because the "creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with **729** the obligation to keep the peace" embodied in the Sherman amendment, we held that the existence of the constitutional background of *Prigg, Dennison,* and *Day* "compell[ed] the conclusion that Congress did not intend municipalities to be held liable [under § 1] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell, supra,* 436 U.S., at 691, 98 S.Ct., at 2036.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                                                    Page 15
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Both *Prigg* and *Dennison* were on the books when the 39th Congress enacted § 1 of the 1866 Act. Supporters of the 1866 Act were clearly aware of *Prigg,* and cited the case for the proposition that the Federal Government could use its *own* instrumentalities to effectuate its laws. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 1294 (1871) (Rep. Wilson). There was, however, no suggestion in the debates surrounding the 1866 Act that the statute violated *Prigg's* complementary holding that federal duties could not be imposed on state instrumentalities by rendering them vicariously liable for the violations of others. Just as it affected our interpretation of § 1 of the 1871 Act in *Monell,* we think the complete silence on this score in the face of a constitutional background known to those who enacted the 1866 Act militates against imputing to Congress an intent to **2720** silently impose vicarious liability on municipalities under the earlier statute. Cf. *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

As originally enacted, the text of § 1983 referred only to the deprivation "of any rights, privileges, or immunities secured by the Constitution of the United States." In 1874, Congress enacted the Revised Statutes of the United States. The words "and laws" were added to the remedial provision of § 1 of the 1871 Act which became Rev.Stat. § 1979. At the same time, the jurisdictional grant in § 1 of the 1871 Act was split into two different provisions, Rev.Stat. § 563(12), granting jurisdiction to the district courts of the United States to redress deprivations under color of state law of any right secured by the Constitution or "by any law of the United States," and Rev.Stat. § 629(16), granting jurisdiction**730** to the old circuit courts for any action alleging deprivation under state authority of any right secured "by any law providing for equal rights." In 1911, Congress abolished the circuit courts of the United States and the Code's definition of the jurisdiction of the district courts was taken from Rev.Stat. § 629(16) with its narrower "providing for equal rights" language. This language is now contained in 28 U.S.C. § 1343(3), the jurisdictional counterpart of § 1983. *Chapman,* 441 U.S. at 608, 99 S.Ct. at 1911.

There is no commentary or other information surrounding the addition of the phrase "and laws" to the remedial provisions of present day § 1983. The revisers' draft of their work, published in 1872, and the marginal notes to § § 629(16) and 563(12),

which appeared in the completed version of the Revised Statutes themselves, provide some clues as to Congress' intent in adopting the change. The marginal note to § 629(16) states: "Suits to redress the deprivation of rights secured by the Constitution and laws to persons within jurisdiction of United States." The note then cross cites to § 1 of the 1871 Act, § § 16 and 18 of the Enforcement Act of 1870, and § 3 of the 1866 Act. Both § § 629(16) and 563(12) were followed by bracketed citations to Rev.Stat. § 1979, present day § 1983, and Rev.Stat. § 1977, present day § 1981. Rev.Stat. 95, 111 (1874). The revisers' draft of 1872 contains the following notation concerning § 629(16):
"It may have been the intention of Congress to provide, by this enactment [the Civil Rights Act of 1871], for all the cases of deprivations mentioned in the previous act of 1870, and thus actually to supersede the indefinite provision contained in that act. But as it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended, it is deemed safer to add a reference to the civil rights act." 1 Revision of the United States Statutes as **731** Drafted by the Commissioners Appointed for that Purpose 362 (1872).

We have noted in the past that the addition of the phrase "and laws" to the text of what is now § 1983, although not without its ambiguities as to intended scope, was *at least* intended to make clear that the guarantees contained in § 1 of the 1866 Act and § 16 of the Enforcement Act of 1870 were to be enforced against state actors through the express remedy for damages contained in § 1983. See *Chapman,* 441 U.S., at 617, 99 S.Ct., at 1915-16 (footnote omitted) (Section 1 of the 1871 Act "served only to ensure that an individual had a cause of action for violations of the Constitution, which in the Fourteenth Amendment embodied and extended to all individuals as against state action the substantive protections afforded by § 1 of the 1866 Act"); *id.,* at 668, 99 S.Ct., at 1942 (WHITE, J., concurring in judgment). See also *Maine v. Thiboutot,* 448 U.S. 1, 7, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1980) ("There is no express explanation offered for the insertion of the phrase 'and laws.' On the one hand, a principal purpose of the added language was to ensure that federal legislation providing specifically for equality of **2721** rights would be brought within the ambit of the civil action authorized by that statute") (some internal quotations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                        Page 16
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

