109 S.Ct. 2702                                                                                    Page 17
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

entered into the promotional process, and informed Brown by *734 letter of his right under § 717(c) to bring an action in federal district court within 30 days of the agency's final decision. Forty-two days later Brown filed suit in federal court, alleging violations of both Title VII and § 1981. The lower courts dismissed Brown's complaint as untimely under § 717(c), and this Court affirmed, holding that § 717 of Title VII constituted the exclusive remedy for allegations of racial discrimination in federal employment.

The Court began its analysis by noting that "Congress simply failed explicitly to describe § 717's position in the constellation of antidiscrimination law." 425 U.S., at 825, 96 S.Ct., at 1964. We noted that in 1972, when Congress extended the strictures of Title VII to federal employment, the availability of an implied damages remedy under § 1981 for employment discrimination was not yet clear. Id., at 828, 96 S.Ct., at 1965. The Court found that this perception on the part of Congress, "seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." Id., at 828-829, 96 S.Ct., at 1966. The Court bolstered its holding by invoking the general principle that "a precisely drawn, detailed statute pre-empts more general remedies." Id., at 834, 96 S.Ct., at 1968.

In *Brown*, as here, while Congress has not definitively spoken as to the relationship of § 1981 and § 1983, there is very strong evidence that the 42d Congress which enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors. The historical evidence surrounding the revision of 1874 further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983. That remedial scheme embodies certain limitations on the liability of local governmental entities based on federalism concerns which had very real constitutional underpinnings for the Reconstruction Congresses. As petitioner *735 here would have it, the careful balance drawn by the 42d Congress between local autonomy and fiscal integrity and the vindication of federal rights could be completely upset by an artifice of pleading.

[2] Since our decision in *Monell,* the Courts of Appeals have unanimously rejected the contention, analogous to petitioner's argument here, that the doctrine of *respondeat superior* is available against a municipal entity under a *Bivens*-type action implied directly from the Fourteenth Amendment. See, *e.g.,* **2723*Tarpley v. Greene,* 221 U.S.App.D.C. 227, 237, n. 25, 684 F.2d 1, 11, n. 25 (1982) (Edwards, J.) ("Because Congress has elected not to impose *respondeat superior* liability under § 1983, appellant invites this court to expand the remedial options under *Bivens* [v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ]. We can find no good logic nor sound legal basis for this view; we therefore decline the invitation"); accord, *Owen v. Independence,* 589 F.2d 335, 337 (CA8 1978); *Thomas v. Shipka,* 818 F.2d 496 (CA6 1987); *Ellis v. Blum,* 643 F.2d 68, 85 (CA2 1981); *Cale v. Covington,* 586 F.2d 311, 317 (CA4 1978); *Molina v. Richardson,* 578 F.2d 846 (CA9), cert. denied, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the protections of the 1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected *736 by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

IV

[3] The jury found that Principal Todd had violated petitioner's rights under § 1981, the First Amendment, and the Equal Protection Clause in recommending petitioner's removal from the athletic director and head coaching positions at South Oak. As to the liability of the DISD, the trial judge gave the jury the following instruction:

"A public independent school district (such as and including the Dallas Independent School District), acts by and through its Board of Trustees and/or its delegated administrative officials (including the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                          Page 18
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Superintendent and school principals), with regard to action taken against or concerning school district personnel.

"A public independent school district (such as and including the Dallas Independent School District) is liable for the actions of its Board of Trustees and/or its delegated administrative officials (including the Superintendent and school principals), with regard to wrongful or unconstitutional action taken against or concerning school district personnel." App. 31.

We agree with the Court of Appeals that this instruction was manifest error. The instruction seems to rest either on the assumption that both Principal Todd and Superintendent Wright were policymakers for the school district, or that the school district is vicariously liable for any actions taken by these employees. Since we have rejected *respondeat superior* as a basis for holding a state actor liable under § 1983 for violation of the rights enumerated in § 1981, we refer to the principles to be applied in determining whether either Principal Todd or Superintendent Wright can be considered policymakers for the school district such that their decisions may rightly be said to represent the official policy of the DISD subjecting it to liability under § 1983.

*737 [4] Last Term in *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), (plurality opinion), we attempted a clarification of tools a federal court should employ in determining where policymaking authority lies for purposes of § 1983. In *Praprotnik,* the plurality reaffirmed the teachings of our prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law.*" *Id.,* at 123, 108 S.Ct., at 924 (emphasis in original), quoting **2724*Pembaur,* 475 U.S., at 483, 106 S.Ct., at 1300 (plurality opinion). As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as " 'custom or usage' having the force of law," *Praprotnik, supra,* at 124, n. 1, 108 S.Ct., at 924, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory

violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see *Monell,* 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. See *Pembaur, supra,* at 485-487, 106 S.Ct., at 1301-1302 (WHITE, J, concurring).

We cannot fault the trial judge for not recognizing these principles in his instructions to the jury since this action was tried in October 1984, and the District Court did not have the benefit of our decisions in either *Pembaur* or *Praprotnik* to guide it. Similarly, the Court of Appeals issued its decision in this action before our decision in *Praprotnik.* Pursuant to its cross-petition in No. 88-214, the school district urges us *738 to review Texas law and determine that neither Principal Todd nor Superintendent Wright possessed the authority to make final policy decisions concerning the transfer of school district personnel. See Brief for Respondent 6-8. Petitioner Jett seems to concede that Principal Todd did not have policymaking authority as to employee transfers, see Brief for Petitioner 30, but argues that Superintendent Wright had been delegated authority to make school district policy concerning employee transfers and that his decisions in this area were final and unreviewable. *Id.,* at 30-32.

[5] We decline to resolve this issue on the record before us. We think the Court of Appeals, whose expertise in interpreting Texas law is greater than our own, is in a better position to determine whether Superintendent Wright possessed final policymaking authority in the area of employee transfers, and if so whether a new trial is required to determine the responsibility of the school district for the actions of Principal Todd in light of this determination. We thus affirm the judgment of the Court of Appeals to the extent it holds that the school district may not be held liable for its employees' violation of the rights enumerated in § 1981 under a theory of *respondeat superior.* We remand these cases to the Court of Appeals for it to determine where final policymaking authority as to employee transfers lay in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above.

*It is so ordered.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Justice SCALIA, concurring in part and concurring in the judgment.

I join Parts I and IV of the Court's opinion, and Part III except insofar as it relies upon legislative history. To hold that the more general provisions of 42 U.S.C. § 1981 establish a mode of liability for a particular category of offense by municipalities that is excluded from the closely related statute (42 U.S.C. § 1983) which deals more specifically with that precise category of offense would violate the rudimentary*739 principles of construction that the specific governs the general, and that, where text permits, statutes dealing with similar subjects should be interpreted harmoniously.

Justice BRENNAN, with whom Justice MARSHALL, Justice BLACKMUN, and Justice STEVENS join, dissenting.

To anyone familiar with this and last Terms' debate over whether **2725Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), should be overruled, see Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), today's decision can be nothing short of astonishing. After being led to believe that the hard question under 42 U.S.C. § 1981-the question that prompted this Court, on its own initiative, to set Patterson for reargument, 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988)-was whether the statute created a cause of action relating to private conduct, today we are told that the hard question is, in fact, whether it creates such an action on the basis of governmental conduct. It is strange, indeed, simultaneously to question whether § 1981 creates a cause of action on the basis of private conduct (Patterson) and whether it creates one for governmental conduct (these cases)-and hence to raise the possibility that this landmark civil rights statute affords no civil redress at all.

In granting certiorari in these cases we did not, as the plurality would have it, agree to review the question whether one may bring a suit for damages under § 1981 itself on the basis of governmental conduct. The plurality hints that petitioner Jett offered this issue for our consideration, ante, at 2710 ("In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981"), when in fact, it was respondent who raised this issue, and who did so for the first time in its brief on the merits in this Court.FN1 In six years of proceedings in *740 the lower courts, including a jury trial and an appeal that produced two opinions, respondent never once suggested that Jett's only remedy was furnished by § 1983. Petitioner was able to respond to this argument only in his reply brief in this Court. While it is true that we often affirm a judgment on a ground not relied upon by the court below, we ordinarily do so only when that ground at least was raised below. See, e.g., Heckler v. Campbell, 461 U.S. 458, 468, n. 12, 103 S.Ct. 1952, 1958, n. 12, 76 L.Ed.2d 66 (1983); Washington v. Yakima Indian Nation, 439 U.S. 463, 476, n. 20, 99 S.Ct. 740, 749, n. 20, 58 L.Ed.2d 740 (1979); Hankerson v. North Carolina, 432 U.S. 233, 240, n. 6, 97 S.Ct. 2339, 2344, n. 6, 53 L.Ed.2d 306 (1977); Massachusetts Mutual Life Ins. Co. v. Ludwig, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976); Dandridge v. Williams, 397 U.S. 471, 475, n. 6, 90 S.Ct. 1153, 1156, n. 6, 25 L.Ed.2d 491 (1970).

> FN1. The plurality twice cites petitioner Jett's opening brief, ante, at 2710, as if it presents this question. Neither of the passages to which the plurality refers, however, even remotely suggests that Jett anticipated, let alone raised, the argument that respondent advanced for the first time in its own brief on the merits.

It is not only unfair to decide the action on this basis; it is unwise. The question is important; to resolve it on the basis of largely one-sided briefing, without the benefit of the views of the courts below, is rash. It is also unnecessary. The Court appears to decide today (though its precise holding is less than pellucid) that liability for violations by the government of § 1981 may not be predicated on a theory of respondeat superior. The answer to that question would dispose of Jett's contentions. In choosing to decide, as well, whether § 1983 furnishes the exclusive remedy for violations of § 1981 by the government, the Court makes many mistakes that might have been avoided by a less impetuous course.

Because I would conclude that § 1981 itself affords a cause of action in damages on the basis of governmental conduct violating its terms, and because I would conclude that such an action may be predicated on a theory of respondeat superior, I dissent.

I

Title 42 U.S.C. § 1981, originally enacted as part of § 1 of the Civil Rights Act of 1866 (1866 Act), provides in full:

*741 **2726 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The question is whether this statute permits a cause of action in damages against those who violate its terms.

The plurality approaches this issue as though it were new to us, recounting in lengthy and methodical detail the introduction, debate, passage, veto, and enactment of the 1866 Act. The story should by now be familiar to anyone with even a passing acquaintance with this statute. This is so because we have reviewed this history in the course of deciding and reaffirming the answer to-the very question that the plurality deems so novel today. See *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Tillman v. Wheaton-Haven Recreation Assn., Inc.*, 410 U.S. 431, 432, 93 S.Ct. 1090, 1091, 35 L.Ed.2d 403 (1973); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). An essential aspect of the holding in each of these cases was the principle that a person injured by a violation of § 1 of the 1866 Act (now 42 U.S.C. § § 1981 and 1982) may bring an action for damages under that statute against the person who violated it.

*742 We have had good reason for concluding that § 1981 itself affords a cause of action against those who violate its terms. The statute does not explicitly furnish a cause of action for the conduct it prohibits, but this fact was of relatively little moment at the time the law was passed. During the period when § 1 of the 1866 Act was enacted, and for over 100 years thereafter, the federal courts routinely concluded that a statute setting forth substantive rights without specifying a remedy contained an implied cause of action for damages incurred in violation of the statute's terms. See, *e.g., Marbury v. Madison,* 1 Cranch 137, 162-163, 2 L.Ed. 60 (1803); *Kendall v. United States,* 12 Pet. 524, 624, 9 L.Ed. 1181 (1838); *Pollard v. Bailey,* 20 Wall. 520, 527, 22 L.Ed. 376 (1874); *Hayes v. Michigan Central R. Co.,* 111 U.S. 228, 240, 4 S.Ct. 369, 374, 28 L.Ed. 410 (1884); *De Lima v. Bidwell,* 182 U.S. 1, 176-177, 21 S.Ct. 743, 745, 45 L.Ed. 1041 (1901); *Texas & N.O.R. Co. v. Railway Clerks,* 281 U.S. 548, 569, 570, 50 S.Ct. 427, 433, 433, 74 L.Ed. 1034 (1930); *Bell v. Hood,* 327 U.S. 678, 684, and n. 6, 66 S.Ct. 773, 777, and n. 6, 90 L.Ed. 939 (1946); *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The classic statement of this principle comes from *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39-40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916), in which we observed: "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law." These cases fit comfortably within *Rigsby* 's framework. It is of small **2727 consequence, therefore, that the 39th Congress established no explicit damages remedy in § 1 of the 1866 Act.[FN2]

> FN2. During the 1970's, we modified our approach to determining whether a statute contains an implied cause of action, announcing the following four-part test:
> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted'-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted), quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S., at 39, 36 S.Ct., at 484.

It would make no sense, however, to apply a test first enunciated in 1975 to a statute enacted in 1866. An inquiry into Congress' actual intent must take account of the interpretive principles in place at the time. See *Cannon v. University of Chicago*, 441 U.S. 677, 698-699, 99 S.Ct. 1946, 1958-1959, 60 L.Ed.2d 560 (1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 375-378, 102 S.Ct. 1825, 1837-1839, 72 L.Ed.2d 182 (1982). See also *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 496, 107 S.Ct. 2941, 2958, 97 L.Ed.2d 389 (1987) (SCALIA, J., concurring) (advising against construing a statute on the basis of an interpretive principle announced after the statute was passed). Thus, I would interpret § 1981 in light of the principle described in *Rigsby*, rather than the one described in *Cort.*

Application even of the test fashioned in *Cort*, however, would lead to the conclusion that Jett may bring a cause of action in damages against respondent under § 1981. Jett belongs to the special class of persons (those who have been discriminated against in the making of contracts) for whom the statute was created; all of the indicators of legislative intent point in the direction of an implied cause of action; such an action is completely consistent with the statute's purposes; and, in view of the fact that this Reconstruction-era legislation was in part designed to curtail the authority of the States, it would be unreasonable to conclude that this cause of action is one relegated to state law.

**\*743** Indeed, the debates on § 1 demonstrate that the legislators' worry was not that their actions would do too much, but that they would do too little. In introducing the bill that became the 1866 Act, Senator Trumbull explained that the statute was necessary because "[t]here is very little importance in

the general declaration of abstract truths and principles [contained in the Thirteenth Amendment] unless they can be carried into effect, *unless the persons who are to be affected by them have some means of availing themselves of their benefits.*" Cong. Globe, 39th Cong., 1st Sess., 474 (1866) (emphasis added).       Representative Thayer of Pennsylvania echoed this theme: "When I voted for the amendment to abolish slavery ... I did not suppose that I was offering ... a mere paper guarantee." "The bill which now engages the attention of the House has for its object to carry out and guaranty **\*744** the reality of that great measure. It is to give to it practical effect and force. It is to prevent that great measure from remaining a dead letter upon the constitutional page of this country." *Id.*, at 1151.

In these circumstances, it would be unreasonable to conclude that inferring a private cause of action from § 1981 is incompatible with Congress' intent. Yet in suggesting that § 2 of the 1866 Act demonstrates Congress' intent that criminal penalties serve as the only remedy for violations of § 1, *ante*, at 2711-2714, this is exactly the conclusion that the plurality apparently would have us draw. Not only, however, is this argument contrary to legislative intent, but we have already squarely rejected it. In *Jones v. Alfred H. Mayer Co.*, respondent argued that because § 2 furnished criminal penalties for violations of § 1 occurring "under color of law," § 1 could not be read to provide a civil remedy for violations of the statute by private persons. Dismissing this argument, we explained: "[Section] 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated 'under color of law' were to be criminally punishable**\*\*2728** under § 2." 392 U.S., at 426, 88 S.Ct., at 2196.[FN3]

> FN3. The Court's heavy emphasis on § 2 of the 1866 Act also ignores the fact that the modern-day descendant of § 1 of the Act, 42 U.S.C. § 1981, includes no remedy or penalty at all. Section 2 of the 1866 Act now appears at 18 U.S.C. § 242, see *United States v. Classic*, 313 U.S. 299, 327, n. 10, 61 S.Ct. 1031, 1043, n. 10, 85 L.Ed. 1368 (1941), a part of the Code entirely separate from § 1981, and is applicable to provisions other than § 1981. These facts strongly argue against placing too much weight on the availability of criminal penalties in deciding whether § 1981 contains an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

implied cause of action.

The plurality's assertion that the 1866 Act created no original federal jurisdiction for civil actions based on the statute, see *ante*, at 2715, is similarly unavailing. The language of § 3 easily includes original jurisdiction over such suits, and we have in fact concluded as much. See *Moor v. County of Alameda,* 411 U.S. 693, 704-705, 93 S.Ct. 1785, 1793, 36 L.Ed.2d 596 (1973) ("The initial portion of § 3 of the Act established federal jurisdiction to hear, among other things, civil actions brought to enforce § 1"). In addition, the plurality's argument confuses the question of which courts (state or federal) will enforce a cause of action with whether a cause of action exists.

*\*745* The only way that the plurality can distinguish *Jones,* and the cases following it, from this action is to argue that our recognition of an implied cause of action against private persons did not include recognition of an action against local governments and government officials. But before today, no one had questioned that a person could sue a government official for damages due to a violation of § 1981. We have, in fact, reviewed two cases brought pursuant to § 1981 against government officials or entities, without giving the vaguest hint that the lawsuits were improperly brought. See *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); *Takahashi v. Fish and Game Comm'n,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Indeed, in *Jones v. Alfred H. Mayer Co.,* the dissenters relied on *Hurd v. Hodge* in arguing that § 1981 applied *only* to governmental conduct. 392 U.S., at 452, 88 S.Ct., at 2209. The lower courts have heeded well the message from our cases: they unanimously agree that suit may be brought directly under § 1981 against government officials who violate the statute's terms. See, *e.g., Metrocare v. Washington Metropolitan Area Transit Auth.,* 220 U.S.App.D.C. 104, 679 F.2d 922 (1982); *Springer v. Seamen,* 821 F.2d 871 (CA1 1987); *Mahone v. Waddle,* 564 F.2d 1018 (CA3 1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Jett v. Dallas Independent School Dist.,* 798 F.2d 748 (CA5 1986), on motion for rehearing, 837 F.2d 1244 (1988) (case below); *Leonard v. Frankfort Electric and Water Plant Board,* 752 F.2d 189 (CA6 1985); *Bell v. Milwaukee,* 746 F.2d 1205 (CA7 1984); *Taylor v. Jones,* 653 F.2d 1193 (CA8 1981); *Greenwood v. Ross,* 778 F.2d 448 (CA8 1985); *Sethy v. Alameda County Water Dist.,* 545 F.2d 1157 (CA9

1976) (en banc).

Perhaps recognizing how odd it would be to argue that one may infer from § 1 of the 1866 Act a cause of action against private persons, but not one against government officials, the Court appears to claim that the 1871 Act erased whatever *\*746* action against government officials previously existed under the 1866 Act. The Court explains:

"That we have read § 1 of the 1866 Act to reach private actors and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the 'state action' portion of § 1981, where Congress has established its own remedial scheme. In the context of the application of § 1981 and 1982 to private actors, we 'had little choice but to hold that aggrieved individuals could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*' ... That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of *\*\*2729* remedies available under a particular statute." *Ante,* at 2721, quoting *Cannon v. University of Chicago,* 441 U.S. 677, 728, 99 S.Ct. 1946, 1973, 60 L.Ed.2d 560 (1979) (WHITE, J., dissenting) (emphasis in original; footnote omitted).

This argument became available only after § 1983 was passed, and thus suggests that § 1983 changed the cause of action implicitly afforded by § 1981. However, not only do we generally disfavor repeals by implication, see, *e.g., Morton v. Mancari,* 417 U.S. 535, 549-550, 94 S.Ct. 2474, 2482-2483, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936); *Henderson's Tobacco,* 11 Wall. 652, 656-658, 20 L.Ed. 235 (1871), but we should be particularly hostile to them when the allegedly repealing statute specifically rules them out. In this regard, § 7 of the 1871 Act is highly significant; it provided "[t]hat nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto." § 7, 17 Stat. 15. [FN4]

> FN4. Several *amici* argue that we need not conclude that § 1983 impliedly repealed the cause of action furnished by § 1981 in order to decide that § 1983 provides the sole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                        Page 23
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

remedy for violations of § 1981. See Brief for International City Management Association et al. as *Amici Curiae* 18-19. Their theory is that an implied cause of action did not exist when the 1871 Act was passed, and that therefore one may argue that the 1871 Act furnished the only remedy for the 1866 Act without arguing that the later statute in any way repealed the earlier one.    To support their premise, they observe, first, that it was not until the 1960's that courts recognized a private cause of action under § 1 of the 1866 Act. In doing so, they ignore our earlier cases approving actions brought directly under § 1981. See *Hurd v. Hodge*, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). In any event, the relevance of the date on which we expressly recognized that one could bring a suit for damages directly under § 1 escapes me; that we did so in the 1960's does not suggest that we would not have done so had we faced the question in the 1860's.

*Amici* assert, in addition, that "[i]n recognizing an implied cause of action" under § 1981, we "rested in part on congressional actions that post-date the creation in 1871 of an explicit civil cause of action for violations of Section 1981." Brief for International City Management Association et al. as *Amici Curiae* 19. It is true that *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 412, n. 1, 88 S.Ct. 2186, 2189, n. 1, 20 L.Ed.2d 1189 (1968), and *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969), cited 28 U.S.C. § 1343(4) in support of federal jurisdiction over those cases. I do not understand, however, how this shows that the 1866 Act as originally enacted did not confer federal jurisdiction over actions to recover damages for violations of the statute. Moreover, even if the 1866 Act did not confer such jurisdiction, the jurisdictional question is separate from the question whether a cause of action may be inferred from the statute. Indeed, *amici* appear to recognize as much when they argue that although § 1 did not establish federal jurisdiction to hear civil actions based on the statute, Congress "left the task of civil enforcement to the state courts." Brief for International City Management Association et al. as *Amici Curiae* 17. I

cannot imagine what "civil enforcement" *amici* have in mind, unless it is the civil remedy that Jett seeks.

*747 The Court's argument fails for other reasons as well.    Its essential point appears to be that, in § 1983, "Congress has established its own remedial scheme" for the " 'state action' portion of § 1981." [FN5] *Ante*, at 2721. For this argument, the Court may not rely, as it attempts to do, on the principle that " 'when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute*748 to subsume other remedies.' "   *Ibid.*, quoting *National Railroad Passenger Corporation v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).    That principle limits the inference of a remedy for the violation of a statute only when *that same statute* already sets forth specific remedies.    It cannot be used to support the argument that the provision of particular remedies in § 1983 tells us whether we should infer a damages remedy for violations of § 1981.

> FN5. The one bright spot in today's decision is its reaffirmation of our holding in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

The suggestion, moreover, that today's holding "finds support in" **2730*Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), is audacious. *Ante*, at 2722. Section 1983-which, for example, specifies no exhaustion requirement, no damages limitation, no defenses, and no statute of limitations-can hardly be compared with § 717 of the Civil Rights Act of 1964, at issue in *Brown*, with its many detailed requirements and remedies, see 425 U.S., at 829-832, 96 S.Ct., at 1966-1968. Indeed, in *Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973), we emphasized the "general" nature of § 1983 in refusing to allow former prisoners to challenge a prison's withholding of good-time credits under § 1983 rather than under the federal habeas corpus statute, 28 U.S.C. § 2254. We never before have suggested that § 1983's remedial scheme is so thorough that it pre-empts the remedies that might otherwise be available under other statutes; indeed, all of our intimations have been to the contrary. See, *e.g.*, *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453 U.S. 1, 19-21, 101 S.Ct. 2615, 2625-2627, 69 L.Ed.2d 435 (1981).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to the Court, to allow an action complaining of government conduct to be brought directly under § 1981 would circumvent our holding in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that liability under § 1983 may not be based on a theory of *respondeat superior. Ante,* at 2722-2723. Not only am I unconvinced that we should narrow a statute as important as § 1981 on the basis of something so vague and inconclusive as "federalism concerns which had very real constitutional underpinnings *749 for the Reconstruction Congresses," *ante,* at 2722, but I am also unable to understand how *Monell's* limitation on § 1983 liability begins to tell us whether the same restriction exists under § 1981, enacted five years earlier than § 1983 and covering a far narrower range of conduct. It is difficult to comprehend, in any case, why the Court is worried that construing § 1981 to create a cause of action based on governmental conduct would render local governments vicariously liable for the delicts of their employees, since it elsewhere goes to great lengths to suggest that liability under § 1981 may *not* be vicarious. See *ante,* at 2713-2715.

The Court's primary reason for distinguishing between private and governmental conduct under § 1981 appears to be its impression that, because private conduct is not actionable under § 1983, we "had little choice" but to hold that private individuals who violated § 1981 could be sued directly under § 1981. See *ante,* at 2721. This claim, however, suggests that whether a cause of action in damages exists under § 1981 depends on the scope of § 1983. In deciding whether a particular statute includes an implied cause of action, however, we have not in the past suggested that the answer will turn on the reach of a different statute. In *National Sea Clammers,* for example, we analyzed both the question whether the Federal Water Pollution Control Act included an implied cause of action for damages, 453 U.S., at 13-19, 101 S.Ct., at 2622-2626, and the question whether an action could be brought under § 1983 for violations of that statute, *id.,* at 19-21, 101 S.Ct., at 2625-2627, thus indicating that the answer to the latter question does not tell us the answer to the former one.

The Court's approach not only departs from our prior analysis of implied causes of action, but also attributes an intent to the 39th Congress that fluctuates depending on the state of the law with regard to § 1983. On the Court's theory, if this case

had arisen during the period between our decisions in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *Monell v. New York City Dept. of Social Services, supra,* when we believed*750 that local governments were not "persons" within the meaning of § 1983, we would apparently have been required to decide that a cause of action could be brought against local governments and their officials directly under § 1981. The plurality, in fact, confirms this conclusion in distinguishing *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), solely on the ground that we **2731 decided it at a time when § 1983 did not apply to the District of Columbia. See *ante,* at 2711. In other words, on the Court's view, a change in the scope of § 1983 alters the reach of § 1981. I cannot endorse such a bizarre conception of congressional intent.

## II

I thus would hold that Jett properly brought his suit against respondent directly under § 1981. It remains to consider whether that statute permits recovery against a local government body on a theory of *respondeat superior.*

Because § 1981 does not explicitly create a cause of action in damages, we would look in vain for an express statement that the statute contemplates liability based on the doctrine of *respondeat superior.* In *Monell v. New York City Dept. of Social Services, supra,* however, our background assumption appears to have been that unless a statute subjecting institutions (such as municipalities) to liability evidences an intent not to impose liability on them based on *respondeat superior,* such liability will be assumed. *Id.,* 436 U.S., at 691, 98 S.Ct., at 2036. The absolute language of § 1981 therefore is significant: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. Certainly nothing in this wording refutes the argument that vicarious liability may be imposed under this law.

Section 1983, in contrast, forbids a person to "subjec[t], or caus[e] to be subjected" another person to a deprivation of the rights protected by the statute. It is telling that § 1981 does not contain this explicit language of causation. In holding in *Monell* that liability under § 1983 may not be predicated*751 on

109 S.Ct. 2702                                                                                                                          Page 25
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

a theory of *respondeat superior,* we emphasized that § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights.... Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." 436 U.S., at 692, 98 S.Ct., at 2036. The absence of this language in § 1 of the 1866 Act, now § 1981, argues against the claim that liability under this statute may not be vicarious.

While it acknowledged that § 1 of the 1866 Act did not contain the "subjects, or causes to be subjected" language of § 1983, the Court of Appeals nevertheless emphasized that § 2 of the 1866 Act did contain this language. 837 F.2d, at 1247. There is not the least inconsistency, however, in arguing that the *criminal* penalties under the 1866 Act may not be imposed on the basis of *respondeat superior,* but that the civil penalties may be. Indeed, it is no surprise that the history surrounding the enactment of § 2, as the plurality stresses, *ante,* at 2714-2715, indicates that Congress envisioned criminal penalties only for those who by their own conduct violated the statute, since vicarious criminal liability would be extraordinary. The same cannot be said of vicarious civil liability.

Nor does anything in the history of § 1981 cast doubt on the argument that liability under the statute may be vicarious. The Court of Appeals placed heavy reliance on Congress' rejection of the Sherman amendment, which would have imposed a dramatic form of vicarious liability on municipalities, five years after passing the 1866 Act. 837 F.2d, at 1246-1247. That the plurality appears to accept this argument, see *ante,* at 2718-2719, is curious, given our frequent reminder that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *752Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980), quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). I do not understand how Congress' rejection of an amendment imposing a very new kind of **2732 vicarious liability on municipalities can tell us what a different and earlier Congress intended with respect to conventional vicarious liability.

According to the plurality, the history of the Sherman

amendment is relevant to the interpretation of § 1981 because it reveals Congress' impression that it had no authority to subject municipalities to the kind of liability encompassed by the amendment. See *ante,* at 2718-2720. The plurality fails to recognize, however, that the circumstances in which municipalities would be vicariously liable under the Sherman amendment are very different from those in which they would be liable under § 1981. As the plurality describes it, the Sherman amendment "provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, 'the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense.' " *Ante,* at 2718, quoting Cong.Globe, 42d Cong., 1st Sess., 755 (1871). Because the threat of such liability would have forced municipalities to ensure that private citizens did not violate the rights of others, it would have run up against Justice Story's conclusion in *Prigg v. Pennsylvania,* 16 Pet. 539, 616, 10 L.Ed. 1060 (1842), that Congress could not "insist that the states are bound to provide means to carry into effect the duties of the national government." To hold a local government body liable for the discriminatory cancellation of a contract entered into by that local body itself, however, is a very different matter. Even assuming that the 39th Congress had the same constitutional concerns as the 42d, therefore, those concerns cast no doubt on Congress' authority to hold local government bodies vicariously liable under § 1 of the 1866 Act in circumstances such as those present here.

*753 I thus would conclude that liability under § 1981 may be predicated on a theory of *respondeat superior.*

### III

No one doubts that § 1983 was an unprecedented federal statute. See *ante,* at 2716-2717. The question is not whether § 1983 wrought a change in the law, but whether it did so in such a way as to withdraw a remedy that § 1 of the 1866 Act had implicitly afforded. Unlike the plurality, I would conclude that it did not.

Justice STEVENS, dissenting.

My agreement with Justice BRENNAN's dissent is buttressed by the views I expressed in *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 22, 101 S.Ct. 2615,

109 S.Ct. 2702                                                              Page 26
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

2627, 69 L.Ed.2d 435 (1981) (opinion concurring in
judgment in part and dissenting in part), and in
*Oklahoma City v. Tuttle,* 471 U.S. 808, 834, 105
S.Ct. 2427, 2441, 85 L.Ed.2d 791 (1985) (dissenting
opinion).

U.S.Tex.,1989.
Jett v. Dallas Independent School Dist.
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas.
(BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105
L.Ed.2d 598, 57 USLW 4858, 54 Ed. Law Rep. 30

Briefs and Other Related Documents (Back to top)

• 1989 WL 1128161 (Appellate Brief) Brief of
Respondent%N*%N (Feb. 03, 1989)
• 1989 WL 1128162 (Appellate Brief) Brief of the
International City Management Association, National
Governors' Association, National Association of
Counties, U.S. Conference of Mayors, and National
League of Cities as Amici Curiae in Support of
Respondent and Cross-Petitioner (Feb. 03, 1989)
• 1989 WL 1128158 (Appellate Brief) Brief Amici
Curiae of the NAACP Legal Defense and
Educational Fund, Inc. and the American Civil
Liberties Union (Jan. 04, 1989)
• 1989 WL 1128159 (Appellate Brief) Brief of the
National Education Association as Amicus Curiae in
Support of Petitioner (Jan. 04, 1989)
• 1989 WL 1128160 (Appellate Brief) Brief of
Petitioner (Jan. 04, 1989)
• 1988 WL 1031739 (Appellate Brief) Petitioner's
Reply Brief (Oct. Term 1988)
• 1988 WL 1094108 (Appellate Petition, Motion and
Filing) Petition (Jul. 21, 1988)
• 1988 WL 1094103 (Appellate Petition, Motion and
Filing) Petition (Jun. 24, 1988)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:47:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 161 F.3d 1318 |
| Lines: | 1230 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

## Westlaw.

161 F.3d 1318                                                                     Page 1
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

▷

Briefs and Other Related Documents
Standard     v.     A.B.E.L.     Services,     Inc.C.A.11
(Ga.),1998.
United States Court of Appeals,Eleventh Circuit.
Alan K. STANDARD, Jr., Plaintiff-Appellant,
v.
A.B.E.L. SERVICES, INC., Plaster Concepts, Inc., et
al., Defendants-Appellees.
**No. 97-9226.**

Dec. 3, 1998.

Caucasian former employee brought action against
his former employer and others, claiming that he was
discriminated against on basis of race, national
origin, age and disability and that he was retaliated
against for exercising his rights under civil rights
statutes. The United States District Court for the
Northern District of Georgia, No. 1:96-CV-1196-
ODE, J. Owen Forrester, J., granted summary
judgment in favor of defendants. Former employee
appealed. The Court of Appeals, Fay, Senior Circuit
Judge, held that: (1) former employee failed to show
that he had disability within meaning of Americans
with Disabilities Act (ADA); (2) former employee's
requests for accommodation of his back injury did
not constitute protected activity for purposes of ADA
retaliation claim; (3) alleged statement of
management member did not show that former
employer intended to discriminate against former
employee because of his age; (4) alleged statements
of management members did not constitute direct
evidence of race or national origin discrimination; (5)
former employee failed to show that former
employer's proffered reason for discharging him was
pretext for race or national origin discrimination; and
(6) former employee failed to show that former
employer's proffered reasons for not considering him
for certain promotion were pretext for race or
national origin discrimination.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ⬤⇝776**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General

170Bk776 k. Trial De Novo. Most Cited
Cases
Court of Appeals reviews grants of summary
judgment de novo, using the same legal standard as
the district court. Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A.

**[2] Federal Courts 170B ⬤⇝802**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)3 Presumptions
170Bk802 k. Summary Judgment. Most
Cited Cases
In making assessment as to whether summary
judgment is appropriate, Court of Appeals must view
the evidence in the light most favorable to the
nonmoving party. Fed.Rules Civ.Proc.Rule 56(c), 28
U.S.C.A

**[3] Civil Rights 78 ⬤⇝1218(3)**

78 Civil Rights
78II Employment Practices
78k1215 Discrimination by Reason of
Handicap, Disability, or Illness
78k1218 Who Is Disabled;   What Is
Disability
78k1218(3) k. Particular Conditions,
Limitations, and Impairments. Most Cited Cases
(Formerly 78k173.1)
Former employee failed to show that his back injury
substantially limited his major life activity of
working, such that he would have disability within
meaning of ADA, where former employee did not
explicitly argue that his back injury significantly
restricted his ability to work, and he admitted that he
was fully capable of performing his job at all times
that he was employed by his former employer.
Americans with Disabilities Act of 1990, § 3(2)(A),
42 U.S.C.A. § 12102(2)(A).

**[4] Civil Rights 78 ⬤⇝1217**

78 Civil Rights
78II Employment Practices
78k1215 Discrimination by Reason of
Handicap, Disability, or Illness
78k1217 k. Practices Prohibited or Required

161 F.3d 1318                                                                                                          Page 2
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

in General; Elements. <u>Most Cited Cases</u>
             (Formerly 78k173.1)
To state a claim for wrongful termination under the
ADA, a plaintiff must first prove that he has a
disability, as defined by the Act. Americans with
Disabilities Act of 1990, §   3(2), <u>42 U.S.C.A. §
12102(2)</u>.

## [5] Civil Rights 78 🔎1019(2)

<u>78</u> Civil Rights
    <u>78I</u>   Rights   Protected   and   Discrimination
Prohibited in General
        <u>78k1016</u> Handicap, Disability, or Illness
            <u>78k1019</u> Who Is Disabled;   What Is
Disability
                <u>78k1019(2)</u> k. Impairments in General;
Major Life Activities. <u>Most Cited Cases</u>
             (Formerly 78k107(1))
Merely proving the existence of a physical
impairment, without addressing any limitation on
major life activities, is not sufficient to prove
disability under the ADA.    Americans with
Disabilities Act of 1990, §   3(2), <u>42 U.S.C.A. §
12102(2)</u>.

## [6] Civil Rights 78 🔎1218(6)

<u>78</u> Civil Rights
    <u>78II</u> Employment Practices
        <u>78k1215</u>   Discrimination   by   Reason   of
Handicap, Disability, or Illness
            <u>78k1218</u> Who Is Disabled;   What Is
Disability
                <u>78k1218(6)</u> k. Perceived Disability;
"Regarded As" Claims. <u>Most Cited Cases</u>
             (Formerly 78k173.1)
Alleged statement of administrative staff member at
employee leasing company which had arranged
former employee's employment, that she felt that
former employee was not able to do his job anymore
and that "perhaps" he was not fit for his job anymore,
did not show that former employer regarded former
employee's back injury as substantially limiting
major life activity, such that former employee would
have disability under ADA, given tentative nature of
staff member's statement, her position relative to
former employee's employment and evidence that all
of decisionmakers perceived former employee as
having temporary injury.   Americans with
Disabilities Act of 1990, §   3(2)(C), <u>42 U.S.C.A. §
12102(2)(C)</u>.

## [7] Civil Rights 78 🔎1243

<u>78</u> Civil Rights
    <u>78II</u> Employment Practices
        <u>78k1241</u> Retaliation for Exercise of Rights
            <u>78k1243</u> k. Practices Prohibited or Required
in General; Elements. <u>Most Cited Cases</u>
             (Formerly   255k30(6.10)      Master   and
Servant)
To establish a prima facie case of retaliation under
the ADA, employee must show (1) that he engaged in
statutorily protected activity, (2) that he suffered an
adverse employment action, and (3) a causal link
between the protected activity and the adverse action.
Americans with Disabilities Act of 1990, § 2 et seq.,
<u>42 U.S.C.A. § 12101</u> et seq.

## [8] Civil Rights 78 🔎1242

<u>78</u> Civil Rights
    <u>78II</u> Employment Practices
        <u>78k1241</u> Retaliation for Exercise of Rights
            <u>78k1242</u> k. In General. <u>Most Cited Cases</u>
             (Formerly   255k30(6.10)      Master   and
Servant)
ADA retaliation claims are assessed under the same
framework employed for retaliation claims under
Title VII. Civil Rights Act of 1964, § 701 et seq., <u>42
U.S.C.A. §   2000e</u> et seq.;   Americans with
Disabilities Act of 1990, § 2 et seq., <u>42 U.S.C.A.</u>
<u>12101</u> et seq.