III

[1] We think the history of the 1866 Act and the 1871
Act recounted above indicates that Congress intended
that the explicit remedial provisions of § 1983 be
controlling in the context of damages actions brought
against state actors alleging violation of the rights
declared in § 1981. That we have read § 1 of the
1866 Act to reach private action and have implied a
damages remedy to effectuate the declaration of
rights contained in that provision does not authorize
us to do so in the context of the "state action" portion
of § 1981, where Congress has established its own
remedial scheme. In the context of the application of
§ 1981 and § 1982 to private actors, we "had little
choice but to hold that aggrieved individuals **\*732**
could enforce this prohibition, *for there existed no
other remedy to address such violations of the
statute.*" *Cannon,* 441 U.S., at 728, 99 S.Ct., at 1974
(WHITE, J., dissenting) (emphasis added; footnote
omitted). That is manifestly not the case here, and
whatever the limits of the judicial power to imply or
create remedies, it has long been the law that such
power should not be exercised in the face of an
express decision by Congress concerning the scope of
remedies available under a particular statute. See
*National Railroad Passenger Corporation v.
National Assn. of Railroad Passengers,* 414 U.S. 453,
458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("A
frequently stated principle of statutory construction is
that when legislation expressly provides a particular
remedy or remedies, courts should not expand the
coverage of the statute to subsume other remedies");
accord, *Fleischmann Corp. v. Maier Brewing Co.,*
386 U.S. 714, 720, 87 S.Ct. 1404, 1408, 18 L.Ed.2d
475 (1967); *Cannon, supra,* at 718-724, 99 S.Ct., at
1968-1972 (WHITE, J., dissenting).

Petitioner cites 42 U.S.C. § 1988, and argues that
that provision "compels adoption of a *respondeat
superior* standard." Brief for Petitioner 27. That
section, as amended, provides in pertinent part:
"The jurisdiction in civil ... matters conferred on the
district courts by the provisions of this [chapter and
Title 18], for the protection of all persons in the
United States in their civil rights, and for their
vindication, shall be exercised and enforced in
conformity with the laws of the United States, so far
as such laws are suitable to carry the same into effect;
but in all cases where they are not adapted to the
object, or are deficient in the provisions necessary to
furnish suitable remedies and punish offenses against

law, the common law, as modified and changed by
the constitution and the statutes of the State wherein
the court having jurisdiction of such civil or criminal
cause is held, so far as the same is not inconsistent
with the Constitution and laws of the United States,
shall be extended to and govern the said courts in the
trial and disposition of the cause...."

**\*733** Far from supporting petitioner's call for the
creation or implication of a damages remedy broader
than that provided by § 1983, we think the plain
language of § 1988 supports the result we reach here.
As we noted in *Moor v. County of Alameda,* 411 U.S.
693, 706, 93 S.Ct. 1785, 1794, 36 L.Ed.2d 596
(1973), in rejecting an argument similar to
petitioner's contention here: "[Section 1988]
expressly limits the authority granted federal courts
to look to the common law, as modified by state law,
to instances in which that law 'is not inconsistent
with the Constitution and laws of the United States.'
" *Ibid.* See also *Johnson v. Railway Express Agency,
Inc.,* 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44
L.Ed.2d 295 (1975). As we indicated in *Moor,*
"Congress did not intend, *as a matter of federal law,*
to impose vicarious liability on municipalities for
violations of federal civil rights by their employees."
**\*\*2722**411 U.S., at 710, n. 27, 93 S.Ct., at 1796, n.
27. Section 1983 provides an explicit remedy in
damages which, with its limitations on municipal
liability, Congress thought "suitable to carry ... into
effect" the rights guaranteed by § 1981 as against
state actors. Thus, if anything, § 1988 points us in
the direction of the express federal damages remedy
for enforcement of the rights contained in § 1981,
not state common law principles.

Our conclusion that the express cause of action for
damages created by § 1983 constitutes the exclusive
federal remedy for violation of the rights guaranteed
in § 1981 by state governmental units finds support
in our decision in *Brown v. GSA,* 425 U.S. 820, 96
S.Ct. 1961, 48 L.Ed.2d 402 (1976). In *Brown,* we
dealt with the interaction of § 1981 and the
provisions of § 717 of Title VII, of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e-16, which proscribe
discrimination in federal employment and establish
an administrative and judicial enforcement scheme.
The petitioner in *Brown* had been passed over for
federal promotion on two occasions, and after the
second occasion he filed a complaint with his agency
alleging that he was denied promotion because of his
race. The agency's Director of Civil Rights
concluded after investigation that race had not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.