## [9] Civil Rights 78 🔎1244

<u>78</u> Civil Rights
    <u>78II</u> Employment Practices
        <u>78k1241</u> Retaliation for Exercise of Rights
            <u>78k1244</u> k. Activities Protected. <u>Most Cited</u>
<u>Cases</u>
             (Formerly   255k30(6.10)      Master   and
Servant)
To engage in protected activity for purposes of ADA
retaliation claim, it is sufficient that an employee
have a good faith, objectively reasonable belief that
his activity is protected by the statute.   Americans
with Disabilities Act of 1990, §   2 et seq., <u>42
U.S.C.A. § 12101</u> et seq.

## [10] Civil Rights 78 🔎1244

<u>78</u> Civil Rights
    <u>78II</u> Employment Practices
        <u>78k1241</u> Retaliation for Exercise of Rights

161 F.3d 1318                                                                                                  Page 3
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

78k1244 k. Activities Protected. Most Cited Cases

(Formerly 255k30(6.10)     Master and Servant)

Employee's requests for accommodation of his back injury did not constitute statutorily protected activity, for purposes of ADA retaliation claim, absent showing that he had good faith, objectively reasonable belief that he was disabled under ADA at time he made the requests.    Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[11] Civil Rights 78 🔑1019(2)**

78 Civil Rights
    78I    Rights    Protected    and    Discrimination Prohibited in General
        78k1016 Handicap, Disability, or Illness
            78k1019 Who Is Disabled;    What Is Disability
                78k1019(2) k. Impairments in General; Major Life Activities. Most Cited Cases
                (Formerly 78k107(1))

In determining whether an injury substantially limits a major life activity, so as to constitute disability under ADA, court considers (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.    Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12102(2)(A);    29 C.F.R. § 1630.2(j)(3)(I).

**[12] Civil Rights 78 🔑1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most Cited Cases
            (Formerly 78k170)

Alleged statement of management member that "older people have more go wrong" did not show that former employer intended to discriminate against former employee because of his age in terminating him as part of reduction-in-force, for purposes of establishing prima facie case under ADEA; statement was devoid of meaningful context and was too vague, and management member who made statement was not involved in decision to terminate former employee.    Age Discrimination in Employment Act

of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[13] Civil Rights 78 🔑1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most Cited Cases
            (Formerly 78k170)

To make out a prima facie case of age discrimination for a reduction-in-force termination, former employee must prove that (1) he was a member of the age group protected by the ADEA at the time of his termination, (2) he was qualified at the time of his termination, and (3) there is evidence from which a reasonable fact finder could conclude that the employer intended to discriminate on the basis of age in making the decision.    Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[14] Civil Rights 78 🔑1401**

78 Civil Rights
    78III Federal Remedies in General
        78k1400    Presumptions,    Inferences,    and Burdens of Proof
            78k1401 k. In General. Most Cited Cases
            (Formerly 78k240(1))

**Civil Rights 78 🔑1535**

78 Civil Rights
    78IV    Remedies    Under    Federal    Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1535 k. In General. Most Cited Cases
            (Formerly 78k377.1)

Both Title VII and § 1981 have the same requirements of proof and use the same analytical framework.    42 U.S.C.A. § 1981;    Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 🔑1535**

78 Civil Rights
    78IV    Remedies    Under    Federal    Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1535 k. In General. Most Cited Cases

161 F.3d 1318                                                                                    Page 4
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

(Formerly 78k377.1)

## Civil Rights 78 ⌐1544

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1544 k. In General. Most Cited Cases
         (Formerly 78k382.1)
To establish a case under Title VII, a plaintiff may
use three different kinds of evidence of
discriminatory intent: direct evidence, circumstantial
evidence or statistical evidence; the analytical
framework and burden of production varies
depending on the method of proof chosen. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

## [16] Civil Rights 78 ⌐1137

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
      (Formerly 78k153)
If a Title VII plaintiff can provide direct evidence of
discriminatory intent, then the employer must prove
by a preponderance of the evidence that the same
employment decision would have been made in the
absence of the discriminatory intent. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

## [17] Civil Rights 78 ⌐1421

78 Civil Rights
   78III Federal Remedies in General
      78k1416 Weight and Sufficiency of Evidence
         78k1421 k. Employment Practices. Most
Cited Cases
         (Formerly 78k242(3))

## Civil Rights 78 ⌐1544

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1544 k. In General. Most Cited Cases
         (Formerly 78k382.1)
Alleged statements of management members that
company's president wanted only Hispanics to be

hired and that one of reasons why Caucasian
employee was not considered for certain promotion
was because he was not Hispanic did not constitute
direct evidence of race or national origin
discrimination with regard to employee's termination;
such management members did not make decision to
terminate employee, and statements referred to hiring
practices for department other than employee's. 42
U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.

## [18] Civil Rights 78 ⌐1421

78 Civil Rights
   78III Federal Remedies in General
      78k1416 Weight and Sufficiency of Evidence
         78k1421 k. Employment Practices. Most
Cited Cases
         (Formerly 78k242(3))

## Civil Rights 78 ⌐1544

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1544 k. In General. Most Cited Cases
         (Formerly 78k382.1)
Alleged statement of management member, before
Caucasian employee was hired, that company desired
to staff its production plant with Hispanic workers
did not constitute direct evidence of race or national
origin discrimination with regard to employee's
termination; any direct link between the statement
and discriminatory intent against employee was
broken when employee was hired on the management
member's recommendation, and employee had not
worked in production department. 42 U.S.C.A. §
1981; Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

## [19] Civil Rights 78 ⌐1421

78 Civil Rights
   78III Federal Remedies in General
      78k1416 Weight and Sufficiency of Evidence
         78k1421 k. Employment Practices. Most
Cited Cases
         (Formerly 78k242(3))
Direct evidence of employment discrimination is
evidence that establishes the existence of
discriminatory intent behind the employment
decision without any inference or presumption.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                          Page 5
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

**[20] Civil Rights 78 ☜1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment Practices. Most
Cited Cases
        (Formerly 78k242(3))
Remarks by non-decisionmakers or remarks
unrelated to the decisionmaking process itself are not
direct evidence of employment discrimination.

**[21] Civil Rights 78 ☜1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
        (Formerly 78k378)
Under *McDonnell Douglas* burden-shifting
framework for establishing employment
discrimination claims, the plaintiff must first
establish a prima facie case of discrimination; the
establishment of a prima facie case creates a
presumption of discrimination.

**[22] Civil Rights 78 ☜1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
        (Formerly 78k378)
Under *McDonnell Douglas* burden-shifting
framework for establishing employment
discrimination claims, once plaintiff establishes
prima facie case of discrimination, the employer must
offer legitimate, nondiscriminatory reasons for the
employment action to rebut the presumption of
discrimination; if the employer successfully rebuts
the presumption, the burden shifts back to the
plaintiff to discredit the proffered nondiscriminatory
reasons by showing that they are pretextual.

**[23] Civil Rights 78 ☜1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited
Cases
        (Formerly 78k144)
Former employee who was discharged as part of
reduction-in-force could establish a prima facie case
of discrimination under Title VII by (1) showing that
he was a member of a protected group and was
adversely affected by an employment decision, (2)
proving that he was qualified for his own position or
to assume another position at the time of the
discharge, and (3) producing sufficient evidence from
which a rational fact finder could conclude that his
employer intended to discriminate against him in
making the discharge decision. Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Civil Rights 78 ☜1234**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
            78k1234 k. Race, Color, Ethnicity, or
National Origin. Most Cited Cases
        (Formerly 78k144)
Former employer satisfied its burden, with regard to
Caucasian former employee's race and national origin
discrimination claims under Title VII and § 1981, of
articulating legitimate, nondiscriminatory reason for
discharging former employee as part of reduction-in-
force; management member who selected former
employee for discharge believed that former
employee was less qualified than other three
members of his department and gave detailed reasons
for this belief. 42 U.S.C.A. § 1981; Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[25] Civil Rights 78 ☜1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
        (Formerly 78k378)
To satisfy its burden in Title VII case of articulating
legitimate, nondiscriminatory reason for discharging
employee, employer need only produce evidence that
could allow a rational fact finder to conclude that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318

Page 6

161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L. Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

employee's discharge was not made for a discriminatory reason. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[26] Civil Rights 78 ☜1234**

78 Civil Rights
   78II Employment Practices
      78k1232 Reverse Discrimination
         78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
         (Formerly 78k153)
Caucasian former employee failed to show that his former employer's proffered reason for discharging him as part of reduction-in-force, that he was less qualified than other three members of his department, was pretext for race or national origin discrimination in violation of Title VII and § 1981; former employee admitted that other department employees either had superior qualities attributed to them or were perceived as having them by manager. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[27] Civil Rights 78 ☜1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
         (Formerly 78k153)
Title VII plaintiff may show that employer's proffered reasons for challenged employment decision are pretext (1) by showing that the legitimate nondiscriminatory reasons should not be believed, or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[28] Civil Rights 78 ☜1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
         (Formerly 78k153)
To directly attack employer's proffered nondiscriminatory reasons for employment decision, Title VII plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable fact finder could find all of those reasons unworthy of credence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[29] Civil Rights 78 ☜1421**

78 Civil Rights
   78III Federal Remedies in General
      78k1416 Weight and Sufficiency of Evidence
         78k1421 k. Employment Practices. Most Cited Cases
         (Formerly 78k242(3))
Alleged statement of management member that Caucasian employee was not considered for certain promotion in part because he was not Hispanic did not constitute direct evidence of race or national origin discrimination in violation of § 1981, where there was no evidence that the management member was involved in the promotion decision or even talked to responsible management member about the decision. 42 U.S.C.A. § 1981.

**[30] Civil Rights 78 ☜1234**

78 Civil Rights
   78II Employment Practices
      78k1232 Reverse Discrimination
         78k1234 k. Race, Color, Ethnicity, or National Origin. Most Cited Cases
         (Formerly 78k148)
Caucasian employee established prima facie case under § 1981 of race and national origin discrimination with regard to employer's failure to promote him to certain position; he was in protected group as a Caucasian-American, he suffered adverse employment action when he was not considered for promotion, employer did not dispute that employee was qualified for the job, and person ultimately hired was Hispanic. 42 U.S.C.A. § 1981.

**[31] Civil Rights 78 ☜1135**

78 Civil Rights
   78II Employment Practices
      78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
         (Formerly 78k148)
To establish prima facie case of discriminatory failure to promote, plaintiff in § 1981 case must show that (1) he was in a protected group, (2) he was not given the promotion, (3) he was qualified for the position and (4) someone outside of the protected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                      Page 7
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
(Cite as: 161 F.3d 1318)

group was given the position. 42 U.S.C.A. § 1981.

## [32] Civil Rights 78 ☞1234

78 Civil Rights
   78II Employment Practices
      78k1232 Reverse Discrimination
         78k1234 k. Race, Color, Ethnicity, or
National Origin. Most Cited Cases
      (Formerly 78k153)
Caucasian employee failed to show that his
employer's proffered reasons for not considering him
for certain promotion, that he was needed in his
current position and that he did not have the military
background desired for the promotion, were pretext
for race or national origin discrimination in violation
of § 1981. 42 U.S.C.A. § 1981.

## [33] Civil Rights 78 ☞1137

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
      (Formerly 78k153)
To establish pretext in employment discrimination
case, a plaintiff may not in all cases merely rest on
the laurels of her prima facie case in the face of
powerful justification evidence offered by the
defendant.

*1322 Rose E. Goff, Atlanta, GA, for Plaintiff-
Appellant.
Kurtis A. Powell, Jerry C. Newsome, Atlanta, GA,
for Defendants-Appellees.

Appeal from the United States District Court for the
Northern District of Georgia.

Before BLACK and CARNES, Circuit Judges, and
FAY, Senior Circuit Judge.
FAY, Senior Circuit Judge:
Appellant, Allen K. Standard, Jr., a Caucasian former
employee of Plaster Concepts, Inc. ("Plaster
Concepts") through A.B.E.L. Services Inc., brought
an action against twelve defendants, five of whom
were dismissed by the district court. The complaint
alleges employment discrimination under 42 U.S.C. §
1981, Title VII, the Age Discrimination in
Employment Act ("ADEA"), the Americans with
Disabilities Act ("ADA"), and unlawful retaliation
for the exercise and protection of his civil rights

under the above statutes, based on his race, national
origin, age and disability. Appellees moved for
summary judgement, contending that Standard was
not considered for a promotion and was later
terminated for legitimate, nondiscriminatory reasons.
The district court granted summary judgement on all
counts, finding that Standard failed to establish a
prima facie case under the ADA or show that
Appellees' legitimate, nondiscriminatory reasons
were pretextual. Because we conclude *1323 that
Standard failed to establish a prima facie case under
the ADA and the ADEA, or produce evidence
sufficient for a reasonable jury to find pretext under
Title VII and § 1981, we AFFIRM the district court's
order of summary judgement for defendants on all
counts.

### I. BACKGROUND

#### A. *Facts*

#### 1. Plaster Concepts

Plaster Concepts, Inc. is a business engaged in the
production and sale of decorative architectural pieces,
such as cornices, columns and ceiling panels. These
pieces are produced by casting them from molds. The
manufacturing process is performed by two
different departments: the tooling department and the
production department. The tooling department is
responsible for crafting the molds that the production
department uses to make the finished product. The
molds can be made from various materials, such as
wood, plaster, bondo, rubber and steel. The
production of these molds requires a far greater level
of skill than is required to cast the finished pieces.
Some of the molds are made from scratch, but others
are made by altering or combining pre-existing molds
in a process known as mold setup.

Plaster Concepts leases most of its employees from
A.B.E.L. Services, Inc. ("A.B.E.L."), an employee
leasing company owned by Barbara Norsworthy, the
wife of Plaster Concepts president, Paul Norsworthy.
Standard was such a leased employee. Leased
employees are interviewed and selected by Plaster
Concepts, while A.B.E.L. is responsible for handling
payroll, tax filings and insurance for the employees.
Plaster Concepts pays A.B.E.L. for the employees'
compensation package, as well as a fee for providing
this service.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                          Page 8
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

In the Spring of 1994, Plaster Concepts moved its
production facility from Griffin, Georgia to East
Point, bringing the plant closer to Atlanta.    This
move was motivated by several considerations,
including the deterioration of the Griffin plant and
the benefits of proximity to Atlanta area customers
and suppliers.  In moving to East Point, management
also hoped to draw from the larger labor pool in the
Atlanta area.    More specifically, Plaster Concepts
wanted to target the Hispanic community and
increase the number of Hispanic workers at the plant.

### 2. Standard is Hired by Plaster Concepts

Prior to the move to East Point, Plaster Concepts
purchased most of its molds from outside sources.
During this period, only one employee, James
Carroll, was engaged in mold-making inside the
company.   At around the time of the move, in the
spring of 1994, Plaster Concepts management
decided that it would be more profitable to increase
their in-house mold-making capabilities.    Appellant
Standard was hired as part of this plan.     Standard
was first interviewed by Harv Mier, and was brought
back for a second interview with Don Grubbs and
Mark Hicks.  During the course of these interviews,
Standard   alleges   that   various   members   of
management told him that they intended to staff the
production   facility   with   Hispanic   workers.
Management allegedly believed that Hispanic
workers were more likely to work longer hours
without complaint than other workers.  Furthermore,
Standard alleges that the fact that he spoke Spanish
was a factor in the decision to hire him, because it
would enable him to communicate with future
Hispanic hires.

At the time that he was hired, Standard was 49 years
old,  and  had  no  architectural  mold-making
experience.    He did, however, have sufficient basic
skills and wood-working experience that Plaster
Concepts management felt he could be trained to
become a proficient mold-maker.    Standard began
working in the tooling department with James Carroll
in July of 1994.

### 3. Work Force Turnover at Plaster Concepts

It is undisputed that, even prior to the move to East
Point, Plaster Concepts had a chronic problem
retaining employees.    Several months before the

move, management changed its pay scheme from an
hourly rate to a set payment per finished piece
produced.    After the plant moved to East Point and
several days after Standard began working there,
most of the workers ended their employment with
Plaster Concepts in a dispute **\*1324** over the price set
for production of a specific piece.     The parties
disagree about whether the terminations were called
firings or resignations.   All of the evidence shows,
however, that after negotiations in which the price
was raised the workers refused to work at the final
price offered.   One of the workers who left at this
time was James Caroll, Standard's fellow Caucasian
tooling  department  worker.      Caroll  was  rehired
shortly after he left.

This mass exodus of employees brought production
to a near standstill, requiring a massive hiring effort.
During this effort, Plaster Concepts specifically
targeted the Hispanic community.    Ads were placed,
both in English and in Spanish, in bilingual
newspapers.    Furthermore, the answering-machine
message was changed to include both Spanish and
English messages, with only the Spanish message
discussing the application process.

### 4. Plaster Concepts Hires a Production Supervisor

A few months after Standard was hired, Plaster
Concepts decided to hire a manager to assist in
supervising the production department.     Standard
alleges that he indicated interest in the position, but
was never actively considered for the job.  He also
admits that he had recently been hired into the tooling
department without having architectural mold-
making experience, that he was in the process of
being trained in mold setup and mold-making, and
that it was difficult to find skilled workers suitable
for the tooling department.   It is also undisputed that
management wanted to hire a manager out of the
military, with experience supervising and motivating
unskilled workers, such as those in the production
department.          Consequently,   the   position   was
advertised in military publications.

Ultimately, Enrique Torres was hired as production
supervisor.   Torres is a bilingual Hispanic-American
citizen, who had recently retired from the Army with
twenty years experience as a sergeant.     Standard
alleges that he was passed up for the supervisor
position because of racial and national origin
discrimination.        His  only  evidence  of  this
discrimination is his own allegation that Mark Hicks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                    Page 9
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
(Cite as: 161 F.3d 1318)

made the statement that Standard was not considered for the position because he "A, was not Hispanic; B, not ex-military; and C, they needed a tool maker, couldn't spare me." Standard concedes that when he initially inquired about the position, Don Grubbs told him that Steve Norsworthy had decided to only consider candidates with a military background. It is also undisputed that Mark Hicks was not involved at any stage of the hiring process for the production supervisor position.

### 5. Plaster Concepts Further Expands the Tooling Department

During the same period of time that Torres was hired, the fall of 1994, Plaster Concepts decided to further expand the tooling department. Management hired Freddie Kinney, a Caucasian who was only two years younger than Standard. Similar to Standard, Kinney had no architectural mold-making experience, but he had over twenty years experience in metal fabrication. Standard admits that Plaster Concepts hired Kinney, in part, because they planned on using more metal fabrication in the tooling department. Kinney's hire brought the tooling department's staff up to three workers, all of them Caucasian Americans.

In January, 1995, Elias Thiers, a Chilean citizen, applied for a job at Plaster Concepts. In contrast to all of the other tooling department workers, Thiers had nine years of mold-making experience and also had an impressive portfolio of past work. Thiers was in the United States on a tourist visa, and therefore was ineligible to become an employee. He was so potentially valuable to the tooling department, however, that Plaster Concepts gave him work as an independent contractor while sponsoring him for a work visa. After Thiers was granted a work visa, Plaster Concepts hired him as an employee.

### 6. Standard's Back Injury

In February, 1995, Standard injured his back while moving a heavy mold. The injury included several herniated discs. Standard had to make several appointments with a doctor and a physical therapist for treatment of this injury. He alleges that the doctor recommended that he schedule his doctor appointments directly after his therapy appointments.**1325** Plaster Concepts requested that Standard schedule his appointments late in the

workday in order to minimize the amount of time lost at work. Standard's workday ended at 3:30, and the doctor's office closed at 5:00. Instead of scheduling his appointments for the late afternoon, however, Standard scheduled them for the middle of the day. Because Standard did not make up any of his lost time, the tooling department began to fall behind schedule. At this point, Plaster Concepts called the physical therapist and rescheduled two of Standard's appointments. As was company policy, Plaster Concepts did not pay Standard for the time missed due to doctor's appointments.

At the same time as he was seeking treatment and therapy for his injury, Standard began taking short breaks during the day to do stretching exercises for his back. His supervisor, Don Grubbs, told him that such breaks would be permitted, but that he had to clock out on his time card for them. Standard failed to do so, and was written up for the violation. Standard also requested special assistance with heavy lifting during this time. Standard claims that he was denied this assistance, but admits that management agreed to give it to him and further admits that co-workers gave him help every time he requested it.

After July, 1995, Standard stopped his physical therapy. His doctor, after reviewing M.R.I. films, suggested that he could try stopping the treatment and that the problem could alleviate itself. Standard claims that after one month without treatment the pain worsened, but that he could not resume treatment because his insurance company had gone bankrupt and he could not afford to pay the doctor. After this time, Standard did not miss another day as a result of his back injury, and he maintains that he remained capable of performing his work up through the time that he was terminated. He alleges, however, that his condition has worsened since his termination and that he is no longer capable of working.

### 7. Standard's Work Record

Between the time of his injury and the date of his termination, Standard received several write-ups indicating problems with his job performance. Some of the disciplinary write-ups concern problems stemming from mold-making blueprints. Plaster Concepts maintains that Standard was having difficulty reading or understanding the blueprints, while Standard alleges that the blueprints were defective and were used to set him up for disciplinary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                    Page 10
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

action.  Other write-ups are undisputed, such as one
stemming from an incident in which Standard shot
Elias Thiers, several times, in the leg with a high-
powered staple gun.

### 8. Reduction in Force

Towards the end of 1995, Paul Norsworthy, president
of Plaster Concepts, anticipated a drop in business
due to the expiration of several large contracts in
December.     In order to prepare for this drop in
business, Norsworthy decided that the number of
staff would have to be reduced by four workers in the
production department and one worker in the tooling
department.      The task of choosing the specific
workers to be laid off was given to Steve Norsworthy
for the production department and Don Grubbs for
the tooling department.

Grubbs testified that he considered the skill sets of
each member of the tooling department in order to
select the worker whose departure would cause the
least drop in productivity.   Grubbs felt that James
Carroll was the best of the four at making molds with
epoxy, rubber and plaster.     It is undisputed that
Carroll was also engaged in research and
development for various new materials and finishes
for the architectural pieces, and was the only worker
doing so.  Freddie Kinney had over twenty years of
metal fabrication experience, and was able to do
work useful outside of the tooling department, such
as welding and forklift operation.   Standard admits
that Plaster Concepts was increasing its use of metal
in mold-making.   Kinney was also able to do mold
setups and produce basic wooden molds.      It is
undisputed that Elias Thiers had years of mold-
making experience before he began working at
Plaster Concepts.      Standard admits that Grubbs
considered Thiers a better mold-maker than Standard.
Grubbs and Steven Norsworthy both testified that
Thiers was more skilled in woodworking than
Standard.   **\*1326** Standard has offered no evidence
to refute that testimony.

Standard alleges that he trained Thiers in how to do
his job.  On closer examination, this alleged training
consisted mainly of helping Thiers adjust to the
differences between working in Chile and America,
such as help with English so that he could understand
the blueprints better and helping Thiers' transition
from the metric system.     Plaster Concepts alleges
that Standard refused to learn new mold-making
techniques, and this resistance to adaptation made

him less useful to the company.  It is undisputed that
Standard was qualified to be a mold-maker at the
time of his termination.   Plaster Concepts maintains
that he was the least valuable qualified tooling
department employee, and was therefore laid off on
December 28, 1995.

Shortly before the time of his layoff, Standard alleges
that he walked in on a conversation between Grubbs
and Steve Norsworthy, in which Norsworthy said that
"older people have more go wrong."    Standard did
not hear any of the conversation immediately before
or after this statement, and so cannot provide any
context for it.      He advances this statement as
evidence of age discrimination.

### 9. EEOC Complaint

On January 20, 1996, Standard filed a charge with the
Equal   Employment   Opportunity   Commission
("EEOC"), alleging national origin and race
discrimination.  A.B.E.L. responded by claiming that
Standard was dismissed as part of a reduction in force
due to lack of work, while more qualified employees
were retained.      During the course of the EEOC
investigation, layoff worksheets were provided,
purporting to document the evaluation process that
Don Grubbs went through while deciding who from
the tooling department to let go.   Grubbs produced
these documents after the EEOC investigation began,
but he back-dated them, listing the date that he claims
he originally discussed the evaluations orally with
Paul Norsworthy.   Ultimately, the EEOC entered a
determination of "no cause."

### B. *Procedural History*

On May 14, 1996, after receiving notice of the
impending  no  cause  determination,   Standard
commenced this action in the United States District
Court for the Northern District of Georgia.      He
alleged employment discrimination under 42 U.S.C.
§ 1981, Title VII, the ADEA, the ADA, and
unlawful retaliation for the exercise and protection of
Appellant's civil rights under the above statutes,
based on his race, national origin, age and disability.
The district court granted Appellees' motion for
summary judgement, holding that the Title VII and
ADEA failure to promote claims were time barred,
that Standard failed to satisfy the prima facie case for
the ADA, that he failed to present any evidence of
retaliatory discharge relating to Title VII or the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                          Page 11
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

ADEA, and that his failure to introduce proof of a disability under the ADA was also fatal to his ADA retaliation claim.    On the ADEA and Title VII discharge claims and the § 1981 claim, the court held that once Appellees offered legitimate non-discriminatory reasons for the employment actions, Standard did not introduce evidence sufficient to allow a rational jury to find the reasons pretextual.

Standard filed notice of appeal on October 27, 1997, and we have jurisdiction pursuant to 28 U.S.C. § 1291.    He does not appeal the dismissal of the Title VII and ADEA failure to promote claims or the retaliation claims based on Title VII, § 1981 or the ADEA. We are, therefore, left with the termination claims based on Title VII, § 1981, the ADEA and the ADA, as well as the § 1981 failure to promote claim and the ADA retaliation claim.

## II. STANDARD OF REVIEW

[1][2] We review grants of summary judgement *de novo,* using the same legal standard as the district court.    *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1374 (11th Cir.1996).    Summary judgment is appropriate when the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law.    *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).    In making this assessment, we must view the evidence in the light most favorable to the nonmoving party.    *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992).

## *1327 III. DISCUSSION

### A. *Disability Discrimination and Retaliation*

Standard alleges that he was discriminated against on the basis of his back injury, in violation of the Americans with Disabilities Act. The ADA prohibits discrimination against a qualified individual with a disability based on that disability when the discrimination involves the hiring, advancement, termination or conditions of employment of that qualified individual.  42 U.S.C. § 12112(a).  Under the ADA rubric of discrimination, an employer must make reasonable accommodations that allow a disabled individual to perform her job, unless that

accommodation would cause an undue hardship.  *Harris v. H & W Contracting Co.,* 102 F.3d 516, 519 (11th Cir.1996);   42 U.S.C. § 12112(b)(5)(A).    A disability, for the purposes of the ADA, is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;  (B) a record of such an impairment;  or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

### 1. Discriminatory Termination

[3][4][5] In order to state a claim for wrongful termination under the ADA, a plaintiff must first prove that he has a disability, as defined by the Act.  *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 910 (11th Cir.1996), *cert. denied,* 522 U.S. 1030, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act. *Id.,* at 911.    Standard has failed to argue or present evidence that his back injury substantially limited any of his major life activities under the ADA. Even after the district court ruled that he had failed to produce evidence of disability, Standard neglected to argue the issue in his Appellant's Brief.    Finally, in his Reply Brief, Standard points to a statement that he alleges Susan Morgan made about his ability to perform his job after the injury.    Although he did not address the legal standard for disability or major life activity, we will assume that he was arguing that the major life activity at issue is working.[FN1]

> FN1. Although the ADA does not explicitly define the term "major life activity," we are guided by EEOC regulations.    The ADA regulations adopt the definition set forth in the Rehabilitation Act regulations.    34 C.F.R. § 104.    Major life activities are defined as " functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."    29 C.F.R § 1630.2(I).

Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job.  29 C.F.R. § 1630.2(j)(3)(i).    Instead, the impairment must significantly restrict "the ability

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* Standard does not explicitly argue that his back injury significantly restricted his ability to work. In fact, he admits that he was fully capable of performing his job at all times that he was employed by Plaster Concepts. Therefore, he cannot be considered disabled by virtue of § 12102(2)(A) of the ADA.

[6] In his Reply Brief, Standard seems to expand his argument to assert disability under § 12102(2)(C), which applies to individuals who are regarded as being disabled, as defined in the ADA [FN2]. Under this provision, the impairment must also be perceived to substantially limit a major life activity. This "regarded as" provision is "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." *Gordon*, 100 F.3d at 913.

> FN2. Standard does not cite any provision of the ADA, but merely asserts that he was perceived to be disabled under the ADA without explaining the legal significance of this allegation. The only way that this fact might be significant is under § 12102(2)(C). The applicable regulations make clear that this provision applies only to an individual who (1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA. 29 C.F.R. § 1630.2(*l*).

**\*1328** The only evidence Standard points to is his claim that Susan Morgan, an administrative staff member at A.B.E.L., made a statement regarding his ability to perform his job. He claims that when he contacted the A.B.E.L. office about recording mileage driven for medical appointments, Morgan "said that she felt that [he] wasn't able to do [his] job anymore, and ... perhaps [he] wasn't fit for [his] job anymore." Standard does not explain how this proves that his employer regarded him as disabled under the ADA. There is no evidence that Morgan

had any authority to make decisions for A.B.E.L., much less Plaster Concepts. It is difficult, therefore, to see how this statement evinces an erroneous or archaic attitude that would disadvantage someone wrongly suspected of being disabled. Indeed, after Morgan made her statement that "perhaps" he was not fit for his job, Standard immediately replied that he was currently performing his job without problems. This ended the inquiry, and there is no evidence that anyone ever inquired further into Standard's ability to work in light of his injury. Furthermore, it is uncontested that all of the decision makers at A.B.E.L. and Plaster Concepts considered Standard's back injury to be a temporary condition.

Given the tentative nature of Morgan's alleged statement, her position relative to Standard's employment, and the evidence that all of the decision makers perceived Standard as having a temporary injury, we hold that Standard has failed to present sufficient evidence to allow a rational juror to find him disabled under § 12102(2)(C) of the ADA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADA wrongful termination claim.

### 2. Retaliation

[7][8][9] In order to establish a prima facie case of retaliation under the ADA, Standard must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir.1997). "[W]e assess ADA retaliation claims under the same framework we employ for retaliation claims under Title VII." *Id.* Therefore, to satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute. *See, e.g., Clover v. Total Sys. Servs., Inc.*, 157 F.3d 824, 827 (11th Cir.1998)(employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir.1998)(employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

[10][11] In this case, Standard argues that his requests for accommodation of his back injury

161 F.3d 1318                                                                                        Page 13
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
(Cite as: 161 F.3d 1318)

constitute statutorily protected activity.    In this context, it would be sufficient for him to show that he had a good faith, objectively reasonable belief that he was entitled to those accommodations under the ADA. He cannot show this, however.  Standard has not produced any evidence that, at the time that he requested accommodations for his back injury, his belief that he was disabled was objectively reasonable.    He merely asserts that his back injury was a disability, without any grounds for the conclusion.  As discussed, *supra,* the mere existence of a physical impairment does not constitute a disability under the ADA;  the impairment must substantially limit a major life activity. *Gordon,* 100 F.3d at 911.    In determining whether an injury substantially limits a major life activity, we consider "(1) the nature and severity of the impairment;  (2) the duration or expected duration of the impairment;  and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(I)). Standard has not introduced any evidence that his doctors, or anyone else, gave him reason to consider his back injury as impairing his ability to work in a long term or permanent way.  In fact, he was taking physical therapy in order to improve his condition.  Don Grubbs testified that Standard initially did not want to go to the doctor on the day of his injury, and had to be told to go anyway.  Grubbs also testified**1329** that on return to work after going to the doctor, Standard told him that he was fine, and that the doctor wanted to continue to see him.  This testimony is not disputed.

The only evidence that Standard points to as establishing his disability is, once again, the statement by Ms. Morgan, a secretary for A.B.E.L., relating to his ability to perform his job.    Standard argues that this statement proves that, at that time, his employer perceived his injury as being permanent. This argument fails for two reasons.    First, as discussed *supra,* the tentative nature of her statement and her position relative to Standard's employment undercut any argument that he reasonably believed that he was perceived as disabled by his employer. Second, this statement was made after he requested accommodation.    Therefore, it could not have been the basis for his belief that he was disabled under the ADA at the relevant time.

In summary, Standard has not introduced any evidence that would allow a rational fact finder to conclude that his belief that he was disabled under the ADA was objectively reasonable.    He cannot,

therefore, establish the first element of the prima facie case.    *See Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1096-97 (7th Cir.1998), *cert. denied,* 525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998)(affirming summary judgement for defendant when plaintiff's belief that employee was disabled, as defined by the ADA, was not reasonable).  Because Standard has failed to present evidence sufficient to allow a fact finder to rationally conclude that he was retaliated against under the ADA, we must affirm the district court's grant of summary judgement for defendants on the retaliation claim.

### B. *Age Discrimination*

[12][13]  Standard alleges that he was terminated because of his age, in violation of the ADEA.  The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).    In order to make a prima facie case of age discrimination for a reduction in force termination, Standard must prove that (1) he was a member of the age group protected by the ADEA at the time of his termination;  (2) he was qualified at the time of his termination;  and (3) there is evidence from which a reasonable fact finder could conclude that the employer intended to discriminate on the basis of age in making the decision. *Jameson v. Arrow Co.,* 75 F.3d 1528, 1532 (11th Cir.1996). Neither party disputes that Standard has proved the first two prongs of this test.    At issue is whether Standard can point to sufficient evidence to allow a reasonable juror to find discriminatory intent.

The only evidence of discriminatory intent that Standard points to is a part of a conversation that he claims he overheard between Don Grubbs and Steve Norsworthy.    Standard walked into a room in the middle of a sentence in which Norsworthy said "older people have more go wrong."    Standard did not hear any other part of the conversation.    The district court found that a reasonable juror could find that this proved a discriminatory animus in upper management, which could have influenced the termination decision. We disagree.[FN3]

> FN3. After holding that Standard satisfied, for the purpose of avoiding summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                    Page 14
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

judgement, the prima facie case, the district court went on to grant the summary judgement against Standard. The court held that he failed to show that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts for the termination were pretextual. Assuming, arguendo, that Standard had made the prima facie case, we agree that he failed to show pretext, for the same reasons stated in our Title VII analysis, *infra*.

First, the conversation fragment, devoid of any meaningful context, is simply too vague to prove even generalized discriminatory animus. We simply have no way of knowing what Steve Norsworthy was talking about. In the light most favorable to Standard, it states a general proposition that old age brings on health complications. There is no nexus to employment issues, nor is it clear what range of old age was being discussed. Without any other circumstantial evidence, it is not probative of employment-related animus.

Second, it is undisputed that Steve Norsworthy was not involved in the decision to **\*1330** terminate Standard. His brother, Paul Norsworthy, made the decision to reduce the work force, and Don Grubbs decided which of the four tooling department employees to terminate. This statement by Steve Norsworthy, even if it had been uttered in the context of employment issues, is not probative of a discriminatory intent behind Standard's termination. See Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir.1987)(holding that company vice president's statement, "The Hardy Corporation was going to weed out the old ones" did not present a genuine issue of material fact as to discriminatory intent when the vice president played no part in the decision to terminate plaintiff and had no knowledge of the decision making process); Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 610-11 (11th Cir.1987)(holding that plaintiff did not establish a prima facie case by introducing personnel manager's statement, "You would have to take another physical examination and at your age, I don't believe you could pass it."). Because this fragment of a conversation is insufficient to allow a rational juror to find that Plaster Concepts intended to terminate Standard because of his age, Standard has failed to establish a prima facie case under the ADEA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADEA claim.

## C. *Race and National Origin Discrimination*

1. Termination in Violation of Title VII and § 1981

[14][15][16] Standard alleges that he was terminated on the basis of his race and national origin (Caucasian-American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well. In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen. If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent. Wall v. Trust Co. of Georgia, 946 F.2d 805, 809 (11th Cir.1991).

[17][18] Standard argues that he has provided direct evidence of discriminatory intent by pointing to three alleged statements made by various members of management. The first was Harvey Mier's affidavit stating that Paul Norsworthy wanted him to hire only Hispanics. The second was a statement made to Standard by either Don Grubbs or Mark Hicks, before Standard was hired, indicating a desire to staff the production plant with Hispanic workers. The third was a statement by Hicks that one of the reasons Standard was not considered for a promotion was because he was not Hispanic. The district court held that none of these statements constituted direct evidence, and we agree.

[19][20] Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir.1989). Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination. E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir.1990). Of the three statements, only the second might have been made by a decisionmaker, and only if it was made by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                                Page 15
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

Grubbs and not Hicks. Assuming for the purposes of summary judgement that it was Grubbs, any direct link between the statement and discriminatory intent against Standard is broken by the simple fact that Standard was hired, on Grubbs's recommendation, after Grubbs made the statement. Furthermore, all three statements referred to hiring practices for production department positions, whereas Standard was fired from the tooling department. Although these statements may constitute direct evidence of discriminatory intent in refusing to hire production workers at those times, one must infer that the same discrimination applied to the tooling department positions at a significantly **\*1331** later date if they are relevant to Standard's discharge. *See Kier v. Commercial Union Ins. Co.*, 808 F.2d 1254, 1259 (7th Cir.1987)(holding that evidence of discriminatory intent in hiring for a different position is not direct evidence of discriminatory intent regarding plaintiff's termination, but may be circumstantial evidence); *Atkin v. Lincoln Property Co.*, 991 F.2d 268, 272 (5th Cir.1993)(holding that a demotion accompanied by employer's statement that plaintiff was "getting up there in years" and should retire was not direct evidence of age discrimination when he was terminated almost one year later). Because all of these statements require some inference or presumption, they do not constitute direct evidence, but may constitute circumstantial evidence.

[21][22] When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual. *Id.*, at 802-04, 93 S.Ct. at 1824-25.

[23] Because this case involves a discharge as part of a reduction in force, Standard may establish a prima facie case of discrimination by (1) showing that he was a member of a protected group and was adversely affected by an employment decision; (2) proving that he was qualified for his own position or

to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision. *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir.1997). It is undisputed that Standard has satisfied the first two prongs of the prima facie case. He is a Caucasian-American and was terminated from his employment. It is not disputed that he was qualified to perform his job at the time of the discharge. The district court also found that Standard satisfied the third prong, although just barely. For our purposes, we will assume that he established the prima facie case.

[24][25] Once Standard established his prima facie case, Plaster Concepts needed to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for Standard's discharge. This is a burden of production, not persuasion. Plaster Concepts need only produce evidence that could allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In this case, Plaster Concepts asserts that a drop in business necessitated a reduction in force. As part of this reduction, one of the four members of the tooling department had to be discharged. Although Standard was qualified, Don Grubbs felt that he was the least valuable to the company when compared to the other three. Specifically, Grubbs determined that (1) James Carroll was valuable for his research and development work and was the best at making molds with epoxy, plaster and rubber; (2) Freddie Kinney was best at mold setups and had twenty years of metal working experience, at a time when Plaster Concepts was expanding its use of metal in molds; (3) Elias Thiers was the better overall mold-maker than Standard, having had years of mold-making experience before he began working at Plaster Concepts as opposed to Standard, who learned entirely on the job; and (4) Standard had no unique skills compared to the others, was less talented in his primary area of expertise (wooden molds) than Thiers while the use of wooden molds was decreasing, resisted learning to work with new materials, was not as hardworking as the others, and had disciplinary problems that the others lacked. These detailed reasons, if believed, are certainly sufficient to allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                                    Page 16
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

**\*1332**    [26][27]  By  presenting  legitimate,
nondiscriminatory reasons for Standard's termination,
Plaster Concepts has rebutted the presumption of
discriminatory intent.  In light of this, Standard must
now create a genuine issue of material fact as to
whether the reasons advanced are pretextual.     In
other words, Standard must provide sufficient
evidence to allow a reasonable fact finder to conclude
that the proffered reasons were not actually the
motivation for his discharge.   _Combs, 106 F.3d at
1538._  Standard may do this (1) by showing that the
legitimate nondiscriminatory reasons should not be
believed; or (2) by showing that, in light of all of the
evidence,  discriminatory  reasons  more  likely
motivated the decision than the proffered reasons.
_Mayfield v. Patterson Pump Co.,_ 101 F.3d 1371,
1376  (11th  Cir.1996)(quoting  _Texas  Dep't  of
Community Affairs v. Burdine,_ 450 U.S. 248, 256,
101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981))._

Standard takes the first approach, arguing that the
proffered reasons should not be believed because the
reasons have shifted over time and have included
misrepresentations.   First, Standard claims that the
initial reason offered for the discharge, that he was
least qualified, was later changed to dissatisfaction
with his job performance. However, the evidence that
Standard was slow, resistant to change, error-prone,
and had disciplinary problems was not provided as a
new reason for the discharge.  Instead, it was used as
later elaboration on the reasons he was less qualified
than the other three tooling department workers, who
did not have these problems.  Such explanation of a
general reason is insufficient to show pretext.  _Id.,_ at
1377 (holding that plaintiff failed to show pretext
when the employer's later statements merely offered
more   detail   regarding   perceived   performance
problems).  Standard also asserts that many of the
negative write-ups he received were unwarranted or
based on errors that were not his fault.  He does not
dispute the validity of some of the more serious
write-ups, however, including an incident in which he
shot Elias Thiers in the back of the leg with a high
powered staple gun.  He also does not dispute that all
of the mistakes that are the subject of the write-ups
did actually happen, nor does he introduce any
evidence that he was set up to make those mistakes.
Therefore, Standard has failed to show that Plaster
Concepts' evaluation of his job performance was
pretextual.

Standard also asserts that Plaster Concepts engaged
in a pattern of misrepresentations before the EEOC.

Specifically, he claims that the initial response stated
that Standard was the least qualified of four "mold-
makers" when, in fact, there is evidence that only two
of the four were technically given the job title of
mold-maker.   However, he does not dispute that
there were four workers in the tooling department
and that the person to be discharged was to be chosen
from those four workers.   The district court found
that his kind of minimal, technical discrepancy is
insufficient to show pretext, and we agree.  Standard
further asserts that Plaster Concepts' statement to the
EEOC, that two similarly situated Caucasian-
Americans were retained in the tooling department,
was a lie.   He does not explain why this was a lie.
Such a naked assertion is not evidence of pretext,
especially  when  the  uncontroverted  evidence
suggests that the statement was in fact true.

Finally, Standard focuses on the fact that Plaster
Concepts submitted a series of layoff worksheets to
the EEOC, explaining the evaluation process that
Don Grubbs went through when making the
discharge decision.   Although Grubbs wrote out the
sheets after the EEOC charges were instituted, he
back-dated them to the time that the evaluation
process occurred, giving the impression that the
worksheets were written contemporaneously with the
evaluation process.   This fact, in isolation, could be
seen as evidence that the reasons listed on the
worksheets were made up after the decision was
made, and therefore pretextual.   However, Standard
either admits or fails to dispute the truth of virtually
all of the evaluations listed on the worksheets.
Instead of disputing the truth of Grubbs' evaluations,
he focuses on his own belief that he was objectively
as qualified as Elias Thiers even though he admits
that  Thiers  had  nine  years  of  mold-making
experience and that Grubbs considered Thiers to be a
superior mold-maker.  This argument must fail.  The
pretext inquiry is concerned  **\*1333**  with the
employer's  perception  of  the  employee's
performance, not  the  employee's own beliefs.
_Holifield  v.  Reno,_  115  F.3d  1555,  1565  (11th
Cir.1997)(holding that when employer produces
negative performance reviews, employee's assertion
of his own good performance is insufficient to defeat
summary judgement).  Standard cannot show that the
reasons listed on the worksheets are pretextual when
he admits their truth, even if the forms are back-
dated.     The heart of the pretext inquiry is not
whether the employee agrees with the reasons that
the employer gives for the discharge, but whether the
employer really was motivated by those reasons.
Once Standard admitted that the other tooling

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                Page 17
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
(Cite as: 161 F.3d 1318)

department employees either had the superior
qualities attributed to them or were perceived as
having them by Grubbs, he can not establish pretext
merely by disagreeing with the evaluations or by
pointing out the back-dating.

[28] In order to directly attack Plaster Concepts'
reasons, Standard must demonstrate "such
weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's
proffered legitimate reasons for its action that a
reasonable fact finder could find [all of those
reasons] unworthy of credence." Combs, 106 F.3d at
1538. Standard has failed to produce such evidence,
and so has failed to prove that the legitimate,
nondiscriminatory reasons advanced by Plaster
Concepts are merely pretext. Therefore, we must
affirm the grant of summary judgement for
defendants on the Title VII and the § 1981 wrongful
discharge claims.

2. Failure to Promote in Violation of § 1981

In addition to his discharge, Standard alleges that he
was not considered for a promotion because of his
race and national origin, in violation of 42 U.S.C. §
1981. A few months after Standard was hired and
began training as a mold-maker in the tooling
department, Plaster Concepts decided to hire a
manager for the production department. The
company focused its search on bilingual persons with
military backgrounds, with experience supervising
and motivating unskilled workers. Although
Standard mentioned his interest in the position, he
was never considered for the job and was
immediately told by Don Grubbs that they were
looking for someone with a military background.
Ultimately, Enrique Torres was hired for the
supervisor's job. He had twenty years of military
experience as a sergeant.

[29] Standard alleges that Mark Hicks told him that
he was not considered for the position because he "A,
was not Hispanic; B, not ex-military; and C, they
need a tool-maker, couldn't spare me." Standard,
again, claims that this statement constitutes direct
evidence of Plaster Concepts' discriminatory intent.
Again, we disagree. Steve Norsworthy was
responsible for the decision of who was promoted,
and there is no evidence that Hicks was involved in
the decision or even talked to Norsworthy about the
decision. As speculation of a non-decisionmaker,
this statement is circumstantial evidence at best.

[30][31] In the absence of direct evidence, we must
proceed with the McDonnell Douglas analysis used
above for the Title VII claim. Because this claim is
based on a failure to promote rather than a reduction
in force termination, however, the requirements for a
prima facie case are slightly different. To establish
his prima facie case of discriminatory failure to
promote, Standard must show that (1) he was in a
protected group; (2) he was not given the promotion;
(3) he was qualified for the position and (4) someone
outside of the protected group was given the position.
See Coutu v. Martin County Bd. of County
Commissioners, 47 F.3d 1068, 1073 (11th Cir.1995).
Under this framework, the district court found that
Standard established a prima facie case, and we
agree. He is in a protected group, as a Caucasian-
American, and he suffered an adverse employment
action when he was not considered for the
supervisor's job. Plaster Concepts does not dispute
that he was qualified for the job, and the person
ultimately hired was Hispanic. Having established a
prima facie case, Standard is now entitled to a
rebuttable presumption of discriminatory intent on
the part of Plaster Concepts.

[32] To rebut this presumption, Plaster Concepts
must advance legitimate, nondiscriminatory reasons
why Standard was not *1334 considered for the job.
The first reason they advance is that Standard had
recently been hired into the tooling department,
without experience making architectural molds.
Standard admits that in contrast to production
department workers, tooling department workers are
highly skilled and difficult to find. The company
had already invested in training Standard, and this
investment would be wasted if he were transferred to
the production department. Furthermore, Plaster
Concepts argues, they were already short-staffed in
the tooling department, and could not afford to lose
Standard. The second reason advanced is that
management had decided to hire someone with a
military background, and Standard did not have one.

[33] Faced with these legitimate, nondiscriminatory
reasons, Standard must now show that they are
pretextual. However, Standard has not presented
any particular evidence tending to discredit the
proffered reasons. He relies on the same evidence he
has introduced for his prima facie case, specifically
that Plaster Concepts hired a Hispanic production
supervisor and the statement allegedly made by
Hicks. This evidence falls far short of establishing
pretext in light of the proffered nondiscriminatory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

161 F.3d 1318                                                                                      Page 18
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750, 74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12 Fla. L.
Weekly Fed. C 302
**(Cite as: 161 F.3d 1318)**

reasons. "[A] plaintiff may not in all cases merely
rest on the laurels of her prima facie case in the face
of powerful justification evidence offered by the
defendant." *Grigsby v. Reynolds Metals Co., 821
F.2d 590, 596 (11th Cir.1987).*    The fact that an
Hispanic was hired does not make discriminatory
animus a more likely motivating force in this case,
because Torres, besides being Hispanic, also had the
attributes listed as lacking by Standard in the
proffered reasons: (1) Torres was not hired, trained
or needed in the tooling department; and (2) he had
twenty years of military supervisory experience.
Likewise, Hicks's statement regarding the reason
Standard wasn't considered, even though it is the
speculation of a non-decisionmaker, actually supports
the two legitimate reasons advanced by Plaster
Concepts.

Standard has failed to produce evidence sufficient to
allow a rational fact finder to conclude that the
legitimate, nondiscriminatory reasons advanced by
Plaster Concepts are unworthy of belief.   Therefore,
we must affirm the grant of summary judgement for
defendants on the § 1981 failure to promote claim.


IV. CONCLUSION

After addressing each of Plaintiff-Appellant's claims
in detail above, we agree with all of the district
court's conclusions.   We therefore AFFIRM the grant
of summary judgement for Defendants-Appellees on
all counts.

C.A.11 (Ga.),1998.
Standard v. A.B.E.L. Services, Inc.
161 F.3d 1318, 78 Fair Empl.Prac.Cas. (BNA) 750,
74 Empl. Prac. Dec. P 45,667, 14 NDLR P 19, 12
Fla. L. Weekly Fed. C 302

Briefs and Other Related Documents (Back to top)

• 97-9226 (Docket) (Nov. 03, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:46:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 222 F.3d 891 |
| Lines: | 276 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

222 F.3d 891                                                                          Page 1
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003
**(Cite as: 222 F.3d 891)**

▷

Briefs and Other Related Documents

Butts v. County of VolusiaC.A.11 (Fla.),2000.
    United States Court of Appeals.Eleventh Circuit.
        David W. BUTTS, Plaintiff-Appellant,
                            v.
    COUNTY OF VOLUSIA, Defendant-Appellee.
                    **No. 99-13527.**

                    Aug. 14, 2000.

County employee sued county for race discrimination
in violation of § 1981's guarantee of equal rights to
make and enforce contracts. The United States
District Court for the Middle District of Florida, No.
98-00178-CV-ORL-22B,Anne C. Conway, J., 1999
WL 737896, entered summary judgment in favor of
county. Employee appealed. The Court of Appeals,
Black, Circuit Judge, held that § 1981 did not
provide cause of action against state actor,
notwithstanding amendments to § 1981 made by
Civil Rights Act of 1991.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ⊂⟶776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited
Cases
The Court of Appeals reviews de novo the district
court's entry of summary judgment.    Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⊂⟶840**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment.
Most Cited Cases
District court did not abuse its discretion in denying
county employee's motion to amend complaint, so as
to add claims under Title VII and Florida Civil Rights
Act (FCRA) to his claim of race discrimination in
violation of § 1981's guarantee of equal rights to
make and enforce contracts; employee conceded that

he failed to comply with district court's scheduling
order and could not demonstrate good cause to
excuse that failure, and his strategic decision to file
separate lawsuit under Title VII and FCRA, which
was dismissed because it contained same allegations
as § 1981 suit, caused much of the delay.    42
U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et
seq., 42 U.S.C.A. § 2000e et seq.; West's F.S.A. §
760.01 et seq.;    Fed.Rules Civ.Proc.Rule 16, 28
U.S.C.A.

**[3] Federal Courts 170B ⊂⟶817**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; Pleading. Most
Cited Cases
A denial of a motion to amend a complaint is
reviewed for an abuse of discretion.

**[4] Civil Rights 78 ⊂⟶1350**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1350 k. Other Particular Cases and
Contexts. Most Cited Cases
            (Formerly 78k206(2.1))
A plaintiff who sues a municipality under § 1983 for
a violation of the rights contained in § 1981, which
guarantees equal rights to make and enforce
contracts, may not rely upon the doctrine of
respondeat superior. 42 U.S.C.A. § § 1981, 1983.

**[5] Civil Rights 78 ⊂⟶1313**

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity,
and Exhaustion of Other Remedies
            78k1313 k. Other Particular Cases and
Contexts. Most Cited Cases
            (Formerly 78k194)

**Civil Rights 78 ⊂⟶1330(6)**

78 Civil Rights
    78III Federal Remedies in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

222 F.3d 891                                                                                    Page 2
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003
(Cite as: 222 F.3d 891)

78k1328 Persons Protected and Entitled to Sue
    78k1330 Private Right of Action
        78k1330(6) k. Other Particular Cases
and Contexts. Most Cited Cases
            (Formerly 78k200)
Section 1981, guaranteeing equal rights to make and
enforce contracts, did not provide cause of action
against state actors, and § 1983 constituted exclusive
remedy against state actors for violations of rights
contained in § 1981, notwithstanding that Civil
Rights Act of 1991 amended § 1981 by adding
provision stating that § 1981 rights were protected
against impairment under color of state law. 42
U.S.C.A. § § 1981(c), 1983; Civil Rights Act of
1991, § 1 et seq., 105 Stat. 1071.

[6] Constitutional Law 92 ⟶70.1(11)

92 Constitutional Law
    92III Distribution of Governmental Powers and
Functions
        92III(B) Judicial Powers and Functions
            92k70 Encroachment on Legislature
                92k70.1 In General
                    92k70.1(7)    Particular    Subjects,
Application to
                    92k70.1(11)   k.   Remedies   and
Procedure. Most Cited Cases
The judicial power to imply a remedy should not be
exercised in the face of an express decision by
Congress concerning the scope of remedies available
under a particular statute.


*892 Frederick C. Morello,Frederick C. Morello,
P.A., Daytona Beach, FL, for Plaintiff-Appellant.
David V. Kornreich, Jeffrey E. Mandel, Muller,
Mintz, Kornreich, Caldwell, Casey, Crosland &
Bramnick, P.A., Orlando, FL, for Defendant-
Appellee.


Appeal from the United States District Court for the
Middle District of Florida.


Before BLACK, CARNES and KRAVITCH, Circuit
Judges.
BLACK, Circuit Judge:
This case requires us to decide whether 42 U.S.C. §
1981 provides a cause of action against state actors.
We conclude it does not and affirm the order of the
district court.

I. BACKGROUND

Appellant David W. Butts initially sued Appellee
County of Volusia in a one-count complaint alleging
racial discrimination in employment in violation of
42 U.S.C. § 1981. Appellant later filed a separate
lawsuit based on Title VII of the Civil Rights Act of
1964 and the Florida Civil Rights Act of 1992
(FCRA), but the district court dismissed that suit
because it contained the same factual allegations as
the § 1981 suit. Appellant then sought to amend his
§ 1981 suit to add the Title VII and FCRA claims.
The district court denied the motion because
Appellant filed it after the scheduling deadline.

Appellee moved for summary judgment based on the
argument that § 1981 does not provide a cause of
action against state actors. The district court agreed,
following Jett v. Dallas Independent School District,
491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598
(1989), which held a plaintiff must use the remedial
provisions of § 1983 to enforce against state actors
the rights created by § 1981. The court also adopted
the analysis of other district courts in this Circuit and
rejected Appellant's argument that the Civil Rights
Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071,
overruled the Supreme Court's interpretation of §
1981 in Jett. This appeal followed.


II. DISCUSSION

[1][2][3] We review de novo the district court's entry
of summary judgment. See AT&T Wireless PCS,
Inc. v. City of Atlanta, 210 F.3d 1322, 1324 (11th
Cir.2000). Appellant contends the district court
improperly granted Appellee's motion for summary
judgment on Appellant's 42 U.S.C. § 1981 claim.[FN1]
Appellant argues the Civil Rights Act of 1991
amended § 1981 to create a cause of action against
state actors and that such a cause of action may rely
on a respondeat superior theory of liability otherwise
prohibited by § 1983 as interpreted in Jett and
Monell v. Department of Social Services of New
York, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d
611 (1978). We conclude the amendments did not
change § 1981 and § 1983 contains the sole cause of
action against state actors for violations of § 1981.[FN2]

> FN1. Appellant could have sued under §
> 1983 for the alleged violation of § 1981, but
> he chose not to do so. Accordingly, this
> appeal requires us to decide whether § 1981
> contains a cause of action against state
> actors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Appellant also argues the district court abused its discretion in denying Appellant's motion to amend the complaint. We review this denial for an abuse of discretion. *See Sosa v. Airprint Sys., 133 F.3d 1417, 1418 (11th Cir.1998).* Appellant concedes he failed to comply with the district court's scheduling order, *see Fed.R.Civ.P. 16,* and cannot demonstrate good cause to excuse that failure. Appellant's strategic decision to file a separate lawsuit before attempting to amend caused much of the delay. Accordingly, the district court did not abuse its discretion. *See Sosa, 133 F.3d at 1418-19.*

Prior to the Civil Rights Act of 1991, § 1981 stated: All persons within the jurisdiction of the United States shall have the same right *893 in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

[4] In *Jett,* the Supreme Court examined the interplay between the pre-amendment § 1981 and § 1983. Justice O'Connor, writing for a plurality, articulated two guiding principles. First, § 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981. *See Jett,* 491 U.S. at 731-32, 109 S.Ct. at 2721. Second, a plaintiff who sues a municipality under § 1983 for a violation of the rights contained in § 1981 may not rely upon the doctrine of respondeat superior. *See id.* at 731-36, 109 S.Ct. at 2721-23.

The plurality considered the relationship between the Civil Rights Act of 1866 and the Civil Rights Act of 1871 (the precursors to § 1981 and § 1983) and concluded the 1866 Act did not contain a remedial provision to create a federal civil cause of action. Rather, the plurality determined Congress enacted the 1871 Act to create a civil remedy for the enforcement of the 1866 Act against state actors. Justice O'Connor explained
That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the "state action" portion of § 1981, where Congress has established its own remedial scheme.

In the context of the application of § 1981 and § 1982 to private actors, we "had little choice but to hold that aggrieved individuals could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*" That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute.

*Id.* at 731-32, 109 S.Ct. at 2721 (citations omitted).

The plurality observed that while Congress had not explained the relationship between § 1981 and § 1983, "there is very strong evidence that the 42nd Congress which enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors." *Id.* at 734, 109 S.Ct. at 2722.

*Jett* therefore determined § 1981 did not contain a cause of action against state actors. If *Jett* remains good law, the district court correctly granted summary judgment. Appellant contends, however, the Civil Rights Act of 1991 legislatively overruled the interpretation of § 1981 contained in *Jett.* Although many district courts in this Circuit, including the district court in this case, have rejected Appellant's claim, we have not yet had the occasion to decide this issue. FN3

FN3. Appellee incorrectly claims this Court has previously addressed this question. In *Johnson v. Fort Lauderdale, 148 F.3d 1228, 1229 n. 2 (11th Cir.1998),* we noted the district court had dismissed a § 1981 claim because § 1983 provided the exclusive remedy. We did not reach that issue, however; the opinion only addressed the relationship between § 1983 and Title VII. This Court decided the other two cases relied upon by Appellee based on the law prior to the Civil Rights Act of 1991. *See Pearson v. Macon-Bibb County Hosp. Auth., 952 F.2d 1274 (11th Cir.1992); Busby v. Orlando, 931 F.2d 764 (11th Cir.1991).*

The Civil Rights Act of 1991 amended § 1981 by designating the existing text, quoted above, as § 1981(a) and adding two new subsections. Those new subsections provide:

222 F.3d 891                                                                                         Page 4
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003
**(Cite as: 222 F.3d 891)**

**\*894** (b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(b), (c).

Appellant argues subsection (c) demonstrates Congress' intent to provide a cause of action against state actors. Appellant relies almost exclusively on the Ninth Circuit's opinion in *Federation of African American Contractors v. Oakland,* 96 F.3d 1204 (9th Cir.1996). In *Federation,* the Ninth Circuit held that although § 1981(c) did not provide an explicit cause of action against state actors, it contained an implicit remedy. *See Federation,* 96 F.3d at 1210-14.

[5] We disagree with *Federation* <sup>FN4</sup> and concur with the decision of the other Court of Appeals to address this issue. *See Dennis v. County of Fairfax,* 55 F.3d 151, 156 n. 1 (4th Cir.1995) (concluding the Civil Rights Act of 1991 did not affect *Jett* ). As we noted above, in *Jett,* the Supreme Court refused to find in § 1981 an implied cause of action against state actors because Congress had clearly established § 1983 as the remedial scheme against state actors. Nothing in the 1991 amendment to § 1981 evinces Congress' desire to alter the Supreme Court's conclusion in *Jett.* The express language of subsection (c) states that § 1981 protects against racial discrimination by private and state actors. Put another way, § 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation.

> FN4. We note, however, the *Federation* court would also affirm the district court in this case. *Federation* concluded that while § 1981 contains a cause of action against state actors, the limitations on respondeat superior liability from *Monell* apply to § 1981 just as they apply to § 1983. *See Federation,* 96 F.3d at 1214-15. We agree such a limitation would exist if § 1981 contained a cause of action. Because Appellant did not plead a "custom or practice" as required by *Monell,* the district court properly granted

summary judgment even if Appellant could sue under § 1981.

The sparse legislative history of the Civil Rights Act of 1991 does not reveal a contrary intent. The Ninth Circuit recognized in *Federation* that the legislative history "does not explicitly announce an intent to create (or deny) a private right of action against a state actor." *Federation,* 96 F.3d at 1212. Instead, the *Federation* court and others have noted Congress added subsection (c) to codify the Supreme Court's decision in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which established that § 1981 protects against private discrimination as well as discrimination by state actors. *See id.* at 1212; *Anderson v. Conboy,* 156 F.3d 167, 179 (2d Cir.1998); *see also* H.R.Rep. No. 102-40(I), at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630; H.R.Rep. No. 102-40(II), at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 731. Congress provided no indication that it contemplated creating a cause of action against state actors outside of § 1983, nor did it even mention the Supreme Court's opinion in *Jett.*

[6] Accordingly, we conclude *Jett* still governs this case. The Supreme Court held the judicial power to imply a remedy "should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute." *Jett,* 491 U.S. at 732, 109 S.Ct. at 2721. Congress made that express decision in § 1983; nothing in the text or history of the Civil Rights Act of 1991 alters that decision. The district court therefore correctly concluded Appellant**\*895** could not proceed with his cause of action based solely on § 1981.

### III. CONCLUSION

The district court correctly granted Appellee's motion for summary judgment. In addition, the district court did not abuse its discretion in denying Appellant's motion to amend his complaint.

AFFIRMED.

C.A.11 (Fla.),2000.
Butts v. County of Volusia
222 F.3d 891, 83 Fair Empl.Prac.Cas. (BNA) 1247, 13 Fla. L. Weekly Fed. C 1003

Briefs and Other Related Documents (Back to top)

• 2000 WL 33991290 (Appellate Brief) Appellant's

Reply Brief (Jan. 19, 2000) Original Image of this
Document (PDF)
• 2000 WL 33991289 (Appellate Brief) Brief of
Appellee (Jan. 03, 2000) Original Image of this
Document (PDF)
• 1999 WL 33618719 (Appellate Brief) Appellant's
Initial Brief (Nov. 01, 1999) Original Image of this
Document (PDF)
• 99-13527 (Docket) (Sep. 20, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:45:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | SCTFIND |
| Citation Text: | 109 S.Ct. 2702 |
| Lines: | 2068 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

109 S.Ct. 2702                                                                      Page 1
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

▷

Briefs and Other Related Documents
Jett        v.      Dallas      Independent      School
Dist.U.S.Tex.,1989.
Supreme Court of the United States
Norman JETT, Petitioner,
v.
DALLAS INDEPENDENT SCHOOL DISTRICT.
DALLAS INDEPENDENT SCHOOL DISTRICT,
Petitioner
v.
Norman JETT.
**Nos. 87-2084, 88-214.**

Argued March 28, 1989.
Decided June 22, 1989.

White former athletic director and head football
coach at public high school brought suit under § §
1981 and 1983 against school district and black
principal, alleging discrimination in his reassignment.
The United States District Court for the Northern
District of Texas, Barefoot Sanders, J., entered
judgment against school district and principal in his
individual capacity, and they appealed.  The Court of
Appeals for the Fifth Circuit, 798 F.2d 748,reversed
and remanded, and, 837 F.2d 1244, denied rehearing.
Certiorari was granted.  The United States Supreme
Court, Justice O'Connor, held that:  (1) municipality
may not be held liable for its employees' violations of
§ 1981 under respondeat superior theory, and (2)
instruction that school district could be held liable for
the actions of its board of trustees and delegated
administrative officials such as superintendent and
school principals for wrongful or unconstitutional
action against school district personnel was manifest
error.

Judgment of Court of Appeals affirmed in part and
remanded in part.

Justice Scalia filed opinion concurring in part and
concurring in judgment.

Justice Brennan filed dissenting opinion in which
Justices Marshall, Blackmun, and Stevens joined.

Justice Stevens filed dissenting opinion.
West Headnotes
**[1] Civil Rights 78 ⬤⟿1307**

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity,
and Exhaustion of Other Remedies
            78k1307 k. In General. Most Cited Cases
            (Formerly 78k1313, 78k194, 78k206(2))

**Civil Rights 78 ⬤⟿1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1345 k. Acts of Officers and Employees
in General;    Vicarious Liability and Respondeat
Superior in General. Most Cited Cases
            (Formerly 78k206(2.1), 78k206(2), 78k13.7)
Municipality may not be held liable for its
employees' violations of § 1981 under respondeat
superior theory;  rather, express "action at law" under
§ 1983 provides the exclusive federal damages
remedy for the violation of rights guaranteed by §
1981 when the alleged violation is by a state actor.
42 U.S.C.A. § § 1981, 1983.

**[2] Civil Rights 78 ⬤⟿1351(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other
Governmental Bodies
            78k1351 Governmental Ordinance, Policy,
Practice, or Custom
                78k1351(5) k. Employment Practices.
Most Cited Cases
            (Formerly 78k206(3), 78k13.7)
White former athletic director and head football
coach at public high school could prevail on his claim
for damages against the school district based on
alleged discrimination by black superintendent and
white principal only if athletic director could show
that alleged violation of his "right to make contracts"
protected by § 1981 was caused by a custom or
policy of the school district. 42 U.S.C.A. § § 1981,
1983;  U.S.C.A. Const.Amends. 1, 5, 14.

**[3] Civil Rights 78 ⬤⟿1438**

78 Civil Rights

109 S.Ct. 2702                                                                                                Page 2
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

78III Federal Remedies in General
   78k1433 Instructions
      78k1438 k. Employment Practices. Most
Cited Cases
      (Formerly 78k245, 78k13.14)
Instruction that school district could be held liable for
the actions of its board of trustees and delegated
administrative officials, such as superintendent and
school principals, if the actions are wrongful or
unconstitutional, was manifest error, in § 1981 suit
brought by white former athletic director and head
football coach against district claiming that principal
and superintendent discriminated against athletic
director; instruction apparently rested on assumption
that either principal or superintendent were
policymakers for school district or that school district
was vicariously liable for actions taken by principal
and superintendent. 42 U.S.C.A. § § 1981, 1983;
U.S.C.A. Const.Amends. 1, 5, 14.

**[4] Civil Rights 78 ☜1426**

78 Civil Rights
   78III Federal Remedies in General
      78k1425 Questions of Law or Fact
         78k1426 k. In General. Most Cited Cases
      (Formerly 78k244, 78k13.14)
In determining whether official's decisions represent
"official policy" of local governmental unit for which
unit can be held liable if policy violates "right to
make contracts" protected by § 1981, trial judge
must resolve issue as legal question before case is
submitted to jury and must identify those officials or
governmental bodies who speak with final
policymaking authority for the local governmental
actor concerning action alleged to have caused
particular constitutional or statutory violation at
issue; once such officials have been identified, it is
for jury to determine whether their decisions have
caused deprivation of rights at issue by policies
which affirmatively command that deprivation occur
or by acquiescence in longstanding practice or
custom which constitutes "standard operating
procedure" of local governmental entity. 42
U.S.C.A. § § 1981, 1983.

**[5] Federal Courts 170B ☜462**

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts of
Appeals
         170Bk462 k. Determination and Disposition

of Cause. Most Cited Cases
Whether superintendent of public school district had
been delegated authority to make school district
policy concerning employee transfers and whether
his decisions in such area were final and
unreviewable would not be decided by Supreme
Court on record before it, on petition for certiorari in
action brought by former athletic director claiming
that black principal and white superintendent
discriminated in reassigning athletic director in
violation of § 1981; rather, Court of Appeals, with
its greater expertise in Texas law, was in better
position to determine whether superintendent
possessed final policymaking authority and whether
school district should be held responsible for actions
of principal in light of superintendent's authority. 42
U.S.C.A. § § 1981, 1983.
**\*\*2704 Syllabus [FN*]**

> [FN*] The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the
> convenience of the reader. See United
> States v. Detroit Lumber Co., 200 U.S. 321,
> 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*701** Petitioner Jett, a white male, was employed by
respondent Dallas Independent School District
(DISD) as a teacher, athletic director, and head
football coach at a predominantly black high school.
After repeated clashes with the school's Principal
Todd, a black man, over school policies and Jett's
handling of the school's football program, Todd
recommended that Jett be relieved of his duties as
athletic director and coach.      The DISD's
Superintendent   Wright   affirmed   Todd's
recommendation and reassigned Jett to a teaching
position in another school, where he had no coaching
duties.       Alleging, inter alia, that Todd's
recommendation was racially motivated, and that the
DISD, acting through Todd and Wright, had
discriminated against him on the basis of race in
violation of 42 U.S.C. § § 1981 and 1983 and the
Equal Protection Clause, Jett brought this action in
the District Court, which upheld a jury verdict in his
favor on all counts.   The Court of Appeals reversed
in part and remanded, finding, among other things,
that the District Court's jury instructions as to the
DISD's liability under § 1983 were deficient, since
(1) they did not make clear that, under Monell v. New
York City Dept. of Social Services, 436 U.S. 658, 98
S.Ct. 2018, 56 L.Ed.2d 611, such liability could be
predicated on the actions of Todd or Wright only if
those officials had been delegated policymaking

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                Page 3
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

authority or acted pursuant to a well settled custom that represented official policy; and (2) even if Wright could be considered a policymaker for purposes of the transfer of personnel, the jury made no finding that his decision to transfer Jett was either improperly motivated or consciously indifferent to the improper motivations of Todd. The Court of Appeals also rejected the District Court's conclusion that the DISD's § 1981 liability for Todd's actions could be predicated on a *respondeat superior* theory, noting that *Monell* had held that Congress did not intend that municipalities be subject to vicarious liability under § 1983 for the federal constitutional or statutory violations of their employees, and declaring that to impose such liability for only certain wrongs based on § 1981 apparently would contravene the congressional intent behind § 1983.

*\*702 Held:* The judgment is affirmed in part, and the cases are remanded.

798 F.2d 748 (CA5 1986), and 837 F.2d 1244 (CA5 1988), affirmed in part and remanded.

Justice O'CONNOR delivered the opinion of the Court with respect to Parts I, III, and IV, concluding that:

1. A municipality may not be held liable for its employees' violations of **\*\*2705** § 1981 under a *respondeat superior* theory. The express "action at law" provided by § 1983 for the "deprivation of ... rights secured by the Constitution and laws" provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Cf., *e.g.,* *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402, where the Court, in holding that § 717 of Title VII of the Civil Rights Act of 1964 constitutes the exclusive remedy for racial discrimination in federal employment despite the possibility of an implied damages remedy under § 1981, invoked the general principle that a precisely drawn, detailed statute pre-empts more general remedies. *Monell, supra,* specifically held that a municipality cannot be liable under § 1983 on a *respondeat superior* theory, while the Courts of Appeals in post-*Monell* decisions have unanimously rejected the contention, analogous to petitioner's argument here, that that theory is available against municipalities under a *Bivens*-type action implied directly from the Fourteenth Amendment. Given this Court's repeated recognition that the Fourteenth Amendment was largely intended to embody and

expand the protections of § 1981's statutory predecessor as against state actors, this Court declines petitioner's invitation to imply a damages remedy broader than § 1983 from § 1981's declaration of rights. Creation of such a remedy would allow § 1983's carefully crafted remedial scheme to be circumvented by artful pleading. Nor can a *respondeat superior* standard be implied from 42 U.S.C. § 1988, since, although that statute does authorize district courts in civil rights actions to look to the common law if federal remedies are deficient, the statute specifically withdraws that authority where, as here, the common law remedy is inconsistent with federal law; *i.e.,* with § 1983. See *Moor v. County of Alameda,* 411 U.S. 693, 706, 710, n. 27, 93 S.Ct. 1785, 1794, 1796, n. 27, 36 L.Ed.2d 596. Thus, to prevail against the DISD, petitioner must show that the violation of his § 1981 "right to make contracts" was caused by a custom or policy within the meaning of *Monell* and subsequent cases. Pp. 2721-2723.

2. These cases are remanded to the Court of Appeals to determine whether, in light of the principles enunciated in *Monell, supra,* and clarified in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452, and *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107, Superintendent Wright possessed final policymaking authority under Texas law in the area of employee transfers, and if so whether a new trial is required to determine the DISD's responsibility for the actions of Principal Todd in light of this determination. Although the Court of Appeals correctly ruled that the District Court's *\*703 jury instructions constituted manifest error, the case was tried before *Pembaur* and *Praprotnik* were decided, and the Court of Appeals issued its decision before *Praprotnik.* Pp. 2723-2724.

Justice O'CONNOR, joined by THE CHIEF JUSTICE, Justice WHITE, and Justice KENNEDY, concluded in Part II that the text and legislative history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of § § 1981 and 1983 respectively, demonstrate that § 1981 does not provide an independent federal damages remedy for racial discrimination by local governmental entities; rather, Congress intended that the explicit remedial provisions of § 1983 control in the context of § 1981 damages actions against state actors. Pp. 2711-2716.

(a) The legislative history of the 1866 Act, which was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                Page 4
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

originally enacted to implement the Thirteenth Amendment, demonstrates that that Act neither provided an express damages remedy for violation of its provisions nor created any original federal jurisdiction which could support such a remedy against state actors, and that the **\*\*2706** Act's penal section-the only provision explicitly directed at state officials-was designed to punish only the official committing a violation and not the municipality itself. Two congressional actions subsequent to the passage of the 1866 Act-the submission of the Fourteenth Amendment to the States for ratification, which Amendment was based upon, and widely viewed as "constitutionalizing," that Act's protections, and the reenactment of that Act's substance in the Enforcement Act of 1870, a Fourteenth Amendment statute-further evidence the relationship between § § 1981 and 1983 and demonstrate that § 1981 is both a Thirteenth and a Fourteenth Amendment statute. Pp. 2716-2721.

(b) The text and legislative history of the 1871 Act, which was expressly enacted to enforce the Fourteenth Amendment, establish that: (1) unlike any portion of the 1866 Act, that statute explicitly exposed state and local officials to liability for damages in a newly created "action at law" for deprivation of constitutional rights; (2) the Act *expanded* federal jurisdiction by explicitly providing original jurisdiction in the federal courts for prosecution of such actions; and (3) the provision of the Act which is now § 1983 was explicitly modeled on the penal provision of the 1866 Act and was intended to amend and enhance the protections of that provision by providing a parallel civil remedy for the same violations. Thus, Jett's contention that the 1866 Act had *already* created a *broader* federal damages remedy against state actors is unpersuasive. Moreover, the fact that Congress rejected the Sherman amendment to the 1871 Act-which specifically proposed the imposition of vicarious liability on municipal governments for injuries caused by mob violence directed at the enjoyment or exercise of federal civil rights-demonstrates an awareness of, and a desire to comply with, the then-reigning constitutional\*704 doctrine of "dual sovereignty," which indicated that Congress did not have the power to assign the duty to enforce federal law to state instrumentalities by making them liable for the constitutional violations of others. Given this constitutional background, Jett's contention that the 1866 Act had already silently created a form of vicarious liability against municipal governments is historically untenable. Furthermore, the addition, in

1874, of the phrase "and laws" to the remedial provision of what is now § 1983 indicates an intent that the guarantees contained in what is now § 1981 were to be enforced against state actors through § 1983's express damages remedy. Pp. 2714-2719.

Justice SCALIA concluded that the *respondeat superior* question is properly decided solely on the rudimentary principles of construction that the specific-here, § 1983, which precludes liability on that basis for the precise category of offense at issue-governs the general-here, § 1981-and that, where the text permits, statutes dealing with similar subjects should be interpreted harmoniously. P. 2724.

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and IV, in which REHNQUIST, C.J., and WHITE, SCALIA, and KENNEDY, JJ., joined; the opinion of the Court with respect to Part III, in which REHNQUIST, C.J., and WHITE and KENNEDY, JJ., joined, and in which SCALIA, J., joined, except insofar as that Part relies on legislative history; and an opinion with respect to Part II, in which REHNQUIST, C.J., and WHITE and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 2724. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post,* p. 2724. **\*\*2707** STEVENS, J., filed a dissenting opinion, *post,* p. 2732.

*Frank Gilstrap* argued the cause for petitioner in No. 87-2084 and respondent in No. 87-214. With him on the briefs were *Frank Hill* and *Shane Goetz.*
*Leonard J. Schwartz* argued the cause and filed a brief for respondent in No. 87-2084 and petitioner in No. 87-214.†
† Briefs of *amici curiae* urging reversal were filed for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers* and *Eric Schnapper;* and for the National Education Association by *Michael H. Gottesman* and *Jeremiah A. Collins.*
*Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch, Donald B. Ayer, Glen D. Nager,* and *Robert D. Sweeney, Jr.,* filed a brief for the International City Management Association et al. as *amici curiae* urging affirmance.
\*705 Justice O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                                          Page 5
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

with respect to Part II, in which THE CHIEF JUSTICE, Justice WHITE, and Justice KENNEDY join.

The questions before us in these cases are whether 42 U.S.C. § 1981 provides an independent federal cause of action for damages against local governmental entities, and whether that cause of action is broader than the damages remedy available under 42 U.S.C. § 1983, such that a municipality may be held liable for its employees' violations of § 1981 under a theory of *respondeat superior.*

I

Petitioner Norman Jett, a white male, was employed by respondent Dallas Independent School District (DISD) as a teacher, athletic director, and head football coach at South Oak Cliff High School (South Oak) until his reassignment to another DISD school in 1983. Petitioner was hired by the DISD in 1957, was assigned to assistant coaching duties at South Oak in 1962, and was promoted to athletic director and head football coach of South Oak in 1970. During petitioner's lengthy tenure at South Oak, the racial composition of the school changed from predominantly white to predominantly black. In 1975, the DISD assigned Dr. Fredrick Todd, a black, as principal of South Oak. Petitioner and Todd clashed repeatedly over school policies, and in particular over petitioner's handling of the school's football program. These conflicts came to a head following a November 19, 1982, football game between South Oak and the predominantly white Plano High School. Todd objected to petitioner's comparison of the South Oak team with professional teams before the match, and to the fact that petitioner entered the officials' locker room after South Oak lost the game and told two black officials that he would never allow black officials to work another South Oak game. Todd also objected to petitioner's **\*706** statements, reported in a local newspaper, to the effect that the majority of South Oak players could not meet proposed National Collegiate Athletic Association academic requirements for collegiate athletes.

On March 15, 1983, Todd informed petitioner that he intended to recommend that petitioner be relieved of his duties as athletic director and head football coach at South Oak. On March 17, 1983, Todd sent a letter to John Kincaide, the director of athletics for DISD, recommending that petitioner be removed based on poor leadership and planning skills and petitioner's

comportment before and after the Plano game. Petitioner subsequently met with John Santillo, director of personnel for DISD, who suggested that petitioner should transfer schools because any remaining professional relationship with Principal Todd had been shattered. Petitioner then met with Linus Wright, the superintendent of the DISD. At this meeting, petitioner informed Superintendent Wright that he believed that Todd's criticisms of his performance as head coach were unfounded and that in fact Todd was motivated by racial animus and wished to replace petitioner with a black head coach. Superintendent Wright suggested that the difficulties between Todd and petitioner might preclude petitioner from remaining in his coaching position at South Oak, but **\*\*2708** assured petitioner that another position in the DISD would be secured for him.

On March 25, 1983, Superintendent Wright met with Kincaide, Santillo, Todd, and two other DISD officials to determine whether petitioner should remain at South Oak. After the meeting, Superintendent Wright officially affirmed Todd's recommendation to remove petitioner from his duties as coach and athletic director at South Oak. Wright indicated that he felt compelled to follow the recommendation of the school principal. Soon after this meeting, petitioner was informed by Santillo that effective August 4, 1983, he was reassigned as a teacher at the DISD Business Magnet School, a position that did not include any coaching duties. Petitioner's attendance\*707 and performance at the Business Magnet School were poor, and on May 5, 1983, Santillo wrote petitioner indicating that he was being placed on "unassigned personnel budget" and being reassigned to a temporary position in the DISD security department. Upon receiving Santillo's letter, petitioner filed this lawsuit in the District Court for the Northern District of Texas. The DISD subsequently offered petitioner a position as a teacher and freshman football and track coach at Jefferson High School. Petitioner did not accept this assignment, and on August 19, 1983, he sent his formal letter of resignation to the DISD.

Petitioner brought this action against the DISD and Principal Todd in his personal and official capacities, under 42 U.S.C. § § 1981 and 1983, alleging due process, First Amendment, and equal protection violations. Petitioner's due process claim alleged that he had a constitutionally protected property interest in his coaching position at South Oak, of which he was deprived without due process of law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                                Page 6
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

Petitioner's First Amendment claim was based on the allegation that his removal and subsequent transfer were actions taken in retaliation for his statements to the press regarding the sports program at South Oak. His equal protection and § 1981 causes of action were based on the allegation that his removal from the athletic director and head coaching positions at South Oak was motivated by the fact that he was white, and that Principal Todd, and through him the DISD, were responsible for the racially discriminatory diminution in his employment status. Petitioner also claimed that his resignation was in fact the product of racial harassment and retaliation for the exercise of his First Amendment rights and thus amounted to a constructive discharge. These claims were tried to a jury, which found for petitioner on all counts. The jury awarded petitioner $650,000 against the DISD, $150,000 against Principal Todd and the DISD jointly and severally, and $50,000 in punitive damages against Todd in his personal capacity.

*708 On motion for judgment notwithstanding the verdict, the defendants argued that liability against the DISD was improper because there was no showing that petitioner's injuries were sustained pursuant to a policy or custom of the school district. App. to Pet. for Cert. in No. 87-2084, p. 46A. The District Court rejected this argument, finding that the DISD Board of Trustees had delegated final and unreviewable authority to Superintendent Wright to reassign personnel as he saw fit. *Id.,* at 47A. In any event, the trial court found that petitioner's claim of racial discrimination was cognizable under § 1981 as well as § 1983, and indicated that "liability is permitted on solely a basis of *respondeat superior* when the claim is one of racial discrimination under § 1981." *Ibid.* The District Court set aside the punitive damages award against Principal Todd as unsupported by the evidence, found the damages award against the DISD excessive and ordered a remittitur of $200,000, but otherwise denied the defendants' motions for judgment n.o.v. and a new trial and upheld the jury's verdict in all respects. *Id.,* at 62A-63A. Principal Todd has reached a settlement with petitioner and is **2709 no longer a party to this action. *Id.,* at 82A-84 A.

On appeal, the Court of Appeals for the Fifth Circuit reversed in part and remanded. 798 F.2d 748 (1986). Initially, the court found that petitioner had no constitutionally protected property interest "in the intangible, noneconomic benefits of his assignment as coach." *Id., at 754.* Since petitioner had received

both his teacher's and coach's salary after his reassignment, the change in duties did not deprive him of any state law entitlement protected by the Due Process Clause. The Court of Appeals also set aside the jury's finding that petitioner was constructively discharged from his teaching position within the DISD. The court found the evidence insufficient to sustain the claim that petitioner's loss of coaching duties and subsequent offer of reassignment to a lesser coaching position were so humiliating or unpleasant that a reasonable employee would have felt compelled to resign.*709 *Id.,* at 754-756. While finding the question "very close," the Court of Appeals concluded that there was sufficient evidence from which a reasonable jury could conclude that Principal Todd's recommendation that petitioner be transferred from his coaching duties at South Oak was motivated by impermissible racial animus. The court noted that Todd had replaced petitioner with a black coach, that there had been racial overtones in the tension between Todd and petitioner before the Plano game, and that Todd's explanation of his unsatisfactory rating of petitioner was questionable and was not supported by the testimony of other DISD officials who spoke of petitioner's performance in laudatory terms. *Id.,* at 756-757. The court also affirmed the jury's finding that Todd's recommendation that petitioner be relieved of his coaching duties was motivated in substantial part by petitioner's protected statements to the press concerning the academic standing of athletes at South Oak. These remarks addressed matters of public concern, and Todd admitted that they were a substantial consideration in his decision to recommend that petitioner be relieved of his coaching duties.

The Court of Appeals then turned to the DISD's claim that there was insufficient evidence to support a finding of municipal liability under 42 U.S.C. § 1983. The Court of Appeals found that the District Court's instructions as to the school district's liability were deficient in two respects. First, the District Court's instruction did not make clear that the school district could be held liable for the actions of Principal Todd or Superintendent Wright only if those officials were delegated policymaking authority by the school district or acted pursuant to a well settled custom that represented official policy. Second, even if Superintendent Wright could be considered a policymaker for purposes of the transfer of school district personnel, the jury made no finding that Superintendent Wright's decision to transfer petitioner was *710 either improperly motivated or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                          Page 7
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

consciously indifferent to the improper motivations of Principal Todd. *Id., at 759-760.*

The Court of Appeals also rejected the District Court's conclusion that the DISD's liability for Principal Todd's actions could be predicated on a theory of *respondeat superior* under § 1981. The court noted that in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), this Court held that Congress did not intend municipalities to be subject to vicarious liability for the federal constitutional or statutory violations of their employees. The Court of Appeals reasoned that "[t]o impose such vicarious liability for only certain wrongs based on section 1981 apparently would contravene the congressional intent behind section 1983." 798 F.2d, at 762.

The Court of Appeals published a second opinion in rejecting petitioner's suggestion for rehearing en banc in which the panel gave further explanation of its holding that *respondeat superior* liability against local **\*\*2710** governmental entities was unavailable under § 1981. 837 F.2d 1244 (1988). The Court of Appeals noted that our decision in *Monell* rested in part on the conclusion that " 'creation of a federal law of *respondeat superior* would have raised all the constitutional problems' " associated with the Sherman amendment which was rejected by the framers of § 1983. 837 F.2d, at 1247, quoting *Monell, supra,* 436 U.S., at 693, 98 S.Ct., at 2037.

Because the Court of Appeals' conclusion that local governmental bodies cannot be held liable under a theory of *respondeat superior* for their employees' violations of the rights guaranteed by § 1981 conflicts with the decisions of other Courts of Appeals, see, *e.g., Springer v. Seaman,* 821 F.2d 871, 880-881 (C.A.1, 1987); *Leonard v. Frankfort Electric and Water Plant Bd.,* 752 F.2d 189, 194, n. 9 (C.A.6, 1985) (dictum), we granted Norman Jett's petition for certiorari in No. 87-2084. 488 U.S. 940, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). We also granted the DISD's cross-petition for certiorari in No. 88-214, *ibid.,* to clarify the application of our decisions in \***711***St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), and *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion), to the school district's potential liability for the discriminatory actions of Principal Todd.

We note that at no stage in the proceedings has the school district raised the contention that the substantive scope of the "right ... to make ... contracts" protected by § 1981 does not reach the injury suffered by petitioner here. See *Patterson v. McLean Credit Union,* 491 U.S. 164, 176-177, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Instead, the school district has argued that the limitations on municipal liability under § 1983 are applicable to violations of the rights protected by § 1981. Because petitioner has obtained a jury verdict to the effect that Dr. Todd violated his rights under § 1981, and the school district has never contested the judgment below on the ground that § 1981 does not reach petitioner's employment injury, we assume for purposes of these cases, without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment. See *Canton v. Harris,* 489 U.S. 378, 388-389, n. 8, 109 S.Ct. 1197, 1204, n. 8, 103 L.Ed.2d 412 (1989); *United States v. Leon,* 468 U.S. 897, 905, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984). See also this Court's Rule 21.1(a).

## II

Title 42 U.S.C. § 1981, as amended, provides that:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other."

In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981. While petitioner concedes that the text **\*712** of the 1866 Act itself is completely silent on this score, see Brief for Petitioner 26, petitioner contends that a civil remedy was nonetheless intended for the violation of the rights contained in § 1 of the 1866 Act. Petitioner argues that Congress wished to adopt the prevailing approach to municipal liability to effectuate this damages remedy, which was *respondeat superior.* Petitioner concludes that with this federal damages remedy in place in 1866, it was not the intent of the 42d Congress, which passed present day § 1983, to narrow the more sweeping remedy against local governments which Congress

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                    Page 8
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

had created five years earlier. Since "repeals by implication are not favored," *id.,* at 15 (citations omitted), petitioner concludes that § 1981 **2711 must provide an independent cause of action for racial discrimination against local governmental entities, and that this broader remedy is unaffected by the constraints on municipal liability announced in *Monell.* In the alternative, petitioner argues that even if § 1981 does not create an express cause of action for damages against local governmental entities, 42 U.S.C. § 1988 invites this Court to craft a remedy by looking to common law principles, which again point to a rule of *respondeat superior.* Brief for Petitioner 27-29. To examine these contentions, we must consider the text and history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of § § 1981 and 1983 respectively.

Justice BRENNAN's dissent errs in asserting that we have strayed from the question upon which we granted certiorari. See *post,* at 2725. Jett's petition for certiorari asks us to decide "[w]hether a public employee who claims job discrimination on the basis of race must show that the discrimination resulted from official 'policy or custom' in order to recover under 42 U.S.C. § 1981." Pet. for Cert. in No. 87-2084, p. i. In answering this question, the lower court looked to the relationship between § § 1981 and 1983, and refused to differentiate "between sections 1981 and 1983 with respect to municipal *respondeat superior* liability." 837 F.2d, at 1247. In both his petition for certiorari and his brief on the merits **713 in this Court, petitioner Jett took issue with the Court of Appeals' conclusion that the express damages remedy under § 1983 militated against the creation or implication of a broader damages remedy under § 1981. See Pet. for Cert. in No. 87-2084, pp. 14-16; Brief for Petitioner 14-25. Moreover, petitioner concedes that "private causes of action under Sections 1981 and 1982 do not arise from the express language of those statutes," Brief for Petitioner 27, and asks this Court to "look to state law or to fashion a single federal rule," of municipal damages liability under § 1981. *Id.,* at 28-29 (footnote omitted). We think it obvious that the question whether a federal damages remedy broader than that provided by § 1983 should be implied from § 1981 is fairly included in the question upon which we granted certiorari.

Equally implausible is Justice BRENNAN's suggestion that we have somehow unwittingly answered this question in the past. See *post,* at 2726.

Most of the cases cited by the dissent involved private conduct, and thus quite obviously could not have considered the propriety of judicial implication of a federal damages remedy under § 1981 in the state action context we address here. The only two cases cited by Justice BRENNAN which involved state actors, *Takahashi v. Fish and Game Comm'n,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), and *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), are completely inapposite. See *post,* at 2728. *Takahashi* involved a mandamus action filed in state court, and thus understandably had nothing to say about federal damages remedies against state actors under § 1981. *Hurd* also involved only injunctive relief, and could not have considered the relationship of § 1981 to § 1983, since the latter statute did not apply to the District of Columbia at the time of our decision in that case. See *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

A

On December 18, 1865, the Secretary of State certified that the Thirteenth Amendment had been ratified and become part of the Constitution. Less than three weeks later, **714 Senator Lyman Trumbull, Chairman of the Senate Judiciary Committee, introduced S. 61, which was to become the Civil Rights Act of 1866. See Cong. Globe, 39th Cong., 1st Sess., 129 (1866). The bill had eight sections as introduced, the first three of which are relevant to our inquiry here. Section 1, as introduced to the Senate by Trumbull, provided:
**2712 "That there shall be no discrimination in civil rights or immunities among the inhabitants of any State or Territory of the United States on account of race, color, or previous condition of slavery; but the inhabitants of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall have the same right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding." *Id.,* at 474.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                      Page 9
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

On January 29, 1866, Senator Trumbull took the floor to describe S. 61 to his colleagues. Trumbull indicated that "the first section will amount to nothing more than the declaration in the Constitution itself unless we have the machinery to carry it into effect." *Id.,* at 475. The Senator then alluded to the second section of the bill which provided:

"That any person who under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, ... **\*715** or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court." *Ibid.*

Senator Trumbull told the Senate: "This is the valuable section of the bill so far as protecting the rights of freedmen is concerned." *Ibid.* This section would allow for criminal prosecution of those who denied the freedman the rights protected by § 1, and Trumbull felt, in retrospect somewhat naively, that, "it will only be necessary to go into the late slaveholding States and subject to fine and imprisonment one or two in a State, and the most prominent ones I should hope at that, to break up this whole business." *Ibid.*

Trumbull then described the third section of the bill, which, as later enacted, provided in pertinent part:

"That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offenses committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever ... such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain

cases,' approved March three, eighteen hundred and sixty three, and all acts amendatory thereof." 14 Stat. 27.

**\*716** Trumbull described this section as "giving to the courts of the United States jurisdiction over all persons committing offenses against the provisions of this act, and also over the cases of persons who are discriminated against by State laws or customs." Cong. Globe, 39th Cong., 1st Sess., 475 (1866). Much of the debate in both the **\*\*2713** Senate and the House over the 1866 Act was taken up with the meaning of the terms "civil rights or immunities" contained in the first sentence of § 1 of the bill as introduced in the Senate. The phrase remained in the bill throughout the Senate's consideration of S. 61, but was stricken by amendment in the House shortly before that body passed the bill.

Discussion of § 2 of the bill focused on both the propriety and constitutionality of subjecting state officers to criminal punishment for effectuating discriminatory state laws. Opponents of the bill consistently referred to criminal punishment and fines being levied against state judges and other state officers for the enforcement of state laws in conflict with § 1. See *id.,* at 475, 499, 500 (Sen. Cowan); *id.,* at 598 (Sen. Davis); *id.,* at 1121 (Rep. Rogers); *id.,* at 1154 (Rep. Eldridge). They never intimated that they understood any part of the bill to create a federal damages remedy against state officers or the political subdivisions of the States.

Debate concerning § 3 focused on the right of removal of civil and criminal proceedings commenced in state court. Senator Howard, an opponent, engaged in a section by section criticism of the bill after its introduction by Trumbull. As to § 3 he gave numerous examples of his perception of its operation. All of these involved removal of actions from state court, and none alluded to original federal jurisdiction except in the case of the exclusive criminal jurisdiction expressly provided for. *Id.,* at 479 ("All such cases will be subject to be removed into the Federal courts"); see also *id.,* at 598 (Sen. Davis) ("Section three provides that all suits brought in State courts that come within the purview of the previous sections may be removed into the Federal courts"). **\*717** On February 2, 1866, the bill passed the Senate by a vote of 33 to 12 and was sent to the House. *Id.,* at 606-607.

Representative Wilson of Iowa, Chairman of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                              Page 10
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

House Judiciary Committee, introduced S. 61 in the House on March 1, 1866. Of § 1 of the bill, he said: "Mr. Speaker, I think I may safely affirm that this bill, so far as it declares the equality of all citizens in the enjoyment of civil rights and immunities merely affirms existing law. We are following the Constitution.... It is not the object of this bill to establish new rights, but to protect and enforce those which already belong to every citizen." *Id.,* at 1117.

As did Trumbull in the Senate, Wilson immediately alluded to § 2, the criminal provision, as the main enforcement mechanism of the bill. "In order to accomplish this end, it is necessary to fortify the declaratory portions of this bill with sanctions as will render it effective." *Id.,* at 1118.

The only discussion of a civil remedy in the House debates surrounding the 1866 Act came in response to Representative Bingham's proposal to send the bill back to the House Judiciary Committee with instructions "to strike out all parts of said bill which are penal and which authorize criminal proceedings, and in lieu thereof to give all citizens of the United States injured by denial or violation of any of the other rights secured or protected by said act, an action in the United States courts, with double costs in all cases of emergency, without regard to the amount of damages." *Id.,* at 1266, 1291. Bingham was opposed to the civil rights bill strictly on the grounds that it exceeded the constitutional power of the Federal Government. As to States "sustaining their full constitutional relation to the Government of the United States," Bingham, along with several other Republicans, doubted the power of the Federal Government to interfere with the reserved powers of the States to define property and other rights. *Id.,* at 1292. While Bingham realized that the same constitutional objections applied to his proposal *718 for modification of the bill, he felt that these would make the bill "less oppressive, and therefore less objectionable." *Id.,* at 1291.

**2714 Representative Wilson responded to his Republican colleague's proposal. Wilson pointed out that there was no difference in constitutional principle "between saying that the citizen shall be protected by the legislative power of the United States in his rights by civil remedy and declaring that he shall be protected by penal enactments against those who interfere with his rights." *Id.,* at 1295. Wilson did however see a difference in the effectiveness of the two remedies. He stated:

"This bill proposes that the humblest citizen shall have full and ample protection at the cost of the Government, whose duty it is to protect him. The [Bingham] amendment ... recognizes the principle involved, but it says that the citizen despoiled of his rights, instead of being properly protected by the Government, must press his own way through the courts and pay the bills attendant thereon.... The highest obligation which the Government owes to the citizen in return for the allegiance exacted of him is to secure him in the protection of his rights. Under the amendment of the gentleman the citizen can only receive that protection in the form of a few dollars in the way of damages, if he shall be so fortunate as to recover a verdict against a solvent wrongdoer. This is called protection. This is what we are asked to do in the way of enforcing the bill of rights. Dollars are weighed against the right of life, liberty and property." *Ibid.*

Bingham's proposal was thereafter defeated by a vote of 113 to 37. *Id.,* at 1296. The Senate bill was subsequently carried in the House, after the removal of the "civil rights and immunities" language in § 1, and an amendment adding a ninth section to the bill providing for a final appeal to the Supreme Court in cases arising under the Act. *Id.,* at 1366-1367. *719 On March 15, 1866, the Senate concurred in the House amendments without a record vote, see *id.,* at 1413-1416, and the bill was sent to the President.

After holding the bill for a full 10 days, President Johnson vetoed the bill and returned it to the Senate with his objections. The President's criticisms of § § 2 and 3 of the bill, and Senator Trumbull's responses thereto, are particularly illuminating. As to § 2, the President declared that it was designed to counteract discriminatory state legislation, "by imposing fine and imprisonment upon the legislators who may pass such ... laws." *Id.,* at 1680. As to the third section, the President indicated that it would vest exclusive federal jurisdiction over all civil and criminal cases where the rights guaranteed in § 1 were affected. *Ibid.*

Trumbull took issue with both statements. As to the charge that § 2 would result in the criminal prosecution of state legislators, Trumbull replied:
"Who is to be punished? Is the law to be punished? Are the men who make the law to be punished? Is that the language of the bill? Not at all. If any person, 'under color of any law,' shall subject another to the deprivation of a right to which he is

entitled, he is to be punished. Who? The person who, under the color of the law, does the act, not the men who made the law. In some communities in the South a custom prevails by which different punishment is inflicted upon the blacks from that meted out to whites for the same offense. Does this section propose to punish the community where the custom prevails? Or is it to punish the person who, under color of the custom, deprives the party of his right? It is a manifest perversion of the meaning of the section to assert anything else." *Id.,* at 1758.

Trumbull also answered the President's charge that the third section of the bill created original federal jurisdiction in all cases where a freedman was involved in a state court proceeding. He stated:

*\*720* "So in reference to this third section, the jurisdiction is given to the Federal courts of a case affecting the person that is discriminated against. Now, he is *\*\*2715* not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a Legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict with a statute of the United States; and it is not to be presumed that any judge of a State court would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court." *Id.,* at 1759.

Senator Trumbull then went on to indicate that "[i]f it be necessary in order to protect the freedman in his rights that he should have authority to go into the Federal courts in all cases where a custom [of discrimination] prevails in a State ... I think we have the authority to confer that jurisdiction under the second clause of the constitutional amendment." *Ibid.* Two days later, on April 6, 1866, the Senate overrode the President's veto by a vote of 33 to 15. *Id.,* at 1809. On April 9, 1866, the House received both the bill and the President's veto message which were read on the floor. *Id.,* at 1857-1860. The House then promptly overrode the President's veto by a vote of 122 to 41, *id.,* at 1861, and the Civil Rights Act of 1866 became law.

Several points relevant to our present inquiry emerge

from the history surrounding the adoption of the Civil Rights Act of 1866. First, nowhere did the Act provide for an express damages remedy for violation of the provisions of § 1. See *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 414, n. 13, 88 S.Ct. 2186, 2189, n. 13, 20 L.Ed.2d 1189 (1968) (noting "[t]hat 42 U.S.C. § 1982 is couched in declaratory*\*721* terms and provides no explicit method of enforcement"); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969); *Cannon v. University of Chicago,* 441 U.S. 677, 690, n. 12, 99 S.Ct. 1946, 1954, n. 12, 60 L.Ed.2d 560 (1979); *id.,* at 728, 99 S.Ct., at 1947 (WHITE, J., dissenting). Second, no original federal jurisdiction was created by the 1866 Act which could support a federal damages remedy against state actors. See *Allen v. McCurry,* 449 U.S. 90, 99, n. 14, 101 S.Ct. 411, 417, n. 14, 66 L.Ed.2d 308 (1980) (§ 3 of the 1866 Act embodied remedy of "post-judgment removal for state-court defendants whose civil rights were threatened"); *Georgia v. Rachel,* 384 U.S. 780, 788-789, 86 S.Ct. 1783, 1788-1789, 16 L.Ed.2d 925 (1966); *Strauder v. West Virginia,* 100 U.S. 303, 311-312, 25 L.Ed. 664 (1880). Finally, the penal provision, the only provision explicitly directed at state officials, was, in Senator Trumbull's words, designed to punish the "person who, under the color of the law, does the act," not "the community where the custom prevails." Cong. Globe, 39th Cong., 1st Sess., 1758 (1866).

Two events subsequent to the passage of the 1866 Act bear on the relationship between § § 1981 and 1983. First, on June 13, 1866, just over two months after the passage of the 1866 Act, a joint resolution was passed sending the Fourteenth Amendment to the States for ratification. As we have noted in the past, the first section of the 1866 Act "constituted an initial blueprint of the Fourteenth Amendment." *General Building Contractors Assn., Inc. v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982). Many of the Members of the 39th Congress viewed § 1 of the Fourteenth Amendment as "constitutionalizing" and expanding the protections of the 1866 Act and viewed what became § 5 of the Amendment as laying to rest doubts shared by both sides of the aisle concerning the constitutionality of that measure. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 2465 (1866) (Rep. Thayer) ("As I understand it, it is but incorporating in the Constitution of the United States the principle of the civil rights bill which has *\*\*2716* lately become a law"); *id.,* at 2498 (Rep. Broomall); *id.,* at 2459 (Rep. Stevens); *id.,* at 2461 (Rep. Finck); *id.,* at

109 S.Ct. 2702                                                                                                    Page 12
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

2467 *722 Rep. Boyer). See also *Hurd v. Hodge,* 334 U.S., at 32, 68 S.Ct., at 851 ("[A]s the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land") (footnote omitted).

Second, the 41st Congress reenacted the substance of the 1866 Act in the Fourteenth Amendment statute, the Enforcement Act of 1870. 16 Stat. 144. Section 16 of the 1870 Act was modeled after § 1 of the 1866 Act. Section 17 reenacted with some modification the criminal provisions of § 2 of the earlier civil rights law, and § 18 of the 1870 Act provided that the entire 1866 Act was reenacted. See *Civil Rights Cases,* 109 U.S. 3, 16-17 (1883). We have thus recognized that present day 42 U.S.C. § 1981 is both a Thirteenth and a Fourteenth Amendment statute. *Runyon v. McCrary,* 427 U.S. 160, 168-169, n. 8, 96 S.Ct. 2586, 2593-2594, n. 8, 49 L.Ed.2d 415 (1976); *id.,* at 190, 96 S.Ct., at 2604 (STEVENS, J., concurring); *General Building Contractors, supra,* at 383-386.

.

### B

What is now § 1983 was enacted as § 1 of "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States and For other Purposes," Act of April 20, 1871, ch. 22, 17 Stat. 13. The immediate impetus for the bill was evidence of widespread acts of violence perpetrated against the freedmen and loyal white citizens by groups such as the Ku Klux Klan. On March 23, 1871, President Grant sent a message to Congress indicating that the Klan's reign of terror in the Southern States had "render [ed] life and property insecure," and that "the power to correct these evils [was] beyond the control of State authorities." Cong. Globe, 42nd Cong., 1st Sess., 244 (1871). A special joint committee consisting of 10 distinguished Republicans, 5 from each House of Congress, was formed in response to President Grant's call for legislation, and drafted the bill that became what is now known as the Ku Klux Act. As enacted, *723 § § 2 through 6 of the bill specifically addressed the problem of the private acts of violence perpetrated by groups like the Klan.

Unlike the rest of the bill, § 1 was not specifically addressed to the activities of the Klan. As passed by the 42d Congress, § 1 provided in full:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases." 17 Stat. 13.

Three points are immediately clear from the face of the Act itself. First, unlike any portion of the 1866 Act, this statute explicitly ordained that any "person" acting under color of state law or custom who was responsible for a deprivation of constitutional rights would "be liable to the party injured in any action at law." Thus, "the 1871 Act was designed to expose state and local officials to a new form of liability." **2717 *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 259, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616 (1981). Second, the 1871 Act explicitly provided original federal jurisdiction for prosecution of these civil actions against state *724 actors. See *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) ("[A] principle purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims"); accord, *Mitchum v. Foster,* 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972). Third, the first section of the 1871 Act was explicitly modeled on § 2 of the 1866 Act, and was seen by both opponents and proponents as amending and enhancing the protections of the 1866 Act by providing a new civil remedy for its enforcement against state actors. See *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 610-611, n. 25, 99 S.Ct. 1905, 1912, n. 25, 60 L.Ed.2d 508 (1979) ("Section 1 of the [1871] Act generated the least concern; it merely added civil remedies to the criminal penalties imposed by the 1866 Civil Rights Act"); *Monroe v. Pape,* 365 U.S. 167, 185, 81 S.Ct.

491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

473, 483, 5 L.Ed.2d 492 (1961); *Mitchum, supra,*
407 U.S., at 238, 92 S.Ct., at 2160.

Even a cursory glance at the House and Senate
debates on the 1871 Act makes these three points
clear.   In introducing the bill to the House,
Representative Shellabarger, who served on the joint
committee which drafted the bill, stated:
"The model for it will be found in the second section
of the act of April 9, 1866, known as the 'civil rights
act.'  That section provides a criminal proceeding in
identically the same case as this one provides a civil
remedy for, except that the deprivation under color of
State law must, under the civil rights act, have been
on account of race, color or former slavery." Cong.
Globe, 42d Cong., 1st Sess., App. 68 (1871).

Representative Shellabarger added that § 1 provided
a civil remedy "on the same state of facts" as § 2 of
the Civil Rights Act of 1866.   *Ibid.*   Obviously
Representative Shellabarger's introduction of § 1 of
the bill to his colleagues would have been altogether
different if he had been of the view that the 39th
Congress, of which he had been a Member, had
*already* created a *broader* federal damages remedy
against state actors in 1866.   The view that § 1 of
the 1871 Act was an amendment or supplement to
the 1866 Act designed to create a new civil remedy
against state actors was *725 echoed throughout the
debates in the House. See *id.*, at 461 (Rep. Coburn);
*id.*, at App. 312-313 (Rep. Burchard).   Opponents of
§ 1 operated on this same understanding. See *id.*, at
429 (Rep. McHenry) ("The first section of the bill is
intended as an amendment of the civil rights act");
*id.*, at 365 (Rep. Arthur).

Both proponents and opponents in the House viewed
§ 1 as working an *expansion* of federal jurisdiction.
Supporters continually referred to the failure of the
state courts to enforce federal law designed for the
protection of the freedman, and saw § 1 as
remedying this situation by interposing the federal
courts between the State and citizens of the United
States.  See *id.*, at 376 (Rep. Lowe) ("The case has
arisen ... when the Federal Government must resort to
its own agencies to carry its own authority into
execution.  Hence this bill throws open the doors of
the United States courts to those whose rights under
the Constitution are denied or impaired").
Opponents recognized the expansion of original
jurisdiction and railed against it on policy and
constitutional grounds.    See *id.*, at 429 (Rep.
McHenry) ("The first section of the bill ... vests in the

Federal courts jurisdiction to determine the individual
rights of citizens of the same State;  a jurisdiction
which of right belongs only to the State tribunals");
*id.*, at App. 50 (Rep. Kerr);  *id.*, at 365-366 (Rep.
Authur);  *id.*, at 373 (Rep. Archer).

The Senate debates on § 1 of the 1871 Act are of a
similar tenor.    Senator Edmunds, Chairman of the
Senate Judiciary Committee, and one of the members
of the **2718 joint committee which drafted the bill,
introduced § 1 to the Senate in the following terms:
"The first section is one that I believe nobody objects
to, as defining the rights secured by the Constitution
of the United States when they are assailed by any
State law or under color of any State law, and it is
merely carrying out the principles of the civil rights
bill, which have *726 since become a part of the
Constitution." *Id.*, at 568, quoted in *Monroe v. Pape,
supra,* 365 U.S., at 171, 81 S.Ct., at 475.

Again Senators addressed § 1 of the Act as creating a
new civil remedy and expanding federal jurisdiction
to accommodate it in terms incompatible with the
supposition that the 1866 Act had already created
such a cause of action against state actors.    See
Cong. Globe, 42d Cong., 1st Sess., 653 (1871) (Sen.
Osborn) ("I believe the true remedy lies chiefly in the
United States district and circuit courts.  If the State
courts had proven themselves competent ... we
should not have been called upon to legislate upon
this subject at all.  But they have not done so"); *id.*,
at App. 216 (Sen. Thurman) ("Its whole effect is to
give to the Federal Judiciary that which does not
belong to it-a jurisdiction that may be constitutionally
conferred upon it, I grant, but that has never yet been
conferred upon it");   see also *id.*, at 501 (Sen.
Frelinghuysen).

The final aspect of the history behind the adoption of
present day § 1983 relevant to the question before us
is the rejection by the 42d Congress of the Sherman
amendment, which specifically proposed the
imposition of a form of vicarious liability on
municipal governments.       This history was
thoroughly canvassed in the Court's opinion in
*Monell,* and only its broadest outlines need be traced
here.  Immediately prior to the vote on the bill in the
Senate, Senator Sherman introduced an amendment
which would have constituted a seventh section of
the 1871 Act.  Cong. Globe, 42d Cong., 1st Sess.,
663 (1871).  In its original form, the amendment did
not place liability on municipal corporations *per se,*
but instead rendered the inhabitants of a municipality

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                        Page 14
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

liable in civil damages for injury inflicted to persons or property in violation of federal constitutional and statutory guarantees "by any persons riotously and tumultuously assembled together." The initial Sherman amendment was passed by the Senate, but was rejected by the House and became the subject of a conference committee. The committee draft of the Sherman **\*727** amendment explicitly provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, "the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense." *Id.*, at 755. Judgments in such actions were to run directly against the municipal corporation, and were to be enforceable through a "lien ... upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof." *Ibid.*

Opposition to the amendment in this form was vehement, and ran across party lines, extending to many Republicans who had voted for § 1 of the 1871 Act, as well as earlier Reconstruction legislation, including the Civil Rights Act of 1866. See *id.*, at 758 (Sen. Trumbull); *id.*, at 798-799 (Rep. Farnsworth).

The Sherman amendment was regarded as imposing a new and theretofore untested form of liability on municipal governments. As Representative Blair put it:
"The proposition known as the Sherman amendment-and to that I shall confine myself in the remarks which I may address to the House-is entirely new. It is altogether without a precedent in this country. Congress has never asserted or attempted to assert, so far as I know, any such authority. That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may **\*\*2719** please upon the municipalities, which are the creations of the States alone." *Id.*, at 795 (Rep. Blair), partially quoted in *Monell,* 436 U.S., at 673-674, 98 S.Ct., at 2026-27.

See also Cong. Globe, 42d Cong., 1st Sess., 758 (1871) (Sen. Trumbull) (referring to the conference committee version of the Sherman amendment as "asserting principles never before exercised, on the part of the United States at any rate").

The strong adverse reaction to the Sherman amendment, and continued references to its complete novelty in the law of **\*728** the United States, make it

difficult to entertain petitioner's contention that the 1866 Act had already created a form of vicarious liability against municipal governments. Equally important is the basis for opposition. As we noted in *Monell,* a large number of those who objected to the principle of vicarious liability embodied in the Sherman amendment were of the view that Congress did not have the power to assign the duty to enforce federal law to state instrumentalities by making them liable for the constitutional violations of others. See *Monell, supra,* at 674-679, 98 S.Ct., at 2027-30. As Representative Farnsworth put it: "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Cong. Globe, 42d Cong., 1st Sess., 799 (1871). Three decisions of this Court lent direct support to the constitutional arguments of the opponents, see *Collector v. Day,* 11 Wall. 113, 20 L.Ed. 122 (1871); *Kentucky v. Dennison,* 24 How. 66, 16 L.Ed. 717 (1861), and *Prigg v. Pennsylvania,* 16 Pet. 539, 10 L.Ed. 1060 (1842). *Day* and *Prigg* were repeatedly cited in the House debates on the Sherman amendment. See *Monell, supra,* 436 U.S., at 673-683, n. 30, 98 S.Ct., at 2027-32, n. 30. In *Prigg,* perhaps the most famous and most oft cited of this line of cases, Justice Story wrote for the Court that Congress could not constitutionally "insist that the states are bound to provide means to carry into effect the duties of the national government." *Prigg, supra,* 16 Pet., at 616. In *Monell,* we concluded that it was this constitutional objection which was the driving force behind the eventual rejection of the Sherman amendment. *Monell, supra,* 436 U.S., at 676, 98 S.Ct., at 2028.

Although the debate surrounding the constitutional principles established in *Prigg, Dennison,* and *Day* occurred in the context of the Sherman amendment and not § 1 of the 1871 Act, in *Monell* we found it quite inconceivable that the same legislators who opposed vicarious liability on constitutional grounds in the Sherman amendment debates would have silently adopted the same principle in § 1. Because the "creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with **\*729** the obligation to keep the peace" embodied in the Sherman amendment, we held that the existence of the constitutional background of *Prigg, Dennison,* and *Day* "compell[ed] the conclusion that Congress did not intend municipalities to be held liable [under § 1] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell, supra,* 436 U.S., at 691, 98 S.Ct., at 2036.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                              Page 15
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

Both *Prigg* and *Dennison* were on the books when the 39th Congress enacted § 1 of the 1866 Act. Supporters of the 1866 Act were clearly aware of *Prigg,* and cited the case for the proposition that the Federal Government could use its *own* instrumentalities to effectuate its laws. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 1294 (1871) (Rep. Wilson). There was, however, no suggestion in the debates surrounding the 1866 Act that the statute violated *Prigg's* complementary holding that federal duties could not be imposed on state instrumentalities by rendering them vicariously liable for the violations of others. Just as it affected our interpretation of § 1 of the 1871 Act in *Monell,* we think the complete silence on this score in the face of a constitutional background known to those who enacted the 1866 Act militates against imputing to Congress an intent to **2720 silently impose vicarious liability on municipalities under the earlier statute. Cf. *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

As originally enacted, the text of § 1983 referred only to the deprivation "of any rights, privileges, or immunities secured by the Constitution of the United States." In 1874, Congress enacted the Revised Statutes of the United States. The words "and laws" were added to the remedial provision of § 1 of the 1871 Act which became Rev.Stat. § 1979. At the same time, the jurisdictional grant in § 1 of the 1871 Act was split into two different provisions, Rev.Stat. § 563(12), granting jurisdiction to the district courts of the United States to redress deprivations under color of state law of any right secured by the Constitution or "by any law of the United States," and Rev.Stat. § 629(16), granting jurisdiction*730 to the old circuit courts for any action alleging deprivation under state authority of any right secured "by any law providing for equal rights." In 1911, Congress abolished the circuit courts of the United States and the Code's definition of the jurisdiction of the district courts was taken from Rev.Stat. § 629(16) with its narrower "providing for equal rights" language. This language is now contained in 28 U.S.C. § 1343(3), the jurisdictional counterpart of § 1983. *Chapman,* 441 U.S. at 608, 99 S.Ct. at 1911.

There is no commentary or other information surrounding the addition of the phrase "and laws" to the remedial provisions of present day § 1983. The revisers' draft of their work, published in 1872, and the marginal notes to § § 629(16) and 563(12),

which appeared in the completed version of the Revised Statutes themselves, provide some clues as to Congress' intent in adopting the change. The marginal note to § 629(16) states: "Suits to redress the deprivation of rights secured by the Constitution and laws to persons within jurisdiction of United States." The note then cross cites to § 1 of the 1871 Act, § § 16 and 18 of the Enforcement Act of 1870, and § 3 of the 1866 Act. Both § § 629(16) and 563(12) were followed by bracketed citations to Rev.Stat. § 1979, present day § 1983, and Rev.Stat. § 1977, present day § 1981. Rev.Stat. 95, 111 (1874). The revisers' draft of 1872 contains the following notation concerning § 629(16):
"It may have been the intention of Congress to provide, by this enactment [the Civil Rights Act of 1871], for all the cases of deprivations mentioned in the previous act of 1870, and thus actually to supersede the indefinite provision contained in that act. But as it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended, it is deemed safer to add a reference to the civil rights act." 1 Revision of the United States Statutes as *731 Drafted by the Commissioners Appointed for that Purpose 362 (1872).

We have noted in the past that the addition of the phrase "and laws" to the text of what is now § 1983, although not without its ambiguities as to intended scope, was *at least* intended to make clear that the guarantees contained in § 1 of the 1866 Act and § 16 of the Enforcement Act of 1870 were to be enforced against state actors through the express remedy for damages contained in § 1983. See *Chapman,* 441 U.S., at 617, 99 S.Ct., at 1915-16 (footnote omitted) (Section 1 of the 1871 Act "served only to ensure that an individual had a cause of action for violations of the Constitution, which in the Fourteenth Amendment embodied and extended to all individuals as against state action the substantive protections afforded by § 1 of the 1866 Act"); *id.,* at 668, 99 S.Ct., at 1942 (WHITE, J., concurring in judgment). See also *Maine v. Thiboutot,* 448 U.S. 1, 7, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1980) ("There is no express explanation offered for the insertion of the phrase 'and laws.' On the one hand, a principal purpose of the added language was to ensure that federal legislation providing specifically for equality of **2721 rights would be brought within the ambit of the civil action authorized by that statute") (some internal quotations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                               Page 16
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

### III

[1] We think the history of the 1866 Act and the 1871 Act recounted above indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981. That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the "state action" portion of § 1981, where Congress has established its own remedial scheme. In the context of the application of § 1981 and § 1982 to private actors, we "had little choice but to hold that aggrieved individuals **\*732** could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*" *Cannon,* 441 U.S., at 728, 99 S.Ct., at 1974 (WHITE, J., dissenting) (emphasis added; footnote omitted). That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute. See *National Railroad Passenger Corporation v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies"); accord, *Fleischmann Corp. v. Maier Brewing Co.,* 386 U.S. 714, 720, 87 S.Ct. 1404, 1408, 18 L.Ed.2d 475 (1967); *Cannon, supra,* at 718-724, 99 S.Ct., at 1968-1972 (WHITE, J., dissenting).

Petitioner cites 42 U.S.C. § 1988, and argues that that provision "compels adoption of a *respondeat superior* standard." Brief for Petitioner 27. That section, as amended, provides in pertinent part:

"The jurisdiction in civil ... matters conferred on the district courts by the provisions of this [chapter and Title 18], for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against

law, the common law, as modified and changed by the constitution and the statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause...."

**\*733** Far from supporting petitioner's call for the creation or implication of a damages remedy broader than that provided by § 1983, we think the plain language of § 1988 supports the result we reach here. As we noted in *Moor v. County of Alameda,* 411 U.S. 693, 706, 93 S.Ct. 1785, 1794, 36 L.Ed.2d 596 (1973), in rejecting an argument similar to petitioner's contention here: "[Section 1988] expressly limits the authority granted federal courts to look to the common law, as modified by state law, to instances in which that law 'is not inconsistent with the Constitution and laws of the United States.' " *Ibid.* See also *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). As we indicated in *Moor,* "Congress did not intend, *as a matter of federal law,* to impose vicarious liability on municipalities for violations of federal civil rights by their employees." **\*\*2722** 411 U.S., at 710, n. 27, 93 S.Ct., at 1796, n. 27. Section 1983 provides an explicit remedy in damages which, with its limitations on municipal liability, Congress thought "suitable to carry ... into effect" the rights guaranteed by § 1981 as against state actors. Thus, if anything, § 1988 points us in the direction of the express federal damages remedy for enforcement of the rights contained in § 1981, not state common law principles.

Our conclusion that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units finds support in our decision in *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). In *Brown,* we dealt with the interaction of § 1981 and the provisions of § 717 of Title VII, of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, which proscribe discrimination in federal employment and establish an administrative and judicial enforcement scheme. The petitioner in *Brown* had been passed over for federal promotion on two occasions, and after the second occasion he filed a complaint with his agency alleging that he was denied promotion because of his race. The agency's Director of Civil Rights concluded after investigation that race had not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702

Page 17

491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

entered into the promotional process, and informed Brown by *734 letter of his right under § 717(c) to bring an action in federal district court within 30 days of the agency's final decision. Forty-two days later Brown filed suit in federal court, alleging violations of both Title VII and § 1981. The lower courts dismissed Brown's complaint as untimely under § 717(c), and this Court affirmed, holding that § 717 of Title VII constituted the exclusive remedy for allegations of racial discrimination in federal employment.

The Court began its analysis by noting that "Congress simply failed explicitly to describe § 717's position in the constellation of antidiscrimination law." 425 U.S., at 825, 96 S.Ct., at 1964. We noted that in 1972, when Congress extended the strictures of Title VII to federal employment, the availability of an implied damages remedy under § 1981 for employment discrimination was not yet clear. _Id.,_ at 828, 96 S.Ct., at 1965. The Court found that this perception on the part of Congress, "seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." _Id.,_ at 828-829, 96 S.Ct., at 1966. The Court bolstered its holding by invoking the general principle that "a precisely drawn, detailed statute pre-empts more general remedies." _Id.,_ at 834, 96 S.Ct., at 1968.

In _Brown,_ as here, while Congress has not definitively spoken as to the relationship of § 1981 and § 1983, there is very strong evidence that the 42d Congress which enacted the precursor of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors. The historical evidence surrounding the revision of 1874 further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983. That remedial scheme embodies certain limitations on the liability of local governmental entities based on federalism concerns which had very real constitutional underpinnings for the Reconstruction Congresses. As petitioner *735 here would have it, the careful balance drawn by the 42d Congress between local autonomy and fiscal integrity and the vindication of federal rights could be completely upset by an artifice of pleading.

[2] Since our decision in _Monell,_ the Courts of

Appeals have unanimously rejected the contention, analogous to petitioner's argument here, that the doctrine of _respondeat superior_ is available against a municipal entity under a _Bivens_-type action implied directly from the Fourteenth Amendment. See, _e.g.,_ **2723**_Tarpley v. Greene,_ 221 U.S.App.D.C. 227, 237, n. 25, 684 F.2d 1, 11, n. 25 (1982) (Edwards, J.) ("Because Congress has elected not to impose _respondeat superior_ liability under § 1983, appellant invites this court to expand the remedial options under _Bivens_ [_v. Six Unknown Fed. Narcotics Agents,_ 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)]. We can find no good logic nor sound legal basis for this view; we therefore decline the invitation"); accord, _Owen v. Independence,_ 589 F.2d 335, 337 (CA8 1978); _Thomas v. Shipka,_ 818 F.2d 496 (CA6 1987); _Ellis v. Blum,_ 643 F.2d 68, 85 (CA2 1981); _Cale v. Covington,_ 586 F.2d 311, 317 (CA4 1978); _Molina v. Richardson,_ 578 F.2d 846 (CA9), cert. denied, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the protections of the 1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected *736 by § 1981 was caused by a custom or policy within the meaning of _Monell_ and subsequent cases.

IV

[3] The jury found that Principal Todd had violated petitioner's rights under § 1981, the First Amendment, and the Equal Protection Clause in recommending petitioner's removal from the athletic director and head coaching positions at South Oak. As to the liability of the DISD, the trial judge gave the jury the following instruction:
"A public independent school district (such as and including the Dallas Independent School District), acts by and through its Board of Trustees and/or its delegated administrative officials (including the

109 S.Ct. 2702                                                                                                      Page 18
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

Superintendent and school principals), with regard to action taken against or concerning school district personnel.

"A public independent school district (such as and including the Dallas Independent School District) is liable for the actions of its Board of Trustees and/or its delegated administrative officials (including the Superintendent and school principals), with regard to wrongful or unconstitutional action taken against or concerning school district personnel." App. 31.

We agree with the Court of Appeals that this instruction was manifest error. The instruction seems to rest either on the assumption that both Principal Todd and Superintendent Wright were policymakers for the school district, or that the school district is vicariously liable for any actions taken by these employees. Since we have rejected *respondeat superior* as a basis for holding a state actor liable under § 1983 for violation of the rights enumerated in § 1981, we refer to the principles to be applied in determining whether either Principal Todd or Superintendent Wright can be considered policymakers for the school district such that their decisions may rightly be said to represent the official policy of the DISD subjecting it to liability under § 1983.

*737 [4] Last Term in *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), (plurality opinion), we attempted a clarification of tools a federal court should employ in determining where policymaking authority lies for purposes of § 1983. In *Praprotnik*, the plurality reaffirmed the teachings of our prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law*." *Id.*, at 123, 108 S.Ct., at 924 (emphasis in original), quoting **2724*Pembaur*, 475 U.S., at 483, 106 S.Ct., at 1300 (plurality opinion). As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as " 'custom or usage' having the force of law," *Praprotnik, supra*, at 124, n. 1, 108 S.Ct., at 924, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory

violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see *Monell*, 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. See *Pembaur, supra*, at 485-487, 106 S.Ct., at 1301-1302 (WHITE, J, concurring).

We cannot fault the trial judge for not recognizing these principles in his instructions to the jury since this action was tried in October 1984, and the District Court did not have the benefit of our decisions in either *Pembaur* or *Praprotnik* to guide it. Similarly, the Court of Appeals issued its decision in this action before our decision in *Praprotnik.* Pursuant to its cross-petition in No. 88-214, the school district urges us *738 to review Texas law and determine that neither Principal Todd nor Superintendent Wright possessed the authority to make final policy decisions concerning the transfer of school district personnel. See Brief for Respondent 6-8. Petitioner Jett seems to concede that Principal Todd did not have policymaking authority as to employee transfers, see Brief for Petitioner 30, but argues that Superintendent Wright had been delegated authority to make school district policy concerning employee transfers and that his decisions in this area were final and unreviewable. *Id.*, at 30-32.

[5] We decline to resolve this issue on the record before us. We think the Court of Appeals, whose expertise in interpreting Texas law is greater than our own, is in a better position to determine whether Superintendent Wright possessed final policymaking authority in the area of employee transfers, and if so whether a new trial is required to determine the responsibility of the school district for the actions of Principal Todd in light of this determination. We thus affirm the judgment of the Court of Appeals to the extent it holds that the school district may not be held liable for its employees' violation of the rights enumerated in § 1981 under a theory of *respondeat superior*. We remand these cases to the Court of Appeals for it to determine where final policymaking authority as to employee transfers lay in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above.

*It is so ordered.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                      Page 19
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Justice SCALIA, concurring in part and concurring in the judgment.

I join Parts I and IV of the Court's opinion, and Part III except insofar as it relies upon legislative history. To hold that the more general provisions of 42 U.S.C. § 1981 establish a mode of liability for a particular category of offense by municipalities that is excluded from the closely related statute (42 U.S.C. § 1983) which deals more specifically with that precise category of offense would violate the rudimentary*739 principles of construction that the specific governs the general, and that, where text permits, statutes dealing with similar subjects should be interpreted harmoniously.

Justice BRENNAN, with whom Justice MARSHALL, Justice BLACKMUN, and Justice STEVENS join, dissenting.

To anyone familiar with this and last Terms' debate over whether **2725_Runyon v. McCrary,_ 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)_, should be overruled, see _Patterson v. McLean Credit Union,_ 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), today's decision can be nothing short of astonishing. After being led to believe that the hard question under 42 U.S.C. § 1981-the question that prompted this Court, on its own initiative, to set _Patterson_ for reargument, 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988)-was whether the statute created a cause of action relating to _private_ conduct, today we are told that the hard question is, in fact, whether it creates such an action on the basis of _governmental_ conduct. It is strange, indeed, simultaneously to question whether § 1981 creates a cause of action on the basis of private conduct _(Patterson)_ and whether it creates one for governmental conduct (these cases)-and hence to raise the possibility that this landmark civil rights statute affords no civil redress at all.

In granting certiorari in these cases we did not, as the plurality would have it, agree to review the question whether one may bring a suit for damages under § 1981 itself on the basis of governmental conduct. The plurality hints that petitioner Jett offered this issue for our consideration, _ante,_ at 2710 ("In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981"), when in fact, it was _respondent_ who raised this issue, and who did so for the first time in its brief on the merits in this Court.[FN1] In six years of proceedings in *740 the lower courts, including a jury trial and an

appeal that produced two opinions, respondent never once suggested that Jett's only remedy was furnished by § 1983. Petitioner was able to respond to this argument only in his reply brief in this Court. While it is true that we often affirm a judgment on a ground not relied upon by the court below, we ordinarily do so only when that ground at least was raised below. See, _e.g., Heckler v. Campbell,_ 461 U.S. 458, 468, n. 12, 103 S.Ct. 1952, 1958, n. 12, 76 L.Ed.2d 66 (1983); _Washington v. Yakima Indian Nation,_ 439 U.S. 463, 476, n. 20, 99 S.Ct. 740, 749, n. 20, 58 L.Ed.2d 740 (1979); _Hankerson v. North Carolina,_ 432 U.S. 233, 240, n. 6, 97 S.Ct. 2339, 2344, n. 6, 53 L.Ed.2d 306 (1977); _Massachusetts Mutual Life Ins. Co. v. Ludwig,_ 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976); _Dandridge v. Williams,_ 397 U.S. 471, 475, n. 6, 90 S.Ct. 1153, 1156, n. 6, 25 L.Ed.2d 491 (1970).

> FN1. The plurality twice cites petitioner Jett's opening brief, _ante,_ at 2710, as if it presents this question. Neither of the passages to which the plurality refers, however, even remotely suggests that Jett anticipated, let alone raised, the argument that respondent advanced for the first time in its own brief on the merits.

It is not only unfair to decide the action on this basis; it is unwise. The question is important; to resolve it on the basis of largely one-sided briefing, without the benefit of the views of the courts below, is rash. It is also unnecessary. The Court appears to decide today (though its precise holding is less than pellucid) that liability for violations by the government of § 1981 may not be predicated on a theory of _respondeat superior._ The answer to that question would dispose of Jett's contentions. In choosing to decide, as well, whether § 1983 furnishes the exclusive remedy for violations of § 1981 by the government, the Court makes many mistakes that might have been avoided by a less impetuous course.

Because I would conclude that § 1981 itself affords a cause of action in damages on the basis of governmental conduct violating its terms, and because I would conclude that such an action may be predicated on a theory of _respondeat superior,_ I dissent.

I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                    Page 20
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

Title 42 U.S.C. § 1981, originally enacted as part of § 1 of the Civil Rights Act of 1866 (1866 Act), provides in full:
**\*741 \*\*2726** "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The question is whether this statute permits a cause of action in damages against those who violate its terms.

The plurality approaches this issue as though it were new to us, recounting in lengthy and methodical detail the introduction, debate, passage, veto, and enactment of the 1866 Act. The story should by now be familiar to anyone with even a passing acquaintance with this statute. This is so because we have reviewed this history in the course of deciding and reaffirming the answer to the very question that the plurality deems so novel today. See *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Tillman v. Wheaton-Haven Recreation Assn., Inc.,* 410 U.S. 431, 432, 93 S.Ct. 1090, 1091, 35 L.Ed.2d 403 (1973); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *General Building Contractors Assn., Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). An essential aspect of the holding in each of these cases was the principle that a person injured by a violation of § 1 of the 1866 Act (now 42 U.S.C. § § 1981 and 1982) may bring an action for damages under that statute against the person who violated it.

**\*742** We have had good reason for concluding that § 1981 itself affords a cause of action against those who violate its terms. The statute does not explicitly furnish a cause of action for the conduct it prohibits, but this fact was of relatively little moment at the time the law was passed. During the period when § 1 of the 1866 Act was enacted, and for over 100 years thereafter, the federal courts routinely concluded that a statute setting forth substantive rights without specifying a remedy contained an implied cause of action for damages incurred in violation of the statute's terms. See, *e.g., Marbury v. Madison,* 1 Cranch 137, 162-163, 2 L.Ed. 60 (1803); *Kendall v. United States,* 12 Pet. 524, 624, 9 L.Ed. 1181 (1838); *Pollard v. Bailey,* 20 Wall. 520, 527, 22 L.Ed. 376 (1874); *Hayes v. Michigan Central R. Co.,* 111 U.S. 228, 240, 4 S.Ct. 369, 374, 28 L.Ed. 410 (1884); *De Lima v. Bidwell,* 182 U.S. 1, 176-177, 21 S.Ct. 743, 745, 45 L.Ed. 1041 (1901); *Texas & N.O.R. Co. v. Railway Clerks,* 281 U.S. 548, 569, 570, 50 S.Ct. 427, 433, 433, 74 L.Ed. 1034 (1930); *Bell v. Hood,* 327 U.S. 678, 684, and n. 6, 66 S.Ct. 773, 777, and n. 6, 90 L.Ed. 939 (1946); *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The classic statement of this principle comes from *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39-40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916), in which we observed: "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law." These cases fit comfortably within *Rigsby* 's framework. It is of small **\*\*2727** consequence, therefore, that the 39th Congress established no explicit damages remedy in § 1 of the 1866 Act.[FN2]

> FN2. During the 1970's, we modified our approach to determining whether a statute contains an implied cause of action, announcing the following four-part test: "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted'-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                          Page 21
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

cause of action one traditionally relegated to
state law, in an area basically the concern of
the States, so that it would be inappropriate
to infer a cause of action based solely on
federal law?" *Cort v. Ash,* 422 U.S. 66, 78,
95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975)
(citations omitted), quoting *Texas & Pacific
R. Co. v. Rigsby,* 241 U.S., at 39, 36 S.Ct., at
484.

It would make no sense, however, to apply a
test first enunciated in 1975 to a statute
enacted in 1866. An inquiry into Congress'
actual intent must take account of the
interpretive principles in place at the time.
See *Cannon v. University of Chicago,* 441
U.S. 677, 698-699, 99 S.Ct. 1946, 1958-
1959, 60 L.Ed.2d 560 (1979); *Merrill
Lynch, Pierce, Fenner & Smith, Inc. v.
Curran,* 456 U.S. 353, 375-378, 102 S.Ct.
1825, 1837-1839, 72 L.Ed.2d 182 (1982).
See also *Welch v. Texas Dept. of Highways
and Public Transportation,* 483 U.S. 468,
496, 107 S.Ct. 2941, 2958, 97 L.Ed.2d 389
(1987) (SCALIA, J., concurring) (advising
against construing a statute on the basis of
an interpretive principle announced after the
statute was passed). Thus, I would interpret
§ 1981 in light of the principle described in
*Rigsby,* rather than the one described in
*Cort.*

Application even of the test fashioned in
*Cort,* however, would lead to the conclusion
that Jett may bring a cause of action in
damages against respondent under § 1981.
Jett belongs to the special class of persons
(those who have been discriminated against
in the making of contracts) for whom the
statute was created; all of the indicators of
legislative intent point in the direction of an
implied cause of action; such an action is
completely consistent with the statute's
purposes; and, in view of the fact that this
Reconstruction-era legislation was in part
designed to curtail the authority of the
States, it would be unreasonable to conclude
that this cause of action is one relegated to
state law.

*743 Indeed, the debates on § 1 demonstrate that the
legislators' worry was not that their actions would do
too much, but that they would do too little. In
introducing the bill that became the 1866 Act,
Senator Trumbull explained that the statute was
necessary because "[t]here is very little importance in

the general declaration of abstract truths and
principles [contained in the Thirteenth Amendment]
unless they can be carried into effect, *unless the
persons who are to be affected by them have some
means of availing themselves of their benefits.*"
Cong. Globe, 39th Cong., 1st Sess., 474 (1866)
(emphasis added).        Representative Thayer of
Pennsylvania echoed this theme: "When I voted for
the amendment to abolish slavery ... I did not suppose
that I was offering ... a mere paper guarantee." "The
bill which now engages the attention of the House
has for its object to carry out and guaranty *744 the
reality of that great measure. It is to give to it
practical effect and force. It is to prevent that great
measure from remaining a dead letter upon the
constitutional page of this country." *Id.,* at 1151.

In these circumstances, it would be unreasonable to
conclude that inferring a private cause of action from
§ 1981 is incompatible with Congress' intent. Yet in
suggesting that § 2 of the 1866 Act demonstrates
Congress' intent that criminal penalties serve as the
only remedy for violations of § 1, *ante,* at 2711-
2714, this is exactly the conclusion that the plurality
apparently would have us draw. Not only, however,
is this argument contrary to legislative intent, but we
have already squarely rejected it. In *Jones v. Alfred
H. Mayer Co.,* respondent argued that because § 2
furnished criminal penalties for violations of § 1
occurring "under color of law," § 1 could not be read
to provide a civil remedy for violations of the statute
by private persons. Dismissing this argument, we
explained: "[Section] 1 was meant to prohibit *all*
racially motivated deprivations of the rights
enumerated in the statute, although only those
deprivations perpetrated 'under color of law' were to
be criminally punishable**2728 under § 2." 392
U.S., at 426, 88 S.Ct., at 2196.[FN3]

> FN3. The Court's heavy emphasis on § 2 of
> the 1866 Act also ignores the fact that the
> modern-day descendant of § 1 of the Act,
> 42 U.S.C. § 1981, includes no remedy or
> penalty at all. Section 2 of the 1866 Act
> now appears at 18 U.S.C. § 242, see *United
> States v. Classic,* 313 U.S. 299, 327, n. 10,
> 61 S.Ct. 1031, 1043, n. 10, 85 L.Ed. 1368
> (1941), a part of the Code entirely separate
> from § 1981, and is applicable to provisions
> other than § 1981. These facts strongly
> argue against placing too much weight on
> the availability of criminal penalties in
> deciding whether § 1981 contains an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                 Page 22
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

implied cause of action.

The plurality's assertion that the 1866 Act created no original federal jurisdiction for civil actions based on the statute, see *ante*, at 2715, is similarly unavailing. The language of § 3 easily includes original jurisdiction over such suits, and we have in fact concluded as much. See *Moor v. County of Alameda*, 411 U.S. 693, 704-705, 93 S.Ct. 1785, 1793, 36 L.Ed.2d 596 (1973) ("The initial portion of § 3 of the Act established federal jurisdiction to hear, among other things, civil actions brought to enforce § 1"). In addition, the plurality's argument confuses the question of which courts (state or federal) will enforce a cause of action with whether a cause of action exists.

**\*745** The only way that the plurality can distinguish *Jones*, and the cases following it, from this action is to argue that our recognition of an implied cause of action against private persons did not include recognition of an action against local governments and government officials. But before today, no one had questioned that a person could sue a government official for damages due to a violation of § 1981. We have, in fact, reviewed two cases brought pursuant to § 1981 against government officials or entities, without giving the vaguest hint that the lawsuits were improperly brought. See *Hurd v. Hodge*, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Indeed, in *Jones v. Alfred H. Mayer Co.*, the dissenters relied on *Hurd v. Hodge* in arguing that § 1981 applied *only* to governmental conduct. 392 U.S. at 452, 88 S.Ct. at 2209. The lower courts have heeded well the message from our cases: they unanimously agree that suit may be brought directly under § 1981 against government officials who violate the statute's terms. See, *e.g.*, *Metrocare v. Washington Metropolitan Area Transit Auth.*, 220 U.S.App.D.C. 104, 679 F.2d 922 (1982); *Springer v. Seamen*, 821 F.2d 871 (CA1 1987); *Mahone v. Waddle*, 564 F.2d 1018 (CA3 1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Jett v. Dallas Independent School Dist.*, 798 F.2d 748 (CA5 1986), on motion for rehearing, 837 F.2d 1244 (1988) (case below); *Leonard v. Frankfort Electric and Water Plant Board*, 752 F.2d 189 (CA6 1985); *Bell v. Milwaukee*, 746 F.2d 1205 (CA7 1984); *Taylor v. Jones*, 653 F.2d 1193 (CA8 1981); *Greenwood v. Ross*, 778 F.2d 448 (CA8 1985); *Sethy v. Alameda County Water Dist.*, 545 F.2d 1157 (CA9

1976) (en banc).

Perhaps recognizing how odd it would be to argue that one may infer from § 1 of the 1866 Act a cause of action against private persons, but not one against government officials, the Court appears to claim that the 1871 Act erased whatever **\*746** action against government officials previously existed under the 1866 Act. The Court explains:

"That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the 'state action' portion of § 1981, where Congress has established its own remedial scheme. In the context of the application of § 1981 and § 1982 to private actors, we 'had little choice but to hold that aggrieved individuals could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*' ... That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope **\*\*2729** of remedies available under a particular statute." *Ante*, at 2721, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 728, 99 S.Ct. 1946, 1973, 60 L.Ed.2d 560 (1979) (WHITE, J., dissenting) (emphasis in original; footnote omitted).

This argument became available only after § 1983 was passed, and thus suggests that § 1983 changed the cause of action implicitly afforded by § 1981. However, not only do we generally disfavor repeals by implication, see, *e.g.*, *Morton v. Mancari*, 417 U.S. 535, 549-550, 94 S.Ct. 2474, 2482-2483, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936); *Henderson's Tobacco*, 11 Wall. 652, 656-658, 20 L.Ed. 235 (1871), but we should be particularly hostile to them when the allegedly repealing statute specifically rules them out. In this regard, § 7 of the 1871 Act is highly significant; it provided "[t]hat nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto." § 7, 17 Stat. 15. [FN4]

> FN4. Several *amici* argue that we need not conclude that § 1983 impliedly repealed the cause of action furnished by § 1981 in order to decide that § 1983 provides the sole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                                                                    Page 23
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
(Cite as: 491 U.S. 701, 109 S.Ct. 2702)

remedy for violations of § 1981. See Brief for International City Management Association et al. as *Amici Curiae* 18-19. Their theory is that an implied cause of action did not exist when the 1871 Act was passed, and that therefore one may argue that the 1871 Act furnished the only remedy for the 1866 Act without arguing that the later statute in any way repealed the earlier one. To support their premise, they observe, first, that it was not until the 1960's that courts recognized a private cause of action under § 1 of the 1866 Act. In doing so, they ignore our earlier cases approving actions brought directly under § 1981. See *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). In any event, the relevance of the date on which we expressly recognized that one could bring a suit for damages directly under § 1 escapes me; that we did so in the 1960's does not suggest that we would not have done so had we faced the question in the 1860's.

*Amici* assert, in addition, that "[i]n recognizing an implied cause of action" under § 1981, we "rested in part on congressional actions that post-date the creation in 1871 of an explicit civil cause of action for violations of Section 1981." Brief for International City Management Association et al. as *Amici Curiae* 19. It is true that *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 412, n. 1, 88 S.Ct. 2186, 2189, n. 1, 20 L.Ed.2d 1189 (1968), and *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969), cited 28 U.S.C. § 1343(4) in support of federal jurisdiction over those cases. I do not understand, however, how this shows that the 1866 Act as originally enacted did not confer federal jurisdiction over actions to recover damages for violations of the statute. Moreover, even if the 1866 Act did not confer such jurisdiction, the jurisdictional question is separate from the question whether a cause of action may be inferred from the statute. Indeed, *amici* appear to recognize as much when they argue that although § 1 did not establish federal jurisdiction to hear civil actions based on the statute, Congress "left the task of civil enforcement to the state courts." Brief for International City Management Association et al. as *Amici Curiae* 17. I

cannot imagine what "civil enforcement" *amici* have in mind, unless it is the civil remedy that Jett seeks.

**\*747** The Court's argument fails for other reasons as well. Its essential point appears to be that, in § 1983, "Congress has established its own remedial scheme" for the " 'state action' portion of § 1981." [FN5] *Ante,* at 2721. For this argument, the Court may not rely, as it attempts to do, on the principle that " 'when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute**\*748** to subsume other remedies.' " *Ibid.,* quoting *National Railroad Passenger Corporation v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). That principle limits the inference of a remedy for the violation of a statute only when *that same statute* already sets forth specific remedies. It cannot be used to support the argument that the provision of particular remedies in § 1983 tells us whether we should infer a damages remedy for violations of § 1981.

> FN5. The one bright spot in today's decision is its reaffirmation of our holding in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

The suggestion, moreover, that today's holding "finds support in" **\*2730**Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), is audacious. *Ante,* at 2722. Section 1983-which, for example, specifies no exhaustion requirement, no damages limitation, no defenses, and no statute of limitations-can hardly be compared with § 717 of the Civil Rights of 1964, at issue in *Brown,* with its many detailed requirements and remedies, see 425 U.S., at 829-832, 96 S.Ct. at 1966-1968. Indeed, in *Preiser v. Rodriguez,* 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973), we emphasized the "general" nature of § 1983 in refusing to allow former prisoners to challenge a prison's withholding of good-time credits under § 1983 rather than under the federal habeas corpus statute, 28 U.S.C. § 2254. We never before have suggested that § 1983's remedial scheme is so thorough that it pre-empts the remedies that might otherwise be available under other statutes; indeed, all of our intimations have been to the contrary. See, *e.g., Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 19-21, 101 S.Ct. 2615, 2625-2627, 69 L.Ed.2d 435 (1981).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to the Court, to allow an action complaining of government conduct to be brought directly under § 1981 would circumvent our holding in _Monell v. New York City Dept. of Social Services,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that liability under § 1983 may not be based on a theory of _respondeat superior. Ante,_ at 2722-2723. Not only am I unconvinced that we should narrow a statute as important as § 1981 on the basis of something so vague and inconclusive as "federalism concerns which had very real constitutional underpinnings     *749     for the Reconstruction Congresses," _ante,_ at 2722, but I am also unable to understand how _Monell's_ limitation on § 1983 liability begins to tell us whether the same restriction exists under § 1981, enacted five years earlier than § 1983 and covering a far narrower range of conduct. It is difficult to comprehend, in any case, why the Court is worried that construing § 1981 to create a cause of action based on governmental conduct would render local governments vicariously liable for the delicts of their employees, since it elsewhere goes to great lengths to suggest that liability under § 1981 may _not_ be vicarious. See _ante,_ at 2713-2715.

The Court's primary reason for distinguishing between private and governmental conduct under § 1981 appears to be its impression that, because private conduct is not actionable under § 1983, we "had little choice" but to hold that private individuals who violated § 1981 could be sued directly under § 1981. See _ante,_ at 2721. This claim, however, suggests that whether a cause of action in damages exists under § 1981 depends on the scope of § 1983. In deciding whether a particular statute includes an implied cause of action, however, we have not in the past suggested that the answer will turn on the reach of a different statute. In _National Sea Clammers,_ for example, we analyzed both the question whether the Federal Water Pollution Control Act included an implied cause of action for damages, 453 U.S., at 13-19, 101 S.Ct., at 2622-2626, and the question whether an action could be brought under § 1983 for violations of that statute, _id.,_ at 19-21, 101 S.Ct., at 2625-2627, thus indicating that the answer to the latter question does not tell us the answer to the former one.

The Court's approach not only departs from our prior analysis of implied causes of action, but also attributes an intent to the 39th Congress that fluctuates depending on the state of the law with regard to § 1983. On the Court's theory, if this case

had arisen during the period between our decisions in _Monroe v. Pape,_ 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and _Monell v. New York City Dept. of Social Services, supra,_ when we believed**750** that local governments were not "persons" within the meaning of § 1983, we would apparently have been required to decide that a cause of action could be brought against local governments and their officials directly under § 1981. The plurality, in fact, confirms this conclusion in distinguishing _Hurd v. Hodge,_ 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), solely on the ground that we **2731** decided it at a time when § 1983 did not apply to the District of Columbia. See _ante,_ at 2711. In other words, on the Court's view, a change in the scope of § 1983 alters the reach of § 1981. I cannot endorse such a bizarre conception of congressional intent.

II

I thus would hold that Jett properly brought his suit against respondent directly under § 1981. It remains to consider whether that statute permits recovery against a local government body on a theory of _respondeat superior._

Because § 1981 does not explicitly create a cause of action in damages, we would look in vain for an express statement that the statute contemplates liability based on the doctrine of _respondeat superior._ In _Monell v. New York City Dept. of Social Services, supra,_ however, our background assumption appears to have been that unless a statute subjecting institutions (such as municipalities) to liability evidences an intent not to impose liability on them based on _respondeat superior,_ such liability will be assumed. _Id.,_ 436 U.S., at 691, 98 S.Ct., at 2036. The absolute language of § 1981 therefore is significant: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. Certainly nothing in this wording refutes the argument that vicarious liability may be imposed under this law.

Section 1983, in contrast, forbids a person to "subjec[t], or caus[e] to be subjected" another person to a deprivation of the rights protected by the statute. It is telling that § 1981 does not contain this explicit language of causation. In holding in _Monell_ that liability under § 1983 may not be predicated**751** on

109 S.Ct. 2702                                                                                    Page 25
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**

a theory of *respondeat superior*, we emphasized that § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights.... Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." 436 U.S., at 692, 98 S.Ct., at 2036. The absence of this language in § 1 of the 1866 Act, now § 1981, argues against the claim that liability under this statute may not be vicarious.

While it acknowledged that § 1 of the 1866 Act did not contain the "subjects, or causes to be subjected" language of § 1983, the Court of Appeals nevertheless emphasized that § 2 of the 1866 Act did contain this language. 837 F.2d, at 1247. There is not the least inconsistency, however, in arguing that the *criminal* penalties under the 1866 Act may not be imposed on the basis of *respondeat superior*, but that the civil penalties may be. Indeed, it is no surprise that the history surrounding the enactment of § 2, as the plurality stresses, *ante*, at 2714-2715, indicates that Congress envisioned criminal penalties only for those who by their own conduct violated the statute, since vicarious criminal liability would be extraordinary. The same cannot be said of vicarious civil liability.

Nor does anything in the history of § 1981 cast doubt on the argument that liability under the statute may be vicarious. The Court of Appeals placed heavy reliance on Congress' rejection of the Sherman amendment, which would have imposed a dramatic form of vicarious liability on municipalities, five years after passing the 1866 Act. 837 F.2d, at 1246-1247. That the plurality appears to accept this argument, see *ante*, at 2718-2719, is curious, given our frequent reminder that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *752Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980), quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). I do not understand how Congress' rejection of an amendment imposing a very new kind of **2732 vicarious liability on municipalities can tell us what a different and earlier Congress intended with respect to conventional vicarious liability.

According to the plurality, the history of the Sherman

amendment is relevant to the interpretation of § 1981 because it reveals Congress' impression that it had no authority to subject municipalities to the kind of liability encompassed by the amendment. See *ante*, at 2718-2720. The plurality fails to recognize, however, that the circumstances in which municipalities would be vicariously liable under the Sherman amendment are very different from those in which they would be liable under § 1981. As the plurality describes it, the Sherman amendment "provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, 'the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense.' " *Ante*, at 2718, quoting Cong.Globe, 42d Cong., 1st Sess., 755 (1871). Because the threat of such liability would have forced municipalities to ensure that private citizens did not violate the rights of others, it would have run up against Justice Story's conclusion in *Prigg v. Pennsylvania,* 16 Pet. 539, 616, 10 L.Ed. 1060 (1842), that Congress could not "insist that the states are bound to provide means to carry into effect the duties of the national government." To hold a local government body liable for the discriminatory cancellation of a contract entered into by that local body itself, however, is a very different matter. Even assuming that the 39th Congress had the same constitutional concerns as the 42d, therefore, those concerns cast no doubt on Congress' authority to hold local government bodies vicariously liable under § 1 of the 1866 Act in circumstances such as those present here.

*753 I thus would conclude that liability under § 1981 may be predicated on a theory of *respondeat superior*.

### III

No one doubts that § 1983 was an unprecedented federal statute. See *ante*, at 2716-2717. The question is not whether § 1983 wrought a change in the law, but whether it did so in such a way as to withdraw a remedy that § 1 of the 1866 Act had implicitly afforded. Unlike the plurality, I would conclude that it did not.

Justice STEVENS, dissenting.

My agreement with Justice BRENNAN's dissent is buttressed by the views I expressed in *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 22, 101 S.Ct. 2615,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 2702                                                              Page 26
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas. (BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105 L.Ed.2d 598,
57 USLW 4858, 54 Ed. Law Rep. 30
**(Cite as: 491 U.S. 701, 109 S.Ct. 2702)**


2627, 69 L.Ed.2d 435 (1981) (opinion concurring in
judgment in part and dissenting in part), and in
*Oklahoma City v. Tuttle,* 471 U.S. 808, 834, 105
S.Ct. 2427, 2441, 85 L.Ed.2d 791 (1985) (dissenting
opinion).

U.S.Tex.,1989.
Jett v. Dallas Independent School Dist.
491 U.S. 701, 109 S.Ct. 2702, 50 Fair Empl.Prac.Cas.
(BNA) 27, 50 Empl. Prac. Dec. P 39,070, 105
L.Ed.2d 598, 57 USLW 4858, 54 Ed. Law Rep. 30

Briefs and Other Related Documents (Back to top)

• 1989 WL 1128161 (Appellate Brief) Brief of
Respondent%N*%N (Feb. 03, 1989)

• 1989 WL 1128162 (Appellate Brief) Brief of the
International City Management Association, National
Governors' Association, National Association of
Counties, U.S. Conference of Mayors, and National
League of Cities as Amici Curiae in Support of
Respondent and Cross-Petitioner (Feb. 03, 1989)

• 1989 WL 1128158 (Appellate Brief) Brief Amici
Curiae of the NAACP Legal Defense and
Educational Fund, Inc. and the American Civil
Liberties Union (Jan. 04, 1989)

• 1989 WL 1128159 (Appellate Brief) Brief of the
National Education Association as Amicus Curiae in
Support of Petitioner (Jan. 04, 1989)

• 1989 WL 1128160 (Appellate Brief) Brief of
Petitioner (Jan. 04, 1989)

• 1988 WL 1031739 (Appellate Brief) Petitioner's
Reply Brief (Oct. Term 1988)

• 1988 WL 1094108 (Appellate Petition, Motion and
Filing) Petition (Jul. 21, 1988)

• 1988 WL 1094103 (Appellate Petition, Motion and
Filing) Petition (Jun. 24, 1988)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:55:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 212 F.3d 571 |
| Lines: | 1486 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

212 F.3d 571                                                                                    Page 1
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

▷

Briefs and Other Related Documents
Gupta v. Florida Bd. of RegentsC.A.11 (Fla.),2000.
United States Court of Appeals,Eleventh Circuit.
Srabana GUPTA, Plaintiff-Appellee,
v.
FLORIDA BOARD OF REGENTS, et al.,
Defendants-Appellants.
**No. 98-5392.**

May 17, 2000.

Assistant professor sued state university board of
regents under Title VII, alleging sexual harassment
and retaliation. The United States District Court for
the Southern District of Florida, No. 96-06690-CV-
KMM, K. Michael Moore, J., entered judgment on
jury verdict for professor. Board of regents appealed.
The Court of Appeals, Carnes, Circuit Judge, held
that: (1) evidence did not support a finding that, from
an objective viewpoint, alleged harassment by
professor's supervisor was so frequent, severe, or
pervasive to constitute actionable sexual harassment
under Title VII, and (2) university proffered
nondiscriminatory reasons for adverse employment
actions, thus defeating retaliation claim.

Reversed and remanded.

Roney, Senior Circuit Judge, filed opinion concurring
in the judgment.
West Headnotes
**[1] Civil Rights 78 ☞1182**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work
Environment
            78k1182 k. In General. Most Cited Cases
            (Formerly 78k167)
Sexual harassment is a form of sex discrimination
prohibited by Title VII. Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).

**[2] Civil Rights 78 ☞1184**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work
Environment
            78k1184 k. Quid Pro Quo. Most Cited

Cases
            (Formerly 78k167)

**Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
There are two types of sexual harassment cases,
including (1) "quid pro quo," which are based on
threats which are carried out or fulfilled, and (2)
"hostile environment," which are based on
bothersome attentions or sexual remarks that are
sufficiently severe or pervasive to create a hostile
work environment. Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).

**[3] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
To support hostile environment claim under Title VII
based on harassment by a supervisor, employee must
establish (1) that he or she belongs to a protected
group; (2) that employee has been subject to
unwelcome sexual harassment, such as sexual
advances, requests for sexual favors, and other
conduct of a sexual nature; (3) that the harassment
must have been based on the sex of the employee;
(4) that harassment was sufficiently severe or
pervasive to alter terms and conditions of
employment and create discriminatorily abusive
working environment; and (5) a basis for holding
employer liable. Civil Rights Act of 1964, § 703(a),
42 U.S.C.A. § 2000e-2(a).

**[4] Civil Rights 78 ☞1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work
Environment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                          Page 2
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
(Formerly 78k167)
Hostile environment sexual harassment plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[5] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
         (Formerly 78k167)
Although court examines challenged statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, statements and conduct must be of a sexual or gender-related nature, e.g., sexual advances, requests for sexual favors, or conduct of a sexual nature, before they are considered in determining whether the severe or pervasive requirement is met, and innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party, are not counted. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[6] Civil Rights 78 ☞1145**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1145 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
         (Formerly 78k1147, 78k145)
Title VII is not a "general civility code." Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[7] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
         (Formerly 78k167)
Alleged comments and actions by assistant professor's supervisor, including telling professor to steer clear of certain faculty members because they were evil and racist, assisting professor with her move to new city, telling professor to come and see him if there was anything he could do for her, and inviting professor to be part of a group going to dinner at a bar and at a restaurant considered offensive by professor, were not gender-related or of a sexual nature, as required to support hostile environment sexual harassment claim under Title VII. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[8] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
         (Formerly 78k167)
If complained of statements and conduct are of a gender-related or sexual nature, court considers four factors in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment, as required to support hostile environment sexual harassment claim, including (1) frequency of the conduct; (2) severity of the conduct; (3) whether conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether conduct unreasonably interferes with employee's job performance. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[9] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
         (Formerly 78k167)
Assuming alleged comments by assistant professor's supervisor, including telling professor she was beautiful on one occasion, frequently calling her at home, and commenting on promiscuity of people from Jamaica as compared to the innocence of people from India, were of a gender-related or sexual nature, they were not sufficiently severe and pervasive to support hostile environment sexual harassment claim; calls were not intimidating or threatening, and did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

System Case 2:06-cv-00110-WC    Document 25-2    Filed 10/31/2006    Page 66 of 103

212 F.3d 571                                                                                                          Page 3
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

contain sexually explicit remarks or innuendos, and
other comments were isolated utterances over period
of several months. Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).

**[10] Civil Rights 78 ⊂⟹ 1179**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1179 k. Discrimination Against Men;
Reverse Discrimination. Most Cited Cases
            (Formerly 78k167)

  Civil Rights 78 ⊂⟹ 1185

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
A man can compliment a woman's looks, or vice
versa, on one or several occasions, by telling her that
she is looking "very beautiful," or words to that
effect, without fear of being found guilty of sexual
harassment for having done so. Civil Rights Act of
1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[11] Civil Rights 78 ⊂⟹ 1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
Flirtation is not sexual harassment. Civil Rights Act
of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[12] Civil Rights 78 ⊂⟹ 1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
Conduct by supervisor, in allegedly asking employee
in phone conversation whether she was "in bed," was
not shown to be gender-based or of a sexual nature,

as required to support hostile environment sexual
harassment claim, since it was common courtesy
when calling late at night to ask if the person
answering was in bed or asleep, and there was no
follow-up question or remark of a sexual nature.
Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. §
2000e-2(a).

**[13] Civil Rights 78 ⊂⟹ 1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
Evidence that assistant professor saw supervisor in
his office with no dress shirt but wearing an
undershirt, and that, when professor entered office,
supervisor grabbed his dress shirt, unbuckled his belt,
pulled down his zipper, and started tucking his shirt
in, did not demonstrate the type of severe and
pervasive conduct required to support hostile
environment sexual harassment claim, where air
conditioning was broken on the day in question and it
was very hot in the building, and supervisor made no
inappropriate gestures or comments when he tucked
in his shirt. Civil Rights Act of 1964, § 703(a), 42
U.S.C.A. § 2000e-2(a).

**[14] Civil Rights 78 ⊂⟹ 1185**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
Assistant professor could not establish hostile
environment sexual harassment claim based on
allegations that supervisor stared at her twice,
touched her ring and bracelet once, and kept asking
her to lunch; assuming such conduct was sexual in
nature, none was severe, threatening, or humiliating.
Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. §
2000e-2(a).

**[15] Civil Rights 78 ⊂⟹ 1185**

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                      Page 4
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

Environment
      78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
            (Formerly 78k167)
Court cannot mandate that employer be required
under pain of legal sanctions to ensure that
supervisors never look or stare at a subordinate
whom they are supervising in such a way that she
might think they are "coming on" to her, nor can
court mandate that employer be required to ensure
that supervisors never touch employees on the hand
or finger or ask them to lunch. Civil Rights Act of
1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).


**[16] Civil Rights 78 ⬅1185**


78 Civil Rights
      78II Employment Practices
         78k1181    Sexual    Harassment;    Work
Environment
            78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
                  (Formerly 78k167)
Allegation that supervisor placed his hand on
assistant professor's knee once, and touched the hem
of her dress once, did not support hostile environment
sexual harassment claim, where these were only two
incidents in a period of six or seven months during
which professor and supervisor were interacting, out
of an even longer period during which the two
worked for the university, each incident was only
momentary, and neither was coupled with any verbal
suggestions or advances. Civil Rights Act of 1964, §
703(a), 42 U.S.C.A. § 2000e-2(a).


**[17] Civil Rights 78 ⬅1243**


78 Civil Rights
      78II Employment Practices
         78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Required
in General; Elements. Most Cited Cases
                  (Formerly    255k30(6.10)    Master    and
Servant)
To recover for retaliation under Title VII, plaintiff
need not prove underlying claim of discrimination
which led to her protest, so long as she had a
reasonable good faith belief that the discrimination
existed. Civil Rights Act of 1964, § 703(a), 42
U.S.C.A. § 2000e-2(a).


**[18] Colleges and Universities 81 ⬅8.1(3)**


81 Colleges and Universities

      81k8 Staff and Faculty
         81k8.1 Duration of Employment and Removal
or Other Discipline
            81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Although conduct that assistant professor complained
about was not so severe and pervasive that it altered
her working conditions, she did not lack a reasonable
good faith belief that she was being sexually
harassed, and, thus, jury verdict finding Title VII
retaliation could stand, independent of Court of
Appeals' reversal of sexual harassment verdict, if
there was sufficient evidence presented at trial to
support the retaliation verdict. Civil Rights Act of
1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).


**[19] Civil Rights 78 ⬅1243**


78 Civil Rights
      78II Employment Practices
         78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Required
in General; Elements. Most Cited Cases
                  (Formerly    255k30(6.10)    Master    and
Servant)
To establish a prima facie case of retaliation under
Title VII, plaintiff must prove (1) she participated in
an activity protected by Title VII, (2) she suffered an
adverse employment action; and (3) there is a causal
connection between the participation in the protected
activity and the adverse employment decision. Civil
Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-
3(a).


**[20] Federal Courts 170B ⬅764**


170B Federal Courts
      170BVIII Courts of Appeals
         170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
               170Bk763 Extent of Review Dependent
on Nature of Decision Appealed from
                  170Bk764 k. Taking Case from Jury.
Most Cited Cases
In considering whether district court erred in failing
to grant employer's post-verdict motion for judgment
as matter of law on employee's Title VII retaliation
claim, Court of Appeals would consider evidence
presented in support of employee's prima facie case
only in evaluating whether a reasonable jury could
disbelieve employer's proffered nondiscriminatory
reasons for its actions, and Court would not revisit
the existence of prima facie case. Civil Rights Act of
1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                    Page 5
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

**[21] Civil Rights 78 ☞1245**

78 Civil Rights
    78II Employment Practices
       78k1241 Retaliation for Exercise of Rights
          78k1245 k. Adverse Actions in General.
Most Cited Cases
      (Formerly    255k30(6.10)    Master and
Servant)
For purposes of Title VII retaliation claim, "adverse
employment action" is an ultimate employment
decision, such as discharge or failure to hire, or other
conduct that alters the employee's compensation,
terms, conditions, or privileges of employment,
deprives him or her of employment opportunities, or
adversely affects his or her status as an employee.
Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. §
2000e-3(a).

**[22] Civil Rights 78 ☞1245**

78 Civil Rights
    78II Employment Practices
       78k1241 Retaliation for Exercise of Rights
          78k1245 k. Adverse Actions in General.
Most Cited Cases
      (Formerly    255k30(6.10)    Master and
Servant)
Conduct that falls short of an ultimate employment
decision must meet some threshold level of
substantiality to be cognizable under Title VII's anti-
retaliation clause, and, in evaluating what actions
meet that required level of substantiality, courts
recognize that Title VII is neither a general civility
code nor a statute making actionable the ordinary
tribulations of the workplace. Civil Rights Act of
1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[23] Civil Rights 78 ☞1245**

78 Civil Rights
    78II Employment Practices
       78k1241 Retaliation for Exercise of Rights
          78k1245 k. Adverse Actions in General.
Most Cited Cases
      (Formerly    255k30(6.10)    Master and
Servant)
Whether an action is sufficient to constitute an
adverse employment action, for purposes of a Title
VII retaliation claim, must be determined on a case-
by-case basis, using both a subjective and an
objective standard. Civil Rights Act of 1964, §
704(a), 42 U.S.C.A. § 2000e-3(a).

**[24] Colleges and Universities 81 ☞8.1(3)**

81 Colleges and Universities
    81k8 Staff and Faculty
       81k8.1 Duration of Employment and Removal
or Other Discipline
          81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Threatened letter, which would have been critical of
assistant professor's tenure, was not an adverse
employment action as required for Title VII
retaliation claim, where letter was never actually
written. Civil Rights Act of 1964, § 704(a), 42
U.S.C.A. § 2000e-3(a).

**[25] Colleges and Universities 81 ☞8.1(3)**

81 Colleges and Universities
    81k8 Staff and Faculty
       81k8.1 Duration of Employment and Removal
or Other Discipline
          81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Evidence that assistant professor was placed on
search committee for a position at another campus,
which prevented her from applying for that position,
was not "adverse employment action" as required for
Title VII retaliation claim; although professor had
indicated some interest in the position when she was
asked to serve on the search committee, she had not
yet applied for the position, and she accepted offer to
serve on committee without objection. Civil Rights
Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[26] Colleges and Universities 81 ☞8.1(3)**

81 Colleges and Universities
    81k8 Staff and Faculty
       81k8.1 Duration of Employment and Removal
or Other Discipline
          81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Evidence that assistant professor was assigned to
teach more credit hours than other professors and to
teach classes on three different campuses in one
session was not "adverse employment action" as
required for Title VII retaliation claim, where
department chair testified that scheduling professor to
three different campuses was a mistake, and that,
once he became aware of it, he promptly corrected
the mistake. Civil Rights Act of 1964, § 704(a), 42
U.S.C.A. § 2000e-3(a).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                    Page 6
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

**[27] Civil Rights 78 ⟳1245**

78 Civil Rights
   78II Employment Practices
     78k1241 Retaliation for Exercise of Rights
      78k1245 k. Adverse Actions in General.
Most Cited Cases
      (Formerly 255k30(6.10) Master and
Servant)
Proposed action that is corrected as soon as the
proper official is made aware of it and before it goes
into effect, so that the employee does not actually
suffer any consequence, is not "adverse," as required
for Title VII retaliation claim. Civil Rights Act of
1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[28] Colleges and Universities 81 ⟳8.1(3)**

81 Colleges and Universities
   81k8 Staff and Faculty
     81k8.1 Duration of Employment and Removal
or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Assistant professor was not subjected to adverse
employment action, as required for Title VII
retaliation claim, when she was not assigned to teach
a desired class in one summer session, absent any
evidence at all that professor was in any way entitled
to or particularly deserving of that class, as opposed
to the classes she was assigned to teach, or that other
untenured professors routinely got to cherry-pick the
classes they taught. Civil Rights Act of 1964, §
704(a), 42 U.S.C.A. § 2000e-3(a).

**[29] Colleges and Universities 81 ⟳8.1(3)**

81 Colleges and Universities
   81k8 Staff and Faculty
     81k8.1 Duration of Employment and Removal
or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most
Cited Cases
Assistant professor was not subject to adverse
employment action, as required for Title VII
retaliation claim, by university's delay in completing
and returning professor's visa application to
Immigration and Naturalization Service (INS);
although visa application was not completed
promptly, it was returned to professor in sufficient
time for her to file application with INS, which she
did, and, as such, she was in no way harmed by the
delay. Civil Rights Act of 1964, § 703(a), 42
U.S.C.A. § 2000e-2(a).

**[30] Colleges and Universities 81 ⟳8.1(3)**

81 Colleges and Universities
   81k8 Staff and Faculty
     81k8.1 Duration of Employment and Removal
or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most
Cited Cases
University's termination of informal resolution
process involving assistant professor's sexual
harassment claim, without first warning her that they
would close the case if she missed deadline for
responding to proposed settlement agreement, was
not an adverse employment action, as required for
Title VII retaliation claim, since settlement of a claim
was not a condition of employment. Civil Rights Act
of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[31] Civil Rights 78 ⟳1245**

78 Civil Rights
   78II Employment Practices
     78k1241 Retaliation for Exercise of Rights
      78k1245 k. Adverse Actions in General.
Most Cited Cases
      (Formerly 255k30(6.10) Master and
Servant)
Employer is not legally required to attempt to settle
an employee's Title VII claim, and any action or
inaction in regard to settlement of a claim cannot be
"retaliation" for making the claim, as failure to settle
is not something that alters employee's compensation,
terms, conditions, or privileges of employment,
deprives him or her of employment opportunities, or
adversely affects his or her status as an employee.
Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. §
2000e-2(a).

**[32] Colleges and Universities 81 ⟳8.1(3)**

81 Colleges and Universities
   81k8 Staff and Faculty
     81k8.1 Duration of Employment and Removal
or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most
Cited Cases
University's alleged actions in failing to give assistant
professor a pay raise despite an above satisfactory
evaluation, and in denying an extension on her tenure
clock, were adverse employment actions as required
for Title VII retaliation claim; denial of a pay raise
affected professor's compensation, and tenure-related
decisions affected an important term of her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                                Page 7
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

employment as a university professor.  Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

## [33] Colleges and Universities 81 ⬅➝8.1(3)

81 Colleges and Universities
  81k8 Staff and Faculty
    81k8.1 Duration of Employment and Removal or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most Cited Cases
Evidence supported finding that decision-makers were aware of assistant professor's protected conduct in filing discrimination complaint against university, for purposes of establishing causal connection between her protected conduct and adverse employment actions taken against her, as required for Title VII retaliation claim, where department chair had announced at a faculty meeting that professor had filed complaint against university, and the two adverse employment actions arguably occurred within close temporal proximity to the respective decision-makers learning of professor's protected activities.  Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

## [34] Civil Rights 78 ⬅➝1252

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
        (Formerly 255k30(6.10) Master and Servant)
To establish causal connection between participation in a protected activity and an adverse employment action, as required for Title VII retaliation claim, plaintiff must show that decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.  Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

## [35] Civil Rights 78 ⬅➝1252

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
        (Formerly 255k40(4) Master and Servant)
For purposes of a prima facie case of retaliation under Title VII, "close temporal proximity" may be

sufficient to show that the protected activity and the adverse action were not "wholly unrelated."  Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

## [36] Colleges and Universities 81 ⬅➝8.1(3)

81 Colleges and Universities
  81k8 Staff and Faculty
    81k8.1 Duration of Employment and Removal or Other Discipline
      81k8.1(3) k. Grounds for Termination. Most Cited Cases
University proffered nondiscriminatory reasons for its actions in failing to give assistant professor a pay raise and in denying an extension on her tenure clock, which professor failed to rebut, thus defeating Title VII retaliation claim, where decision not to award professor a pay raise was based on appropriate and reasonable criteria related to student evaluations, ranking of other instructors, and professor's lack of published articles, and professor's request for tenure clock extension was denied as premature.  Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

*576 Linda Rae Spaulding, Conrad & Scherer, Fort Lauderdale, FL, for Florida Bd. of Regents.
William Robert Amlong, Karen Coolman Amlong, Amlong & Amlong, P.A., Jennifer Daley, Ft. Lauderdale, FL, for Gupta.

Appeal from the United States District Court for the Southern District of Florida.

Before ANDERSON, Chief Judge, CARNES, Circuit Judge, and RONEY, Senior Circuit Judge.
CARNES, Circuit Judge:
The Florida Board of Regents ("Board") appeals from a judgment entered against it pursuant to a jury verdict in this sexual harassment and retaliation case.  The jury returned a verdict in favor of the plaintiff, Dr. Srabana Gupta, finding that the Board *577 was liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., to Gupta for sexual harassment she suffered while employed as a professor at Florida Atlantic University ("University").  The jury also found that the Board had violated Title VII by retaliating against Gupta because she complained about the alleged sexual harassment to the University, and because she filed a sexual harassment charge with the United States Equal Employment Opportunity Commission ("EEOC").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                    Page 8
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

The district court denied the Board's post-verdict motion for judgment as a matter of law on both claims. We conclude that there was insufficient evidence to support the jury's verdict on either the sex discrimination or the retaliation claim, and the district court should have granted the Board judgment as a matter of law on both claims. Consequently, we reverse the judgment of the district court and remand the case for entry of judgment in favor of the Board.

## I. BACKGROUND

### A. The General Facts

Plaintiff Dr. Srabana Gupta[FN1] is a citizen of India. In 1988 wishing to further her education, she came to the United States on a student visa and studied at the University of Florida, where she earned a Ph.D. in economics in August of 1994. She remains in the United States on a work visa.

> FN1. All the main characters in this case have Ph.D. degrees and can be referred to with the title "Dr." before their name. However, in order to avoid "doctoring up" the opinion, we will refer to each of them once with that title and then only by the proper name. The only exceptions will be references in quoted testimony.

Gupta applied in the spring of 1994 for a position as a tenure track assistant professor of economics at Florida Atlantic University. Following the University's procedure, she sent her application directly to Dr. Rupert Rhodd, a native of Jamaica, who was at the time an associate professor of economics and chairman of the search committee for the position she sought. Rhodd met Gupta at the Fort Lauderdale airport in late April or early May of 1994 when she arrived for her interview with the University's search committee. During Gupta's interview weekend, Rhodd was responsible for accompanying her to meetings, including lunch and dinner with other faculty members.

A few weeks after the interview Gupta called Dr. Neela Manage, a member of the search committee, to ask whether the University had decided whom they were going to hire for the position. Manage responded that the committee had not yet decided. A few days later, Rhodd called Gupta and said that the search committee was going to meet later that day and that he thought they were going to choose her for the position. Rhodd called her back in a couple of hours and informed her that the search committee had decided to hire her for the position. Prior to Gupta's acceptance of the assistant professor position, Rhodd, at Gupta's request, negotiated a salary increase for her from $35,000 to $40,000.

Soon thereafter, Gupta planned another trip to Fort Lauderdale to locate an apartment. Rhodd arranged Gupta's hotel reservations, drove her around the city because she did not know her way, and helped her find an apartment and inexpensive furniture. During this trip, Gupta also met with Dr. Sarah Ransdell, a member of the search committee who, along with Rhodd, showed Gupta around the Fort Lauderdale area.

Gupta joined the University's faculty as an assistant professor of economics in August of 1994 on the Davie campus. Her position was within the Social Sciences Division of the College of Liberal Arts. During the 1994-95 school year, Rhodd was the coordinator of the Social Sciences Division for the Davie campus. One of his responsibilities was coordinating the *578 schedules of courses taught by each of the professors in the Social Sciences Division.

### B. Facts Relating to the Sexual Harassment Claim[FN2]

> FN2. When reviewing for sufficiency of the evidence to support the verdict, we set out the facts in the light most favorable to the nonmoving party. See Morro v. City of Birmingham, 117 F.3d 508, 510 n. 1, 513 (11th Cir.1997). Some of the facts concerning the alleged sexual harassment and retaliation were hotly contested at trial, but for present purposes we assume that all of Gupta's testimony, and any other evidence favoring her position, is true. Where her testimony consisted of her characterizations of an event, we identify it as such.

When Rhodd first met Gupta at the airport when she arrived for her initial interview, Gupta perceived that he "looked [ ] me up and down." Later that afternoon, Rhodd suggested that he, Gupta, and Neela Manage, co-chairman of the economics department and Associate Dean of the College of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                          Page 9
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

Social Sciences, have lunch at a Hooters restaurant, but they did not actually go there. Instead, at the suggestion of Manage, they had lunch at Houston's Restaurant. After a tour of the University's Boca Raton campus and interviews with several professors, Rhodd and Sarah Ransdell took Gupta to dinner at Mango's, which Gupta described as "a bar." Rhodd suggested that Gupta change into casual attire before dinner.

In August of 1994, after accepting the associate professor position, Gupta returned to Fort Lauderdale to look for an apartment. During this trip, Rhodd looked at her when she took off her jacket, which made her very uncomfortable. He also accompanied Gupta, Sarah Ransdell, and Ransdell's boyfriend to dinner at Shooters, which Gupta describes as "a bar" and "a place where single people meet."

After Gupta was hired, Rhodd was very supportive of her and often went "out of his way" to help her. He told Gupta, "If you need anything, just come and talk to me. If you have any problem, come and talk to me." After Gupta complained about the size of her office, Rhodd moved her from a smaller office directly across from his office to a larger office. He also volunteered to drop Jamaican food off by her house when she asked where she could find spicy food, but she declined his offer. Rhodd and Gupta did pick up Jamaican food one day and bring it back to the campus to eat for lunch.

Soon after Gupta arrived in August, Rhodd began calling her at her home at night. As Gupta described it in her testimony:
[H]e used to call me at home.... Quite frequently-two times, three times, you know, a week on an average.... He would call me either late at night, because often 9:30, 10:00 o'clock at night, or over the weekends.... He said, "Are you talking to your boyfriend? Where is your boyfriend?"

His phone calls continued until January of 1995. In one of the calls, Rhodd asked Gupta, "I was wondering how you were doing?" During some of these evening phone calls, Rhodd asked if she was in bed. He also called her one Sunday morning and informed her that he was going to be the new Associate Dean of the College of Liberal Arts. He told her that "as an economist now, [she had] to take up more responsibilities."

Rhodd also frequently asked Gupta to have lunch with him. At first, Gupta had lunch with Rhodd almost every day, but later she began having lunch

with other colleagues. Gupta thought that Rhodd was upset when she went to lunch with other people. Rhodd started telling Gupta, "Well, you know, I know with whom you went to lunch with," and "You don't go to lunch with me any more." He commented that some of the faculty members that Gupta had lunch with were "racist" and "evil." Once when she was wearing a skirt that was above her knee, she perceived that Rhodd "was staring at [her] legs." It made her "uncomfortable" and *579 since that time she has "never worn a short skirt."

Once when Gupta was in Rhodd's office discussing her teaching schedule, as she described it, he "just rolled his chair and came close to me and he put his hand on my right thigh." His hand was partly on the inside of her thigh. It happened very quickly, and Gupta moved away very quickly. On another occasion, Rhodd touched her bracelet and said, "Oh, it is a very nice bracelet." Another time, he touched a ring Gupta was wearing.

On another occasion when Gupta went into Rhodd's office, "he suddenly rolled his chair towards [her] and he said, 'What kind of material is that?' and he lifted the hem of [her] dress" about four inches with his hand. She instinctively stepped back. Another day, when the air conditioning was broken and it was very hot, Rhodd was expecting Gupta to come pick up a book from his office. Gupta entered Rhodd's office and discovered that he had on his undershirt, but had taken his dress shirt off. She offered to come back to see him later, but he said to wait and at the same time "he unbuckled his belt and pulled down his zipper and start[ed] tucking his [dress] shirt in." She thanked him for the book and left.

Rhodd also made some comments to Gupta that she characterized as harassment. He told her that the reason she was assigned to teach more hours than other teachers and the reason she had not received her new computer was that "people here are racist."[FN3] Once Dr. Rhodd commented, "You are looking very beautiful." Twice he told her, "Indian people are really decent, and the Caribbean and Western people are really promiscuous. I can look at you and I can tell you are innocent and you don't have much experience." One morning after a bad thunderstorm the night before, Rhodd called Gupta and asked if she needed a ride to a University seminar. During that conversation, he said, "Oh, you were all by yourself on a dark and stormy night? Why didn't you call me? I would have come and spend [sic] the night with you." Gupta understood Dr. Rhodd's suggestion to mean "that he wanted to [have a] sexual

212 F.3d 571                                                                                               Page 10
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

relationship with me."  She told him, "Don't talk to me that way.  You are talking nonsense."

> FN3.  Gupta never explained why she thought that statement amounted to harassment of her.  She said she believed that these statements were made "to get me to his side, so that I know that this place is bad."  She stated that these statements made her "very distressed" and "very upset."

On one occasion, Rhodd stated that he considered men superior to women, that women are like meat, and that "men need variety in women."  Once, Rhodd came into Gupta's office and asked her "Why do you look so unhappy?  Have you fallen for a man you can't talk about?"  She responded, "What are you talking about?"  He replied, "I give you six months to fall for a man about which you won't be able to talk about."  Gupta thought that Rhodd was referring to himself.

Although no precise date is given in the record, Gupta apparently arrived at the University in or around August of 1994.  When the case was tried in July and August of 1997, she was still employed as an assistant professor of economics at the University.  However, the last time she spoke with or otherwise had anything directly to do with Rhodd was in or around February of 1995.    His statements and actions about which she complains occurred during a period of six or seven months.

### C. Facts Relating to Gupta's Complaints Inside the University [FN4]

> FN4. *See supra* note 2.

In 1994 Gupta confided in Ransdell that Rhodd had told her that certain people in the College of Liberal Arts were racist and that he would protect her.  Ransdell assured**580** her that these people were not racist.    In November 1994, Gupta had another conversation with Ransdell in which she told her about Rhodd's comment that men are superior to women and his statement that he would have spent the night with Gupta during the storm.  Ransdell told her: "Don't talk to anybody about it.   Keep your mouth shut.   I'm not going to tell it to anybody. And look for another job."

Gupta also talked with Dr. Ganson, a junior faculty

member;  Dr. Rose, a professor of history;  Dr. Mona Domash, associate professor of economics;  Dr. Lynn Appleton, a professor of sociology;   and Neela Manage, the co-chairman of the Economics Department and the Associate Dean of the College of Social Sciences.[FN5]   The first time she spoke with Manage was sometime in October of 1994.  Gupta told Manage that she was distressed because Rhodd was calling her at home late at night and over the weekends and he was telling her that people at the University were racist.  According to Gupta, she also told "her that there was more to it, but I did not mention anything much more than those things." Manage told her to "be very careful."

> FN5.  Gupta did not describe her conversations with Ganson or Rose. The record is unclear about what Gupta told Domash and Appleton, but it does reveal that they both advised Gupta to speak with one of the University's sexual harassment advisors.

Later that same month, Gupta went to Manage's office to talk to her again.    Gupta began crying because she felt "unsafe and uncomfortable."   She talked with Manage about the possibility of transferring to the Boca Raton campus.  Manage told her that she saw no reason why Gupta could not apply for a position at the Boca Raton campus, but that Gupta should be careful because the decision-maker, Dr. Stronge, then the acting chairman of the Department of Economics, and "Doctor Rhodd, they're like this, they're very good friends."    In December, Gupta again talked with Manage and told her about Rhodd "wanting to come and spend the night with me, [and] all of those incidents."  Manage told Gupta that she should talk to Dean White, Dean of the College of Liberal Arts.

Thereafter, still in December of 1994, Gupta told Dean White that she was having some problems with Rhodd.  She explained to him that Rhodd was giving her inaccurate information and telling her that it was not important that she attend certain meetings. White asked her if she would describe Rhodd's behavior as sexual harassment.  As Gupta recounted, she responded, "I told him that I did not want to talk to him about the details at that point in time, but I told him that, you know, Doctor Rhodd was going out for promotion and I could have put him into lot [sic] of trouble if I wanted to.   I told him that; that is, I gave him enough indication."  White told her that, if it was of the nature of sexual harassment, "it's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                Page 11
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

not going to stop that easily."    Having read the University's policy against sexual harassment, Gupta thought if she "blew the whistle on Doctor Rhodd, that would really hurt his career," and she did not want to do that.

In January of 1995, Gupta heard a rumor that Rhodd was telling others that Gupta was not doing her job and should be fired.    Gupta told Ransdell about the rumor, and Ransdell told her to "look for another job."    Gupta met again with White and told him about the rumor she had heard.    She also told White that Rhodd had been sexually harassing her.    The record does not indicate what White said to Gupta in response.

Gupta met with one of the University's sexual harassment counselors, Debra Minney, in January of 1995.    Minney informed Gupta that the University used two types of resolution proceedings, informal and formal.    Gupta chose to attempt an informal resolution of her complaint against Rhodd.    As part of the informal resolution process, Dean White prepared a document in which he listed all of the specific allegations made by Gupta.    Rhodd then responded**581 to Gupta's allegations.    Based on what Gupta and Rhodd said, White drew up a draft of the allegations which he hoped the parties would find mutually agreeable.

Because Gupta would not agree to sign White's draft, Ondina Felipe, the University's attorney, prepared a proposed informal settlement agreement which was presented to Gupta in March of 1995.    Gupta was not satisfied with the proposal, so Paula Behul, the University's Director of Equal Opportunity Programs, requested that Gupta describe in writing the parts she found objectionable.    Gupta had not responded by September of 1995.    Behul then met with Gupta and requested that she formulate a response to the proposed agreement and present it to Behul on or before October 9, 1995.    Gupta failed to meet that deadline.    Because of what she considered to be Gupta's failure to cooperate in the informal resolution process, Behul closed the case on October 12, 1995.[FN6]

> FN6. We recount the facts relating to the allegedly retaliatory actions the University took against Gupta in our discussion of that claim.    *See infra* Part II.B.

*D. Legal Proceedings*

Gupta filed a charge of discrimination with the EEOC, and on April 10, 1996, a notice of a right to sue was issued to her.    On June 25, 1996, Gupta filed a three-count complaint against Rhodd and the Florida Board of Regents in federal district court. The first count, which was brought pursuant to 42 U.S.C. § 1983, alleged that Rhodd had sexually harassed her under color of state law and had thereby deprived her of her rights under the Equal Protection Clause.    The second count alleged that the Board was liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, for Rhodd's discriminatory conduct, and the third count alleged that the Board was also liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, on theories of hostile work environment and quid pro quo sexual harassment.    Gupta filed an amended complaint on February 26, 1997, dropping the Title IX count but leaving the other two counts.

On May 6, 1997, Gupta filed a supplemental complaint adding another count against the Board. The new count alleged that after Gupta filed an internal complaint with the University and a formal complaint with the EEOC against the Board and Rhodd, the University unlawfully retaliated against her in violation of Title VII.    Gupta's claims were tried and submitted to a jury.    After four-and-one-half hours of deliberation, the jurors sent a note to the judge, which stated that they could not unanimously agree on the answers to the three questions on the first page of the verdict form.[FN7]    In response, the district court gave the jury an *Allen* charge.[FN8]

> FN7. Those three questions on the first page of the verdict form were as follows:
> 1.  Do you find by a preponderance of the evidence that Defendant Florida Board of Regents is liable to Plaintiff for sexual harassment under Title VII of the Civil Rights Act of 1964 for hostile work environment and/or quid pro quo sexual harassment?
> 2.  Do you find by a preponderance of the evidence that Defendant Florida Board of Regents retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 for complaining about sexual harassment and filing a sexual harassment charge with the United States Equal Employment Opportunity Commission?
> 3.  Do you find by a preponderance of the evidence that Defendant Rupert Rhodd, while acting under color of state law,

212 F.3d 571                                                                                          Page 12
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

intentionally deprived Plaintiff of her Constitutional rights under the Constitution of the United States?

FN8. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Soon thereafter, the jury returned a verdict finding that Rhodd was not liable under 42 U.S.C. § 1983, but that the Board was liable under Title VII for sexual harassment and retaliation.[FN9] The jury *582 awarded Gupta $45,000 in compensatory damages for the sexual harassment claim and $50,000 in compensatory damages for the retaliation claim. Following the entry of judgment, the Board renewed its earlier motion for judgment as a matter of law on both claims or, in the alternative, a new trial. The district court denied the Board's motion.[FN10] The Board appeals.

FN9. The jury answered the first two questions quoted in the preceding footnote "yes," and the third one "no."

FN10. Among the arguments the Board made in its motion for judgment as a matter of law or new trial and repeats in this appeal is the contention that, because the jury found in favor of Rhodd on the § 1983 claim, the Board cannot be held liable for his actions under Title VII. Because we hold that the Board is entitled to judgment for other reasons, we need not address that contention.

## II. DISCUSSION

We review the district court's denial of the Board's motion for judgment as a matter of law on both claims *de novo,* applying the same standard as the district court. *See Montgomery v. Noga,* 168 F.3d 1282, 1289 (11th Cir.1999). In applying that standard, "we review the evidence 'in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party.'" *Montgomery,* 168 F.3d at 1289 (quoting *Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995)). We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence. *See Delpit v. Nocuba Shipping Co.,* 302 F.2d 835, 838 (5th Cir.1962).

### A. The Sexual Harassment Claim

[1] Title VII states that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Sexual harassment is a form of sex discrimination prohibited by Title VII. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (stating that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' ").

[2] There are two types of sexual harassment cases: (1) quid pro quo, which are "based on threats which are carried out" or fulfilled, and (2) hostile environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). Although the jury in this case was instructed on both types of sexual harassment, construing the facts in the light most favorable to Gupta, we find that there was no evidence at all in the record to support a claim of quid pro quo sexual harassment. Therefore, our discussion of Gupta's sexual harassment claim focuses on her theory of hostile environment sexual harassment.

[3] This Court set forth in *Mendoza v. Borden, Inc.,* 195 F.3d 1238 (11th Cir.1999) (en banc), the elements that an employee must establish to support a hostile environment claim under Title VII based on harassment by a supervisor. An employee must establish:
(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*583 *Id.* at 1245.[FN11] The fourth element-that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

create an abusive work environment"-is the element that tests the mettle of most sexual harassment claims.    Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory 'conditions of employment.' " *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

> FN11. The Supreme Court held in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998), that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." There was sufficient evidence at trial from which a reasonable jury could conclude that Rhodd was Gupta's supervisor.

[4] Accordingly, a plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (explaining that the objective component of the "severe and pervasive" element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections (citation omitted).    We have no doubt that Gupta subjectively perceived the alleged harassment to be severe and pervasive.    However, the evidence presented at trial does not support a finding that from an objective viewpoint the alleged sexual harassment was so frequent, severe, or pervasive to constitute actionable sexual harassment under Title VII. *See Mendoza*, 195 F.3d at 1246 ("[t]he environment must be one that a reasonable person would find hostile or abusive ...." (citation and internal marks omitted)).

[5][6] Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to

constitute sexual harassment, *see Mendoza*, 195 F.3d at 1242, the statements and conduct must be of a sexual or gender-related nature-"sexual advances, requests for sexual favors, [or] conduct of a sexual nature," *id.* at 1245-before they are considered in determining whether the severe or pervasive requirement is met.    Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted.    Title VII, as it has been aptly observed, is not a "general civility code." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84.

### (1) Non-Gender Related and Non-Sexual Statements and Conduct

[7] Gupta complains of several things that no reasonable person would consider to be of a gender-related or sexual nature.    For example, she complains that Rhodd told her to steer clear of certain faculty members because they were evil and racist.    Those statements merit no mention in a discussion of sexual harassment, except perhaps to serve as a clear example of what it is not.

Gupta also complains that Rhodd assisted her with the move to Fort Lauderdale by helping her find a place to live and to find inexpensive furniture.    She also criticizes him for telling her to come and see him if there was anything he could do for her.    Mere solicitude, even if repetitive, is not sexually harassing behavior.

*584 Another matter Gupta complains about that is either not sexual in nature, or insufficiently so to be due any real weight, is that Rhodd suggested he, Gupta, and Neela Manage go to lunch at a Hooters restaurant a few hours after she arrived for her interview with the University.    Gupta may have been offended by that suggestion, and apparently was, but we do not think that a reasonable person would have thought that such an invitation, unaccompanied by any sexual remark and not pressed when it was declined, was necessarily based on the sex of the invitees or was a sexual comment or suggestion of any kind.    The same is true of Rhodd and Sarah Ransdell taking Gupta to dinner at Mango's, and of both of them and Ransdell's boyfriend taking Gupta to dinner at Shooter's, places which Gupta described as bars.    Inviting a member of the opposite sex to be part of a group going to dinner at a bar is not evidence of sexual harassment. *See Mendoza*, 195 F.3d at 1254 (Edmondson, J., concurring) ("The conduct of which plaintiff complains is neither

212 F.3d 571                                                                                                      Page 14
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

obviously sexual in nature nor even sex-specific.")

### (2) Statements and Conduct of a Gender-Related or Sexual Nature or Arguably So

[8] If the complained of statements and conduct are of a gender-related or sexual nature, there are four factors that we consider in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. We will now consider comments and behavior of Rhodd that are, or arguably could be, considered to be of a sexual or gender-related nature. We doubt some of it is, but for present purposes we will assume it to be.

[9][10][11] Gupta complains that on one occasion-one time during six months-Rhodd told her, "You are looking very beautiful." She did not say he made any kind of sexual gesture along with the remark, or even that she perceived he was leering at her when he said it, only that he complimented her looks with those words. It is debatable whether such a compliment is sexual in nature, but assuming that it is, we do not believe that a reasonable person would deem it to be offensive. A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions, by telling her that she is looking "very beautiful," or words to that effect, without fear of being found guilty of sexual harassment for having done so.       Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment. *See Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003 (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory "conditions of employment").

[12] Except for the phone calls to her home, none of Rhodd's conduct can be described as frequent. Gupta testified that Rhodd phoned her often at 9:30 or 10:00 at night, and over the weekends, and sometimes asked her personal questions during these phone calls.[FN12] While Gupta testified that these phone calls were frequent, she never contended that they were intimidating or threatening. At no point during these phone calls did Rhodd ask Gupta for a

date or make sexually explicit *585 remarks or innuendos.[FN13] Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd. While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment-if it is sexually harassing conduct at all. As for Rhodd's comments about the promiscuity of people from Jamaica as compared to the innocence of people from India, and the opinion he expressed of women, those statements were far from laudatory, but they were also isolated utterances over a period of several months.

> FN12. Rhodd asked Gupta over the phone, "I was wondering how you were doing?" He also asked, "Are you talking to your boyfriend?" and "Have you had dinner?" Once he asked her, "What kind of personal problems did you have?" in relation to why Gupta had to return to India while studying at the University of Florida.

> FN13. Rhodd asked Gupta in more than one phone conversation, "Are you in bed?" but there is no evidence that this question was asked in a sexual context or had any improper sexual connotation. Given that it is common courtesy when calling late at night to ask if the person answering was in bed or asleep, and given the absence of any follow-up question or remark of a sexual nature, we do not think that a reasonable person would interpret the question as one that is sexually suggestive.

[13] Gupta did testify that on one occasion when Rhodd was expecting her to come pick up a book from his office, she entered his office and found him sitting in his chair with no dress shirt on, but wearing an undershirt. When she entered his office, he grabbed his dress shirt, "unbuckled his belt and pulled down his zipper and start[ed] tucking his shirt in." But Gupta acknowledged that the air conditioning was broken on the day in question and that it was "very hot in the building." Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt. His conduct on this isolated occasion was not "physically threatening or humiliating." *See Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir.1999) ("It is not enough that a supervisor or coworker fails to treat a female employee with

212 F.3d 571                                                                 Page 15
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory.").

[14][15] Moreover, Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch. Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating. As the Supreme Court has observed, in a normal office setting interaction between employees is to be expected. *See Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84. What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter. We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her." *Mendoza*, 195 F.3d at 1256 (Carnes, J., concurring). Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

[16] Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once. He should not have done either of those things. But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University). Each incident was only momentary, and neither was coupled with any verbal suggestions or advances. *See Minor*, 174 F.3d at 857 (no hostile environment where the supervisor, among other things, on one occasion "put his arms around [the plaintiff], kissed her, squeezed her, and said, 'Now, is this sexual harassment?' ").

**\*586** The fourth factor in determining whether conduct and statements are "sufficiently severe or pervasive" to create a hostile work environment is whether the conduct and statements unreasonably interfere with the plaintiff's job performance-a factor which involves both a subjective and objective inquiry. *See Mendoza*, 195 F.3d at 1246. Gupta contended at trial that she suffered from depression, nervousness, anxiety, nose bleeds, fatigue, weight gain, and other physical manifestations of stress as a result of Rhodd's behavior and her fear that she would be fired. She testified that those manifestations affected her research and caused her

to miss deadlines. She also testified that she stayed away from the University's campus as much as possible to avoid seeing Rhodd. Given the posture of this case, we accept all of that as true, and Gupta has certainly met the subjective prong of the required showing. But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component. The standard does have an objective component, and applying it we conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement. We have done so, and it does not. The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment. Gupta failed to present evidence that Rhodd's conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe." *Mendoza*, 195 F.3d at 1246. The Fifth Circuit recently opined, "All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir.1999) (citations omitted). This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment." *Mendoza*, 195 F.3d at 1252 n. 10. Based upon *Mendoza*, we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title VII, and we reverse the judgment of the district court on that claim.

*B. The Retaliation Claim*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                    Page 16
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
**(Cite as: 212 F.3d 571)**

[17][18] Retaliation is a separate violation of Title VII. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989)). Although the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a "reasonable good faith belief" that she was being sexually harassed. As a result, the jury's verdict finding retaliation may stand independent of our reversal of the sexual harassment verdict if there was sufficient evidence presented at trial to support the retaliation verdict. *See* *587Sullivan v. National R.R. Passenger Corp.,* 170 F.3d 1056, 1058-59 (11th Cir.1999). As with the verdict on the sexual harassment claim, we view all of the evidence in the light most favorable to the plaintiff, and do not re-weigh the credibility of the witnesses. *See id.* at 1059.

[19][20] In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See* *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir.1999). We consider the evidence presented in support of Gupta's prima facie case only in evaluating whether a reasonable jury could disbelieve the Board's proffered nondiscriminatory reasons for its actions. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1999) ("When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case is no longer relevant."). We will not revisit the existence of a prima facie case. *See id.*

It is undisputed that Gupta participated in a protected activity. As the district court correctly instructed the jury, Gupta "participated in an activity protected by Title VII by complaining about sexual harassment and filing a sexual harassment charge with the United States Equal Employment Opportunity Commission."

[21][22][23] Gupta alleges that she suffered numerous adverse employment actions. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3rd Cir.1997) (citation and internal marks omitted). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998). In evaluating what actions meet that required level of substantiality, we recognize that "Title VII[ ] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.' " *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1178 (10th Cir.1999) (citation omitted). Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, *id.* at 1178, using both a subjective and an objective standard, *see Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1448-49 (11th Cir.1998) (recognizing that the subjective requirement is virtually almost always satisfied and imposing an objective requirement, as well).

[24] Gupta presented testimony that she was subject to the following actions, which she contends are adverse employment actions: (1) she was not given a pay raise despite an above satisfactory evaluation by her supervisor; (2) she was denied an extension on her tenure clock;[FN14] (3) she was placed on the search committee for a position at the University's Boca Raton campus, which prevented her from applying for that position; (4) she was assigned to teach more credit hours than other professors and to teach classes on three different campuses in the Fall 1997 session; (5) she was not assigned to teach a desired class in the Summer 1995 second session; (6) Dean White's office intentionally delayed*588 her visa application to the Immigration and Naturalization Service; and (7) the informal resolution process involving her sexual harassment claim was terminated without notice after she missed one deadline.[FN15]

> FN14. "Tenure clock" refers to the six-year period in which an untenured professor has to obtain tenure.

> FN15. We dispose here of Gupta's complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                          Page 17
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

about Stronge telling her that he was going "to have to write [her] a letter saying that [she was] not making sufficient progress towards tenure." A threatened letter never actually written cannot constitute an adverse employment action.

[25] The last five listed actions that Gupta complains of are not "adverse employment actions."[FN16] None of those actions were "objectively serious and tangible enough" to alter Gupta's "compensation, terms, conditions, or privileges of employment, deprive ... her of employment opportunities or adversely affects ... her status as an employee." *Robinson,* 120 F.3d at 1300 (internal marks omitted). First we consider Gupta's placement on the search committee to fill a position at the University's Boca Raton campus, which prevented her from applying for that position. Although Gupta had indicated some interest in the position at the time she was asked to serve on the search committee, she had not yet applied for the position. Once asked to serve on the committee, Gupta accepted the offer to serve and at no time asked to be removed from the committee. Serving on a search committee is something most people would consider an honor and Gupta's doing so without objection cannot be considered an adverse employment action.

> FN16. We reach this conclusion after considering all of her allegations individually and collectively. *See Wideman,* 141 F.3d at 1456 (considering plaintiff's allegations collectively and holding that plaintiff established adverse employment action).

[26][27] Nor do Gupta's teaching assignments constitute adverse employment actions. Stronge testified that scheduling Gupta to three different campuses was a mistake, and once he became aware of it, he promptly corrected the mistake. He then revised Gupta's schedule so that she was teaching only two classes on two different campuses. She never taught on more than two campuses in any term.[FN17] A proposed action that is corrected as soon as the proper official is made aware of it and before it goes into effect, so that the employee does not actually suffer any consequence, is not "adverse."

> FN17. Stronge testified that Gupta was not the only professor who was teaching two classes on two different campuses. She

apparently would have been the only professor teaching on three different campuses if that mistake had not been corrected.

[28] A university can assign its professors to teach the classes it needs them to teach. Although Gupta complains that she was not assigned a particular class in the second session of Summer 1995, she presented no evidence at all that she was in any way entitled to or particularly deserving of that class, as opposed to the classes she was assigned to teach, or that other untenured professors routinely got to cherry-pick the classes they taught. Besides, Gupta later chose not to teach at all that summer, because she "was not feeling good." Instead of teaching, she took a trip to Hawaii with a friend. An action which, it turns out, had no effect on an employee is not an "adverse" action. Under the facts and circumstances of this case, Gupta's teaching assignments do not constitute actionable adverse employment actions.[FN18]

> FN18. Gupta also complains that Stronge refused to let her develop a proposal for a new class entitled "Women in the Global Economy." A university can choose to offer whatever courses it wants to offer and has no duty to accommodate its professors' desire to create new classes. Furthermore, Stronge testified without contradiction that when Gupta asked him whether it was a good idea to teach the proposed class, he responded "that [it] would not [be] a good thing for her to do at this stage of her career, because at this stage of her career, she does not have tenure and she would be moving away from her field of specialization in order to develop this new course...." There was no evidence that Stronge encouraged or allowed other professors in the economics department to develop and teach new courses away from their field of specialization.

*589 [29] The delay by White's office in completing and returning Gupta's visa application to the Immigration and Naturalization Service was not an adverse employment action. Although the visa application was not completed promptly, it was returned to Gupta in sufficient time for her to file the application with the Immigration and Naturalization Service, which she did. Gupta was in no way harmed by the delay. It follows that the action, or inaction, was not "adverse."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                                    Page 18
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

[30] Finally, the University's termination of the informal resolution process involving Gupta's sexual harassment claim, without first warning her that if she missed the deadline they would close the case, was not an adverse employment action. Gupta chose to use the University's informal resolution process, and on March 30, 1995, she was given a proposed settlement agreement prepared by the University's attorney. She took the settlement agreement home, but later chose not to sign it because she did not want "to give up [her] rights." Notwithstanding that decision, around April 6, 1995, Gupta asked Paula Behul, the Director of Equal Opportunity Programs, for more time to respond to the proposed agreement. Behul gave her sixty additional days in which to respond. Gupta, however, failed to respond during the additional sixty-day period. In June of 1995, Gupta stopped by Behul's office and said that she had been very busy and would get back with her some time in the future. In September of 1995, after having not heard from Gupta for almost three months following the sixty-day extension, Behul scheduled a meeting with Gupta in an attempt to resolve the issue. At that meeting, the two of them agreed that Gupta would give Behul a counter-proposal to the proposed agreement no later than October 9, 1995. Gupta did not return the counter-proposal by that deadline.[FN19] On October 12, 1995, Behul sent Gupta a letter stating that the informal resolution process was terminated. That termination occurred after six months of attempting to get Gupta to respond to the University's settlement proposal.[FN20]

> FN19. On October 9, 1995, Gupta called Behul and stated that she was really busy and would be unable to get the counter-proposal to her that day, but would probably be able to bring the counter-proposal to Behul by October 10 or 11. Gupta sent Behul a letter and counter-proposal in the mail sometime prior to October 11, but Behul never received the letter.

> FN20. Gupta testified that White remarked, "Why don't you drop the case and get on with your life," when she asked him to reopen her case and resume the informal resolution process. Even assuming that statement could constitute circumstantial evidence of retaliation, it does not in this case because White was not a decision-maker in closing her case or in either of the two actions that we hold constitute adverse

employment actions. Although his office was responsible for the delay in completing Gutpa's visa application, as we have already stated, that delay was not an adverse employment action.

[31] To begin with, an employer is not legally required to attempt to settle an employee's Title VII claim at all. Any action or inaction in regard to settlement of a claim cannot be retaliation for making the claim in any meaningful sense, because every action or inaction in regard to settlement of the claim is caused by the claim. The anti-retaliation provisions of the various job discrimination statutes are aimed at preventing the employer from punishing the employee by making job conditions worse. The failure to settle a claim for whatever reason does not make job conditions worse as a result of the claim having been made. They are already "worse" (if the underlying claim is valid). The failure to settle is not something that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *590*Robinson, 120 F.3d at 1300 (internal marks omitted). The settlement of a claim, in short, is not a condition of employment. [FN21]

> FN21. Even if it were possible to have a viable retaliation claim on bad faith in settlement negotiations, Gupta has utterly failed to present an evidentiary basis for a finding that the University failed to act in good faith in regard to settling her claim. Gupta was given abundant opportunity to respond to the University's proposal, and negotiations broke down because of her indecisiveness. No reasonable fact finder could find that the University's decision to end the process was based upon anything except Gupta's failure to respond or that its decision was unreasonable under the circumstances.

[32] Having explained why five of the seven actions about which Gupta complains were not adverse employment actions, we turn now to the remaining two-not being given a pay raise despite an above satisfactory evaluation and the denial of an extension on her tenure clock. The denial of a pay raise clearly affects Gupta's compensation, and tenure-related decisions affect an important term of employment for a university professor. They are adverse employment actions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

212 F.3d 571                                                                                                     Page 19
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

[33][34][35] Accordingly, we proceed to determine whether there is a causal connection between Gupta's participation in a protected activity and an adverse employment action.    To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Farley,* 197 F.3d at 1337 (citations, internal marks, and emphasis omitted).  For purposes of a prima facie case, "close temporal proximity" may be sufficient to show that the protected activity and the adverse action were not "wholly unrelated." *Id.*

Gupta presented sufficient evidence at trial that the decision-makers were aware that she had filed a complaint against the University.    Stronge announced at a faculty meeting in 1996 that Gupta had filed a complaint against the University.[FN22] Moreover, the two adverse employment actions arguably occurred within close temporal proximity to the respective decision-makers learning of Gupta's protected activities.  Although Gupta did not file a complaint with the EEOC until the spring of 1996 and did not file suit until June 25, 1996, she complained about the alleged sexual harassment to other faculty members in late 1994 and to Dean White in January 1995.  Gupta was denied a merit raise in the spring of 1996 and was denied a tenure extension in early 1997.

> FN22. The Board never denied that those in decision-making positions regarding the two adverse employment actions knew about Gupta's pending lawsuit.  Moreover, several professors acknowledged that they were sensitive to Gupta's lawsuit.  For example, Stronge testified in his deposition, "I said I wanted to be sure that I responded properly to her request for the tenure clock extension, and that one reason for that was that she currently had a lawsuit against the university, and I did not wish to influence that lawsuit one way or the other."

[36] As it was entitled to do, however, the Board proffered nondiscriminatory reasons for its employment actions. *See Sullivan,* 170 F.3d at 1059 ("Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." (citation and internal marks omitted)).  With respect to the

first retaliatory act alleged by Gupta, not being given a merit raise, the University established without evidentiary dispute that its decision not to award Gupta a pay raise was based on appropriate and reasonable criteria.

In the spring of 1996, Stronge ranked eight economics professors and placed them into three groups-high, medium, and low.  Stronge divided the professors into those groups by reviewing 1995 year-end evaluations made by each professor's supervisor and by making an independent evaluation of each professor.  In the course of assessing the evaluations by the **591** supervisors, Stronge reviewed the information upon which they were based, including student evaluations, publications and research accomplished,    grants    received,    service    on committees, and service to the University.  Stronge's ranking was then reviewed and merit raises were awarded to the professors based on the group in which each professor was placed, *i.e.,* the highest group received the highest merit raise.

Gupta's initial evaluation, performed by Mona Domash, who was Gupta's immediate supervisor during 1995, was above satisfactory.[FN23]  However, when Stronge reviewed Domash's evaluation, he disagreed with her findings.    He believed Gupta's teaching was "generally below the average" based on a review of student evaluations and "her research was generally below what I would expect to see." Stronge found it particularly relevant that Gupta had not published anything at all during the year in question.[FN24]   He also testified that he believed Domash's evaluation was influenced by a letter from Gupta apologizing for accomplishing so little that particular year due to a medical illness.    Gupta's letter was attached to Domash's evaluation.

> FN23. Domash's evaluation stated that Gupta has shown "considerable improvement in teaching relatively large rigorous courses."    She also commented that:  "Doctor Gupta has worked hard on two research articles.    In 1996, she resubmitted an article to the Rand Journal of Economics, a top-ranked journal.    She has also submitted another major article for publication.    This is the start of a very promising research career."

> FN24. Gupta did not have her first article published until two years later, and a few weeks before this trial began in July of

212 F.3d 571                                                                                   Page 20
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

1997.

Gupta produced no evidence upon which a reasonable fact finder could conclude that Stronge's explanation for not awarding her a merit pay raise was pretextual. She does not dispute that she had failed to publish anything. Moreover, in her letter to Domash she acknowledged she had accomplished little. Nor did Gupta present any evidence that her 1995 student evaluations justified a higher ranking than she received. Finally, Gupta produced no evidence at all that any professor whom Stronge ranked higher than her for merit pay purposes had not performed better than she. Gupta failed to create a genuine issue of material fact that the Board's nondiscriminatory reasons for not giving her a merit pay raise were pretextual.

With respect to the second adverse employment action, the denial of an extension on Gupta's tenure clock, the University established without evidentiary dispute that an extension was not justified and, moreover, her request for one was premature. In December of 1996, Gupta wrote a letter to Dr. Osborn, the Provost of the University, requesting an additional year on her tenure clock and stating as the sole reason that the criteria used to evaluate her for tenure and promotion had changed when she was transferred from the College of Liberal Arts to the College of Business.[FN25] Osborn received her request and, in response, he asked Gupta to explain specifically what those changes were. He also suggested that she meet with her current and former deans for guidance. Gupta sent a second letter, but she neither explained the changes further nor indicated that she had consulted with either dean.[FN26]

> FN25. Gupta had first written to Osborn in April 1996, requesting an additional year beyond the normal six-year period in which to obtain tenure. That April 1996 request stated: "Between the months of January 1995 and January 1996, I experienced severe medical problems."
> Osborn sent Gupta's letter to then-Associate Provost, Marilyn Federico. Federico responded to Gupta and advised her of the proper procedures to request a tenure clock extension. Gupta presented no evidence that she pursued this particular request any further. The action she contends was retaliatory is the denial of her later request for a tenure clock extension, one in which

she did not cite medical reasons as a ground.

> FN26. In Gupta's second letter, she merely enclosed a copy of the guidelines and procedure documents for tenure in the two colleges.

*592 Notwithstanding Gupta's failure to follow Osborn's instructions as to the form of the request, he considered her request for an extension of the tenure clock on its merits. As was the procedure in such matters, Osborn reviewed the recommendations of three other professors who had opined that Gupta should be denied a tenure extension.[FN27] He independently analyzed the guidelines and procedures for the Colleges of Liberal Arts and Business and found no significant differences between the tenure criteria of the two colleges. Moreover, Osborn stated that he considered Gupta's request for a tenure clock extension to be premature. Although tenure candidates may wait until their fifth year of continuous employment to request an extension, Gupta applied for the extension in her third year of employment. Consequently, Osborn denied her request.

> FN27. Osborn made the final decision to deny Gupta's tenure clock extension request, but three other professors-Stronge, Dr. Mallen, Dean of the College of Business, and Dr. McBride, vice-president for the Broward campuses-reviewed Gupta's request and recommended that the request be denied.

Gupta presented the testimony of Dr. Appleton, who opined that "significant differences" did exist between the tenure criteria for the College of Liberal Arts and the College of Business. However, Dr. Appleton's conclusory opinion did not delineate any differences in the core requirements of tenure-teaching, research, and service. Gupta also showed that two other professors, Sylvia Laursen and Emily Stockard, previously had been granted tenure extensions. However, the circumstances of those extensions were significantly different from Gupta's request. Laursen was granted a tenure extension after suffering a disabling injury in an automobile accident, while Stockard was granted an extension after her child died immediately after birth. Gupta's 1997 request, on the other hand, stated as its only ground that the criteria for evaluation had changed, not that any medical problem she had would warrant an extension. She presented no evidence at all that

212 F.3d 571                                                                                    Page 21
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663
(Cite as: 212 F.3d 571)

anyone else had been granted an extension on their tenure clock as early as the third year of employment. The evidence Gupta presented is insufficient to create a genuine issue of material fact that the Board's nondiscriminatory reasons for declining to extend her tenure clock were pretextual.

After a thorough review of the record, we hold that Gupta failed to present sufficient evidence at trial to support the jury's verdict of retaliation.    Although Gupta satisfied the elements of a retaliation claim, the Board presented nondiscriminatory reasons for its actions.    The meager evidence, or lack of it, produced by Gupta in response did not permit the jury to "legitimately draw the inference" that the Board's proffered nondiscriminatory reasons for its employment decisions were pretextual and that the real reasons behind their actions were retaliatory. *Sullivan*, 170 F.3d at 1061.    No reasonable juror could have found that the Board retaliated against Gupta because she filed a complaint of sexual harassment.    Accordingly, we reverse the judgment of the district court on that claim.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for entry of judgment in favor of the Florida Board of Regents.
RONEY, Senior Circuit Judge, concurring:
I concur in the judgment.

**\*593** I agree that there was insufficient evidence to go to the jury on the retaliation claim, and that the hostile environment sex discrimination claim could not survive the analysis prescribed by this circuit's decision in *Mendoza v. Borden*, 195 F.3d 1238 (11th Cir.1999)(en banc).

C.A.11 (Fla.),2000.
Gupta v. Florida Bd. of Regents
212 F.3d 571, 82 Fair Empl.Prac.Cas. (BNA) 1863, 144 Ed. Law Rep. 822, 13 Fla. L. Weekly Fed. C 663

Briefs and Other Related Documents (Back to top)

• 1999 WL 33617515 (Appellate Brief) Reply Brief of Appellant, the Florida Board of Regents (Oct. 22, 1999) Original Image of this Document (PDF)
• 1999 WL 33617507 (Appellate Brief) Brief of Plaintiff-Appellee (Sep. 29, 1999) Original Image of this Document (PDF)
• 1999 WL 33617514 (Appellate Brief) Amended

Initial Brief of Appellant, the Florida Board of Regents (Aug. 12, 1999) Original Image of this Document (PDF)
• 98-5392 (Docket) (Sep. 21, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:56:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 291 F.3d 1307 |
| Lines: | 651 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

291 F.3d 1307                                                                                      Page 1
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482. 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

▷

Briefs and Other Related Documents
Weeks v. Harden Mfg. Corp.C.A.11 (Ala.),2002.
    United States Court of Appeals,Eleventh Circuit.
    Anthony WEEKS, Charles Willingham, Melissa
    Frye, Angela Gable, Jarir Jackson, Plaintiffs-
                        Appellees,
                          v.
HARDEN MANUFACTURING CORP., Defendant-
                       Appellant.
                  **No. 01-16638.**

                    May 22, 2002.

Employees who were terminated after they refused to
agree to employer's new compulsory arbitration
policy sued employer, asserting, inter alia, claims for
retaliation under Title VII, the Age Discrimination in
Employment Act (ADEA), and the Americans with
Disabilities Act (ADA). Employer moved for
judgment on the pleadings or, in the alternative, for
summary judgment. The United States District Court
for the Northern District of Alabama, No. 00-01844-
CV-J-S,Inge P. Johnson, J., granted summary
judgment to employer on all claims except for the
retaliation   claims,   and   subsequently   granted
employer's motion to certify the matter for
interlocutory appeal. The Court of Appeals, Martin,
District Judge, sitting by designation, held that
employees could not have reasonably believed that
the mandatory arbitration provision was an unlawful
employment practice and so, by refusing to sign it,
they did not engage in statutorily protected activity,
as required to establish a prima facie case of
retaliation under Title VII, the ADEA, or the ADA.

Vacated in part and remanded.
West Headnotes
**[1] Federal Courts 170B** ⬿776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited
Cases

**Federal Courts 170B** ⬿802

170B Federal Courts

    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk802 k. Summary Judgment. Most
Cited Cases
Court of Appeals reviews the district court's grant or
denial of a motion for summary judgment *de novo*,
viewing the record and drawing all reasonable
inferences in the light most favorable to the non-
moving party.

**[2] Civil Rights 78** ⬿1243

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices Prohibited or Required
in General; Elements. Most Cited Cases
            (Formerly 255k30(6.10)      Master   and
Servant)
To successfully allege a prima facie retaliation claim
under either Title VII, the Age Discrimination in
Employment Act (ADEA), or the Americans with
Disabilities Act (ADA), plaintiff must show that (1)
plaintiff engaged in statutorily protected expression,
(2) plaintiff suffered an adverse employment action,
and (3) the adverse action was causally related to the
protected   expression.    Age   Discrimination   in
Employment Act of 1967, § 2 et seq., 29 U.S.C.A. §
621 et seq.; Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.; Americans with
Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. §
12101 et seq.

**[3] Civil Rights 78** ⬿1244

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most Cited
Cases
            (Formerly 255k30(6.10)      Master   and
Servant)
To show that plaintiff engaged in statutorily protected
expression, for purposes of establishing a retaliation
claim under Title VII, the Age Discrimination in
Employment Act (ADEA), or the Americans with
Disabilities Act (ADA), plaintiff must demonstrate
that she had a good faith, reasonable belief that the
employer   was   engaged   in   unlawful   employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                                                    Page 2
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

practices. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

## [4] Civil Rights 78 ☞1541

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1541 k. Retaliation Claims. Most Cited Cases
      (Formerly 255k40(1) Master and Servant)
In establishing a retaliation claim under Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act (ADA), plaintiff's burden to show that he engaged in statutorily protected expression has both a subjective and an objective component; plaintiff must not only show that he subjectively, in good faith, believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

## [5] Civil Rights 78 ☞1244

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1244 k. Activities Protected. Most Cited Cases
      (Formerly 255k30(6.10) Master and Servant)
To show that plaintiff engaged in statutorily protected expression, for purposes of establishing a retaliation claim under Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act (ADA), it is not enough for plaintiff to allege that his belief that his employer was engaged in unlawful employment practices was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq.,

42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

## [6] Civil Rights 78 ☞1247

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1247 k. Discharge or Layoff. Most Cited Cases
      (Formerly 255k30(6.10) Master and Servant)
Employees could not have reasonably believed that employer's new compulsory arbitration provision regarding employment discrimination claims constituted an unlawful employment practice and so, by refusing to sign it, they did not engage in statutorily protected activity, as required to establish a prima facie case of retaliatory discharge under Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act (ADA); the United States Supreme Court's mandate, Eleventh Circuit precedent, and the holdings of almost every other circuit provided that compulsory arbitration agreements regarding federal employment discrimination claims were enforceable under the Federal Arbitration Act (FAA), and so employees had reasonable notice that such agreements were lawful. 9 U.S.C.A. § 1 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

## [7] Alternative Dispute Resolution 25T ☞113

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
      (Formerly 33k1.2 Arbitration)
Although previously disfavored by the courts, arbitration agreements to resolve disputes between parties have now received near universal approval.

## [8] Alternative Dispute Resolution 25T ☞113

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                                      Page 3
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases

(Formerly 33k1.2 Arbitration)

Purpose of the Federal Arbitration Act (FAA) was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place agreements to arbitrate on the same footing as other contracts. 9 U.S.C.A. § 1 et seq.

## [9] Civil Rights 78 ⌐1118

78 Civil Rights
  78II Employment Practices
    78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
      (Formerly 78k141)

## Civil Rights 78 ⌐1201

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k168.1)

## Civil Rights 78 ⌐1217

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handicap, Disability, or Illness
      78k1217 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k173.1)

Simply because an arbitration agreement is unenforceable or even "illegal" does not mean that employers who require employees to sign the agreements as a condition of employment are guilty of violating Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act (ADA). Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

## [10] Civil Rights 78 ⌐1119

78 Civil Rights

78II Employment Practices
  78k1119 k. Adverse Actions in General. Most Cited Cases
    (Formerly 78k151, 78k158.1, 78k142)

Definition of "unlawful employment practices," as set forth in Title VII, includes such activities as making hiring or other job classification decisions based upon an individual's race, color, religion, sex, or national origin. Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

## [11] Civil Rights 78 ⌐1217

78 Civil Rights
  78II Employment Practices
    78k1215 Discrimination by Reason of Handicap, Disability, or Illness
      78k1217 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k173.1)

Americans with Disabilities Act (ADA) prohibits such unlawful employment practices as hiring, enacting job classifications, or testing employees in any way that would adversely affect an employee because of a disability. Americans with Disabilities Act of 1990, § 102(b), 42 U.S.C.A. § 12112(b).

## [12] Civil Rights 78 ⌐1201

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k168.1)

## Civil Rights 78 ⌐1204

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1204 k. Discharge or Layoff. Most Cited Cases
        (Formerly 78k170)

Age Discrimination in Employment Act (ADEA) prohibits such unlawful employer practices as refusing to hire an individual or discharging or reducing the wages of an employee because of his or her age. Age Discrimination in Employment Act of 1967, § 4(a), 29 U.S.C.A. § 623(a).

## [13] Civil Rights 78 ⌐1118

291 F.3d 1307                                                                                              Page 4
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161. 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in
General; Elements. Most Cited Cases
            (Formerly 78k141)
Unenforceable arbitration agreement does not amount
to an unlawful employment practice under the federal
employment      discrimination    laws.      Age
Discrimination in Employment Act of 1967, § 2 et
seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
Americans with Disabilities Act of 1990, § 2 et seq.,
42 U.S.C.A. § 12101 et seq.

## [14] Civil Rights 78 ⌾∼1247

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1247 k. Discharge or Layoff. Most Cited
Cases
            (Formerly     255k30(6.10)      Master    and
Servant)
Employees could not stand on their ignorance of the
substantive law to argue that their belief, that
employer's new compulsory arbitration provision
constituted an unlawful employment practice, was
reasonable, for purposes of establishing a prima facie
case of retaliatory discharge under Title VII, the Age
Discrimination in Employment Act (ADEA), or the
Americans with Disabilities Act (ADA).        Age
Discrimination in Employment Act of 1967, § 2 et
seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of
1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
Americans with Disabilities Act of 1990, § 2 et seq.,
42 U.S.C.A. § 12101 et seq.

**\*1310** Jonathan B. Lowe,Lowe, Mobley & Lowe,
Haleyville, AL, Susan Salonimer Wagner, Frank S.
James, III, Berkowitz, Lefkovits, Isom & Kushner,
Birmingham, AL, for Defendant-Appellant.
Rocco Calamusa, Jr., Brian M. Clark, Dennis George
Pantazis, Gordon, Silberman, Wiggins & Childs,
P.C., Birmingham, AL, for Plaintiffs-Appellees.
Ann Elizabeth Reesman, McGuiness, Norris &
Williams, LLP, Washington, DC, for Equal Advisory
Council and Chamber of Commerce of U.S., Amici
Curiae.

Appeal from the United States District Court for the
Northern District of Alabama.

Before CARNES and FAY, Circuit Judges, and

MARTIN [FN*], District Judge.

> FN* Honorable Beverly B. Martin, U.S.
> District Judge for the Northern District of
> Georgia, sitting by designation.

MARTIN, District Judge:
In this interlocutory appeal of a retaliatory discharge
case, the court is asked to determine whether an
employee's refusal to agree to a compulsory
arbitration    provision    regarding    employment
discrimination claims constitutes protected activity
for the purposes of alleging a prima facie case of
retaliation. We find that it does not. We therefore
vacate in part the district court's order and remand for
further proceedings consistent with this opinion.

## I. BACKGROUND

The appellant, Harden Manufacturing Corporation
("Harden"), employed the appellees, Anthony
Weeks, Charles Willingham, Melissa Frye, Angela
Gable and Jarir Jackson (hereinafter "plaintiffs") at
its facility in Haleyville, Alabama. On January 8,
1999, Harden issued new employee handbooks to the
plaintiffs which included an arbitration provision.
The arbitration provision mandated that all claims by
a Harden employee arising out of his/her employment
must be resolved through arbitration, including all
"Title VII claims or actions, and all actions based
upon any form of discrimination." [FN1] Harden
required all of its employees to agree to the
arbitration provision as a condition of continued
employment. The plaintiffs refused to agree to the
new arbitration policy, and Harden terminated their
employment on January 14, 1999.

> FN1. The arbitration provision stated in full:
> Harden Manufacturing Corporation and I
> each agree and understand that we choose
> arbitration instead of litigation to resolve
> any dispute between us. Harden
> Manufacturing Corporation and I each
> understand that we have a right or
> opportunity to litigate disputes through a
> court, but we prefer to resolve our disputes
> through arbitration. Each of the parties to
> this employment arbitration policy
> voluntarily and knowingly waive any right
> they have to a jury trial either pursuant to
> arbitration under this clause or pursuant to a
> court action by Harden Manufacturing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                                                                 Page 5
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552. 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
(Cite as: 291 F.3d 1307)

Corporation.    Harden Manufacturing Corporation and I agree and understand that all disputes arising under case law, statutory law and all other laws, including but not limited to, all contract, tort, workmen's compensation, retaliatory discharge, Title VII claims or actions, and all actions based upon any form of discrimination (cumulatively referred to herein as "employment related disputes" for the purposes of this contract) based on a legal claim will be subject to binding arbitration in accordance with this contract.

**\*1311** After timely filing charges with the Equal Employment Opportunity Commission ("EEOC"), the plaintiffs filed suit on June 30, 2000 in the Northern District of Alabama.    The complaint included five counts for relief, including claims for retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203.    Harden thereafter moved for judgment on the pleadings or in the alternative for summary judgment on all counts. In its motion, Harden admitted that it terminated the plaintiffs for refusing to sign the arbitration provision.    However, Harden argued that the plaintiffs did not engage in statutorily protected conduct because they could not have reasonably believed that the mandatory arbitration provision was an unlawful employment practice.    Based upon this, Harden took the position that the plaintiffs had failed to establish a prima facie case of retaliation.

The district court considered the motion as one for summary judgment and granted summary judgment to Harden on all claims except for the retaliation claims under the various employment discrimination statutes.    The district court found that although the arbitration provision may have been lawful, the plaintiffs reasonably, albeit mistakenly, believed that the arbitration provision was unenforceable.    The court therefore held that plaintiffs' refusal to sign the arbitration policy was protected activity and the discharge of the plaintiffs constituted actionable retaliation.    In finding that the plaintiffs had a reasonable belief that arbitration provisions were unenforceable, the district court relied on the Ninth Circuit's decision in *Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182 (9th Cir.1998) and the EEOC's position that such provisions violate public policy. *See* EEOC Notice No. 915.002, *Policy Statement on*

*Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment* (July 10, 1997).    Harden thereafter moved to certify the issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which the district court granted.    We granted the petition for review.

## II. DISCUSSION

[1] We review the district court's grant or denial of a motion for summary judgment *de novo,* viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party. *See Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir.2002).    The sole issue in this appeal is whether the plaintiffs had a reasonable belief that Harden engaged in an unlawful employment practice by requiring the plaintiffs to sign the agreement to arbitrate.

[2] It is well established in this circuit that to successfully allege a prima facie retaliation claim under either Title VII, the ADEA or the ADA, a plaintiff must show that (1) she engaged in statutorily protected expression;  (2) she suffered an adverse employment action;  and (3) the adverse action was causally related to the protected expression. *See Pipkins v. City of Temple Terrace, Fla.,* 267 F.3d 1197, 1201 (11th Cir.2001);    *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1260 (11th Cir.2001); *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir.1998).    The first element is the only one in dispute in this case.

[3][4][5] To establish that a plaintiff engaged in statutorily protected expression, we have held that a plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."    **\*1312***Little v. United Tech., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997) (citing *Rollins v. State of Fla. Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989)).    In *Little,* this standard was succinctly described as follows:
It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.    A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.    It thus is not enough for a plaintiff to allege that his belief in this regard was honest and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                                              Page 6
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
(Cite as: 291 F.3d 1307)

bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

[6][7][8][9] Harden does not contest that the plaintiffs subjectively believed that Harden was engaged in an unlawful employment practice by requiring arbitration of employment discrimination claims. Rather, Harden contends that the plaintiffs did not have an objectively reasonable belief that the mandatory arbitration agreement was an unlawful employment practice. This is so, according to Harden, because such provisions have been unequivocally approved by the Supreme Court in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) and *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), by Congress through the Civil Rights Act of 1991, and by this circuit in *Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698 (11th Cir.1992). The plaintiffs respond that although authority existed which approved arbitration provisions at the time the plaintiffs refused to sign the arbitration provision, sufficient contrary authority also existed at the time, such as the Ninth Circuit's decision in *Duffield* and EEOC policy statements, to give the plaintiffs a reasonable belief that Harden's conduct was unlawful. We agree with Harden that the plaintiffs' belief that Harden was engaged in an unlawful employment practice by requiring the arbitration of employment discrimination claims was not objectively reasonable.

Although previously disfavored by the courts, arbitration agreements to resolve disputes between parties have now received near universal approval. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626-27, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985) ("[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution."). Congress demonstrated its approval of arbitration by enacting the Federal Arbitration Act ("FAA") in 1925. The FAA's purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place agreements to arbitrate on the same footing as other contracts. *See Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219-220, and n. 6, 105 S.Ct.

1238, 1241-1242, and n. 6, 84 L.Ed.2d 158 (1985); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510 n. 4, 94 S.Ct. 2449, 2453 n. 4, 41 L.Ed.2d 270 (1974). Its primary substantive provision states that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

**\*1313** Courts have consistently found that claims arising under federal statutes may be the subject of arbitration agreements and are enforceable under the FAA. *See Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). Similarly, arbitration agreements encompassing claims brought under federal employment discrimination statutes have also received near universal approval.

In *Gilmer,* the plaintiff employee had agreed, as a condition of employment, that arbitration would be his exclusive remedy for any controversy arising out of his employment. Later, when he was terminated, the plaintiff filed suit alleging violations of the ADEA. The employer responded with a motion to compel arbitration under the FAA. In determining whether the ADEA precluded compulsory arbitration of claims arising under the statute, the Supreme Court held that arbitration agreements are enforceable with regard to claims arising under a federal statute, "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue [as indicated] in the text of the [statute], its legislative history, or an inherent conflict between arbitration and the [statute's] underlying purposes." *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1647. The Court found that nothing in the text, legislative history, or the purposes of the ADEA demonstrated a congressional aim to preclude arbitration, and thus concluded that compulsory arbitration agreements were enforceable under the FAA with respect to claims under the ADEA. *See id.* at 26-27, 111 S.Ct. at 1647.

In keeping with the reasoning of *Gilmer,* we found in *Bender* that Title VII claims may also be subject to compulsory arbitration. We noted that there was "no reason to distinguish between ADEA claims and Title

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                        Page 7
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

VII claims. Like *Gilmer*, [the plaintiff] has not waived her right to a forum, for she can pursue her claims in arbitration, and if the arbitration proceedings are somehow legally deficient, she may return to federal court for review." *Bender,* 971 F.2d at 700 (citation omitted).[FN2] Almost every other circuit is in agreement with our decision in *Bender* that Title VII does not prohibit mandatory arbitration for claims arising under the statute. *See, e.g., Desiderio v. National Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 204-06 (2d Cir.1999), *cert. denied,* 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 7 (1st Cir.1999); *Koveleskie v. SBC Capital Mkts., Inc.,* 167 F.3d 361, 365 (7th Cir.1999), *cert. denied,* 528 U.S. 811, 120 S.Ct. 44, 145 L.Ed.2d 40 (1999); *Seus v. John Nuveen & Co.,* 146 F.3d 175, 182 (3d Cir.1998), *cert. denied,* 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999), *abrogated on other grounds, Blair v. Scott Specialty Gases,* 283 F.3d 595 (3d Cir.2002); *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir.1997); *1314*Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482-83 (D.C.Cir.1997); *Austin v. Owens-Brockway Glass Container, Inc.,* 78 F.3d 875, 882 (4th Cir.1996), *cert. denied,* 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1487 (10th Cir.1994); *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 307 (6th Cir.1991); *Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 (5th Cir.1991).

> FN2. We recognize that in *Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519 (1997), we held that an arbitration provision in a collective bargaining agreement in that case was not enforceable under the ADA. The reasons we gave were that the employee did not personally agree to the arbitration provision, the provision did not mention arbitration of statutory claims, and the provision was one-sided because it gave the employer but not the employee the right to insist on arbitration. In this case, in contrast, the arbitration provision that was submitted to the employees was for individual employee approval, it expressly covered federal statutory claims, and it made arbitration available to both sides.

In addition to our holding in *Bender,* many of the above cited cases from other circuits have recognized

that Congress has approved the use of arbitration to resolve employment discrimination claims in the Civil Rights Act of 1991 ("1991 Act"). The 1991 Act, passed shortly after *Gilmer,* specifically includes a provision on arbitration, stating that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Pub.L. No. 102-166, § 118, 105 Stat. 1071, 1081, *reprinted in* 42 U.S.C. § 1981 app. at 509 (1994). Almost every circuit to consider this question has construed the language in the 1991 Act favoring arbitration to apply to Title VII claims. This has happened most often in the context of a required Form U-4 regarding employment of securities brokers. *See, e.g., Desiderio,* 191 F.3d at 204-05 ("We conclude ... that the text of § 118 evinces a plain Congressional purpose of encouraging arbitration of Title VII claims and not one of precluding such arbitration."); *Koveleskie,* 167 F.3d at 365 (same); *Seus,* 146 F.3d at 182 (same); *Austin,* 78 F.3d at 881-83 (same).

Other circuits have also recognized that the ADA includes language favoring arbitration which is identical to the 1991 Act. *See* 42 U.S.C. § 12212 ("Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under this chapter."); *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 143 (1st Cir.1998) ("[F]ar from evidencing an intention to preclude arbitration, [the statute] can only be interpreted as favoring it."). We have also noted in dicta that the ADA permits compulsory arbitration of claims arising under the statute. *See Brisentine,* 117 F.3d at 523 ("Encouragement is towards the other end of the pole from preclusion. Congress in the ADA did not manifest an intention to preclude a collective bargaining waiver of a judicial remedy for an arbitration remedy.").

Finally, last year the Supreme Court in *Circuit City* held that the FAA was applicable to all contracts of employment except those contracts involving transportation workers. In so holding, the Court examined the FAA's exemption clause of section 1 in the context of the Ninth Circuit ruling in *Craft v. Campbell Soup Co.,* 177 F.3d 1083 (9th Cir.1998), which interpreted the exemption clause to apply to all contracts of employment, such that no contracts of employment would be governable under the FAA.[FN3] *See Circuit City,* 532 U.S. at 110, 121 S.Ct. at 1306.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                Page 8
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
(Cite as: 291 F.3d 1307)

In reversing the Ninth Circuit's expansive reading of section 1, the Supreme Court analyzed the text and legislative history of the FAA, as well as the contrasting views of other appellate courts, and determined that the section 1 exemption was intended to apply only to the employment contracts of transportation workers. See id. 532 U.S. at 111-21, 121 S.Ct. at 1307-12.

> FN3. The exemption clause of section 1 of the FAA states: "[N]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

*1315 The only circuit not to construe the Supreme Court's holding in Gilmer or the 1991 Act's language approving of arbitration to apply to federal employment discrimination claims is the Ninth Circuit in Duffield, a pre-Circuit City case. The court in that case suggested that the text of section 118 in the 1991 Act is ambiguous when viewed in conjunction with the general purpose of the Act, and concluded that the goal of expanding remedies was at odds with compulsory arbitration, which would limit a plaintiff's options for recourse. See Duffield, 144 F.3d at 1192-93. The Duffield decision has been specifically considered and rejected by other courts. See, e.g., Desiderio, 191 F.3d at 205; Koveleskie, 167 F.3d at 365.[FN4] Further, the viability of Duffield has been recognized to be in considerable doubt in light of the later decided Circuit City. See, e.g., Borg Warner Protective Servs. Corp. v. EEOC, 245 F.3d 831, 838 (D.C.Cir.2001) ("We cannot say whether the Ninth Circuit will continue to adhere to Duffield in the face of the Supreme Court's Circuit City decision...."); Farac v. Permanente Med. Group, 186 F.Supp.2d 1042, 1045 (N.D.Cal.2002) ("While the focus may have been different, Circuit City implicitly overruled Duffield. Circuit City expresses a strong federal presumption in favor of enforcing arbitration agreements."); Scott v. Burns Int'l Sec. Servs., Inc., 165 F.Supp.2d 1133, 1137-38 (D.Hawai'i 2001) ("[T]he Supreme Court's contrary statement in Circuit City that arbitration agreements do not contravene the policies of congressional enactments or the protections of federal law ... implicitly overrules th[e] holding of Duffield.").

> FN4. For example, the Second Circuit in Desiderio stated the following:

We are unable to adopt the view expressed in Duffield. Compulsory arbitration does not defeat the right to compensatory and punitive damages, or fee shifting because an arbitrator is also empowered to grant this kind of relief. Moreover, it is untenable to contend that compulsory arbitration conflicts with the Act's provision for the right to a jury trial, because Gilmer ruled that compulsory arbitration clauses could be enforced in claims under the ADEA, a statute that explicitly provides for jury trials. Nor are we convinced that the underlying purposes of Title VII and the 1991 Civil Rights Act inherently conflict with the imposition of compulsory arbitration. Desiderio, 191 F.3d at 205.

We see no reason to depart from our own precedent, the mandate of the Supreme Court, and the holdings of almost every other circuit to find that compulsory arbitration agreements constitute an unlawful employment practice. We are not persuaded that the plaintiffs in this case could have "reasonably believed" that such agreements were an unlawful employment practice at the time they refused to agree to the policy in 1999. The Supreme Court's decision in Gilmer, our holding in Bender and the passage of the 1991 Act all transpired almost ten years before the facts of this case occurred. Thus, the plaintiffs had reasonable notice that compulsory arbitration agreements for employment discrimination claims were lawful.

We further note that the plaintiffs' "reasonable belief" that compulsory arbitration agreements constitute unlawful conduct in violation of the opposition clauses of Title VII, the ADEA and the ADA is not even supported by the holding of Duffield and the EEOC policy statement at issue. Duffield and the EEOC policy do not state that requiring employees to sign arbitration agreements itself violates Title VII. Instead, they stand for the proposition that compulsory arbitration agreements are "unenforceable" or are "inconsistent" with Title VII. See Duffield, 144 F.3d 1199 ("In view of the fact that the context, language, and [legislative] history of the *1316 1991 Act together make out a conclusive case, that Congress intended to preclude compulsory arbitration of Title VII claims, we think it inescapable that Form U-4 is unenforceable as applied to such claims." (citation and internal quotation marks omitted)); EEOC Policy Statement ("[T]he Commission believes that such agreements are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                    Page 9
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

inconsistent with the civil rights laws...."). However, simply because an agreement is unenforceable or even "illegal" does not mean that employers who require employees to sign the agreements as a condition of employment are guilty of violating Title VII, the ADEA or the ADA. The District of Columbia Circuit has recognized this distinction in *Borg-Warner:*

... To say that an agreement is illegal is not to say that employers who require employees to sign the agreements as a condition of employment are guilty of violating Title VII. Calling an unenforceable agreement "illegal" is "misleading insofar as it suggests that some penalty is necessarily imposed on one of the parties, apart from the court's refusal to enforce the agreement. In some cases, the conduct that renders the agreement unenforceable is a crime, but this is not necessarily or even usually so." E. Allan Farnsworth, Contracts § 5.1 (2d ed.1990).

Even *Duffield* does not say that companies requiring employees to sign arbitration agreements are guilty of violating Title VII. Although the *Duffield* court refused, with respect to Title VII claims, to enforce a general arbitration agreement, the court enforced the same agreement in regard to state law claims. *See* 144 F.3d at 1203. In the face of that ruling, we cannot see how an employer exposes itself to punitive damages by having employees sign such an agreement. Furthermore, the notion that [an employer] could be held liable in punitive damages for insisting upon an arbitration agreement in the face of the Supreme Court's *Circuit City* opinion and the decisions of eleven courts of appeals upholding such agreements is, we think, far-fetched.

245 F.3d at 837-38 (affirming district court's dismissal for lack of standing of employer's declaratory action against EEOC to declare that compulsory arbitration agreements do not violate Title VII).

[10][11][12] It is also worthwhile to briefly review the statutes under which plaintiffs brought their action. Each statute sets forth a list of what constitutes an unlawful employment practice. The definition of "unlawful employment practices" as set forth in Title VII includes such activities as making hiring or other job classification decisions based upon an individual's race, color, religion, sex or national origin. *See* 42 U.S.C. § 2000e-2(a). The list is similar for the ADA, which prohibits, for example, hiring, enacting job classifications or testing employees in any way that would adversely affect an employee because of a disability. *See* 42 U.S.C. §

12112(b). The ADEA also includes a list of unlawful "employer practices" such as refusing to hire an individual or discharging or reducing the wages of an employee because of his or her age. *See* 29 U.S.C. § 623(a). To attempt to extrapolate from these lists the premise that the action of an employer requiring employees to arbitrate employment disputes is an "unlawful" employment practice would require an intellectual dishonesty in which this court will not engage.

[13] We agree with the court in *Borg-Warner* that an unenforceable arbitration agreement does not amount to an unlawful employment practice under the federal employment discrimination laws. We find nothing in the statutory text of Title VII, the ADEA or the ADA which identifies compulsory arbitration agreements to be an unlawful employment practice. The *1317 court thus concludes that the plaintiffs could not have had a reasonable belief that the refusal to sign such agreements constituted protected activity even when relying on *Duffield* and EEOC policy.

[14] Finally, the plaintiffs may not stand on their ignorance of the substantive law to argue that their belief was reasonable. As we have stated previously, "[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge." *Harper v. Blockbuster Entertainment, Corp.,* 139 F.3d 1385, 1388 n. 2 (11th Cir.1998); *Little,* 103 F.3d at 960. Accordingly, we find that the plaintiffs have not alleged a prima facie case of retaliation under Title VII, the ADEA or the ADA, and their claims must be dismissed.

### III. CONCLUSION

The district court's order is VACATED in part and REMANDED for further proceedings consistent with this opinion.

C.A.11 (Ala.),2002.
Weeks v. Harden Mfg. Corp.
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23 NDLR P 161, 15 Fla. L. Weekly Fed. C 601

Briefs and Other Related Documents (Back to top)

• 2002 WL 32099885 (Appellate Brief) Appellant's Reply Brief (Mar. 01, 2002)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291 F.3d 1307                                                                                                                    Page 10
291 F.3d 1307, 88 Fair Empl.Prac.Cas. (BNA) 1482, 83 Empl. Prac. Dec. P 41,181, 146 Lab.Cas. P 59,552, 23
NDLR P 161, 15 Fla. L. Weekly Fed. C 601
**(Cite as: 291 F.3d 1307)**

• 2002 WL 32099887 (Appellate Brief) Appellees'
Reply Brief (Feb. 13, 2002)
• 2002 WL 32099886 (Appellate Brief) Brief of
Appellant (Jan. 09, 2002)
• 01-16638 (Docket) (Nov. 28, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for DERRICK,TODD 5691641**

| | |
|---|---|
| Date/Time of Request: | Sunday, October 29, 2006 23:56:00 Central |
| Client Identifier: | PETERSON V CLAYTON |
| Database: | FEDFIND |
| Citation Text: | 170 F.3d 1056 |
| Lines: | 431 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

170 F.3d 1056                                                                 Page 1
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
**(Cite as: 170 F.3d 1056)**

# H

Briefs and Other Related Documents
Sullivan v. National R.R. Passenger Corp.C.A.11
(Fla.),1999.
United States Court of Appeals,Eleventh Circuit.
Barry T. SULLIVAN, Plaintiff-Appellee,
v.
NATIONAL RAILROAD PASSENGER
CORPORATION, a foreign corporation, Defendant-
Appellant.
**No. 98-4080.**

March 25, 1999.

Employee brought action alleging that employer
violated Title VII by retaliating against him for
complaining of sexual harassment. Following jury
trial, the United States District Court for the Southern
District of Florida, No. 95-0037-CIV-DLG, Donald
L. Graham, J., entered judgment in favor of
employee. Employee appealed. The Court of
Appeals, Barkett, Circuit Judge, held that: (1) that
jury found against employee on harassment claim did
not compel finding that it could not have found for
him on retaliation claim, and (2) change in
employee's work hours, subsequent elimination of his
position, and failure to rehire him to management
position were not causally related to his harassment
complaint.

Reversed and remanded.
West Headnotes
**[1] Civil Rights 78 ☞1554**

78 Civil Rights
78IV Remedies Under Federal Employment
Discrimination Statutes
78k1554 k. Trial in General. Most Cited Cases
(Formerly 255k30(6.10) Master and
Servant)
That jury found against employee on his Title VII
sexual harassment claim did not compel finding that
it could not, as matter of law, have found for him on
his Title VII claim that employer retaliated against
him for complaining of sexual harassment; jury could
have concluded that incident took place but did not
meet all elements required for successful sexual
harassment action. Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Federal Courts 170B ☞776**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk776 k. Trial De Novo. Most Cited
Cases
Court of Appeals reviews district court's denial of
motion for judgment as a matter of law de novo.

**[3] Federal Civil Procedure 170A ☞2371**

170A Federal Civil Procedure
170AXVI New Trial
170AXVI(C) Proceedings
170Ak2371 k. Impeaching Verdict. Most
Cited Cases
Courts may not reach behind jury verdicts to evaluate
their reasoning.

**[4] Civil Rights 78 ☞1244**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1244 k. Activities Protected. Most Cited
Cases
(Formerly 255k30(6.10) Master and
Servant)
Retaliation is a separate offense from discrimination
under Title VII; employee need not prove underlying
claim of discrimination for retaliation claim to
succeed. Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ☞1243**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1243 k. Practices Prohibited or Required
in General; Elements. Most Cited Cases
(Formerly 255k30(6.10) Master and
Servant)
To make a prima facie case for retaliation under Title
VII, employee must show: (1) a statutorily protected
expression; (2) an adverse employment action; and
(3) a causal link between the protected expression
and the adverse action. Civil Rights Act of 1964, §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170 F.3d 1056                                                                                    Page 2
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
**(Cite as: 170 F.3d 1056)**

701 et seq., 42 U.S.C.A. § 2000e et seq.

## [6] Civil Rights 78 ⬩1541

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1541 k. Retaliation Claims. Most Cited
Cases
        (Formerly 255k40(1) Master and Servant)
Once employee makes out a prima facie case of
retaliation under Title VII, the burden shifts to the
employer to rebut the presumption of retaliation by
producing legitimate reasons for the adverse
employment action. Civil Rights Act of 1964, § 701
et seq., 42 U.S.C.A. § 2000e et seq.

## [7] Civil Rights 78 ⬩1541

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1541 k. Retaliation Claims. Most Cited
Cases
        (Formerly 255k40(1) Master and Servant)
If employer produces legitimate reasons for its
adverse employment action in Title VII retaliation
action, the presumption of retaliation disappears, and
employee must then show that employer's proffered
reasons for taking adverse action were actually a
pretext for prohibited retaliatory conduct.    Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

## [8] Civil Rights 78 ⬩1252

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases
        (Formerly 255k30(6.10) Master and
Servant)
Change in employee's work hours and subsequent
elimination of his position were not causally linked to
his sexual harassment complaint, and thus did not
violate Title VII's prohibition against retaliation;
employee failed to refute employer's contentions that
change in hours was in response to administrative

regulation and that elimination of position was part of
nationwide restructuring. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

## [9] Civil Rights 78 ⬩1252

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases
        (Formerly 255k30(6.10) Master and
Servant)
Failure to rehire employee to management position
was not causally linked to his sexual harassment
complaint, and thus did not violate Title VII's
prohibition against retaliation; employee failed to
rebut testimony that decisionmakers were not aware
of his complaint, and human resources director
testified regarding questions about employee's
performance ratings. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

## [10] Civil Rights 78 ⬩1553

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1553 k. Retaliation Claims. Most Cited
Cases
        (Formerly 255k40(4) Master and Servant)
Circumstantial evidence can suffice in Title VII
retaliation action to support inferences that retaliation
was the reason for employer's adverse action.  Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

---

*1057 Mark S. Landman, William Ballaine,
Landman, Corsi, Ballaine & Ford, P.C., New York
City, Bradley S. Fischer, Melito & Adolfsen, Fort
Lauderdale, FL, for Defendant-Appellant.
Susan Leslie Dolin, Daniel R. Levine, Muchnick,
Wasserman & Dolin, Hollywood, FL, for Plaintiff-
Appellee.

Appeal from the United States District Court for the
Southern District of Florida.

Before COX and BARKETT, Circuit Judges, and
FAY, Senior Circuit Judge.
BARKETT, Circuit Judge:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170 F.3d 1056                                                                                      Page 3
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
**(Cite as: 170 F.3d 1056)**

National Railroad Passenger Corporation ("Amtrak") appeals a final judgment following a jury verdict in favor of Barry T. Sullivan on his claim of unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) and the Florida Whistleblower's Protection Act, Fla. Stat. Ann. § 448.102(3) (West 1998). Amtrak argues that the district court should have granted its motion for judgment as a matter of law or, in the alternative, for a new trial. We reverse.

### Background

In 1995, Barry Sullivan sued Amtrak, claiming that he was the victim of sexual harassment and retaliation stemming from an incident in December 1993 when Sullivan's immediate supervisor, Kevin Scott, allegedly sexually propositioned him in a hotel parking garage. Sullivan claims that the incident occurred while the two were traveling on business and staying at a hotel in Tampa, Florida. According to Sullivan, when Sullivan accompanied Scott to the hotel parking garage to retrieve Scott's briefcase from the car, Scott suggested that Sullivan accompany him to Scott's room for a short while, and that Sullivan would not regret it. Sullivan claimed he slammed Scott to the trunk of the car, causing Scott to lose his glasses. As Scott retrieved his glasses from the ground, he apologized profusely to Sullivan, asking him to forget about the incident and assuring him that it would not happen again. According to Sullivan, Scott further assured him that he would have nothing to worry about for as long as the two continued to work together. Sullivan did not report this incident to anyone at Amtrak until February 1994, after he had been demoted from his job as manager.

Sullivan's demotion occurred on January 26, 1994, when Scott hand-delivered a letter to Sullivan informing him that his management job as District Manager of the Miami Station had been eliminated as part of Amtrak's nationwide reorganization. This led to Sullivan's taking the non-managerial position of Yard Chief of the Miami Station. On February 11, 1994, Amtrak began an investigation into the whereabouts of fifteen missing Publix gift certificates as well as a cellular phone that had been in Sullivan's care. **\*1058** Shortly thereafter, Sullivan returned eight of the gift certificates and the phone. He could not account for the missing eight certificates, which were cashed at a grocery store near his home. He also admitted to making, along with his wife, over

one thousand dollars worth of unauthorized calls on the company phone. Amtrak took no formal action against Sullivan regarding either the phone or the gift certificates.

On approximately February 15, 1994, Sullivan's attorney lodged a complaint with Amtrak on Sullivan's behalf, claiming that the incident with Scott in December 1993 constituted sexual harassment. Amtrak officials investigated the complaint and concluded that the incident had not in fact occurred. In June 1994, Sullivan's work schedule was changed from four to five days a week. Amtrak claims that this change was necessary to satisfy a Food and Drug Administration ("FDA") regulation that all inbound trains be inspected and cleaned upon arrival. In July 1994, Amtrak eliminated all Yard Chief positions nationwide. Sullivan then took the lesser position of Chief of On Board Service. Throughout 1995, Sullivan unsuccessfully applied for a number of different management positions including: Director of OBS Station Support (January 1995); Product Line Director (March 1995); Manager of Terminal Services, Miami (March 1995); Manager of Terminal Services, New Orleans (May 1995); Conventional Services Manager, Northeast Corridor (April 1995).

Sullivan filed suit against Amtrak in February 1995, claiming that the incident with Scott in December 1994 constituted sexual harassment. Sullivan amended his complaint in June 1995 to include charges that Amtrak had retaliated against him by: 1) investigating his involvement with the misuse of a company cellular telephone and the theft of fifteen Publix gift certificates; 2) changing the job description of Sullivan's job as Yard Chief and then eventually eliminating the position, and; 3) after eliminating the position, failing to hire him for any of the other management positions for which he applied.

The jury found against Sullivan on his claim of sexual harassment and Sullivan has not appealed from the judgment on that claim. However, the jury found for Sullivan on his claims of retaliation, awarding him $50,000 in compensatory damages. Following the trial, the magistrate judge held an evidentiary hearing and awarded Sullivan equitable damages in the amount of $98,783 in backpay, with pre-judgment and post-judgment interest calculated at 6.5%, and front pay in the amount of $458,166.

On appeal, Amtrak argues that the district court erred

170 F.3d 1056                                                                Page 4
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
(Cite as: 170 F.3d 1056)

by not granting Amtrak judgment as a matter of law or, alternatively, a new trial because: 1) the jury found against Sullivan on his sexual harassment claim and therefore could not reasonably find for Sullivan on his retaliation claim; and 2) there was no evidence of retaliation. Amtrak additionally claims that the damage amounts awarded by both the jury and the magistrate judge were not supported by the evidence.

### Discussion

[1][2] We first address Amtrak's claim that, as a matter of law, the jury could not find against Sullivan on his sexual harassment claim while finding for him on the retaliation claim.[FN1] Amtrak argues that Sullivan's harassment claim is based on a single incident which Amtrak maintains never occurred. Because the jury found for Amtrak on the sexual harassment claim, Amtrak asserts, the jury must have accepted Amtrak's contention that the incident never happened. Consequently, Amtrak argues, Sullivan's claim of retaliation cannot stand because it requires a good faith, objectively reasonable belief that the discrimination occurred. See *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir.1998).

> FN1. We review the district court's denial of Amtrak's motion for judgment as a matter of law de novo. See *Daniel v. City of Tampa, Fla.*, 38 F.3d 546, 549 (11th Cir.1994).

[3][4] We find this argument totally meritless. The fact that the jury concluded that Sullivan's claim did not meet all the elements for a successful sexual harassment action does not mean that it could not have found that the incident did take place and that Sullivan could have reasonably believed himself the victim of sexual harassment. For *1059 example, the jury could well have determined that the incident occurred but did not rise to the level of harassment prohibited by Title VII. Courts may not reach behind jury verdicts to evaluate their reasoning. See, e.g., *U.S. v. Russo*, 796 F.2d 1443, 1450 (11th Cir.1986) (court will not look behind verdict for evidence of jury confusion); *Delpit v. Nocuba Shipping Co.*, 302 F.2d 835, 838 (5th Cir.1962) ("We may not second-guess jurors or substitute our judgment for theirs when theirs is supported by sufficient evidence."); *Vera-Lozano v. International Broadcasting*, 50 F.3d 67, 71 (1st Cir.1995) (court will not supplant the jury

verdict nor second-guess what may have been their thought process). Moreover, retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed. See *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir.1989).

[5][6][7] Turning to the question of whether there is sufficient evidence to support Sullivan's claim of retaliation, however, we find Amtrak's appeal meritorious. To make a prima facie case for retaliation, the plaintiff must show: 1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between the protected expression and the adverse action. See *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998); *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir.1997).[FN2] Once the plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Raney*, 120 F.3d at 1196 (quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993)). If the defendant offers legitimate reasons, the presumption of retaliation disappears. *Id.* The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. *Olmsted*, 141 F.3d at 1460.

> FN2. The district court instructed the jury to apply this test for both Sullivan's state and federal retaliation claims. Neither party has disputed that instruction. Consequently, we follow the same procedure.

There is no dispute that Sullivan's complaint to Amtrak's management that he had been sexually harassed constituted protected expression nor that Sullivan suffered adverse employment actions. The only issue to be addressed here is whether a causal link existed between the adverse employment actions and the protected expression.

While Sullivan initially included in his complaint as adverse employment actions his first demotion and the investigation into the gift certificates and cellular phone, he concedes that these cannot be considered retaliatory actions because they predate the protected expression. Thus, the only question before us is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170 F.3d 1056                                                                                                      Page 5
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
(Cite as: 170 F.3d 1056)

whether a causal link exists between Sullivan's sexual harassment complaint and the change in his work hours, the subsequent elimination of his job, and Amtrak's failure to rehire him.

[8] Although Sullivan argues that the change in his work hours as Yard Chief and the subsequent elimination of the position were retaliatory actions taken directly by Scott, he offers no evidence to refute Amtrak's contentions that the change in hours was a response to an FDA requirement and that the job's subsequent elimination (along with all other Yard Chief positions) was part of a nationwide restructuring. Absent evidence suggesting that Amtrak's reasons for changing the Yard Chief's hours and then eliminating the position were pretextual, Sullivan's retaliation claim arising from this action must fail.

[9] Sullivan next claims that Amtrak failed to rehire him to a management position for retaliatory reasons. He argues that he was more qualified than the successful applicants for all of the management positions for which he applied, and that in each case he was denied the position by someone who had some tie to Scott or who knew of his sexual harassment complaint. In each case, however, there is insufficient evidence to support*1060 a conclusion that Sullivan was not hired for retaliatory reasons.

First, according to Sullivan, he should have received the position of Director of OBS Station Support because the job's responsibilities were similar to those he had been performing for the past twenty years. Sullivan claims that Jon Tainow, who did the hiring for the position, told him that as far as he was concerned, Sullivan had the job but that Ken Bagley, Deputy Chief Executive Officer for the Northeast Corridor and a friend of Scott's, told Tainow to "take a good look" at another candidate, Mark Rose. Rose eventually got the position. Tainow, however, testified that he never told Sullivan that Sullivan had the job and that he hired Mark Rose as Director of Operations because of his administrative background and budget experience. Tainow further stated that the only role Bagley played in the hiring process was that Tainow and Bagley reviewed the list of candidates prior to Tainow's informing Bagley that he was going to hire Mark Rose. More importantly, Tainow testified that he only learned of Sullivan's harassment complaint a week before the trial. Sullivan presented no evidence to rebut the testimony that the decisionmaker in this case was not aware of his complaint or to show that the reasons Sullivan

was not hired were false.

Second, Sullivan claims he should have received the Product Line Director position because it also encompassed duties he had been performing for many years. Moreover, Dennis Hale, the successful candidate, had a marketing background which Sullivan maintains did not prepare him for the on-board services component of the job. Sullivan further claims that the decision about whom to interview was made "in conjunction" with John Stafford, Amtrak's Director of Human Resources, who knew of Sullivan's sexual harassment complaint. However, Allan Edelston, who did the hiring for the position, testified that he hired Dennis Hale for the Product Line Director position because of Hale's experience managing the Autotrain, Amtrak's flagship train. Although Stafford participated in the interview process, the decision was made by Edelston and Edelston testified that the first time he heard of Sullivan's sexual harassment complaint was in the Spring of 1996, over a year after he had filled the position. Again, there is no evidence in the record to rebut the testimony that the decisionmaker did not know of Sullivan's complaint or to show that Amtrak's reasons for hiring Hale were pretextual.

Third, Sullivan claims he should have received the Manager of Terminal Services positions, jobs for which he was not interviewed. Scott Weddle, who was hired for the Miami position, had held a lower position than Sullivan's prior to the reorganization. The New Orleans position went to James Turngren, who had also held a position lower than Sullivan. In each case, Sullivan claims Stafford participated in the hiring process by pointing out what the interviewer should look for when selecting the person for the job. In response, Dennis Hale testified that he hired Scott Weddle for the Miami Service Manager job because of his training background in on-board service and because of his philosophy of integrating employees into the decision-making process, and because Hale considered him the best qualified applicant for the job.[FN3] He further testified that he only learned of Sullivan's sexual harassment complaint in late 1996. Sullivan presented no evidence to rebut Hale's asserted ignorance of the complaint or to show that the reasons Hale proffered for selecting Weddle over Sullivan were false. And, while Charles Bothwell did not testify directly as to why Turngren got the New Orleans job over Sullivan, he testified in a deposition read at trial that at a General Managers meeting he attended following the reorganization, several people raised questions as to Sullivan's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170 F.3d 1056                                                                                                    Page 6
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
**(Cite as: 170 F.3d 1056)**

integrity and honesty.    Those concerns stemmed
from their belief that Sullivan gave false reasons for
requesting a transfer to Miami from New York, and
from his attempts to get his wife a position in Miami
in violation of the company's nepotism policy.    John
Stafford **1061** also testified that at that meeting
Scott recommended Sullivan for several open
management positions but that questions were raised
about Sullivan's performance ratings and about his
integrity stemming from his attempt to get his wife
hired in Miami.[FN4]

> FN3. There is some discrepancy in the
> record as to who got this position.    Hale
> testified at trial that the position went to
> Weddle.    However, Stafford, in his
> deposition, states that the job went to J.
> MacArthur.    In either case, Sullivan
> presented no evidence to show that the
> hiring decision was made for retaliatory
> reasons.

> FN4. Sullivan testified that he was aware
> that he had angered a number of people in
> management following his move to Miami.
> Margaret Leitereg, Amtrak's Human
> Resources Manager for the New York
> district until 1995, also testified that Stafford
> told her in January 1994, a month prior to
> Sullivan's lodging a complaint, that Sullivan
> would not wind up with a management
> position following the reorganization
> because he had alienated too many people in
> the years previous.

Finally, Sullivan claims that he, rather than John
Coffe, should have gotten the Conventional Service
Manager position.    He argues that Coffe, who was
not an Amtrak employee, was selected over him
despite Amtrak's policy of hiring and promoting from
within, and that Coffe's technical background with
commuter railroads did not match Sullivan's
qualifications for a position that dealt with food
amenities and sleeper cars.    According to Sullivan,
David Nogar told him after their interview that he
was at the head of the list of candidates, but Nogar
then checked with some of Sullivan's previous
supervisors and removed him from contention for the
job.    Sullivan also asserts that Nogar "reported to"
Bagley and "knew" Scott.    He further notes that each
of the other district managers who lost their positions
during the reorganization were subsequently rehired
in management positions.    In response, David Nogar

testified that he chose Coffe, a man with whom he
had worked previously, because of Coffe's customer
service sensitivity and mechanical background.    He
denied checking with any of Sullivan's previous
superiors or to knowing any more about his
employment history than Sullivan listed on his
application.    He further stated that he only learned of
Sullivan's sexual harassment complaint a week prior
to testifying at the trial.    Sullivan again failed to
rebut Nogar's stated ignorance of the harassment
complaint.

[10] When an employer offers legitimate reasons for
its actions, as Amtrak did, the presumption of
retaliation disappears.    The plaintiff then bears the
burden of showing that the employer's reasons for not
promoting him were pretextual.    Sullivan has not
borne that burden.    He failed to introduce any
evidence that would have permitted the jury to
legitimately draw the inference that the reasons
proffered by Amtrak for Sullivan not getting these
jobs were false and that the real reason was
retaliation.    We recognize that circumstantial
evidence can suffice to support inferences that
retaliation was the reason for the adverse action.    In
this case, however, the evidence presented is far too
speculative to support the jury's conclusion that
Amtrak retaliated against Sullivan by not promoting
him to any of the management jobs for which he
applied following his demotion.

Accordingly, we REVERSE the judgment of the
district court and REMAND the case for entry of
judgment on behalf of Amtrak.[FN5]

> FN5. Because we reverse on the retaliation
> claims, we need not address the issue of
> whether the damage amount was
> appropriate.

C.A.11 (Fla.),1999.
Sullivan v. National R.R. Passenger Corp.
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956,
79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac.
Dec. P 45,842, 12 Fla. L. Weekly Fed. C 637

Briefs and Other Related Documents (Back to top)

• 1998 WL 34181921 (Appellate Brief) Reply Brief
for Defendant-Appellant (Oct. 13, 1998) Original
Image of this Document (PDF)
• 1998 WL 34181920 (Appellate Brief) Answer Brief
of Plaintiff/Appellee Barry T. Sullivan (Sep. 23,
1998) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170 F.3d 1056                                                                    Page 7
170 F.3d 1056, 79 Fair Empl.Prac.Cas. (BNA) 956, 79 Fair Empl.Prac.Cas. (BNA) 958, 75 Empl. Prac. Dec. P
45,842, 12 Fla. L. Weekly Fed. C 637
**(Cite as: 170 F.3d 1056)**

• 1998 WL 34181919 (Appellate Brief) Brief for
Defendant-Appellant (Aug. 07, 1998) Original Image
of this Document (PDF)
• 98-4080 (Docket) (Jan. 20, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.